IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF THE SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

| | |
|---|---|
| D.P. by and through his next friend P.S.; P.S. in her individual capacity; E.S., by and through his next friend J.S.; J.S. in her individual capacity; L.A. by and through her next friend A.B.; A.B. in her individual capacity; W.B. by and through his next friend L.H.; L.H. in her individual capacity; M.S. by and through her next friends S.S. and R.S.; S.S. and R.S. in their individual capacities; DISABILITY RIGHTS FLORIDA; and FLORIDA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, | Civil Case No. 9:21cv81099 |
| Plaintiffs, | **COMPLAINT** |
| vs. | |
| SCHOOL BOARD OF PALM BEACH COUNTY; DR. DONALD E. FENNOY II, in his official capacity as Superintendent of the School District of Palm Beach County and in his individual capacity; DANIEL ALEXANDER, in his official capacity of Police Chief of the School District of Palm Beach County; OFFICER JOSE CUELLAR; OFFICER JOSEPH M. MARGOLIS, JR.; OFFICER HOWARD BLOCHER; OFFICER BROWN; OFFICER DONALD SILVA; and OFFICER DOE, in their individual capacities, | |
| Defendants. | |

## INTRODUCTION

1.     Every year, police employed by the School District of Palm Beach County

("SDPBC") remove hundreds of children from their classrooms, handcuff them, and drive them

away in the back of police cars. Although they are treated like criminals, these children, who are

as young as five years old, are not being charged with a crime. Instead, school employees have decided these children are a threat to themselves or others and are taking them to a psychiatric facility for involuntary psychiatric examination. Though SDPBC police officers have limited or no mental health training, they are vested with the power to subject children to involuntary psychiatric examination, pursuant to the Florida Mental Health Act, Fla. Stat. §§ 394.451-.47892, known as the Baker Act. This decision is often made without parents' input, consent, or prior knowledge, and even over their strenuous objections.

2.      The overwhelming majority of these children do not need or benefit from involuntary examination and are deeply traumatized by the experience. Once sent for an examination, children wait hours or days in a psychiatric facility, also known as a "receiving facility," without their parents, for an examination by a clinician. The Baker Act permits them to be held for up to 12 hours, including overnight, before this examination even begins. The receiving facility has up to 72 hours to complete this examination, after which the facility must either release the child or seek a court hearing for longer-term detention.

3.      Under the Baker Act, courts, medical professionals, and law enforcement officers may initiate an involuntary psychiatric examination of a person in specific circumstances, including when there is reason to believe that (a) the person has a mental illness and (b) because of that mental illness, they pose an imminent danger to themselves or others. The practice is so common that it has become a verb: a person detained for involuntary examination is often referred to as having been "Baker Acted."

4.      SDPBC used the Baker Act to initiate at least 1,216 involuntary examinations of its students in the 2016-2020 school years, including 252 times on elementary school students. SDPBC seized Black children for involuntary examination at twice the rate of white children, a disparity that worsens for young children: 40 of 59 children under age eight examined under the Act in that period were Black.

5.      SDPBC has taken children for involuntary examination over their parents' pleas to be allowed to bring their children home and parents' assurances that they will protect their

children from harm. It has seized children who did not meet the statutory criteria for involuntary psychiatric examination, such as children manifesting behaviors of developmental disabilities that are specifically excluded from the statute's definition of mental illness. It has subjected children to the Baker Act without consulting its own mental health professionals, and after overruling the judgments of those professionals. It has even initiated examinations on children for normal, childish misbehavior; for example, it initiated an examination on a nine-year-old child for being a supposed "threat" to others because he allegedly wanted to "stab" another child with a plastic fork. This overuse and misuse of the Baker Act by SDPBC is unjustifiable.

6.      Despite being aware of its inappropriate use of the Baker Act for years, SDPBC has done little to eliminate unnecessary Baker Act use or train its personnel on alternatives. Its published Baker Act policy, as well as its meager police training materials, are full of omissions and inaccuracies about the statute's requirements and provide little guidance about when initiating an involuntary examination of a child is appropriate. They also do nothing to explain to staff that use of the Baker Act in non-emergency situations is far more likely to traumatize children than to help them.

7.      SDPBC has failed to take basic affirmative steps that could eliminate unlawful Baker Act use, like reviewing uses of the Act after the fact to determine if they were lawful, tracking and monitoring the data it already possesses about Baker Act use, and intervening when schools or employees use it disproportionately often. It has also unlawfully failed to allow parents, who have the best knowledge of and legal right to make decisions regarding their children's mental health, to decide if involuntary psychiatric hospitalization is appropriate. Finally, it has failed to use the numerous mental health professionals it employs to make determinations regarding use of involuntary examination, instead entrusting those decisions to often untrained police without mental health expertise. Addressing these failures and employing other basic interventions are necessary to end SDPBC's abuse of involuntary psychiatric examination of the students in its care.

8. Plaintiffs bring this suit to end SDPBC's harmful and illegal use of the Baker Act. Plaintiffs are children who have been wrongfully subjected to involuntary examination under the Baker Act, their parents, Disability Rights Florida, and the Florida Conference of the NAACP. They bring this suit for damages for harm to the individual Plaintiffs and injunctive relief to prevent future harm to all Plaintiffs and their members and constituents.

## JURISDICTION AND VENUE

9. This action arises under 42 U.S.C. § 1983, 42 U.S.C. § 12132, the Americans with Disabilities Act, and 29 U.S.C. § 794, § 504 of the Rehabilitation Act. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

10. This Court has the authority to issue declaratory relief, injunctive relief, and other relief pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §§ 2101–2102.

11. Venue is proper in this Court because Plaintiffs and Defendants reside in this district and the events giving rise to this action occurred in this district. *See* 28 U.S.C. § 1391(b)-(c).

## THE PARTIES

### I. PLAINTIFFS

12. Plaintiff D.P. is a twelve-year-old Black student enrolled in the School District of Palm Beach County. He is a student with a disability and qualifies for Exceptional Student Education ("ESE") under the exceptionalities of Developmentally Delayed, Speech Impaired, Language Impaired, Specific Learning Disability, and Autism Spectrum Disorder ("ASD").

13. Plaintiff P.S.[1] is D.P.'s grandmother and guardian. She brings this suit as next friend to D.P. and on her own behalf.

---

[1] Plaintiffs use the true initials of the guardians of the minor child plaintiffs in place of their true names to protect the identities of the minors. *See D.L. ex rel. Phan L. v. Bateman*, No. 3:12-CV-208-J-32JBT, 2012 WL 1565419, at *2 (M.D. Fla. May 2, 2012) (holding parents could proceed without using full names "because public disclosure of [the parents'] identities would nullify any

14.     Plaintiff E.S. is an eleven-year-old white student who was formerly enrolled in the School District of Palm Beach County. He is a student with a disability and qualifies for Exceptional Student Education ("ESE") under the exceptionality of Other Health Impaired ("OHI").

15.     Plaintiff J.S. is E.S.'s mother. She brings this suit as next friend to E.S. and on her own behalf.

16.     Plaintiff W.B. is a ten-year-old Black student enrolled in the School District of Palm Beach County. He is a student with a disability and qualifies for ESE with the exceptionality of Emotional Behavioral Disability.

17.     Plaintiff L.H. is W.B.'s mother. She brings this suit as next friend to W.B. and on her own behalf.

18.     Plaintiff L.A. is a ten-year-old Black student enrolled in the School District of Palm Beach County. She is a student with a disability of Attention Deficit Hyperactivity Disorder ("ADHD").

19.     Plaintiff A.B. is L.A.'s mother. She brings this suit as next friend to L.A. and on her own behalf.

20.     Plaintiff M.S. is an eleven-year-old biracial student enrolled in the School District of Palm Beach County. She is a student with a disability of Post-Traumatic Stress Disorder ("PTSD").

21.     Plaintiff S.S. is M.S.'s mother. Plaintiff R.S. is M.S.'s father. They bring this suit as next friends to M.S. and on their own behalf.

---

privacy protection given to their children alone"); *cf.* Fed. R. Civ. Pro. 5.2(a)(3) (requiring use of initials for minors' names). They will file a motion for leave to do so once all the Defendants' counsel have been identified and the parties have had an opportunity to confer regarding the motion as required by Local Rule 7.1(a)(3).

22.     Plaintiff Disability Rights Florida ("DRF") is an independent, non-profit corporation organized under the laws of the State of Florida and its primary office is in Tallahassee, FL.

23.     DRF is Florida's Protection and Advocacy system, as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 15041 et seq., the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. § 10801 et seq., and the Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e et seq., with offices in the State of Florida located at: 2473 Care Drive, Suite 200, Tallahassee, FL 32308; 4723 NW 53rd Ave Suite B, Gainesville, FL 32653; 1000 North Ashley Drive, Suite 640, Tampa, FL 33602; and 1930 Harrison Street, Suite 104, Hollywood, FL 33020.

24.     As Florida's Protection and Advocacy system, DRF is specifically authorized to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i). DRF's constituents consist of all individuals residing in Florida who have been diagnosed with a disability, have a disability which has not yet been diagnosed, or are perceived as or regarded as having a disability. The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2).

25.     One of DRF's primary responsibilities is to investigate public entities who fail to comply with the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") in order to protect DRF's clients and constituents.

26.     Individuals with physical and mental impairments—among DRF's constituents— are on DRF's board of directors. DRF represents people with physical and mental impairments and provides the means by which they express their collective views and protect their collective interests.

27.     Pursuant to the authority vested in it by the United States Congress to file claims of abuse, neglect, and rights violations on behalf of individuals with disabilities, DRF brings claims on behalf of its constituents, including the individuals named herein as Plaintiffs as well as all constituents and clients who attend or attended school in SDPBC who have been subject to involuntary examination or are at risk of involuntary examination. DRF's constituents and clients include those students who are identified as individuals with disabilities or are suspected of having a disability. DRF represents students with disabilities or suspected of having a disability within the School District of Palm Beach County.

28.     DRF has standing on behalf of its constituents and clients who are substantially affected by Defendants' inappropriate use of involuntary examination as stated in this Complaint because the use of the Baker Act falls within DRF's general scope of interest and activity; the relief requested—declaratory and injunctive—is the type of relief appropriate for DRF to receive on behalf of its individual constituents; and neither the claims asserted nor the relief requested require the participation of individual members or constituents in the lawsuit.

29.     DRF's constituents have suffered—and continue to suffer—injury that would allow them to have standing to sue in their own right. The interests DRF seeks to protect are germane to DRF's purpose.

30.     The number of children at risk of being harmed by Defendant's deficiencies far exceed what can be contemplated in the Complaint and a remedy at law, alone, will not prevent this harm. Without injunctive relief, DRF's clients and constituents will continue to be harmed by SDPBC's inappropriate use of involuntary examination.

31.     Plaintiff the Florida State Conference of the National Association for the Advancement of Colored People ("FL NAACP") is the state affiliate of the national NAACP, the nation's oldest and largest civil rights organization. FL NAACP is a membership organization dedicated to securing political, educational, social, and economic equality rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons. As part

of this mission, FL NAACP is committed to eliminating discrimination on the basis of race in healthcare and public education.

32.     FL NAACP has a longstanding commitment to ending the disproportionate use of exclusionary discipline, which includes arrest, suspension, expulsion, and other forms of school discipline, on Black children in Florida and spends a significant portion of its organizational resources on this priority. It understands that use of the Baker Act in Florida is inextricably linked to the disproportionate use of all forms of exclusionary discipline on Black children and that the Baker Act itself has been disproportionately used as a form of exclusionary discipline on Black children in the SDPBC.

33.     FL NAACP has standing to bring this action on behalf of its individual members in families with children attending school in SDPBC. Black children, including those of FL NAACP members, are at disproportionate risk of being excluded from school, detained and involuntarily examined in a psychiatric facility due their race and/or disability. Black children are twice as likely to be subjected to examination under the Baker Act as white children. Young Black children are examined under the Act even more disproportionally, constituting 68 percent of children under age eight who are examined but only 28 percent of the SDPBC student population. Black children are also underdiagnosed with ASD, which can manifest in behaviors that lead to use of the Baker Act but which are not a legal basis for use of the Act.

II.     **DEFENDANTS**

34.     Defendant School Board of Palm Beach County ("School Board") is the board of education governing the School District of Palm Beach County ("SDPBC"), the public-school system for all of Palm Beach County.

35.     The School Board has the power to issue policies directing the implementation of the Baker Act in SDPBC schools.

36.     The School Board is not entitled to sovereign immunity under the Eleventh Amendment. *Travelers Indem. Co. v. Sch. Bd. of Dade Cnty., Fla.*, 666 F.2d 505, 509 (11th Cir. 1982).

37.     The School Board and SDPBC employ school police officers through the Palm Beach County School District Police Department.

38.     The Police Department is supervised by the School Board and SDPBC's superintendent.

39.     Defendant Dr. Donald E. Fennoy II is the superintendent of the School District of Palm Beach County.

40.     Defendant Fennoy is responsible for supervision of the Palm Beach County School District Police Department, including selecting the Police Chief.

41.     Defendant Fennoy has issued and has the power to issue in the future policies concerning the implementation of the Baker Act in SDPBC schools.

42.     Defendant Daniel Alexander is the Police Chief of the Palm Beach County School District Police Department. Defendant Alexander is sued in his official capacity only.

43.     Defendant Alexander is responsible for the hiring and training of school police officers employed by SDPBC and has the power to issue policies concerning officers' use of the Baker Act.

44.     Defendant Officer Joseph M. Margolis, Jr. is a school police officer employed by SDPBC. He seized and initiated an involuntary examination of D.P. under the Baker Act.

45.     Defendant Officer Jose Cuellar is a school police officer employed by SDPBC. He seized and initiated an involuntary examination of E.S. under the Baker Act.

46.     Defendant Officer Howard Blocher is a school police officer employed by SDPBC. He seized and initiated an involuntary examination of L.A. under the Baker Act.

47.     Defendant Officer Brown, whose first name is unknown to Plaintiffs, is a school police officer employed by SDPBC. He seized and initiated an involuntary examination of W.B. under the Baker Act.

48.     Defendant Officer Donald Silva is a school police officer employed by SDPBC. He seized and initiated an involuntary examination of M.S. under the Baker Act.

49.     Defendant Officer Doe, whose name is unknown to Plaintiffs, is a school police officer employed by SDPBC. He seized and initiated an involuntary examination of M.S. under the Baker Act.

## FACTUAL ALLEGATIONS

### I.   THE BAKER ACT

50.     Florida, like all states, has a statutory process for the involuntary psychiatric hospitalization of people who pose a danger to themselves or others. However, Florida uses this procedure against children, particularly children in schools, at a scale unknown in any other state.

51.     Statewide, in the 2016-17 school year, children were seized for involuntary examination under the Baker Act 32,763 times. Of those children, at least 22 percent, and likely significantly more, were taken directly from their schools.[2] Data on involuntary examinations initiated at school has not been reported in subsequent years, but, in the most recent reporting year, 2018-2019, Florida children were examined under the Baker Act 37,882 times.

52.     The Baker Act states the same criteria for involuntary examination of youth as it does for adults:

(1)   CRITERIA.—A person may be taken to a receiving facility for involuntary examination if there is reason to believe that the person has a mental illness and because of his or her mental illness:

---

[2] In 2016-17, Baker Act receiving facilities indicated that "school" was the location of 22 percent of children involuntarily examined under the Act when the involuntary examination was initiated. However, receiving facilities did not answer this question for approximately 10 percent of examinations and the number of children sent for involuntary examination under the Baker Act from schools is likely undercounted because "receiving facility staff may not know the details of the location at the time of the involuntary examination initiation." Annette F. Christy et. all, *Fiscal Year 2016-17 Report*, 13 n. 5 (Baker Act Reporting Center, June 2018), https://www.usf.edu/cbcs/baker-act/documents/annual_report_2016_2017.pdf. Involuntary examinations also sharply fall, more than twenty-five percent, over the summer months when school is not in session, suggesting that many involuntary examinations are initiated at school. Annette Christy, et al., Fiscal Year 2018-19 Report, 12 n.2 (Baker Act Reporting Center, November 2020), https://www.usf.edu/cbcs/baker-act/documents/ba_usf_annual_report_2018_2019.pdf.

(a)1. The person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination; or
2. The person is unable to determine for himself or herself whether examination is necessary; and
(b)1. Without care or treatment, the person is likely to suffer from neglect or refuse to care for himself or herself; such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; or
2. There is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior.

Fla. Stat. § 394.463(1).

53.    While courts and some medical and mental health professionals are also authorized by the Baker Act to initiate involuntary examinations, police officers initiate the vast majority of examinations that begin while a child is in school.[3] SDPBC employs its own police officers through the Palm Beach County School District Police Department. Nearly every Baker Act originating in an SDPBC school was initiated by an officer of the School District Police Department.

54.    SDPBC has "mobile response teams," also known as "mobile crisis units," which are intended to be used to assess and deescalate crisis situations and be available to support

---

[3] Initiation by a police officer provides the fewest procedural protections under the statute. When the court initiates an involuntary examination, it must "enter an ex parte order stating that a person appears to meet the criteria for involuntary examination and specifying the findings on which that conclusion is based," and the order "must be based on written or oral sworn testimony that includes specific facts that support the findings." Fla. Stat. § 394.463(2)(a)1. When a medical or mental health professional initiates an involuntary examination, they must "execute a certificate stating that he or she has examined a person within the preceding 48 hours and finds that the person appears to meet the criteria for involuntary examination and stating the observations upon which that conclusion is based." Fla. Stat. § 394.463(2)(a)1. In both cases, a police officer will then take the person into custody and transfer them to a receiving facility only if "other less restrictive means, such as voluntary appearance for outpatient evaluation, are not available." Fla. Stat. § 394.463(2)(a)1.-3. In contrast, for a police officer to initiate an involuntary examination, the only statutory requirement is to "execute a written report detailing the circumstances under which the person was taken into custody." Fla. Stat. § 394.463(2)(a)2.

police officers. However, SDPBC police officers are not required to contact or follow the recommendations of the mobile response team.[4]

55.     In practice, because children are not expected to care for themselves, SDPBC police generally rely on section (b)2. of the Baker Act when initiating an involuntary examination of a child. Under this provision, the Baker Act is appropriate and legal only when "there is reason to believe that the person has a mental illness *and because of his or her mental illness* . . . [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others *in the near future*" (emphasis added).

56.     The definition of mental illness under the Baker Act explicitly excludes developmental disabilities. Fla. Stat. § 394.455(29). Involuntary commitment of people with developmental disabilities, including ASD, is addressed by a different statute, Fla. Stat. § 393.11, which only allows involuntary confinement after a hearing at which the person is represented by counsel.

57.     "Serious bodily harm" is "[s]erious physical impairment of the human body; esp., bodily injury that creates a substantial risk of death or that causes serious, permanent

---

[4] Recognizing that schools should contact parents, utilize mobile response teams, and attempt to deescalate children before relying on the Baker Act, in 2021 the Florida legislature passed SB 590, which is awaiting Governor DeSantis's signature. However, this legislation, even if enacted and implemented, would not resolve the deficiencies in SDPBC's use of the Act. While SB 590 would require principals to make a "reasonable attempt" to contact a parent before a child is removed from school for involuntary examination, in most cases, it would not require the school to wait for the parent to arrive, require the parent's consent to involuntary examination, or require the school to allow the parent to attempt de-escalation or to transport the child to the receiving facility themselves. SB 590 would also require the principal to verify that "de-escalation strategies have been utilized and outreach to a mobile response team has been initiated" before contacting law enforcement—*unless* he "reasonably believes that any delay in removing the student will increase the likelihood of harm to the student or others." Similarly, SB 590 requires that school or law enforcement make a "reasonable attempt" to contact a mental health professional who could initiate voluntary examination "unless the child poses an imminent danger to themselves or others"—the very criteria that is already used to justify contacting law enforcement to initiate use of the Baker Act. By its terms, the Baker Act is only appropriate when there is a "substantial likelihood . . . the person will cause serious bodily harm to himself or herself or others in the near future." As such, these exceptions are so broad that they swallow the new rules.

disfigurement or protracted loss or impairment of the function of any body part or organ."
*Black's Law Dictionary* (11th ed. 2019).

58.     The Baker Act also includes a section specifically enumerating the rights of persons seized under the authority of the Baker Act, referred to as "patients." Fla. Stat. § 394.459. "The right to individual dignity" is the very first right set forth. Fla. Stat. § 394.459(1). This provision prohibits the use of "restraining devices utilized for criminals or those accused of a crime," such as handcuffs, except when necessary to protect the person subject to involuntary examination or others. *Id*.

## II.    UNNECESSARY INVOLUNTARY PSYCHIATRIC HOSPITALIZATION IS DEEPLY HARMFUL TO CHILDREN AND THEIR FAMILIES

59.     The unnecessary use of involuntary examination through the Baker Act puts children and their families at significant risk of long-term and serious psychological harm. As a result of being subjected to involuntary examination under the Baker Act, children may experience new or exacerbated post-traumatic stress, general anxiety, separation anxiety, depression, humiliation, and emotional withdrawal.

60.     Being subjected to unnecessary involuntary examination through the Baker Act risks significant harm to children in multiple ways. Children experience harm from the actions of school police in restraining them with handcuffs and/or hobble restraints, removing them from school, and transporting them to a Baker Act receiving facility. Children experience harm from being removed from their families. Children experience harm from being subjected to the unnecessarily restrictive environment of the receiving facility. Moreover, children experience harm from lost instructional time and a loss of school connectedness.

61.     Children who have been handcuffed or placed in hobble restraints—forms of mechanical restraints—put in the back of a police car, and taken to a psychiatric hospital are

understandably and virtually inevitably traumatized by the experience.[5] The use of restraints, including mechanical restraints, has been found to subject children, especially children with disabilities, to a high risk of harm.[6] Compared to children who are not handcuffed during an encounter with police, children who are handcuffed by police report significantly higher emotional distress during the interaction, and social stigma and post-traumatic stress afterwards.[7]

62.     This trauma is compounded when children arrive at a receiving facility, where they must wait hours or days for examination in a locked jail-like facility—indeed, some children refer to their time in Baker Act facilities as when they were "in jail." In this unfamiliar place, they often spend a night or more away from their parents for the first time in their lives. Sometimes they are not even allowed to talk to their parents for days, and in-person visitations are regularly limited to once a week.

63.     The conditions within psychiatric facilities have been found to traumatize individuals. In one of the most comprehensive studies of experiences in psychiatric facilities, researchers found that patients experienced physical assault and sexual assault at high rates in mental health facilities, and most witness traumatic events while there.[8] Other studies have

---

[5] *See* Statement of Interest of the United States, *S.R. et al. v. Kenton County et al.*, no. 15-cv-00143-WOB-JGW (2015), ECF no. 32 (Collecting cases for the proposition that "[h]andcuffing a young child, particularly a child with a disability, constitutes an extraordinary intrusion" and "[s]uch interactions are fraught with the potential for lasting trauma and damage.") (observing that children with mental health and other disorders are at especially high risk for death or serious injury from the use of restraints).

[6] *See* General Accounting Office, *Improper Restraint or Seclusion Use Places People at Risk*, (Sept. 1999), https://www.gao.gov/products/hehs-99-176; U.S. Department of Educ., R*estraint and Seclusion: Resource Document,* at 12 (May 2012), http://www.ed.gov/policy/seclusion/restraints-and-seclusion-resources.pdf (recommending that "[s]chools should never use mechanical restraints to restrict a child's freedom of movement").

[7] *See* Jackson et al., *Police Stops Among At-Risk Youth: Repercussions for Mental Health*, Journal of Adolescent Health 65 (2019) 627-632, https://www.amostbeautifulthing.com/wp-content/uploads/2020/01/Police-Stops-Among-At-Risk-Youth-Repercussions-for-Mental-Health.pdf.

[8] *See* B. Christopher Frueh, et al., *Special Section on Seclusion and Restraint: Patients' Reports of Traumatic or Harmful Experiences Within the Psychiatric Setting*, 56 Psychiatric Services 1123-1133 (2005), https://ps.psychiatryonline. org/doi/pdfplus/10.1176/appi.ps.56.9.1123.

similarly found that the majority of individuals in mental health facilities experience trauma victimization and that almost half suffer from post-traumatic stress disorder as a result of their experiences in the psychiatric facility itself.[9] These experiences can be especially damaging or retraumatizing for patients in psychiatric facilities who may already be vulnerable or have experienced past trauma.[10]

64.     Childhood traumatic stress can have significant and lasting effects on a child's development. It can impact a child's physical and mental development, make it more difficult to learn and focus, and impact a child's way of thinking about the world around them and their own future.[11]

65.     Receiving facilities are not equipped to provide treatment for ongoing psychiatric conditions. Involuntary examination is intended only to provide emergency stabilization of people in genuine psychiatric crises that pose a risk to themselves or others and to determine if longer-term institutionalization is necessary for that same purpose. Even if a child has a serious mental illness that is not responding to existing treatment, involuntary examination is not beneficial unless it serves these goals. Indeed, facilities often provide little or no therapy and are often unable to administer children medications they have already been prescribed and need.

66.     Research on children subjected to involuntary examination has shown that children learn from the experience that if they are open with adults about their thoughts and emotions, including normal feelings of sadness, they will be punished and taken away from their parents.[12] This lesson makes it less likely that children will be willing to engage in future mental

---

[9] *See* Karen J. Cusack, et al., *Trauma Within the Psychiatric Setting: A Preliminary Empirical Report*, 30 Administration and Policy in Mental Health 453-460 (2003).
[10] *See* Frueh et al., n. 8 above.
[11] *See* The National Child Traumatic Stress Network, *What is Child Traumatic Stress?*, (2003), https://www.samhsa.gov/sites/default/files/programs_campaigns/childrens_mental_health/what-is-child-traumatic-stress.pdf.
[12] *See* Jones, N., Gius, B.K., Shields, M. et al., *Investigating the impact of involuntary psychiatric hospitalization on youth and young adult trust and help-seeking in pathways to care*, Soc Psychiatry & Psychiatric Epidemiol (2021).

health treatment or counseling, or that children will be honest about any true mental health concerns. *Id.*

67.     The use of the Baker Act also results in missed school time. This includes the time that the child is transported by the police officer to the receiving facility and held at the receiving facility pending involuntary examination. It may also include time that the child must spend out of school dealing with the aftereffects of the Baker Act. Parents and children may be understandably reluctant to return the child to school given their memories of the traumatic Baker Act experience and when facing the possibility of another involuntary examination, resulting in further delays. Instructional time is critical to student achievement,[13] and this educational disruption can ultimately result in school transfer, lower grades,[14] dropped classes, and/or being placed on a lower academic track.

68.     The unnecessary use of involuntary examination under the Baker Act also risks harm to students' school connectedness, students' belief that adults within the school care about them and their educational progress.[15] That sense of connectedness is critical to protect against a number of risk factors for poor academic and life outcomes. School connectedness functions as a critical factor in supporting academic achievement for economically disadvantaged students and also protects against health risks that reduce students' focus on academics and achievement.[16]

---

[13] *See* M. Karega Rausch & Russell J. Skiba, *The Academic Cost of Discipline: The Relationship Between Suspension/Expulsion and School Achievement* 6 (2006), http://www.agi.harvard.edu/Search/download.php?id=45.
[14] *See* Aaron Kupchik, *Things are Tough All Over: Race, Ethnicity, Class and School Discipline*, 11 Punishment & Society 291, 307, (2009), http://www.suspensionstories.com/wp-content/uploads/2010/10/things-are-tough-all-over.pdf (finding that lost instructional time served to aggravate students' academic deficits because they fell further behind their classmates).
[15] *See* Centers for Disease Control and Prevention, *School Connectedness: Strategies for Increasing Protective Factors Among Youth* 3 (2009), http://www.cdc.gov/healthyyouth/adolescenthealth/pdf/connectedness.pdf
[16] *See* Bronwyn E. Becker & Suniya S. Luthar, *Social-Emotional Factors Affecting Achievement Outcomes Among Disadvantaged Students: Closing the Achievement Gap*, 37 Educ. Psychologist 197-214 (2002), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3523355/; Dorian Wilson, *The Interface of School Climate and School Connectedness and Relationships with Aggression and Victimization*, 74 Journal of School Health 293, 298 (2004), available at

Students with high degrees of school connectedness are less likely to attempt suicide[17] or engage in violent behavior.[18] For students to feel connected to a school community, they must perceive school authorities to be caring and fair.[19] A school's unnecessary reliance on school police undermines this perception:[20] negative interaction with school police has been found to damage students' views of teachers' authority.[21]

69.     Parents also experience harm from witnessing their children go through the traumatic involuntary examination process. Parents are at risk for direct trauma due to the removal of their children from their care and custody and are also at risk for secondary trauma as

http://www.jhsph.edu/departments/population-family-and-reproductive-health/_archive/wingspread/Septemberissue.pdf.

[17] *See* CDC, *School Connectedness,* n. 15, above; Bronwyn E. Becker & Suniya S. Luthar, Social-Emotional Factors Affecting Achievement Outcomes Among Disadvantaged Students: Closing the Achievement Gap, 37 Educ. Psychologist 197-214 (2002), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3523355/; Dorian Wilson, *The Interface of School Climate and School Connectedness and Relationships with Aggression and Victimization*, 74 Journal of School Health 293, 298 (2004), http://www.jhsph.edu/departments/population-family-and-reproductive- health/_archive/wingspread/Septemberissue.pdf.

[18] *See id.*; *see also* Richard F. Catalano et al., *The Importance of Bonding to School for Healthy Development: Findings from the Social Development Research Group*, 74 Journal of School Health 252, 256, 259 (2004), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.464.4284&rep=rep1&type=pdf.

[19] See Jaana Juvonen, RAND, *School Violence: Prevalence, Fears and Prevention*, 3 (2001), http://www.rand.org/pubs/issue_papers/IP219.html (concluding that the presence of police on campus can "breed a sense of mistrust among students"); Adena M. Klem & James P. Connell, *Relationships Matter: Linking Teacher Support to Student Engagement and Achievement*, 74 J. of Sch. Health 262, 266 (2004), http://www.fifeschools.com/fhs/documents/RelationshipsMatterLinkingTeacherSupporttoStudentEngagementandAc hievement.pdf; Catalano et al., n. 17, above.

[20] Juvonen, n. 19 above.

[21] See Arrick Jackson, *Police-school Resource Officers' and Students' Perception of the Police and Offending*, 25 Policing: Int'l J. Police Strategies & Mgmt. 631, 634 (2002) (finding that officers' presence on school campuses posed obstacles for free and open learning environments by damaging students' view of teachers' authority); Matthew J. Meyer & Peter E. Leone, *A Structural Analysis of School Violence and Disruption: Implications for Creating Safer Schools*, 22 Education and Treatment of Children 333, 349 (1999) (creating a highly scrutinized school environment may result in higher levels of disorder), http://www.popcenter.org/problems/bomb_threats/pdfs/mayer%26leone_ 1999.pdf.

they help their children deal with the trauma they have experienced from the involuntary examination.

**III.     SDPBC ILLEGALLY INITIATED INVOLUNTARY EXAMINATIONS OF SCHOOLCHILDREN**

>           **A.  D.P.**

70.      D.P. was nine years old and in third grade when SDPBC school police Officer Joseph M. Margolis, Jr. seized him for involuntary examination after he became upset. According to the officer's report, the incident began when D.P. threw stuffed animals around the classroom.

71.      D.P. was eligible for ESE with exceptionalities of ASD and Language Impaired. D.P. also has a medical diagnosis of ADHD, of which the school had been informed.

72.      SDPBC has been aware of D.P.'s disabilities since at least 2013, when SDPBC identified D.P. as a child with disabilities through the district's Child Find program for preschool aged children. During his third-grade year, the 2018-2019 school year, he was placed in an ASD classroom.

73.      D.P. lives with P.S., his grandmother, who is his legal guardian.

74.      D.P. had targeted case management services in the community. SDPBC staff were aware of these services.

75.      On multiple occasions in the 2018-2019 school year, D.P. was restrained in the ASD classroom. After at least one incident, school staff documented rug burns on D.P.'s head as a result of a restraint.

76.      On October 22, 2018, P.S. met with school staff and expressed concern over D.P. getting upset in the classroom and the school's use of prone restraints on D.P., including the rug burns on D.P.'s face as a result of the restraints.

77.      On November 6, 2018, P.S. informed school staff that D.P. had a death in the family, that P.S. would be away for a few days, and that D.P. might be struggling as a result of the circumstances.

78.     According to Officer Margolis' report, on November 8, 2018, while in his ASD classroom, D.P. became upset and threw one or more objects.

79.     D.P. said he was upset because his teacher told him he could not use the computer.

80.     There were multiple strategies that had proved effective to deescalate D.P. in the past. For example, when he was upset on a prior occasion, a teacher let him leave his classroom to take a short walk by himself, which gave him time to calm down. Similarly, simply allowing him to sit by himself and calm down instead of having several people talk to him in an aggressive and unhappy fashion would have allowed him to deescalate. However, none of these effective strategies were tried.

81.     Instead, school staff put D.P. in a two-person prone restraint: D.P. was placed face-down on the floor, with two staff members applying pressure to his body so he could not move. The other students were removed from the room.

82.     The assistant principal called P.S. and told her that D.P. was out of control and not listening, and that if D.P. didn't calm down he would be suspended.

83.     Subsequently, D.P. calmed down, and the assistant principal left the room.

84.     D.P. got upset again and reportedly made remarks about wanting to hurt himself.

85.     The assistant principal called Officer Margolis. The assistant principal told the officer that D.P. was yelling and throwing things in the room and that she was hit by a stuffed animal when she approached him.

86.     Officer Margolis's report claims that D.P. had made statements to his teacher such as, "I wish I could shoot you in your [expletive] head," and "Right now I am thinking I want to hold my breath so I can die." Such alleged statements are not uncommon for an upset child. D.P. did not have access to a weapon and made no overt action to harm himself.

87.     Officer Margolis had no reason to believe D.P. had a mental illness.

88.     Officer Margolis had no reason to believe that D.P. posed an imminent danger of serious bodily harm to himself or others.

89.     Nonetheless, P.S. was called and told that D.P. would be taken for an involuntary examination under the Baker Act. P.S. explained that she had to go to her father's funeral and that D.P.'s aunt was caring for him. The district was aware that P.S. would be out of town for her father's funeral.

90.     No medical or mental health professional was consulted about the decision to use the Baker Act on D.P.

91.     In the Report of Law Enforcement Officer Initiating Involuntary Examination, Officer Margolis detailed the behavioral issues from the day and the statements allegedly made by D.P., along with the guardian's unavailability to pick him up. However, there was no mention of D.P.'s ASD diagnosis or placement in an ASD classroom, other options to deescalate D.P., or any attempts to contact D.P.'s aunt.

92.     Upon information and belief, D.P. was handcuffed in the back of the police car awaiting transport for over an hour.

93.     To induce D.P. to get in the police car, Officer Margolis told him that he was being taken home. D.P. did not know that he was being sent for involuntary examination until he arrived at the receiving facility.

94.     Officer Margolis transported D.P. to a receiving facility, with D.P. handcuffed in the back of the police car for approximately 30 minutes during transport.

95.     At the receiving facility, D.P. expressed that he was bullied at school by other students. He also said that he was upset because he could not go on a field trip.

96.     Intake documents from the receiving facility stated that D.P. did not appear to be in any acute stress, that the school explained an issue with behavior problems, and that D.P. said, "I just get mad. I don't want to hurt myself."

97.     The report from the Baker Act receiving facility psychiatrist stated that D.P. was calm and not suicidal, and had no psychosis, suicidal ideations, or homicidal ideations.

98.     D.P. and his family have suffered greatly from the trauma of SDPBC's misuse of the Baker Act on him. D.P.'s involuntary examination compounded his pre-existing traumatic experiences.

99.     After D.P.'s involuntary experience with the Baker Act, he has become more aggressive and gets upset more easily. He has had two years of therapy but requires ongoing therapy and is still afraid that police and school staff are out to get him. This harm has created lasting impacts on D.P.

**B.  E.S.**

100.     E.S. was nine years old and in third grade when SDPBC school police Officer Jose Cuellar seized him for involuntary examination due to behavior consistent with E.S.'s ASD.

101.     E.S. was eligible for ESE with the exceptionality of Other Health Impaired.[22] E.S. had been diagnosed with ASD, ADHD, and Dyslexia.

102.     E.S.'s school was aware of his disability-related behavioral needs and had some supports in place to address them, including placement in a smaller classroom designed to address the needs of children with ASD with a paraprofessional to support the primary teacher.

103.     E.S.'s mother provided a board-certified behavioral analyst ("BCBA") who worked with E.S. at school.

104.     The school's ESE coordinator and principal were aware that his mother, J.S., could successfully de-escalate E.S. when he exhibited challenging behaviors.

---

[22] "Other health impaired" means "having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems. This includes, but is not limited to, asthma, attention deficit disorder or attention deficit hyperactivity disorder, Tourette syndrome, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and acquired brain injury." Florida Administrative Code, 6A-6.030152.

105.    On August 30, 2019, E.S. was in his classroom working on a computer when he allegedly became upset and started ripping up and eating some pieces of paper. He was taken from the classroom to the main office.

106.    At the office, E.S. yelled. While his BCBA worked to de-escalate him, he swung his arm and hit her twice in the chest, hard enough to leave a red mark but not hard enough to injure her. He also hit a window but did not damage it.

107.    Shortly thereafter, E.S. was able to self-soothe and was seated with his arms crossed across his chest, breathing heavily. However, the school staff had already contacted Officer Jose Cuellar, the SDPBC Police Officer assigned to E.S.'s campus that day. Officer Cuellar was not regularly assigned to the campus—instead he was there that day filling in for another officer.

108.    According to the BCBA's employee incident report, Officer Cuellar tackled E.S. to the ground and said, "If you're going to act like a fool I'm going to treat you like a fool," and "You are coming with me." E.S. became upset again.

109.    When E.S. was slammed to the floor by Officer Cuellar, E.S.'s knees were scraped.

110.    Even though E.S. had at that point de-escalated, Officer Cuellar decided to initiate an involuntary examination under the Baker Act and handcuffed E.S.

111.    The BCBA who E.S. had struck in the chest disagreed with Officer Cuellar's decision to initiate an involuntary examination and stated in her report that "the tantrum behavior had ceased and was under control."

112.    The school principal called and told J.S. that E.S. had been taken away in handcuffs but she did not know where E.S. had been taken.

113.    In fact, the still-handcuffed E.S. had been transported in the back of a SDPBC police car to the Baker Act receiving facility.

114.    Officer Cuellar later contacted J.S. and told her that, regardless of E.S.'s disability, he would have initiated an involuntary examination under the Baker Act. Officer

Cuellar also stated that there was "no point" in J.S. racing to the hospital because she was not going to be allowed to see E.S.

115.    After examination, the Baker Act receiving facility told J.S. that E.S. was not a danger to himself or others, and she was allowed to take him home the same day.

116.    E.S. returned to school after several days.

117.    After the incident, E.S. was extremely afraid of Officer Cuellar and became upset whenever Officer Cuellar was present. E.S.'s fear extended to all men, especially men in uniform.

118.    After the Baker Act incident, Officer Cuellar repeatedly approached E.S.'s BCBA and asked her to press charges against E.S. for hitting her. The BCBA refused.

119.    After the incident, J.S. requested that the school district investigate the school and the officer's conduct. Office Cuellar told department investigators that he knew E.S. had a diagnosis of ASD.

120.    ASD, a developmental disability, is explicitly excluded from the definition of mental illness under the Baker Act.

121.    Officer Cuellar had no reason to believe that E.S. had a mental illness.

122.    Officer Cuellar had no reason to believe that E.S. was at imminent risk of causing serious bodily harm to himself or others.

123.    No mobile response team or other medical professional was consulted about the decision to initiate an involuntary examination under the Baker Act on E.S.

124.    E.S.'s BCBA stated she did not think the involuntary examination under the Baker Act was appropriate.

125.    SDPBC did not employ the Baker Act on E.S. again, but he was repeatedly suspended and physically restrained by school personnel.

126.    After some time J.S. lost trust in the school's ability to ensure her son's education and keep him safe and placed E.S. in a private school using a state voucher program. If that trust is restored, she would be interested in exploring his return to SDPBC.

### C.  L.A.

127.     L.A. was eight years old and in the third grade when SDPBC school police Officer Howard Blocher seized her for involuntary examination, despite SDPBC's mobile response team recommending against involuntary examination.

128.     More than a month earlier, L.A.'s mother, A.B., had provided school officials— including the assistant principal—with documentation of L.A.'s diagnosis of ADHD. This was L.A.'s only diagnosis.

129.     School officials had a pattern of regularly calling A.B., who speaks English as a second language and was at that time living with L.A. in a homeless shelter, over minor matters and questioning her fitness as a mother. They regularly demanded she visit the school campus to discuss minor issues and sit with her children in class, even though they knew she had difficulty arranging transportation to the school campus and this disrupted her ability to find and retain employment.

130.     School officials were also aware that L.A. was receiving therapy outside of school and had a targeted case manager.[23]

131.     On March 1, 2019, L.A., who loves to draw, drew a picture of a rocket with a girl hugging it and showed it some classmates. A teacher saw it and thought that it was a drawing of male genitalia. L.A. became upset out of embarrassment and fear that she would get in trouble.

132.     L.A. ran out of the classroom, as she had done on previous occasions when she was upset. She typically went to the assistant principal, who would talk to her and help her return to class. On this day, she was intercepted by the principal, who did not employ the same de-escalation strategies.

133.     Instead, school staff contacted both the school police officer, Officer Howard Blocher, and the mobile response team, and brought L.A. to the principal's office.

---

[23] A targeted case manager assists a client in accessing needed medical, mental health, social, educational, and other services.

134.     According to the officer's Incident Report and the School Discipline Referral, L.A. stated that she wanted to kill herself; that she did not want to go home with her mother; that she suffered abuse at home; that she had the devil inside her; and that she wanted her mom to take her to church. She also stated that "Momo"[24] is real and asked the officer take out his phone "so I can show you how I'm going to kill all of you."

135.     According to these documents, L.A. also tried to leave the principal's office and had to be redirected. L.A. was also reportedly ripping up pieces of paper, throwing them, and putting them into her mouth.

136.     In fact, L.A. did put pieces of paper in her mouth, not to harm herself but to soften them so she could more easily blend lines in a drawing she was working on to create a shaded effect—she is an avid and talented drawer. Her comments were similarly misinterpreted: she called the principal, who she viewed as having harassed her mother and now as holding her in his office and threatening her, "a devil" and said he had "eyes like Momo." At no time prior to the involuntary examination did L.A. ever try or say she wanted to harm herself.

137.     There were multiple strategies that would have effectively calmed L.A. down. The simplest one would have been to simply allow her to draw by herself. She also would have been calmed by being allowed to speak with her mother.

138.     The school made a report to the Department of Children and Families. No removal from A.B.'s custody resulted from this report.

139.     The mobile response worker recommended counseling for L.A. but did not recommend that she be taken for involuntary examination pursuant to the Baker Act.

140.     Nonetheless, Officer Blocher initiated involuntary examination under the Baker Act.

---

[24] "Momo" is an internet urban legend that became popular in mid-2018 through 2019. Supposedly, internet users posing as a character named "Momo" convinced children and adolescents to harm themselves and others.

141.     Officer Blocher had no reason to believe that L.A. posed an imminent danger of serious bodily harm to herself or others.

142.     L.A.'s mother, A.B. was contacted by school staff. Since A.B. had no vehicle for transportation, she walked to the school. She asked to see her child and the school refused. She asked to take her home and the school refused.

143.     A.B. told the school staff that she would come and take care of L.A., and that L.A. did not need to be hospitalized. Officer Blocher deemed the mother "uncooperative" because she demanded to see her child. Officer Blocher told A.B. she could see L.A. at the hospital.

144.     L.A.'s therapist and case manager were never contacted to determine possible strategies to deescalate L.A., or whether they could have provided treatment and services to her without the need for removal from school and her community.

145.     There is no documentation of any attempts by school staff to deescalate the situation. To the contrary, refusing to allow L.A. to see her mother heightened the situation.

146.     To induce L.A. to cooperate, Officer Blocher told her that he was placing her in his police car in order to take her home. She did not know she was being transported for involuntary examination until she arrived at the receiving facility.

147.     To induce her to not resist handcuffing, Officer Blocher asked her if she wanted to see what handcuffs felt like before putting them on her. He then handcuffed her while walking her from the school to his police car, removing them before placing her in the back of the car.

148.     A.B. then walked miles to the receiving facility, where she was not allowed to see or take her daughter home.

149.     The receiving facility found no evidence of abuse.

150.     L.A. spent two days in the Baker Act receiving facility. During that time she was only allowed to see her mother once, on the first day, for 30 minutes. She was so upset by her experience there that she vomited five times and her two days there felt to her like two weeks.

151.    L.A. suffered great harm due to the trauma of being Baker Acted by SDPBC. There were less restrictive means to address her behavior, but none were explored or implemented by SDPBC. More than two years later, L.A. still has nightmares about her experience with the Baker Act. She was bullied by other students, who knew that she had been transported for a purported desire to kill herself and told her that she should "just do it." Unlike prior to the involuntary examination, she has had suicidal thoughts after it, due to the trauma she experienced there.

152.    A.B. changed L.A.'s school after this incident and SDPBC has not subjected her to further involuntary examinations under the Baker Act.

153.    However, the family is haunted by their involuntary experience with the Baker Act. L.A. is concerned about the stigma of being taken to a mental health hospital, and A.B. remains fearful that she could again be subjected to such trauma.

> **D.  W.B.**

154.    W.B. was ten years old and in fourth grade when SDPBC school police Officer Brown seized him for involuntary examination, over the objections of his parents.

155.    W.B. was eligible for ESE with exceptionality of Emotional/Behavioral Disability ("EBD") and SDPBC had placed him in a direct instruction cluster class for EBD students.

156.    Prior to the 2020-2021 school year, W.B.'s parents informed SDPBC that he was taking medication for Oppositional-Defiant Disorder; that he was receiving counseling; and that he did not like to be touched or hugged by anyone, especially men.

157.    On December 16, 2020, W.B. got into a fight with another child in the EBD unit. L.H., W.B.'s mother, was concerned about safety in the classroom and the teacher's lack of control and intervention in the classroom, as well as the teacher's lack of ESE certification.

158.    L.H. shared her concerns with SDPBC. On January 7, 2021, SDPBC shared that a plan was devised to provide additional training and support for the EBD classroom teacher.

159.     On January 13, 2021, L.H. expressed concerns about another altercation with the same student in the EBD unit and the teacher's lack of intervention. L.H. shared these concerns with SDPBC.

160.     On February 16, 2021, W.B. became involved in a physical altercation with another student over a mouse pad. He became upset and began throwing chairs and, when a staff member approached him and started to touch him, he inadvertently came in physical contact with her. The school police officer, Officer Brown, became involved.

161.     W.B.'s mother was called and told to come to the school and that W.B. would be taken for involuntary examination. When L.H. arrived at the school, she was told to enter in the side entrance of the school. W.B.'s father also tried to enter the school but was not permitted to enter.

162.      The administrator and principal's secretary were waiting with W.B. When she entered the room, W.B.'s mom saw her son sitting a chair with his hands handcuffed behind his back. He was angry and upset but not getting up. He expressed that he wanted his handcuffs removed, but they were not.

163.     No school staff contacted W.B.'s counselor. The mobile response team was called, but school staff told W.B.'s mother that they had cancelled the request for the team to report to the school because "they had enough to Baker Act" W.B.

164.     The school refused to allow L.H. or W.B.'s father to take W.B. home.

165.     Officer Brown's report states that W.B. wanted to commit suicide by jumping off a building and that he wanted to take the police officer's supervisor's gun and kill people. The report also states that the mother said that W.B. commented he had been looking up ways to kill people on the internet.

166.     W.B. said he would jump over a gate, but he never said he would jump off of a building. W.B.'s mother also never stated that W.B. had been looking up ways to kill people on the internet. She later searched all devices at their home and did not find any records of the alleged searches referenced in the report.

167.    The school and police officers did not take action to deescalate W.B. In particular, they failed to contact W.B.'s counselor or prescriber; told the mobile response team not to come; and handcuffed a child who has an aversion to touch.

168.    Officer Brown had no reason to believe that W.B. posed an imminent danger of serious bodily harm to himself or others.

169.    Instead, Officer Brown transported W.B., handcuffed, in his police car, to a receiving facility for involuntary examination. This facility is more than 50 miles away and takes an hour to drive to without traffic.

170.    As of the next day, W.B. was still in a "hold department" and not admitted because there were no beds available. He spent the previous day and night in a reclining chair in front of the television in the emergency room. His parents were not permitted to visit him at the facility.

171.    Once W.B. was finally moved to the children's department, he was involuntarily detained for another day before he was finally examined by a doctor.

172.    After W.B. was evaluated and released, the only change to his mental health treatment was a slight increase in his existing medication—medication that school staff were aware he was already prescribed.

173.    W.B. expressed that he did not want to go back to the Baker Act facility and that he did not like being away from his family.

174.    Because of the SDPBC's unnecessary use of the Baker Act against him and because W.B. was not allowed to return to school until a meeting with school staff was scheduled, W.B. missed a significant amount of school and L.H. missed days of work.

175.    W.B. and his family have suffered from the SDPBC's use of involuntary examinations under the Baker Act. The trauma of being handcuffed, taken away from his family in a police car, and locked away from them for days has created tremendous harm for W.B.

### E.  M.S.

176.    M.S. was eleven years old and in sixth grade when she was twice seized from her school for involuntary examination under the Baker Act, despite the availability of less restrictive options.

177.    M.S. lives with her parents S.S. and R.S.

178.    Over the course of 2020, M.S. experienced a number of traumatic events.

179.    On January 27, 2021, M.S. was allegedly seen in her art class scratching her left forearm with a dull, clay-modeling knife. The clay-modeling knife had been provided to M.S. by her art teacher for use in art class, and M.S. referred to it as a "Play-Doh knife."

180.    S.S. and R.S. were called to M.S.'s school by the school's assistant principal. They were told that M.S. had "scratched herself," and were told by the assistant principal that the school wanted S.S. and R.S. to come to school to create a school safety plan for M.S.

181.    When they arrived at the school, they were brought to the assistant principal's office where they met with SDPBC staff, a child protective investigator from the Department of Children and Families and a sheriff's deputy from the Palm Beach County Sheriff's Office.

182.    After the group had created a safety plan, S.S. and R.S. were informed that M.S. would be transported to a Baker Act receiving facility for involuntary examination. S.S. and R.S. questioned the appropriateness of the involuntary examination in light of M.S.'s recent traumas. R.S. stated that, although M.S. had scratched her forearm, everyone in the meeting had agreed that she was not suicidal. R.S. asked if it was necessary to take such an extreme step as initiating an involuntary examination under the Baker Act.

183.     The sheriff's deputy responded to R.S. by saying that the Baker Act gives them the authority to take children, not just when they are suicidal, but also when they have harmed themselves. R.S. and S.S. were informed that there was no other option.

184.    The sheriff's deputy handcuffed M.S. and escorted her to a police car. This happened during the school dismissal period and M.S. was seen by fellow students while she was escorted to the police car by the sheriff's deputy.

185.    The sheriff's deputy then transported M.S., still in handcuffs, to a receiving facility.

186.    Upon arrival at the Baker Act receiving facility, M.S. was found to have "[n]umerous superficial self-inflicted abrasions to left forearm." No medical treatment was provided for the superficial abrasions.

187.    M.S. was confined to the emergency room for about 24 hours, waiting for the psychiatrist to visit with her. Her parents were allowed to call M.S. once a day in the evenings to talk to her when she was at the facility.

188.    S.S. and R.S. were told by a doctor at the receiving facility that M.S. required outpatient therapy. S.S. and R.S. promptly identified a private therapist who could accept M.S. as a patient.

189.    Upon M.S.'s release after the January 27, 2021, involuntary examination, her parents informed the school that they identified a private therapist who had accepted M.S. as a patient and could provide therapy to M.S. at her home.

190.    S.S. had a phone conference with the school counselor. During the conference, S.S. stated that S.S. and R.S. had not been given the chance to know their rights when M.S. was being taken away for involuntary examination. The school counselor emphasized that the school had just been following their policy. S.S. asked the school counselor, if M.S. was ever transported for involuntary examination again, to transport her using an ambulance instead of police car because the police car transport had been very traumatic for M.S.

191.    On February 22, 2021, S.S. and R.S. were called by the school assistant principal to come to the school for a meeting about M.S. S.S. and R.S. promptly came to the school and met with the assistant principal, counselor, Officer Silva, and a mobile response team counselor. S.S. and R.S. informed the meeting attendees of a recent event that had triggered M.S. and that M.S. was seeing her therapist more often in response. M.S. was sent home with her parents and was seen by her therapist later on the same day at their home.

192.    On February 25, 2021, S.S. and R.S. were called by the assistant principal with Officer Silva and Officer Doe, another SDPBC officer, on the line. They were informed that M.S. had attempted to cut herself with the corner of a plastic school identification card.

193.    S.S. and R.S. were told that SDPBC was going to initiate an involuntary examination under the Baker Act for M.S. S.S. and R.S. asked if they could wait to transport M.S. to the receiving facility until her parents could come to the school. Officer Doe told them that he could not wait for them to arrive at school because he needed to return to lunch duty.

194.    Neither Officer Silva nor Officer Doe had reason to believe that M.S. posed an imminent danger of serious bodily harm to herself or others.

195.    The Report of Law Enforcement Initiating Involuntary Examination for the February 25, 2021, incident makes no mention of the school or the officers contacting the mobile response team or M.S.'s private therapist.

196.    No medical or mental health professional was consulted about the decision to initiate an involuntary examination under the Baker Act for M.S.

197.    Officer Doe transported M.S. to a receiving facility, with M.S. handcuffed in the back of the police car. The assistant principal also went to the receiving facility with M.S. and Officer Doe.

198.    S.S. and R.S. went to the receiving facility to see M.S. immediately upon learning that she was being transported there. When they were allowed to visit with M.S., she told them that the assistant principal had told her that she had to go to the receiving facility to heal and get better.

199.    After the second involuntary examination, S.S. and R.S. decided to keep her at home for virtual instruction due to fear of another involuntary examination under the Baker Act.

200.    Before M.S. was seized for involuntary examination under the Baker Act, M.S. received As and Bs in school. Afterwards, her grades dropped precipitously and she had a difficult time engaging in her visual arts program of study. She is on academic probation and is at risk of being ejected from the school entirely if her grades do not improve.

201.    M.S. and her family have suffered greatly from the trauma of SDPBC's misuse of the Baker Act on her. M.S.'s involuntary examination compounded her pre-existing traumatic experiences. M.S. has told her mother that she felt a lot of guilt and shame, because she thought she was treated like a criminal in front of her classmates when she was taken to the facility. After M.S.'s experience with the Baker Act, she has become withdrawn and gets upset more easily. This harm has created lasting impacts on M.S.

### F.  Other Children

202.    SDPBC's treatment of D.P., E.S., W.B., M.S., and L.A. is sadly typical of its use of the Baker Act on youth. Review of other police reports written by SDPBC officers to justify their use of the Baker Act reveals that, even if their narratives are taken as factual and complete: many children whose involuntary examination under the Act was initiated by school police did not in fact meet the statutory criteria; SDPBC police officers routinely failed to seek input from a mental health professional; and SDPBC police officers routinely failed to attempt to identify less restrictive means to deescalate the child.

203.    In addition, while the Baker Act requires that handcuffs and other restraints only be used when necessary to protect the person subject to involuntary examination or others, Fla. Stat. § 394.459(1), SDPBC policy provides that officers shall handcuff and restrain children both while at school and during transportation to the receiving facility.

204.    For example:

a.    School police seized a nine-year-old for involuntary examination after he allegedly threatened to hurt others with what the report describes as a "white plastic fork."

b.    A seven-year-old was sent for involuntary examination at the recommendation of his school's mental health counselor after he "threw books and kicked chairs" even though he denied wanting to hurt himself or others.

      c.      After a police officer learned that a thirteen-year-old girl had been treated by the school nurse for scratching her wrist with a plastic knife, he took her for involuntary examination. The officer made the decision without consulting a mobile response team even though the student had an appointment with her counselor later that day and had documented trauma from a past experience with the Baker Act.

      d.      An eight-year-old who made comments suggesting a desire to self-harm was taken for involuntary examination by school police against the recommendations of SDPBC's own mobile response team.

      e.      School police used the Baker Act on a twelve-year-old boy, without the involvement of a mobile response team, after he left class without permission and was "defiant" toward staff when they tried to restrain him. The police report gives no reason to think he had a mental illness.

      f.      A school police officer and a mobile response team member employed the Baker Act on a seven-year-old boy after he told an officer that he wanted to "tie up [his teacher] by the legs and punch her repeatedly" because "she wouldn't let him attend a pizza party."

      g.      An officer was called to observe the search of an eleven-year-old boy's backpack because he had been seen "in possession of a black plastic knife." The boy communicated that he needed to have the knife "because he needed it to protect himself from other students he alleged were 'plotting against him.'" Though no knife was found, he was sent for involuntary examination on the recommendation of a mobile response team member because she had previously interviewed him at a different school he then attended, and he had then made threats to self-harm.

      h.      A ten-year-old girl told an officer that she "ha[d] thoughts of harming herself multiple times." But all of her attempts were "performed by using her finger nails [sic] and scraping her wrist multiple times", and her wrists did not show any signs of scratching. Nonetheless, the mobile response team was called and recommended use of the Baker Act.

i.      A seven-year-old boy described as "hostile, aggressive, and in full rage" was flipping and throwing classroom furniture and books. There was no indication that the student desired to harm himself or that he actually had the physical capacity to harm anyone else. Nonetheless, a mobile crisis unit member recommended use of the Baker Act and the officer complied because he believed the student "was in need of professional intervention."

j.      A ten-year-old boy left class without permission, hit his teacher on the arm, and shoved her. When a school police officer took him to the assistant principal's office, he yelled, tried to leave, knocked some items off her desk and kicked her twice. Even though he at no time threatened to harm himself or posed any danger of serious bodily harm to anyone, the officer then initiated an involuntary examination under the Baker Act.

k.      An officer was called to an elementary school classroom for children with disabilities, where an eight-year-old boy had "tossed and thrown around" chairs and desks and attempted to bite his teacher. He was initially "defiant" until the officer played dinosaur videos on YouTube, which "calmed him down and allowed [SDPBC staff] to make contact with his mother and mobile crisis." According to the report, when the mobile response team arrived, the boy said, "shut up, I'll punch you in the face." Even though the boy had been able to deescalate by watching a dinosaur video, the mobile response team recommended that the child be sent for involuntary examination, and the officer complied.

l.      A thirteen-year-old girl was taken for involuntary examination by an SDPBC officer because she had reportedly cut her arm with a plastic knife the night before. The student told the officer that she would calm down if she could see her eighteen-year-old sister, but the sister was not contacted. The Baker Act was used even though the parents already had a session scheduled with the child's counselor and caseworker for the same day.

m.      SDPBC police seized a twelve-year-old boy for involuntary examination because he had scratched himself on the wrist with a pencil and "seemed to be upset."

These incidents, and the many more like them in the District's records, show that the District's misuse of the Baker Act on D.P., E.S., W.B., M.S., and L.A. were not aberrations but instead consistent with its routine practice.

## IV.   SDPBC'S INADEQUATE POLICIES, PROCEDURES AND TRAININGS RESULT IN ITS EXCESSIVE AND ILLEGAL USE OF THE BAKER ACT

205.   In the period from July 2019 to March 2020, before SDPBC switched to remote instruction due to the Covid-19 pandemic, the district seized 286 students for involuntary examination on 323 occasions. Before remote instruction began, SDPBC was on track to initiate involuntary psychiatric examination of students more than 400 times by the end of the academic year.



**PALM BEACH COUNTY IN-SCHOOL BAKER ACTS PER YEAR:**

*In person instruction for the school year ended on March 13, 2020, at which time 132 of the scheduled 179 days of instruction had occurred and the District had Baker Acted 323 children. Had the District continued to Baker Act children at the same rate it would have done so 438 times.*

206.   From July 2019 to March 2020, 62 Baker Act incidents involved elementary school students and 103 involved middle school students. L.A., at just eight years old, is far from the youngest child SDPBC subjected to the Baker Act that year. Indeed, SDPBC initiated involuntary examination of children younger than nine a total of 17 times in the 2019-2020 school year: four six-year-olds, nine seven-year-olds, and six eight-year-olds.

207.   The 2019-2020 school year is not an anomaly. SDPBC used the Baker Act 401 times in 2018-2019 (including on 36 children under age nine, one of whom was just five); 236

times in 2017-2018 (including on 10 children under age nine, three of whom were five); and 257

times in 2016-2017 (including on 23 children under nine-years-old, four of whom were five).

208.    SDPBC data also shows troubling racial disparities. Of the 323 children SDPBC

subjected to the Baker Act in the 2019-2020 school year, 24 percent were non-Hispanic white

and 40 percent were Black. Comparatively, the Palm Beach County student population is 33

percent non-Hispanic white and 28 percent Black. In total, SDPBC used the Baker Act on Black

children at twice the rate of white children.

209.    Even more concerningly, 40 out of 59, or 68 percent, of the five, six, and seven-

year-olds who SDPBC seized for involuntary examination over the last four years were Black

children—consistent with data that shows adults routinely see Black children as older and more

threatening.[25] In total, SDPBC removed Black children from school through involuntary

examinations under the Baker Act at twice the rate of white children.

210.    SDPBC employs involuntary examination in many instances when it is not

necessary, and even when it is prohibited by statute.

211.    A review of police reports from all Baker Acts initiated by District Police in the

2018-19 and 2019-20 school years, obtained through public records requests, shows that,

according to the narrative written by the officer initiating an involuntary examination:[26]

a.    In about 60 percent of cases, there is no evidence that a mobile response

team was contacted.

b.    Where the report indicates that the school had knowledge of the child's

treatment provider, fewer than half of those cases document any attempt to contact the existing

treatment provider.

---

[25] Phillip Atiba Goff et. all, *The Essence of Innocence: Consequences of Dehumanizing Black Children*, 106 J. of Personality and Soc. Psych. (2014), https://www.apa.org/pubs/journals/releases/psp-a0035663.pdf.

[26] The percentages are based on analysis of complete police reports provided by SDPBC. 26 incomplete reports were excluded because the narrative portion of the police report was missing. 17 police reports of involuntary examinations initiated at charter schools were also excluded.

c.    In about 10 percent of cases, there was evidence the child had been involuntarily examined under the Baker Act previously.

212.    SDPBC's disproportionate and inappropriate use of the Baker Act is unfortunately unsurprising given the inadequate and inaccurate information about the law the district provides to its employees.

213.    Police officers employed by the SDPBC initiate involuntary examination under the Baker Act of children independently or, more typically, after they are contacted by teachers or school administrators. Despite assigning police to determine when young children will undergo the traumatic experience of involuntary psychiatric examination, SDPBC provides police officers with inaccurate information about the legal standard for involuntary examination and inadequate training on applying that legal standard accurately and without discrimination against children with disabilities.

214.    In an August 10, 2018 "Bulletin" entitled "Baker Act Decision Tree Protocol," Deputy Superintendent Keith Oswald wrote to district principals that the "[c]riteria for an involuntary exam are that the individual: presents a danger to self or others; and/or appears to have a mental illness as determined by a licensed mental health professional."

215.    This short statement contains multiple false claims and crucial omissions about the Baker Act. The use of the term "and/or" is patently incorrect, as *both* of the identified factors are required in order to legally initiate a Baker Act. The statement also omits the statutory requirements that the danger posed by the person subject to the Baker Act must be "in the near future," "evidenced by recent behavior," and constitute "serious bodily harm." Fla. Stat. § 394.463(1)(b)2.

216.    The Bulletin tells school officials to "make every effort to include the parents/guardians in all phases of the process" but does not instruct schools officials to give parents the option of taking their children home instead of using the Baker Act, even when doing so would be safe and prevent the need for an involuntary examination.

217.    The Bulletin does not clarify that behavior that is the result of a developmental disability is not a legal basis for use of the Baker Act.

218.    The 2018 Bulletin also includes a "Baker Act Decision Tree." This document suggests that police will make the final decision to employ the Baker Act, even when mental health professionals are involved or disagree: it states that after the "school contacts District Response Team/School Police" and the "student remains in crisis and exhibits behaviors which potentially meet Baker Act criteria" then either "School Police determines behavior does not meet Baker Act criteria" or "School Police/licensed staff initiate Baker Act, if criteria met."

219.    Under the Bulletin, contacting parents is "recommended" but there is no suggestion that parental consent be sought or obtained before a child is transported to a receiving facility. Instead, the Decision Tree includes parents in only two steps. First, after learning of a potential Baker Act situation, the tree indicates that a principal should contact the parents but does not suggest that they be involved further nor that their involvement might change the course of the situation. Second, the Decision Tree provides that after a school police officer or licensed staff has initiated an exam under the Act, a "School Designee contacts and informs parent(s)/legal guardian(s) and informs them that the decision has been made to BA and is being transported."

220.    SDPBC has not publicly disavowed use of the Baker Act Decision Tree or publicly released any updated or different Baker Act policy.

221.    SDPBC provides its officers with plainly inadequate training on determining when it is necessary that young children undergo the traumatic experience of involuntary psychiatric examination.

222.    According to SDPBC's response to public records requests, the only Baker Act training the district provides to its officers is a single 23-minute video entitled "Mental Health Crisis & Appropriate Interventions." The fifteen minutes of the video that actually address the Baker Act misstate the law and omit critical information about when the Baker Act can legally and appropriately be used. For instance, the video says that the Baker Act can be used on

"individuals who have a mental illness, *or* who may harm or neglect themselves or others" (emphasis added). Like the language in the Bulletin, this a serious misstatement of the law. In reading the statute out loud, the instructor entirely omits the mental illness requirement. The video also states that "[y]oung children that [sic] cannot regain control AND are putting themselves at significant risk" are "candidates" for the Baker Act, but does not mention any of the other statutory requirements such as mental illness, substantial bodily harm, or imminence. Finally, the instructor recommends that officers contact mobile response teams only "if you are unsure of whether to Baker Act a person."

223.    The SDPBC Police Department's policy on Baker Act use is similarly inadequate. It quotes the statutory criteria for Baker Act initiation but gives officers no other guidance on when to use the Act. It does not define any of the terms in the Baker Act or give any examples of situations in which it could be appropriately used. It does not address the Baker Act's requirement that handcuffs and other restraints only be used when necessary for safety purposes. Fla. Stat. § 394.459(1). Finally, the policy says that parents will be contacted when involuntary examination under the Baker Act is initiated but does not suggest or require that this occur before the child is transported to a receiving facility or that parents be involved in the decision to do so.

224.    While SDPBC also contracts with mental health professionals, including "mobile response teams" designed to address youth mental health crises, there are issues with both quality and implementation. For example, SDPBC's contract with South County Mental Health for "mobile response services" does not impose any training or credential standards on members of the teams.

225.    Moreover, limited though they are, mobile response teams are often left out of the Baker Act process: in many cases, the mobile response team is never called.

226.    Even when they are consulted, mobile response teams sometimes recommend use of involuntary examination in situations where less restrictive alternatives are available. This may be because of a lack of proper training and qualifications or pressure by school officials. Even when mobile response teams correctly recommend against involuntary examinations,

school police officers can and sometimes do to initiate involuntary examinations regardless of these recommendations.[27]

227.    SDPBC has no policy or practice of regularly reviewing or evaluating individual uses of the Baker Act by school staff or mobile response teams. Nor does it review its overall rate of Baker Act use at either the school or District level to determine if the Act is being used appropriately.

**V.    THE SCHOOL BOARD HAS KNOWINGLY FAILED TO TAKE ACTION TO PREVENT ILLEGAL AND INAPPROPRIATE USE OF THE BAKER ACT AGAINST CHILDREN**

228.    The School Board of Palm Beach County has long been aware that it was misusing the Baker Act.

229.    As early as 2014, a report on community mental health resources in Palm Beach, which was presented to the School Board in April 2014, found that schools were not adequately identifying and helping students with mental illnesses and other behavioral challenges. "As a result," the report wrote, "the number of children who are being Baker Acted from school is increasing."

230.    SDPBC employees have also been made aware of inappropriate use of the Baker Act in numerous individual instances by medical experts and child advocates over the intervening years, including some it employs itself.

231.    SDPBC employees have collected and possessed data showing increasing rates of Baker Act use over at least four school years, yet have taken no effective actions to address it.

232.    Upon information and belief, SDPBC employees have expressed concerns with SDPBC's use of the Baker Act to the members of the School Board, including at School Board meetings, and yet SDPBC has taken no effective actions to address it.

---

[27] In a small number of cases mobile response team members who do have mental health credentials have initiated examinations themselves in SDPBC schools, leaving children to be transported by police.

233.     Over the 2018-19 and 2019-2020 school years, the school district's police department conducted two internal affairs investigations of officers who initiated a Baker Act, including the case of E.S. Both were conducted only after the child's parents made a complaint.

234.     In E.S.'s case, the use of the Baker Act was inappropriate: E.S.'s behavior was due to his ASD and he was not a danger to himself or others in any respect—let alone an imminent danger or a danger of serious bodily harm. Despite the complete absence of any evidence that E.S. met the legal criteria, the Internal Affairs investigation found that Officer Cuellar was not in violation of the District's Baker Act procedures. The Internal Affairs report also found that Officer Cuellar's use of force was not "excessive" due to "resistance" by E.S., a nine-year-old.

235.     Yet, the investigator also found that their "investigation did identify concerns which should be addressed through training, with regards to Baker Acts involving students with Autism." He went on to write that "[i]t has been recommended that supervisors and school-based police officers, particularly those who are assigned to schools with ASD cluster sites, have up-to-date training regarding ASD and Baker Acts."

236.     SDPBC has not acted on these recommendations for increased training.

237.     In the other case, which occurred in 2018, an officer responded to a report of an elementary school student with ASD who was attempting to hit students and shove food from a lunch box into their faces. The officer successfully contacted the child's mother, who said she was coming to the school. School staff knew from prior experience that she was often able to deescalate the child when school officials could not. While she was en route, the child again attempted to hit a school employee. Even though the child was nine years old, and the supposed adult victim was 6'3'' and weighed 275 pounds, the officer concluded that the child was a danger to others and placed him in handcuffs and "hobble restraints."

238.     While the officer was taking the child to his police car for transportation to a receiving facility, the child apologized to the school employee he had hit. The officer did not view the child's apology as a sign that he was no longer a danger to others, if he had ever been.

He instead concluded that, unlike other children with ASD whom he perceived as "in their own world," this child was "cognizant of his actions." The officer's statement suggests that he thought the child's behavior deserved punishment because his actions were "calculated" and that he viewed use of the Baker Act as a form of punishment.

239.    While the investigators found that the officer had not violated department policies, they also "recommended that school-based officers and supervisors understand the importance of contacting parents or guardians of ASD children." However, upon information and belief, no such training occurred.

240.    SDPBC has also been aware of illegal use of involuntary examination under the Baker Act through a recording, first made public by the Palm Beach Post in 2021 but known to SDPBC prior to that date. The recording was made by a SDPBC school police officer of a 2017 incident in which an elementary school principal attempted to pressure him into using the Baker Act on a seven-year-old girl.[28]

241.    On that same day, the police officer sent the audio recording to his supervisor raising concerns that "the Principal, Staff and even the Crisis Response try to push for a (child) to be Baker Acted, for throwing things, books against the wall. . . . I'm certain the incident does not meet the criteria for a Baker Act."

242.    As revealed by that recording, the officer, the principal, a teacher, and a representative of the mobile response team met and spoke about a seven-year-old girl, who was also present. The other adults urged the officer to initiate an involuntary examination under the Baker Act of the student, who had allegedly "kicked" and "slapped" a teacher and then laid down on the floor and refused to follow directions.

243.    The officer explained that the girl could not be sent for involuntary examination because she did not meet the Baker Act criteria: there was no indication she wanted to harm

---

[28] Sonja Isger, *Should school use Baker Act on 7-year-old? A look inside one case*, The Palm Beach Post (May 14, 2021), https://www.palmbeachpost.com/story/news/2021/05/14/should-7-year-old-baker-acted-school-look-inside-one-case/5054465001/.

herself, and she did not pose an actual risk of harm to the adults around her, since she was seven and physically incapable of hurting them.

244.     The principal eventually admitted that she wanted the girl sent for involuntary examination because she was frustrated with the child's mother for not working with the school and with previous failed interventions. The principal asked, "How is she going to learn? How am I supposed to put her in an academic setting?" The officer replied that he was not there to make the child learn, but to see if she was a danger to herself or others. The principal then made clear that the real reason she wanted an involuntary examination was to get the student to leave the school, saying that "this is not the right placement for her." The officer countered that teaching a child a lesson or trying to convince her mother to move her to another school are not legal bases for use of the Baker Act.

245.     The school staff remained undeterred: the teacher said that "I'm not saying she wants to kill herself," but the teacher thought "the Baker Act will be a wake-up call."

246.     Even more disturbingly, the mobile response team member also recommended use of the Baker Act, despite not being able to articulate any reasons the child actually was a danger to others aside from the fact that she was "throwing things around."

247.     While the officer in this case did not use the Baker Act, the audio tape reflects that SDPBC officials have pressured school police and other staff to use the Baker Act even when its use is known to be unlawful. As described above, other officers have subsequently used the Baker Act on children in similar circumstances. Upon information and belief, SDPBC was made aware of the content of this recording.

248.     In March 2021, the Southern Poverty Law Center ("SPLC") and others issued a report identifying Baker Act misuse in Palm Beach County and throughout the state.

249.     At least one School Board member was aware of the issue long before the report; multiple community members have informed this Board Member about the inappropriate use of the Baker Act on Black children.

250.     Nonetheless, despite repeatedly being made aware of Baker Act misuse, SDPBC has sent an increasing number of children for involuntary examination over the last four years.

251.     The School Board has also taken no actions to reduce SDPBC's use of the Baker Act despite possessing data that show the high and increasing rate of its use.

252.     Superintendent Fennoy responded to the SPLC report by saying, falsely, that the data was "three to four years old" when in fact the report's data included the 2019-2020 school year. He also acknowledged that there is a grave risk of increased use of involuntary examination under the Baker Act as soon as SDPBC schools reopen fully.

253.     When challenged in the press on its Baker Act use, SDPBC staff have asserted, falsely, that the District has already taken steps sufficient to reduce inappropriate Baker Act use and/or that its use of the Baker Act is in fact appropriate and therefore no corrective action is needed. For instance, in a statement quoted in a March 30, 2021 article on cbs12.com, a spokesman for SDPBC claimed that "[t]he School District relies on the Baker Act statute as a last resort when children are in danger of hurting themselves or others," even as board members conceded that was not the case.[29] In another CBS12 article, Deputy Superintendent Keith Oswald again defended SDPBC's Baker Act use: "'[I]s a Baker Act a traumatic experience for a child? Absolutely,' Oswald said. 'But nothing is worth the cost of life.'"[30] SDPBC staff also continued Superintendent Fennoy's attempt to describe the issue as one that had been solved, pointing to increased mental health resources in schools funded in a 2018 referendum. But while these new mental health resources were fully in place by mid-2019, SDPBC used the Baker Act at a record rate in the 2019-2020 school year.

---

[29] "Palm Beach County School District 'Excessively' Baker Acts students, study says," CBS 12 News (Mar. 30, 2021), https://cbs12.com/news/local/palm-beach-county-school-district-excessively-baker-acts-students-study-says.
[30] "Palm Beach County School District says Baker Act report left out critical information," CBS 12 News (Apr. 29, 2021), https://cbs12.com/news/local/palm-beach-county-school-district-says-baker-act-report-left-out-critical-information.

254. At a recent School Board meeting, SDPBC claimed that it is revising its Baker Act policies in consultation with "experts," but has not named these experts or explained what changes it might be considering.

255. SDPBC has a history of using involuntary examination under the Baker Act for disability-related behaviors that are not related to a mental illness and/or do not require treatment in a restrictive environment; of seizing children for involuntary examination under the Baker Act without reasonable belief that the children met the statutory criteria for involuntary examination; of handcuffing all children transported for involuntary examination regardless of any individualized determination; of disregarding or denying its own stark Baker Act data; and of failing to develop policies and practices to ensure legal and appropriate use of the Baker Act. This history shows that SDPBC cannot and will not remedy its Baker Act issues without court oversight. Instead, SDPBC's abuse of the Baker Act use will only end with comprehensive injunctive relief.

## CAUSES OF ACTION

### COUNT 1

**All Plaintiffs against All Defendants: Violation of the Americans With Disabilities Act**

256. Plaintiffs re-allege paragraphs 12-49 and 59-255.

257. Defendant School Board is a public entity subject to Title II of the ADA and officially responsible for supervising the operations of a public entity subject to Title II of the ADA. 42 U.S.C. § 12131(1).

258. D.P., E.S., W.B., M.S., and L.A., constituents of DRF, and children of members of the FL NAACP ("Plaintiff Children") are, or are suspected of being, qualified individuals with disabilities within the meaning of Title II of the ADA and meet the essential eligibility requirements for the receipt of services, programs, or activities of Defendants. *Id.* § 12131(2). P.S., J.S., A.B., L.H., S.S., and R.S. and members of the FL NAACP ("Plaintiff Parents") are individuals with known relationships or associations with individuals with known disabilities within the meaning of Title II of the ADA. 28 C.F.R. § 35.130 (g).

259.     Through the acts and omissions set forth above, Defendants violate Title II of the ADA and discriminate against Plaintiffs by reason of their disability or their known relationship or association with individuals with disabilities by:

    a.    Denying Plaintiff Children an opportunity to participate in and benefit from education services equal to that afforded to other students;

    b.    Denying Plaintiff Children education services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided to other students;

    c.    Denying Plaintiff Children the opportunity to receive educational programs and services in the most integrated setting appropriate to their needs;

    d.    Putting Plaintiff Children at risk of denial of the opportunity to receive educational programs and services in the most integrated setting appropriate to their needs;

    e.    Failing to reasonably modify SDPBC's programs and services as needed to avoid discrimination against Plaintiffs;

    f.    Using methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of the Defendants' programs with respect to the Plaintiffs; and

    g.    Excluding or otherwise denying equal services, programs, or activities to Plaintiffs because of their disabilities or their known relationship or association with individuals with disabilities.

260.     The Plaintiff Children did not and do not pose a significant risk to the health or safety of others, or any risk posed could have been or could be eliminated by the provision of reasonable modifications and/or non-discriminatory services.

261.     Thus, Defendants have deprived Plaintiffs and have placed them at significant risk of further deprivation of participation in or the benefits of services, programs, or activities of a public entity.

262.     Defendants have demonstrated deliberate indifference, in that they were aware of substantially likely harm to Plaintiffs' federally protected rights under Title II of the ADA and failed to act upon that likelihood.

263.     As a result of Defendants' violations, Plaintiffs have suffered and are at a significant risk of suffering irreparable harm, including substantial losses of educational opportunities, and they have no adequate remedy at law.

264.     Due to Defendants' ongoing violations of Title II of the ADA, injunctive relief, declaratory relief and damages are appropriate remedies.

### COUNT 2

**All Plaintiffs against School Board: Violation of Section 504 of the Rehabilitation Act**

265.     Plaintiffs re-allege paragraphs 12-49 and 59-264.

266.     Defendant School Board has been and is a recipient of federal financial assistance sufficient to invoke the coverage of Section 504. *Id.* § 794(b)(3).

267.     Plaintiff Children are, or are suspected of being, qualified individuals with disabilities within the meaning of Section 504 and are or may be otherwise qualified to participate in or receive benefits from Defendants' programs or activities. 29 U.S.C. § 794(a).

268.     By reason of their disabilities, Plaintiffs are being excluded from participation in, and being denied the benefits of, an educational opportunity that is equal to that afforded to other students and being subjected to discrimination by Defendants.

269.     By reason of their disabilities, Plaintiffs are subjected to discrimination by Defendants.

270.     As set forth above, Defendants' actions and omissions violate Section 504 of the Rehabilitation Act of 1973.

271.     Defendants have demonstrated a deliberate indifference in that they were aware of substantially likely harm to Plaintiffs' federally protected rights under Section 504 and failed to act upon that likelihood.

272.     As a result of Defendants' violations, Plaintiffs have suffered and are at significant risk of suffering irreparable harm, including substantial losses of educational opportunities, and they have no adequate remedy at law.

273.     Due to Defendants' ongoing violations of Section 504 and implementing regulations, injunctive relief, declaratory relief and damages are appropriate remedies.

## COUNT 3

**All Plaintiffs against All Defendants: Violation of the Florida Educational Equity Act**

274.     Plaintiffs re-allege the paragraphs 12-49 and 59-273.

275.     The Florida Educational Equity Act ("FEEA") prohibits discrimination "on the basis of race, ethnicity, national origin, gender, disability, religion, or marital status against a student or an employee in the state system of public K-20 education." Fla. Stat. § 1000.05(3)(d).

276.     By reason of their disabilities, Plaintiff Children are subjected to discrimination by Defendants, who have inappropriately and unlawfully used the Baker Act against them.

277.     By failing to establish appropriate safeguards to prevent the Baker Act from being used inappropriately against students with disabilities, including Plaintiff Children, Defendants have acted with deliberate indifference, in violation of the FEEA.

278.     As a result of Defendants' violations, Plaintiffs have suffered and are at significant risk of suffering irreparable harm, including substantial losses of educational opportunities, and they have no adequate remedy at law.

279.     Due to Defendants' ongoing violations of the FEEA, injunctive and declaratory relief are appropriate remedies.

## COUNT 4

**P.S., J.S., A.B., L.H., S.S., and R.S and FL NAACP against All Defendants: § 1983
Procedural Due Process Claim for Deprivation of Parental Right to Custody and Control**

280.    Plaintiffs re-allege the paragraphs 12-21, 31-49, and 59-255.

281.    Parents have a fundamental right to the care, custody, and control of their children.

282.    Parents cannot be deprived of this fundamental right without constitutionally sufficient due process under the Fourteenth Amendment.

283.    Plaintiff Parents bring this claim against Defendants because SDPBC employee school police officers took Plaintiff Children into their custody and transported them to a receiving facility, where Plaintiff Children were denied contact with their parents, without notifying or seeking consent from Plaintiff Parents, and/or over Plaintiff Parents' objections.

284.    No actual or perceived emergency existed that would justify SDPBC depriving Plaintiff Parents of their fundamental rights without any due process protections.

285.    The failure to provide any type of notice or consent requirement prior to removing Plaintiff Children from their parents' custody and control is constitutionally insufficient and violates Plaintiff Parents' procedural due process rights.

286.    These violations of Plaintiffs Parents' rights by SDPBC police officers were the result of longstanding District policies adopted by, ratified by, acquiesced to and endorsed by Defendants School Board, Fennoy, and Alexander and their predecessors. The District's Baker Act Decision Tree provides that even contacting parents before initiating an examination, let alone seeking their permission, is only "recommended."

287.    These violations were also the result of those Defendants' failure to supervise and train SDPBC police to seek parental consent before initiating a Baker Act examination. Despite being aware that hundreds of children were being Baker Acted and that many of those Baker Acts could be prevented by contacting children's parents, Defendants failed to train their officers to do so.

288.     These violations interfered with the Plaintiff Parents' relationship with their children at a time those children needed them most. This caused Plaintiff Parents and Plaintiff Children great distress. Without adequate relief Plaintiffs are at significant risk of suffering similar harms in the future.

289.     Due to Defendants' ongoing violations of the Fourteenth Amendment, injunctive and declaratory relief are appropriate remedies.

## COUNT 5

**P.S., J.S., A.B., L.H., S.S., R.S., and FL NAACP against All Defendants: § 1983 Procedural Due Process Claim for Control Over Medical Decision-Making Under the Fourteenth Amendments**

290.     Plaintiffs re-allege paragraphs 12-21, 31-49, and 59-255.

291.     Parents have a fundamental right to the care, custody, and control of their children.

292.     Parents cannot be deprived of this fundamental right without constitutionally sufficient due process under the Fourteenth Amendment.

293.     The fundamental right of parents to the care custody, and control of their children encompasses right to make medical decisions for their children.

294.     Plaintiff Parents and FL NAACP bring this claim against Defendants because SDPBC employees initiated involuntary examinations of Plaintiff Children under the Baker Act without notifying or seeking consent from Plaintiff Parents, and/or over the Plaintiff Parents' objections.

295.     No actual or perceived emergency existed that would justify SDPBC depriving Plaintiff Parents of their fundamental rights without any due process protections.

296.     The failure to provide any type of notice or consent requirement prior to employing the Baker Act on a child is constitutionally insufficient and violates Plaintiff Parents' procedural due process rights.

297.     These violations of Plaintiffs Parents' rights by SDPBC police officers were the result of longstanding District policies adopted by, ratified by, acquiesced to and endorsed by

Defendants School Board, Fennoy, and Alexander and their predecessors. The District's Baker Act Decision Tree provides that even contacting parents before initiating an examination, let alone seeking their permission, is only "recommended."

298.    These violations were also the result of those Defendants' failure to supervise and train SDPBC police to seek parental consent before initiating a Baker Act examination. Despite being aware that hundreds of children were being seized for involuntary examination under the Baker Act and that many of those Baker Acts could be prevented by contacting children's parents, Defendants failed to train their officers to do so.

299.    These violations interfered with Plaintiff Parents' ability to make the best medical decisions for their children, harming the interests of both parents and children in ensuring that children's medical needs are met adequately. Without adequate relief Plaintiffs are at significant risk of suffering similar harms in the future.

300.    Due to Defendants' ongoing violations of the Fourteenth Amendment, injunctive and declaratory relief are appropriate remedies.

## **COUNT 6**

**All Plaintiffs against All Defendants: § 1983 Claim for Violation of Due Process Right to be Free of Unreasonable Seizures under the Fourth and Fourteenth Amendments**

301.    Plaintiffs re-allege paragraphs 12-49 and 59-255.

302.    The Fourth Amendment prohibits unreasonable seizures in the context of involuntary psychiatric examinations.

303.    The legality of a seizure by a school employee depends on the reasonableness, under all the circumstances, of the seizure. The reasonableness of the seizure is determined using a two-step inquiry: "first, one must consider 'whether the . . . action was justified at its inception.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (internal citations omitted).

304.    "[S]econd, one must determine whether the [seizure] as actually conducted 'was reasonably related in scope to the circumstances which justified interference in the first place.'" *Id.* The measures employed during the seizure must be "reasonably related to the objectives of

the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

305.    School employees, including SDPBC police officers, regularly seize children for involuntary examination who plainly do not meet the criteria of the Baker Act. Specifically, school staff, typically police officers, officers seize children by sending them for involuntary examination when they do not have a reasonable belief that the children have a mental illness and/or when they do not have a reasonable belief that the children are at imminent risk of causing serious bodily harm to themselves or others.

306.    Under these circumstances, seizure of a child for involuntary examination is unreasonable and unconstitutional.

307.    SDPBC does not accurately train its staff on the law concerning when and on who the Baker Act may legally be used. It does not conduct any after-the-fact review of its employees use of the Act. And when abuses of the Act are reported, it takes no corrective action.

308.    As a result of Defendants' unreasonable seizure of children, Plaintiffs have suffered and continue to suffer emotional distress, pain, and humiliation. Plaintiff Children continue to experience fear, distrust, and anxiety, as well as other impacts on their education.

309.    Due to Defendants' ongoing violations of the Fourth Amendment, injunctive and declaratory relief are appropriate remedies.

## COUNT 7

**D.P. against the School Board, Superintendent Fennoy, and Officer Margolis: § 1983 Claim for Violation of Due Process Right to be Free of Unreasonable Seizures under the Fourth and Fourteenth Amendments**

310.    Plaintiffs re-allege paragraphs 12-13, 34-41, 44, 52-69, 70-99, and 202-255.

311.    The Fourth Amendment prohibits unreasonable seizures in the context of involuntary psychiatric examinations.

312.    The legality of a seizure by a school employee depends on the reasonableness, under all the circumstances, of the seizure. The reasonableness of the seizure is determined using

a two-step inquiry: "first, one must consider 'whether the . . . action was justified at its inception.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (internal citations omitted).

313.    "[S]econd, one must determine whether the [seizure] as actually conducted 'was reasonably related in scope to the circumstances which justified interference in the first place.'" *Id.* The measures employed during the seizure must be "reasonably related to the objectives of the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

314.    Officer Margolis' seizure of D.P. was not justified at its inception because Officer Margolis did not reasonably believe that D.P.'s behavior posed an imminent risk of serious bodily harm to himself or others, which is required for a legal seizure under the Baker Act. Specifically, nine-year-old D.P.'s behavior allegedly consisted of throwing objects, including a stuffed animal, and pushing furniture.

315.    Even if Officer Margolis' seizure of D.P. was justified at its inception, the seizure as actually conducted was excessively intrusive in light of D.P.'s age and his behavior. Officer Margolis handcuffed D.P. for approximately at least 90 minutes while he was awaiting transport and transported to a receiving facility in a police car.

316.    Officer Margolis violated the Fourth Amendment prohibition on unreasonable seizures and is liable for damages under § 1983.

317.    The School Board and Superintendent Fennoy are liable for Officer Margolis' actions because they knew that Officer Margolis was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and they made a deliberate choice not to provide additional training or supervision to Officer Margolis.

318.    Specifically, Officer Margolis was not trained by SDPBC in the kind of behavior that could reasonably lead to an inference that a child is a danger to himself or others or that the Baker Act could not be legally used for behavior that is a manifestation of a child's ASD. His

Case 9:21-cv-81099-AMC   Document 1   Entered on FLSD Docket 06/22/2021   Page 55 of 78

failure to obtain and follow the recommendations of mental health professionals about whether D.P. should be examined was consistent with District Policies adopted or ratified by Defendants School Board and Fennoy. Had Defendants School Board and Fennoy supervised school staff's use of the Baker Act appropriately, they could have identified overuse of the Baker Act, including on children with ASD, and taken steps that would have prevented D.P.'s involuntary examination under the Baker Act.

319.     As a result of Defendants' unreasonable seizure of him, D.P. has suffered and continues to suffer emotional distress, pain, and humiliation. D.P. underwent more than two years of therapy and continues to require additional counseling. D.P. also was more aggressive and became upset more easily after the event. D.P. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

320.     Due to Defendants' violation of D.P.'s right to be free from unreasonable seizures, D.P. is entitled to damages.

## COUNT 8

**E.S. against the School Board, Superintendent Fennoy, and Officer Cuellar: § 1983 Claim for Violation of Due Process Right to be Free of Unreasonable Seizures under the Fourth and Fourteenth Amendments**

321.     Plaintiffs re-allege paragraphs 14-15, 34-41, 45, 52-69, 100-126, and 202-255.

322.     The Fourth Amendment prohibits unreasonable seizures in the context of involuntary psychiatric examinations.

323.     The legality of a seizure by a school employee depends on the reasonableness, under all the circumstances, of the seizure. The reasonableness of the seizure is determined using a two-step inquiry: "first, one must consider 'whether the . . . action was justified at its inception.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (internal citations omitted).

324.     "[S]econd, one must determine whether the [seizure] as actually conducted 'was reasonably related in scope to the circumstances which justified interference in the first place.'" *Id.* The measures employed during the seizure must be "reasonably related to the objectives of

COMPLAINT

the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

325.    Officer Cuellar knew that E.S.'s behavior was due to ASD, a developmental disability, and not due to mental illness as defined in the Baker Act. He did not reasonably believe that E.S.'s behavior was due to mental illness. As a result, seizure under the authority of the Baker Act was not legal and Officer Cuellar's seizure of E.S. was not justified at its inception.

326.    In addition, because Officer Cuellar did not reasonably believe that E.S.'s behavior posed an imminent risk of serious bodily harm to himself or others, seizure under the authority of the Baker Act was not legal and Officer Cuellar's seizure of E.S. was not justified at its inception.

327.    Even if Office Cuellar's seizure of E.S. was justified at its inception, the seizure as actually conducted was not reasonably related to the objectives of the seizure and was excessively intrusive in light of E.S.'s age and his behavior. Nine-year-old E.S.'s behavior consisted of swinging his arms in the air. In response, in the process of seizing E.S., Officer Cuellar slammed E.S., a nine-year-old boy, on a couch and on the floor, scuffing his knees, and the handcuffed him. E.S. remained in the handcuffs for approximately at least 30 minutes as he was transported to a receiving facility.

328.    Officer Cuellar violated the Fourth Amendment prohibition on unreasonable seizures and is liable for damages under § 1983.

329.    Officer Cuellar exhibited wanton disregard and malicious intent in his seizure of E.S.

330.    The School Board and Superintendent Fennoy are liable for Officer Cuellar's actions because they knew that Officer Cuellar was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further

violations, and they made a deliberate choice not to provide additional training or supervision to Officer Cuellar.

331.    Specifically, Officer Cuellar was not trained by SDPBC in the kind of behavior that could reasonably lead to an inference that a child is a danger to himself or others or that the Baker Act could not be legally used for behavior that is a manifestation of a child's ASD. His failure to obtain and follow the recommendations of mental health professionals about whether E.S. should be examined was consistent with District Policies adopted or ratified by Defendants School Board and Fennoy. Had Defendants School Board and Fennoy supervised school staff's use of the Baker Act appropriately, they could have identified overuse of the Baker Act, including on children with ASD, and taken steps that would have prevented E.S.'s involuntary examination under the Baker Act.

332.    As a result of Defendants' unreasonable seizure of him, E.S. has suffered and continues to suffer emotional distress, pain, and humiliation. After the incident, E.S. was deeply afraid of men in uniform, including Officer Cuellar, who was still a regular presence at his school. E.S. eventually had to leave public school entirely to feel safe. E.S. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

333.    Due to Defendants' violation of E.S.'s right to be free from unreasonable seizures, E.S. is entitled to damages.

## COUNT 9

**L.A. against the School Board, Superintendent Fennoy, and Officer Blocher: § 1983 Claim for Violation of Due Process Right to be Free of Unreasonable Seizures under the Fourth and Fourteenth Amendments**

334.    Plaintiffs re-allege paragraphs 18-19, 34-41, 46, 52-69, 127-153, and 202-255.

335.    The Fourth Amendment prohibits unreasonable seizures in the context of involuntary psychiatric examinations.

336.    The legality of a seizure by a school employee depends on the reasonableness, under all the circumstances, of the seizure. The reasonableness of the seizure is determined using

a two-step inquiry: "first, one must consider 'whether the . . . action was justified at its inception.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (internal citations omitted).

337.    "[S]econd, one must determine whether the [seizure] as actually conducted 'was reasonably related in scope to the circumstances which justified interference in the first place.'" *Id.* The measures employed during the seizure must be "reasonably related to the objectives of the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

338.    Officer Blocher's seizure of L.A. was not justified at its inception because Officer Blocher did not reasonably believe that L.A.'s behavior posed an imminent risk of serious bodily harm to herself or others, which is required for a legal seizure under the Baker Act. Specifically, eight-year-old L.A.'s behavior consisted of allegedly stating that she wanted to kill herself and did not want to go home with her mom, and eating paper.

339.    Even if Officer Blocher's seizure of L.A. was justified at its inception, the seizure as actually conducted was not reasonably related to the objectives of the seizure and was excessively intrusive in light of L.A.'s age and behavior. Officer Blocher handcuffed L.A. for a total of approximately at least five minutes while she was transported to a police car for transport to a receiving facility.

340.    Officer Blocher violated the Fourth Amendment prohibition on unreasonable seizures and is liable for damages under § 1983.

341.    The School Board and Superintendent Fennoy are liable for Officer Blocher's actions because they knew that Officer Blocher was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and they made a deliberate choice not to provide additional training or supervision to Officer Blocher.

342.    Specifically, Officer Blocher was not trained by SDPBC in the kind of behavior that could reasonably lead to an inference that a child is a danger to herself or others or that the

Baker Act could not be legally used for behavior that is a manifestation of a child's disability. His use of the Baker Act on L.A. against the recommendations of the mobile response team was consistent with District Policies adopted or ratified by Defendants School Board and Fennoy. Had Defendants School Board and Fennoy supervised school staff's use of the Baker Act appropriately, they could have identified overuse of the Baker Act and taken steps that would have prevented L.A.'s involuntary examination under the Baker Act.

343.    As a result of Defendants' unreasonable seizure of her, L.A. has suffered and continues to suffer emotional distress, pain, and humiliation. Though she did not have a desire to harm herself before she was involuntarily examined, L.A. did after it as a direct result of that experience. After she was released, she was taunted by her classmates and suffered from nightmares for years. L.A. continues to experience fear, distrust, and anxiety, as well as other impacts on her education.

344.    Due to Defendants' violation of L.A.'s right to be free from unreasonable seizures, L.A. is entitled to damages.

## COUNT 10

**W.B. against the School Board, Superintendent Fennoy, and Officer Brown: § 1983 Claim for Violation of Due Process Right to be Free of Unreasonable Seizures under the Fourth and Fourteenth Amendments**

345.    Plaintiffs re-allege paragraphs 16-17, 34-41, 47, 52-69, 154-175, and 202-255.

346.    The Fourth Amendment prohibits unreasonable seizures in the context of involuntary psychiatric examinations.

347.    The legality of a seizure by a school employee depends on the reasonableness, under all the circumstances, of the seizure. The reasonableness of the seizure is determined using a two-step inquiry: "first, one must consider 'whether the . . . action was justified at its inception.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (internal citations omitted).

348.    "[S]econd, one must determine whether the [seizure] as actually conducted 'was reasonably related in scope to the circumstances which justified interference in the first place.'" *Id.* The measures employed during the seizure must be "reasonably related to the objectives of

the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

349.    Officer Brown's seizure of W.B. was not justified at its inception because Officer Brown did not reasonably believe that W.B.'s behavior posed an imminent risk of serious bodily harm to herself or others, which is required for a legal seizure under the Baker Act. Specifically, ten-year-old W.B.'s behavior consisted of throwing chairs and pushing staff.

350.    Even if Officer Brown's seizure of W.B. was justified at its inception, the seizure as actually conducted was not reasonably related to the objectives of the seizure and was excessively intrusive in light of W.B.'s age and behavior. Officer Brown handcuffed W.B. for approximately at least 40 minutes, both at the school and while he was transported to a receiving facility.

351.    Officer Brown violated the Fourth Amendment prohibition on unreasonable seizures and is liable for damages under § 1983.

352.    The School Board and Superintendent Fennoy are liable for Officer Brown's actions because they knew that Officer Brown was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and they made a deliberate choice not to provide additional training or supervision to Officer Brown.

353.    Specifically, Officer Brown was not trained by SDPBC in the kind of behavior that could reasonably lead to an inference that a child is a danger to himself or others and he acted according to District Policies adopted or ratified by Defendants School Board and Fennoy. His failure to obtain and follow the recommendations of mental health professionals about whether W.B. should be examined was consistent with District Policies adopted or ratified by Defendants School Board and Fennoy. Had Defendants School Board and Fennoy supervised school staff's use of the Baker Act appropriately, they could have identified overuse of the Baker Act and taken steps that would have prevented W.B.'s involuntary examination.

354.     As a result of Defendants' unreasonable seizure of him, W.B. has suffered and continues to suffer emotional distress, pain, and humiliation. The stress of being involuntarily detained and held away from his family caused him emotional distress that lasted long after he was released. W.B. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

355.     Due to Defendants' violation of W.B.'s right to be free from unreasonable seizures, W.B. is entitled to damages.

## COUNT 11

**M.S. against the School Board, Superintendent Fennoy, Officer Silva and Officer Doe: § 1983 Claim for Violation of Due Process Right to be Free of Unreasonable Seizures under the Fourth and Fourteenth Amendments**

356.     Plaintiffs re-allege paragraphs 20-21, 34-41, 48-49, 52-69, and 176-255.

357.     The Fourth Amendment prohibits unreasonable seizures in the context of involuntary psychiatric examinations.

358.     The legality of a seizure by a school employee depends on the reasonableness, under all the circumstances, of the seizure. The reasonableness of the seizure is determined using a two-step inquiry: "first, one must consider 'whether the . . . action was justified at its inception.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (internal citations omitted).

359.     "[S]econd, one must determine whether the [seizure] as actually conducted 'was reasonably related in scope to the circumstances which justified interference in the first place.'" *Id.* The measures employed during the seizure must be "reasonably related to the objectives of the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

360.     Officer Silva and Officer Doe's seizure of M.S. was not justified at its inception because Officer Silva and Officer Doe did not reasonably believe that M.S.'s behavior posed an imminent risk of serious bodily harm to herself or others, which is required for a legal seizure under the Baker Act. Specifically, eleven-year-old M.S.'s behavior consisted of allegedly

scratching her wrist with a dull clay-modeling knife and with the corner of a school identification card.

361.    Even if Officer Silva and Office Doe's seizure of M.S. was justified at its inception, the seizure as actually conducted was not reasonably related to the objectives of the seizure and was excessively intrusive in light of M.S.'s age and behavior. Officer Silva and Officer Doe handcuffed M.S. for a total of approximately at least ten minutes while she was transported to a receiving facility.

362.    Officer Silva and Officer Doe violated the Fourth Amendment prohibition on unreasonable seizures and are liable for damages under § 1983.

363.    The School Board and Superintendent Fennoy are liable for Officer Silver and Officer Doe's actions because they knew that Officer Silva and Officer Doe were inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and they made a deliberate choice not to provide additional training or supervision to Officer Silva and Officer Doe.

364.    Specifically, Officer Silva and Officer Doe were not trained by SDPBC in the kind of behavior that could reasonably lead to an inference that a child is a danger to herself or others and they acted according to District Policies adopted or ratified by Defendants School Board and Fennoy. Their failure to obtain and follow the recommendations of mental health professionals about whether M.S. should be examined was consistent with District Policies adopted or ratified by Defendants School Board and Fennoy. Had Defendants School Board and Fennoy supervised school staff's use of the Baker Act appropriately, they could have identified overuse of the Baker Act and taken steps that would have prevented M.S.'s involuntary examination under the Baker Act.

365.    As a result of Defendants' unreasonable seizure of her, M.S. has suffered and continues to suffer emotional distress, pain, and humiliation. M.S. suffered trauma during her involuntary examination that exacerbated her pre-existing traumatic experiences. Since the

incident she has become withdrawn and is more easily upset. Her grades have dropped precipitously. She has told her family that she feels guilt and shame from being treated like a criminal in front of her classmates. M.S. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

366.    Due to Defendants' violation of M.S.'s right to be free from unreasonable seizures, M.S. is entitled to damages.

## COUNT 12

**All Plaintiffs against All Defendants: § 1983 Claim for Excessive Force under the Fourth and Fourteenth Amendments**

367.    Plaintiffs re-allege paragraphs 12-49, 58, 60-61, 70-224, 234-240, 255.

368.    The Fourth Amendment prohibits the use of excessive force by police officers in conducting arrests and other seizures.

369.    To determine where force is excessive, courts examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.

370.    As a matter of policy, SDPBC police officers employ handcuffs and/or hobble restraints on every child transported to a receiving facility for involuntary examination under the Baker Act.

371.    Because the policy mandates handcuffing even when there is no need for any application of force, it violates the Fourth Amendment.

372.    The unnecessary and excessive handcuffing of vulnerable children is traumatic, humiliating, and has caused and continues to cause long-lasting harm to Plaintiff Children subjected to it.

373.    Due to Defendants' ongoing violations of the Fourth Amendment, injunctive relief and declaratory relief are appropriate remedies.

## COUNT 13

**D.P. against the School Board, Superintendent Fennoy and Officer Margolis: § 1983 Claim for Excessive Force under the Fourth and Fourteenth Amendments**

374.    Plaintiffs re-allege paragraphs 12-13, 34-41, 44, 58, 60-61, 70-99, 202-203, 224, 234-240, and 255.

375.    The Fourth Amendment prohibits the use of excessive force by police officers in conducting arrests and other seizures.

376.    To determine where force is excessive, courts examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.

377.    In the process of seizing D.P., Officer Margolis handcuffed him. The handcuffs remained on nine-year-old D.P. prior to and during transportation to the receiving facility for a total of approximately at least 90 minutes.

378.    The use of force was clearly excessive and unreasonable because D.P. did not pose an immediate safety threat to Officer Margolis, himself, or others and D.P. did not try or threaten to escape Officer Margolis' custody, either at the school or during transport.

379.    D.P. was psychologically injured by the use of handcuffs.

380.    Office Margolis, while acting under color of law, intentionally committed acts which violated D.P.'s right not to be subjected to excessive or unreasonable force, and this conduct caused injuries to D.P.

381.    Accordingly, Officer Margolis subjected D.P. to excessive force and is liable under § 1983.

382.    Defendants School Board and Fennoy are liable for Officer Margolis' use of excessive force because they knew that Officer Margolis was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were

necessary to prevent further violations, and they made a deliberate choice not to provide additional training or supervision to Officer Margolis.

383.     Defendants School Board and Fennoy are also liable because their official policy or custom of requiring handcuffing during transportation to receiving facilities directly caused D.P.'s injuries. As a result of Defendants' use of excessive force against him, D.P. has suffered and continues to suffer emotional distress, pain, and humiliation. D.P. underwent more than two years of therapy and continues to require additional counseling. D.P. also was more aggressive and became upset more easily after the event. D.P. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

384.     Due to Defendants' violation of D.P.'s right to be free from excessive force, D.P. is entitled to damages.

## **COUNT 14**

### **E.S. against the School Board, Superintendent Fennoy and Officer Cuellar: § 1983 Claim for Excessive Force under the Fourth and Fourteenth Amendments**

385.     Plaintiffs re-allege paragraphs 13-14, 34-41, 45, 58, 60-61, 100-126, 202-203, 224, 234-240, and 255.

386.     The Fourth Amendment prohibits the use of excessive force by police officers in conducting arrests and other seizures.

387.     To determine where force is excessive, courts examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.

388.     In the process of seizing E.S., Officer Cuellar slammed E.S., a nine-year-old boy, on a couch and on the floor, scuffing his knees, and then handcuffed him.

389.     E.S. did not pose an immediate safety threat to Officer Cuellar, himself, or others.

390.     The force used against E.S. was clearly excessive and unreasonable given his age, size, and behavior; the amount of force used was greatly disproportionate to the circumstances.

391.    E.S. was physically injured due to the scuffing of his knees and psychologically injured by the use of excessive force.

392.    Accordingly, Officer Cuellar subjected E.S. to excessive force and is liable under § 1983.

393.    In the process of seizing E.S., Officer Cuellar handcuffed him. The handcuffs remained on E.S. prior to and during transportation to the receiving facility for approximately at least 30 minutes.

394.    The use of force was clearly excessive and unreasonable because E.S. did not pose an immediate safety threat to Officer Cuellar, himself, or others and E.S. did not try or threaten to escape Officer Cuellar's custody, either at the school or during transport.

395.    Office Cuellar, while acting under color of law, intentionally committed acts which violated E.S.'s right not to be subjected to excessive or unreasonable force, and this conduct caused injuries to E.S.

396.    Accordingly, Officer Cuellar subjected E.S. to excessive force and is liable under § 1983.

397.    Defendants School Board and Fennoy are liable for Officer Cuellar's use of excessive force because they knew that Officer Cuellar was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and they made a deliberate choice not to provide additional training or supervision to Officer Cuellar.

398.    Defendants School Board and Fennoy are also liable because their official policy or custom of requiring handcuffing during transportation to receiving facilities directly caused E.S.'s injuries.

399.    As a result of Defendants' use of excessive force against him, E.S. has suffered and continues to suffer emotional distress, pain, and humiliation. In addition to his physical injuries, after the incident, E.S. was deeply afraid of men in uniform, including Officer Cuellar,

who was still a regular presence at his school. E.S. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

400.    Due to Defendants' violation of E.S.'s right to be free from excessive force, E.S. is entitled to damages.

## COUNT 15

**L.A. against the School Board, Superintendent Fennoy and Officer Blocher: § 1983 Claim for Excessive Force under the Fourth and Fourteenth Amendments**

401.    Plaintiffs re-allege paragraphs 18-19, 34-41, 46, 58, 60-61, 127-153, 202-203, 224, 234-240, and 255.

402.    The Fourth Amendment prohibits the use of excessive force by police officers in conducting arrests and other seizures.

403.    To determine where force is excessive, courts examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.

404.    In the process of seizing eight-year-old L.A., Officer Blocher handcuffed her. The handcuffs remained on eight-year-old L.A. until he placed her in his police car, approximately at least five minutes.

405.    The use of force was excessive and unreasonable because L.A. did not pose an immediate safety threat to Officer Blocher, herself, or others and L.A. did not try or threaten to escape Officer Blocher's custody, either at the school or during transport.

406.    L.A. was psychologically injured by the use of handcuffs.

407.    Office Blocher, while acting under color of law, intentionally committed acts which violated L.A.'s right not to be subjected to excessive or unreasonable force, and this conduct caused injuries to L.A.

408.    Accordingly, Officer Blocher subjected L.A. to excessive force and is liable under § 1983.

409.     Defendants School Board and Fennoy are liable for Officer Blocher's use of excessive force because they knew that Officer Blocher was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and they made a deliberate choice not to provide additional training or supervision to Officer Blocher.

410.     Defendants School Board and Fennoy are also liable because their official policy or custom of requiring handcuffing during transportation to receiving facilities directly caused L.A.'s injuries. As a result of Defendants' use of excessive force against her, L.A. has suffered and continues to suffer emotional distress, pain, and humiliation. Though she did not have a desire to harm herself before she was involuntarily examined, L.A. did after it as a direct result of that experience. L.A. continues to experience fear, distrust, and anxiety, as well as other impacts on her education.

411.     Due to Defendants' violation of L.A.'s right to be free from excessive force, L.A. is entitled to damages.

## <u>COUNT 16</u>

**W.B. against the School Board, Superintendent Fennoy and Officer Brown: § 1983 Claim for Excessive Force under the Fourth and Fourteenth Amendments**

412.     Plaintiffs re-allege paragraphs 16-17, 34-41, 47, 58, 60-61, 154-175, 202-203, 224, 234-240, and 255.

413.     The Fourth Amendment prohibits the use of excessive force by police officers in conducting arrests and other seizures.

414.     To determine where force is excessive, courts examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.

415.     In the process of seizing W.B., Officer Brown handcuffed him at his school. The handcuffs remained on ten-year-old W.B. during transportation to the receiving facility, a more than 50-mile journey, for a total of approximately at least 40 minutes.

416.     The use of force was excessive and unreasonable because W.B. did not pose an immediate safety threat to Officer Brown, himself, or others and W.B. did not try or threaten to escape Officer Brown's custody, either at the school or during transport.

417.     W.B. was psychologically injured by the use of handcuffs.

418.     Office Brown, while acting under color of law, intentionally committed acts which violated W.B.'s right not to be subjected to excessive or unreasonable force, and this conduct caused injuries to W.B.

419.     Accordingly, Officer Brown subjected W.B. to excessive force and is liable under § 1983.

420.     Defendants School Board and Fennoy are liable for Officer Brown's use of excessive force because they knew that Officer Brown was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and they made a deliberate choice not to provide additional training or supervision to Officer Brown.

421.     Defendants School Board and Fennoy are also liable because their official policy or custom of requiring handcuffing during transportation to receiving facilities directly caused W.B.'s injuries.

422.     As a result of Defendants' use of excessive force against him, W.B. has suffered and continues to suffer emotional distress, pain, and humiliation. The stress of being involuntarily detained and held away from his family caused him emotional distress that lasted long after he was released. W.B. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

423.     Due to Defendants' violation of W.B.'s right to be free from excessive force, W.B. is entitled to damages.

### COUNT 17

**M.S. against the School Board, Superintendent Fennoy, Officer Silva, and Officer Doe: § 1983 Claim for Excessive Force under the Fourth and Fourteenth Amendments**

424.     Plaintiffs re-allege paragraphs 20-21, 34-41, 48-49, 58, 60-61, 175-203, 224, 234-240, and 255.

425.     The Fourth Amendment prohibits the use of excessive force by police officers in conducting arrests and other seizures.

426.     To determine where force is excessive, courts examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.

427.     In the process of seizing M.S., Officer Silva handcuffed her. Office Doe kept the handcuffs on eleven-year-old M.S. while he transported her to the receiving facility, for a total of approximately at least ten minutes.

428.     The use of force was excessive and unreasonable because M.S. did not pose an immediate safety threat to Officer Silva or Officer Doe, herself, or others and M.S. did not try or threaten to escape Officer Silva or Officer Doe's custody, either at the school or during transport.

429.     M.S. was psychologically injured by the use of handcuffs.

430.     Office Silva and Officer Doe, while acting under color of law, intentionally committed acts which violated M.S.'s right not to be subjected to excessive or unreasonable force, and this conduct caused injuries to M.S.

431.     Accordingly, Officer Silva and Officer Doe subjected M.S. to excessive force and are liable under § 1983.

432.     Defendants School Board and Fennoy are liable for Officer Silva and Officer Doe's use of excessive force because they knew that Officer Silva and Officer Doe were inadequately trained and supervised and knew that, based on at least one earlier materially

similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and they made a deliberate choice not to provide additional training or supervision to Officer Silva and Officer Doe.

433.     Defendants School Board and Fennoy are also liable because their official policy or custom of requiring handcuffing during transportation to receiving facilities directly caused M.S.'s injuries.

434.     As a result of Defendants' use of excessive force against her, M.S. has suffered and continues to suffer emotional distress, pain, and humiliation. Since the incident she has become withdrawn and is more easily upset. Her grades have dropped precipitously. She has told her family that she feels guilt and shame from being treated like a criminal in front of her classmates. M.S. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

435.     Due to Defendants' violation of M.S.'s right to be free from excessive force, M.S. is entitled to damages.

## PRAYER FOR RELIEF

436.     **WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor and grant the following relief:

a.     Adjudge and declare that Defendants' actions, policies, practices, and procedures regarding use of the Baker Act violate the rights of Plaintiffs as set forth above in this complaint;

b.     Award actual damages to the individual Plaintiffs for harms suffered due to Defendants' illegal use of the Baker Act against Plaintiff Children;

c.     Award punitive damages against Officer Cuellar and to the individual Plaintiff E.S. for wanton and malicious violation of his constitutional rights;

d.     Enjoin Defendants, their successors in office, agents, employees and

assigns, and all persons acting in concert to:

i.      Immediately discontinue all actions, policies, practices, and procedures that do not comply with the laws cited above in this complaint;

ii.     Create and broadly disseminate to District teachers, administrators, other district and school-site staff (including District police department staff), and families a School Board-approved written policy statement that (a) explains in detail the circumstances in which the Baker Act may and may not be legally used against students, (b) describes the ways in which inappropriate Baker Act use harms students, (c) directs that no student may be referred for involuntary examination under the Baker Act unless: parental consent for involuntary examination has been obtained or the child has been taken into custody pursuant to Fla. Stat. § 39.401; the student's existing mental health provider and/or Individualized Education Program ("IEP") team, if applicable, has been consulted; and a mobile crisis team has been consulted and agrees that no less restrictive alternative can sufficiently mitigate the risk to self or others and that the student meets the statutory criteria for involuntary examination under the Baker Act; and (d) specifies that if an involuntary examination of a student is initiated under the Baker Act, the student shall not be handcuffed, placed in hobble restraints, or otherwise restrained absent a true and immediate physical threat to self or to the person(s) transporting, or transported in a police vehicle;

iii.    Maintain written documentation of all referrals for involuntary examination under the Baker Act;

iv.    Create a committee (including at least one member from District ESE, School Psychology Guidance, and one external expert), to review the file of, and consult with school staff regarding, any student who has been subjected to an involuntary examination under the Baker Act more than once during the prior or current school year, to identify any services and supports that should be provided to the child, and to prevent against repetitive, unnecessary, traumatic referrals for involuntary examination;

v.    Make the following deidentified, aggregated data available to families and to the public on the District website and school-site websites: number of involuntary examinations under the Baker Act initiated by school staff; number of suspensions; number of expulsions; number of student arrests while at school;

vi.    For any student referred by Defendants for involuntary examination under the Baker Act, within five days of the student's return to school, convene a School Based Team ("SBT") or Child Study Team ("CST") meeting, whichever is appropriate, that includes a District ESE Behavior Resource Teacher, Behavior Health Professional, School Psychologist, and parents/guardians, and, for students with a dependency team, the dependency team and the Multi-Agency Network for students with Emotional/Behavioral Disabilities, to review the situation and ensure a supported, successful return to school;

vii.    Implement improved practices as recommended by experts and engage in ongoing monitoring and evaluation by experts, in the following areas:

(1)    District-wide timely access to mental and behavioral health

services, supports, programs, and activities for all students in the most integrated setting appropriate, including positive behavioral supports, trauma-informed de-escalation practices, trauma-informed crisis management systems, universal mental health prevention and promotion interventions and programs, multi-tiered services and supports, targeted interventions, and social-emotional learning programs;

(2)     District-wide availability of effective alternatives to the use of involuntary examination under the Baker Act, including ensuring that school arrests are not substituted for involuntary examination under the Baker Act;

(3)     Use of and procedures for involuntary examination under the Baker Act for students, particularly students with disabilities and students of color, including in relation to disproportionate use of the Baker Act and the elimination of traumatic aspects of transport for involuntary examination;

(4)     Reasonable accommodations and/or modifications to policies and procedures to avoid discrimination against students with disabilities and students of color and to avoid unnecessary traumatization of students;

(5)     Policies, procedures, and training to ensure parents/guardian rights to make medical decisions about mental health treatment for their children are protected, and that parents/guardians are provided with a meaningful

opportunity to support de-escalation prior to referral for involuntary examination under the Baker Act;

(6)    Training, accountability, and ongoing development for the District's personnel (including school police) regarding: the statutory criteria for use of the Baker Act; developmentally appropriate, trauma-informed crisis response practices; trauma-informed classroom practices; how to appropriately identify and distinguish behaviors that may indicate a serious, imminent risk of harm; understanding of the impact of trauma (including family separation and interaction with police) on child and adolescent development; and limiting the use of the Baker Act, including through provision of appropriate school-based and community-based interventions for students at risk of involuntary examination under the Baker Act;

(7)    District's collection and regular review of data regarding use of the Baker Act; and

(8)    Effective use of mobile crisis response teams in responding to and assessing students' mental health needs and making connections to developmentally appropriate treatment in the least restrictive setting.

e.    Order any other actions appropriate to prevent further violations of Plaintiffs' constitutional and statutory rights;

f.    Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction;

g.    Award Plaintiffs reasonable costs and expenses, including attorney's fees,



as authorized by law; and

h.      Grant such other and further relief as the Court deems just and proper.

Dated: June 22, 2021                    Respectfully submitted,

                                        */s/ Bacardi Jackson*

BACARDI JACKSON (Florida Bar No. 47728)
EVIAN WHITE DELEON (Florida Bar No. 84790)
SAM BOYD (Florida Bar No. 1012141)
Southern Poverty Law Center
P.O. Box 12463
Miami, FL 33101
Tel: 786-347-2056
Fax: 786-237-2949
bacardi.jackson@splcenter.org
evian.whitedeleon@splcenter.org
sam.boyd@splcenter.org

ANN MARIE CINTRON-SIEGEL (Florida Bar No. 166431)
MOLLY J. PARIS (Florida Bar No. 90486)
Disability Rights Florida, Inc.
1930 Harrison St. Ste. 104
Hollywood, FL 33020
Tel: 800-342-0823
Fax: 850-617-6647
anns@disabilityrightsflorida.org
mollyp@disabilityrightsflorida.org

SHAHAR PASCH (Florida Bar No. 580971)
Pasch Law Group
1806 Old Okeechobee Road, Suite B
West Palm Beach, FL 33409
Tel: 561-599-7400
Fax: 561-258-8243
shahar@paschlaw.com

MELISSA DUNCAN (Florida Bar No. 796921)
Legal Aid Society of Palm Beach County, Inc.
423 Fern St., Ste. 200
West Palm Beach, FL 33401-5839
Tel: 561-655-8944
Fax: 561-655-5269
mduncan@legalaidpbc.org

HANNAH BENTON EIDSATH (pro hac vice forthcoming)
National Center for Youth Law

712 H Street NE, DPT #32020
Washington, D.C. 20002
Tel: 202-868-4781
Fax: (510) 380-7603
hbenton@youthlaw.org

JEAN STROUT (pro hac vice forthcoming)
RACHEL VELCOFF HULTS (pro hac vice forthcoming)
National Center for Youth Law
1212 Broadway, Ste. 600
Oakland, CA 94612
Tel: 510-835-8098
Fax: (510) 835-8099
jstrout@youthlaw.org
rvelcoff@youthlaw.org

JOSHUA C. TOLL (pro hac vice forthcoming)
King & Spalding LLP
1700 Pennsylvania Ave. NW, Ste. 200
Washington, D.C. 20006
Tel: 202-737-8616
Fax: 202-626-3737
jtoll@kslaw.com

COMPLAINT