IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| D.P. by and through his next friend P.S.; P.S. in her individual capacity; E.S., by and through his next friend J.S.; J.S. in her individual capacity; W.B. by and through his next friend L.H.; L.H. in her individual capacity; M.S. by and through her next friends S.S. and R.S.; S.S. and R.S. in their individual capacities; and DISABILITY RIGHTS FLORIDA, <br><br> Plaintiffs, <br><br><br> vs. <br><br> SCHOOL BOARD OF PALM BEACH COUNTY, <br><br> Defendant. | Civil Case No. 9:21cv81099 <br><br><br> **SECOND AMENDED COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Complaint Filed: June 22, 2021 <br><br> Judge: Hon. Aileen Cannon |

## INTRODUCTION

1.      This case is about a school district that believes it has the right to overrule parents and force their children to get psychiatric treatment, even when that treatment is unnecessary and results in trauma, humiliation, and the violation of the constitutional rights of children and their parents. Plaintiffs D.P., E.S., W.B., and M.S. are just a few of the hundreds

of students that police working for the School District of Palm Beach County ("SDPBC") removed from their classrooms, handcuffed, and drove away to locked facilities in the back of police cars in the 2018 through 2021 school years. The four child Plaintiffs are joined in this lawsuit by their guardians, who wanted to but were denied the right to decide whether and how their children received psychiatric treatment, and by Disability Rights Florida, which represents the interests of children with disabilities in SDPBC. All Plaintiffs brought this suit to prevent the same thing from happening to other children in SDPBC in the future.

2.      Although D.P., E.S., W.B., M.S., and hundreds of other children like them were treated like criminals, they were not charged with a crime. Instead, school police decided these children, who were as young as five years old, were dangerous and took them to a psychiatric facility for involuntary psychiatric examination. Though police officers working for SDPBC had limited or no mental health training, they subjected these children to involuntary psychiatric examination, pursuant to the Florida Mental Health Act, Fla. Stat. §§ 394.451-.47892, known as the Baker Act. This decision was and is often made without parents' input, consent, or prior knowledge, and even over their strenuous objections.

3.      The overwhelming majority of these children did not need or benefit from involuntary examination and were deeply traumatized by the experience. Once sent for an examination, children wait hours or days in a psychiatric facility, also known as a "receiving facility," without their parents, for an examination by a clinician. The Baker Act permits them to be held for up to 12 hours, including overnight, before this examination even begins. The receiving facility has up to 72 hours to complete this examination, after which the facility must either release the child or seek a court hearing for longer-term detention.

4.      Under the Baker Act, courts, medical professionals, and law enforcement officers may initiate an involuntary psychiatric examination of a person in specific circumstances, including when there is reason to believe that (a) the person has a mental illness and (b) because of that mental illness, they pose an imminent danger to themselves or

others. The practice is so common that it has become a verb: a person detained for involuntary examination is often referred to as having been "Baker Acted."

5.      SDPBC used the Baker Act to initiate at least 1,216 involuntary examinations of its students in the 2016-2020 school years, including 252 times on elementary school students. SDPBC seized Black children for involuntary examination at twice the rate of white children, a disparity that worsens for young children: 40 of 59 children under age eight examined under the Baker Act in that period were Black.

6.      SDPBC has taken children for involuntary examination over their parents' pleas to be allowed to bring their children home and parents' assurances that they will protect their children from harm. It has seized children who did not meet the statutory criteria for involuntary psychiatric examination, such as children manifesting behaviors of developmental disabilities that are specifically excluded from the statute's definition of mental illness. It has subjected children to the Baker Act without consulting its own mental health professionals, and after overruling the judgments of those professionals. It has even initiated examinations on children for normal, childish misbehavior; for example, it initiated an examination on a nine-year-old child for being a supposed "threat" to others because he allegedly wanted to "stab" another child with a plastic fork. This overuse and misuse of the Baker Act by SDPBC is unjustifiable.

7.      Despite being aware of its inappropriate use of the Baker Act for years, SDPBC did little to eliminate unnecessary Baker Act use or train its personnel or contractors on alternatives. Its Baker Act policies at the time of Plaintiffs' examinations, as well as its meager police training materials, were full of omissions and inaccuracies about the statute's requirements, including that mental illness was not a requirement for Baker Act use and that officers did not need probable cause to believe a child met the Baker Act criteria before initiating an examination. Officers were provided little guidance about when initiating an involuntary examination of a child is appropriate and were trained that handcuffing of even compliant and calm children was required when a child was transported for an involuntary

examination under the Baker Act. They also did nothing to explain to staff that use of the Baker Act in non-emergency situations is far more likely to traumatize children than to help them. These inaccurate and illegal policies were adopted by final policymakers in SDPBC.

8.      SDPBC also failed to take basic affirmative steps that could eliminate unlawful Baker Act use, like reviewing uses of the Baker Act after the fact to determine if they were lawful, tracking and monitoring the data it already possessed about Baker Act use, and intervening when schools or employees used it disproportionately often. It also unlawfully failed to allow parents, who have the best knowledge of and a constitutionally protected right to make decisions regarding their children's mental health, to decide if involuntary psychiatric hospitalization is appropriate. Finally, it failed to use the numerous mental health professionals it employed to make determinations regarding use of involuntary examination, instead entrusting those decisions to police without mental health expertise.

9.      SDPBC's failures continue to this day. District staff, including mental health professionals and police specifically tasked with making Baker Act decisions, do not know the statutory criteria. For example, they are unaware that an involuntary examination can only be initiated for behavior that is due to mental illness, and cannot be initiated for behavior that is due to a developmental disability such as Autism, which the Baker Act specifically states is not a mental illness. District policy, practice, and training still do not provide parents the ability to refuse consent to an involuntary examination for their children, even when there is no true emergency and no reason to suspect parents are not acting in their children's best interests. There are still no after-action meetings where staff involved in a Baker Act decision determine if it was necessary or preventable. SDPBC's Police Department policy still inaccurately states that use of the Baker Act does not require probable cause. Police officers still believe handcuffing is required for involuntary examinations and children are still transported for involuntary examination in handcuffs in marked police cars by uniformed officers, despite SDPBC staff being aware that this is unnecessarily traumatic.

SECOND AMENDED COMPLAINT

10.     Plaintiffs bring this suit to end SDPBC's harmful and illegal use of the Baker Act. They seek damages for harm to the individual Plaintiffs and injunctive relief to prevent future harm to all Plaintiffs and their members and constituents.

## JURISDICTION AND VENUE

11.     This action arises under 42 U.S.C. § 1983, 42 U.S.C. § 12132, the Americans with Disabilities Act, and 29 U.S.C. § 794, § 504 of the Rehabilitation Act. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

12.     This Court has the authority to issue declaratory relief, injunctive relief, and other relief pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §§ 2101–2102.

13.     Venue is proper in this Court because Plaintiffs and Defendant reside in this district and the events giving rise to this action occurred in this district. *See* 28 U.S.C. § 1391(b)-(c).

## THE PARTIES

### I.     PLAINTIFFS

14.     Plaintiff D.P. is a Black student enrolled in the School District of Palm Beach County. He was nine years old at the time of involuntary examination in 2018. He is a student with a disability and qualifies for Exceptional Student Education ("ESE") under the exceptionalities of Developmentally Delayed, Speech Impaired, Language Impaired, Specific Learning Disability, and Autism Spectrum Disorder ("ASD").

15.     Plaintiff P.S.[1] is D.P.'s grandmother and guardian. She brings this suit as next friend to D.P. and on her own behalf.

16.     Plaintiff E.S. is a white student who was formerly enrolled in the School District of Palm Beach County. He was nine years old at the time of his involuntary

---

[1] Plaintiffs use the true initials of the guardians of the four minor child plaintiffs in place of their true names to protect the identities of the minors, with permission of the Court. *See* Order of June 21, 2021, ECF No. 13.

examination in 2019. He is a student with a disability and qualifies for ESE under the exceptionality of Other Health Impaired ("OHI") with known medical diagnoses of Attention Deficit Hyperactivity Disorder, ASD, and Specific Learning Disability with Reading Dyslexia.

17.     Plaintiff J.S. is E.S.'s mother. She brings this suit as next friend to E.S. and on her own behalf.

18.     Plaintiff W.B. is a Black student enrolled in the School District of Palm Beach County. He was ten years old at the time of his involuntary examination in 2021. He is a student with a disability and qualifies for Exceptional Student Education ("ESE") with the exceptionality of Emotional Behavioral Disability.

19.     Plaintiff L.H. is W.B.'s mother. She brings this suit as next friend to W.B. and on her own behalf.

20.     Plaintiff M.S. is a biracial student enrolled in the School District of Palm Beach County. She was eleven years old at the time of her involuntary examination. She is a student with a disability of Post-Traumatic Stress Disorder ("PTSD").

21.     Plaintiff S.S. is M.S.'s mother. Plaintiff R.S. is M.S.'s father. They bring this suit as next friends to M.S.

22.     Plaintiff Disability Rights Florida ("DRF") is an independent, non-profit corporation organized under the laws of the State of Florida and its primary office is in Tallahassee, FL.

23.     DRF is Florida's Protection and Advocacy system, as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 15041 et seq., the Protection and Advocacy Protection for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. § 10801 et seq., and the Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e et seq., with offices in the State of Florida located at: 2473 Care Drive, Suite 200, Tallahassee, FL 32308; 4723 NW 53rd

Ave, Suite B, Gainesville, FL 32653; 1000 North Ashley Drive, Suite 640, Tampa, FL 33602; and 1930 Harrison Street, Suite 104, Hollywood, FL 33020.

24.     As Florida's Protection and Advocacy system, DRF is specifically authorized to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i). DRF's constituents consist of all individuals residing in Florida who have been diagnosed with a disability, have a disability which has not yet been diagnosed, or are perceived as or regarded as having a disability. The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2).

25.     One of DRF's primary responsibilities is to investigate public entities who fail to comply with the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") in order to protect DRF's clients and constituents.

26.     Individuals with physical and mental impairments—among DRF's constituents—are on DRF's board of directors. DRF represents people with physical and mental impairments and provides the means by which they express their collective views and protect their collective interests.

27.     Pursuant to the authority vested in it by the United States Congress to file claims of abuse, neglect, and rights violations on behalf of individuals with disabilities, DRF brings claims on behalf of its constituents, including the individuals named herein as Plaintiffs as well as all constituents and clients who attend or attended school in SDPBC who have been subject to involuntary examination or are at risk of involuntary examination. DRF's constituents and clients include those students who are identified as individuals with disabilities or are suspected of having a disability. DRF represents students with disabilities or suspected of having a disability within the School District of Palm Beach County.

28.     DRF has standing on behalf of its constituents and clients who are substantially affected by SDPBC's inappropriate use of involuntary examination as stated in this Second

Amended Complaint because the use of the Baker Act falls within DRF's general scope of interest and activity; the relief requested—declaratory and injunctive—is the type of relief appropriate for DRF to receive on behalf of its individual constituents; and neither the claims asserted nor the relief requested require the participation of individual members or constituents in the lawsuit.

29.     DRF's constituents have suffered—and continue to suffer—injury that would allow them to have standing to sue in their own right. The interests DRF seeks to protect are germane to DRF's purpose.

30.     The number of children at risk of being harmed by Defendant School Board of Palm Beach County's deficiencies far exceed what can be contemplated in the Second Amended Complaint and a remedy at law, alone, will not prevent this harm. Without injunctive relief, DRF's clients and constituents will continue to be harmed by SDPBC's inappropriate use of involuntary examination.

## II.     DEFENDANT

31.     Defendant School Board of Palm Beach County ("School Board") is the board of education governing SDPBC, the public-school system for all of Palm Beach County.

32.     The School Board has the power to issue policies directing the implementation of the Baker Act in SDPBC schools.

33.     The School Board is not entitled to sovereign immunity under the Eleventh Amendment. *Travelers Indem. Co. v. Sch. Bd. of Dade Cnty., Fla.*, 666 F.2d 505, 509 (11th Cir. 1982).

34.     The School Board and SDPBC employ school police officers through the SDPBC Police Department.

35.     The SDPBC Police Department is supervised by the School Board and SDPBC's superintendent.

36.     The School Board and SDPBC have also entered Security Agreements with other police departments to contract officers to be stationed at and work in its schools.

## FACTUAL ALLEGATIONS

### I.   THE BAKER ACT

37.     Florida, like all states, has a statutory process for the involuntary psychiatric hospitalization of people who pose a danger to themselves or others. However, Florida uses this procedure against children, particularly children in schools, at a scale unknown in any other state.

38.     Statewide, in 2020-2021, the most recent reporting year, Florida children were examined under the Baker Act 38,557 times.

39.     The Baker Act states the same criteria for involuntary examination of youth as it does for adults:

(1)   CRITERIA.—A person may be taken to a receiving facility for involuntary examination if there is reason to believe that the person has a mental illness and because of his or her mental illness:
(a)1. The person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination; or
2. The person is unable to determine for himself or herself whether examination is necessary; and
(b)1. Without care or treatment, the person is likely to suffer from neglect or refuse to care for himself or herself; such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; or
2. There is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior.

Fla. Stat. § 394.463(1).

40.     While courts and some medical and mental health professionals are also authorized by the Baker Act to initiate involuntary examinations, police officers initiate the vast majority of examinations that begin while a child is in school.[2] SDPBC employs its own

---

[2] Initiation by a police officer provides the fewest procedural protections under the statute. When the court initiates an involuntary examination, it must "enter an ex parte order stating that a person appears to meet the criteria for involuntary examination and specifying the findings on which that conclusion is based," and the order "must be based on written or oral sworn testimony

police officers through the Palm Beach County School District Police Department. It has in the past contracted with other police departments for school policing.

41.     During the time the child plaintiffs were sent for involuntary examination, nearly every involuntary examination originating in a SDPBC school was initiated by an officer of the SDPBC Police Department or an officer contracted by SDPBC to be stationed at a school campus.

42.     SDPBC has, from before 2018 through the present, had access to "mobile response teams," also known as "mobile crisis units," a community-based resource intended to be used to assess and deescalate crisis situations and to support police officers. Beginning in 2018, SDPBC also developed its own in-house "Crisis Assessment, Prevention, Education and Support Team," known as the CAPE team. During the period when the individual Plaintiffs were involuntarily examined, however, neither police officers nor school officials were required to contact or follow the recommendations of the mobile response or CAPE teams.[3]

_____

that includes specific facts that support the findings." Fla. Stat. § 394.463(2)(a)1. When a medical or mental health professional initiates an involuntary examination, they must "execute a certificate stating that he or she has examined a person within the preceding 48 hours and finds that the person appears to meet the criteria for involuntary examination and stating the observations upon which that conclusion is based." Fla. Stat. § 394.463(2)(a)1. In both cases, a police officer will then take the person into custody and transfer them to a receiving facility only if "other less restrictive means, such as voluntary appearance for outpatient evaluation, are not available." Fla. Stat. § 394.463(2)(a)3. In contrast, for a police officer to initiate an involuntary examination, the only statutory requirement is to "execute a written report detailing the circumstances under which the person was taken into custody." Fla. Stat. § 394.463(2)(a)2.
[3] Recognizing that schools should contact parents, utilize mobile response teams, and attempt to deescalate children before relying on the Baker Act, in 2021 the Florida legislature passed and Governor DeSantis signed SB 590, a bill making some changes to how the Baker Act is used in schools. SB 590 requires principals to make a "reasonable attempt" to contact a parent before a child is removed from school for involuntary examination, in most cases, but it does not require the school to wait for the parent to arrive, require the parent's consent to involuntary examination, or require the school to allow the parent to attempt de-escalation or to transport the child to the receiving facility themselves. SB 590 also requires the principal to verify that "de-escalation strategies have been utilized and outreach to a mobile response team has been initiated" before contacting law enforcement—*unless* he "reasonably believes that any delay in

43.     In practice, because children are not expected to care for themselves, police in SDPBC schools generally rely on section (b)2 of the Baker Act when initiating an involuntary examination of a child. Under this provision, the Baker Act is appropriate and legal only when "there is reason to believe that the person has a mental illness *and because of his or her mental illness* . . . [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others *in the near future*, as evidenced by recent behavior." Fla. Stat. § 394.463(1) (emphasis added).

44.     The definition of mental illness under the Baker Act explicitly excludes developmental disabilities. Fla. Stat. § 394.455(29). Involuntary commitment of people with developmental disabilities, including ASD, is addressed by a different statute, Fla. Stat. § 393.11, which only allows involuntary confinement after a hearing at which the person is represented by counsel.

45.     "Serious bodily harm" is "[s]erious physical impairment of the human body; esp., bodily injury that creates a substantial risk of death or that causes serious, permanent disfigurement or protracted loss or impairment of the function of any body part or organ." *Black's Law Dictionary* (11th ed. 2019).

46.     The Baker Act also includes a section specifically enumerating the rights of persons seized under the authority of the Baker Act, referred to as "patients." Fla. Stat. § 394.459. "The right to individual dignity" is the very first right set forth. Fla. Stat. § 394.459(1). This provision prohibits the use of "restraining devices utilized for criminals or

---

removing the student will increase the likelihood of harm to the student or others." Similarly, SB 590 requires that school or law enforcement make a "reasonable attempt" to contact a mental health professional who could initiate voluntary examination "unless the child poses an imminent danger to themselves or others"—the very criteria that is already used to justify contacting law enforcement to initiate use of the Baker Act. By its terms, the Baker Act is only appropriate when there is a "substantial likelihood . . . the person will cause serious bodily harm to himself or herself or others in the near future." As such, these exceptions are so broad that they swallow the new rules.

those accused of a crime," such as handcuffs, except when necessary to protect the person subject to involuntary examination or others. *Id*.

## II. UNNECESSARY INVOLUNTARY PSYCHIATRIC HOSPITALIZATION IS DEEPLY HARMFUL TO CHILDREN AND THEIR FAMILIES

47.     The unnecessary use of involuntary examination through the Baker Act puts children and their families at significant risk of long-term and serious psychological harm. As a result of being subjected to involuntary examination under the Baker Act, children may experience new or exacerbated post-traumatic stress, general anxiety, separation anxiety, depression, humiliation, and emotional withdrawal.

48.      Being subjected to unnecessary involuntary examination through the Baker Act risks significant harm to children in multiple ways. Children experience harm from the actions of school police in restraining them with handcuffs and/or hobble restraints, removing them from school, and transporting them to a Baker Act receiving facility. Children experience harm from being removed from their families. Children experience harm from being subjected to the unnecessarily restrictive environment of the receiving facility. Moreover, children experience harm from lost instructional time and a loss of school connectedness.

49.     Children who have been handcuffed or placed in hobble restraints—forms of mechanical restraints—put in the back of a police car, and taken to a psychiatric hospital are understandably and virtually inevitably traumatized by the experience.[4] The use of restraints, including mechanical restraints, has been found to subject children, especially children with

---

[4] *See* Statement of Interest of the United States, *S.R. et al. v. Kenton County et al.*, no. 15-cv-00143-WOB-JGW (2015), ECF no. 32 (Collecting cases for the proposition that "[h]andcuffing a young child, particularly a child with a disability, constitutes an extraordinary intrusion" and "[s]uch interactions are fraught with the potential for lasting trauma and damage.") (observing that children with mental health and other disorders are at especially high risk for death or serious injury from the use of restraints).

disabilities, to a high risk of harm.[5] Compared to children who are not handcuffed during an encounter with police, children who are handcuffed by police report significantly higher emotional distress during the interaction and social stigma and post-traumatic stress afterwards.

50.     This trauma is compounded when children arrive at a receiving facility, where they must wait hours or days for examination in a locked jail-like facility—indeed, some children refer to their time in Baker Act facilities as when they were "in jail." In this unfamiliar place, they often spend a night or more away from their parents for the first time in their lives. Sometimes they are not even allowed to talk to their parents for days, and in-person visitations are regularly limited to once a week.

51.     The conditions within psychiatric facilities have been found to traumatize individuals. In one of the most comprehensive studies of experiences in psychiatric facilities, researchers found that patients experienced physical assault and sexual assault at high rates in mental health facilities, and most witness traumatic events while there.[6] Other studies have similarly found that the majority of individuals in mental health facilities experience trauma victimization and that almost half suffer from post-traumatic stress disorder as a result of their experiences in the psychiatric facility itself.[7] These experiences can be especially damaging or retraumatizing for patients in psychiatric facilities who may already be vulnerable or have experienced past trauma.[8]

---

[5] See General Accounting Office, *Improper Restraint or Seclusion Use Places People at Risk*, (Sept. 1999), https://www.gao.gov/products/hehs-99-176; U.S. Department of Educ., *Restraint and Seclusion: Resource Document,* at 12 (May 2012), http://www.ed.gov/policy/seclusion/restraints-and-seclusion-resources.pdf (recommending that "[s]chools should never use mechanical restraints to restrict a child's freedom of movement").
[6] See B. Christopher Frueh, et al., *Special Section on Seclusion and Restraint: Patients' Reports of Traumatic or Harmful Experiences Within the Psychiatric Setting*, 56 Psychiatric Services 1123-1133 (2005), https://ps.psychiatryonline. org/doi/pdfplus/10.1176/appi.ps.56.9.1123.
[7] See Karen J. Cusack, et al., *Trauma Within the Psychiatric Setting: A Preliminary Empirical Report*, 30 Administration and Policy in Mental Health 453-460 (2003).
[8] See Frueh et al., n. 8 above.

52.     Childhood traumatic stress can have significant and lasting effects on a child's development. It can impact a child's physical and mental development, make it more difficult to learn and focus, and impact a child's way of thinking about the world around them and their own future.[9]

53.     Receiving facilities are not equipped to provide treatment for ongoing psychiatric conditions. Involuntary examination is intended only to provide emergency stabilization of people in genuine psychiatric crises that pose a risk to themselves or others and to determine if longer-term institutionalization is necessary for that same purpose. Even if a child has a serious mental illness that is not responding to existing treatment, involuntary examination is not beneficial unless it serves these goals. Indeed, facilities often provide little or no therapy and are often unable to administer to children medications they need and have already been prescribed.

54.     Research on children subjected to involuntary examination has shown that children learn from the experience that if they are open with adults about their thoughts and emotions, including normal feelings of sadness, they will be punished and taken away from their parents.[10] This lesson makes it less likely that children will be willing to engage in future mental health treatment or counseling, or that children will be honest about any true mental health concerns.[11]

55.     The use of the Baker Act also results in missed school time. This includes the time that the child is transported by the police officer to the receiving facility and held at the receiving facility pending involuntary examination. It may also include time that the child must spend out of school dealing with the aftereffects of the Baker Act. Parents and children

---

[9] *See* The National Child Traumatic Stress Network, *What is Child Traumatic Stress?*, (2003), https://www.samhsa.gov/sites/default/files/programs_campaigns/childrens_mental_health/what-is-child-traumatic-stress.pdf.
[10] *See* Jones, N., Gius, B.K., Shields, M. et al., *Investigating the impact of involuntary psychiatric hospitalization on youth and young adult trust and help-seeking in pathways to care*, Soc Psychiatry & Psychiatric Epidemiol (2021).
[11] *Id.*

may be understandably reluctant to return the child to school given their memories of the traumatic Baker Act experience and when facing the possibility of another involuntary examination, resulting in further delays. Instructional time is critical to student achievement,[12] and this educational disruption can ultimately result in school transfer, lower grades,[13] dropped classes, and/or being placed on a lower academic track.

56.     The unnecessary use of involuntary examination under the Baker Act also risks harm to students' school connectedness—students' belief that adults within the school care about them and their educational progress.[14] That sense of connectedness is critical to protect against a number of risk factors for poor academic and life outcomes. School connectedness functions as a critical factor in supporting academic achievement for economically disadvantaged students and also protects against health risks that reduce students' focus on academics and achievement.[15] Students with high degrees of school connectedness are less

---

[12] *See* M. Karega Rausch & Russell J. Skiba, *The Academic Cost of Discipline: The Relationship Between Suspension/Expulsion and School Achievement* 6 (2006), http://www.agi.harvard.edu/Search/download.php?id=45.

[13] *See* Aaron Kupchik, *Things are Tough All Over: Race, Ethnicity, Class and School Discipline*, 11 Punishment & Society 291, 307, (2009), http://www.suspensionstories.com/wp-content/uploads/2010/10/things-are-tough-all-over.pdf (finding that lost instructional time served to aggravate students' academic deficits because they fell further behind their classmates).

[14] *See* Centers for Disease Control and Prevention, *School Connectedness: Strategies for Increasing Protective Factors Among Youth* 3 (2009), http://www.cdc.gov/healthyyouth/adolescenthealth/pdf/connectedness.pdf.

[15] *See* Bronwyn E. Becker & Suniya S. Luthar, *Social-Emotional Factors Affecting Achievement Outcomes Among Disadvantaged Students: Closing the Achievement Gap*, 37 Educ. Psychologist 197-214 (2002), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3523355/; Dorian Wilson, *The Interface of School Climate and School Connectedness and Relationships with Aggression and Victimization*, 74 Journal of School Health 293, 298 (2004), available at http://www.jhsph.edu/departments/population-family-and-reproductive-health/_archive/wingspread/Septemberissue.pdf.

likely to attempt suicide[16] or engage in violent behavior.[17] For students to feel connected to a school community, they must perceive school authorities to be caring and fair.[18] A school's unnecessary reliance on school police undermines this perception:[19] negative interaction with school police has been found to damage students' views of teachers' authority.[20]

57.     Parents also experience harm from witnessing their children go through the traumatic involuntary examination process. Parents are at risk for direct trauma due to the removal of their children from their care and custody and are also at risk for secondary trauma as they help their children deal with the trauma they have experienced from the involuntary examination.

---

[16] *See* CDC, *School Connectedness,* n. 15, above; Bronwyn E. Becker & Suniya S. Luthar, Social-Emotional Factors Affecting Achievement Outcomes Among Disadvantaged Students: Closing the Achievement Gap, 37 Educ. Psychologist 197-214 (2002), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3523355/; Dorian Wilson, *The Interface of School Climate and School Connectedness and Relationships with Aggression and Victimization*, 74 Journal of School Health 293, 298 (2004), http://www.jhsph.edu/departments/population-family-and-reproductive- health/_archive/wingspread/Septemberissue.pdf.

[17] *See id.*; *see also* Richard F. Catalano et al., *The Importance of Bonding to School for Healthy Development: Findings from the Social Development Research Group*, 74 Journal of School Health 252, 256, 259 (2004), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.464.4284&rep=rep1&type=pdf.

[18] *See* Jaana Juvonen, RAND, *School Violence: Prevalence, Fears and Prevention*, 3 (2001), http://www.rand.org/pubs/issue_papers/IP219.html (concluding that the presence of police on campus can "breed a sense of mistrust among students"); Adena M. Klem & James P. Connell, *Relationships Matter: Linking Teacher Support to Student Engagement and Achievement*, 74 J. of Sch. Health 262, 266 (2004), http://www.fifeschools.com/fhs/documents/RelationshipsMatterLinkingTeacherSupporttoStudentEngagementandAc hievement.pdf; Catalano et al., n. 17, above.

[19] Juvonen, n. 19 above.

[20] *See* Arrick Jackson, *Police-school Resource Officers' and Students' Perception of the Police and Offending*, 25 Policing: Int'l J. Police Strategies & Mgmt. 631, 634 (2002) (finding that officers' presence on school campuses posed obstacles for free and open learning environments by damaging students' view of teachers' authority); Matthew J. Meyer & Peter E. Leone, *A Structural Analysis of School Violence and Disruption: Implications for Creating Safer Schools*, 22 Education and Treatment of Children 333, 349 (1999) (creating a highly scrutinized school environment may result in higher levels of disorder), http://www.popcenter.org/problems/bomb_threats/pdfs/mayer%26leone_ 1999.pdf.

### III.   SDPBC ILLEGALLY INITIATED INVOLUNTARY EXAMINATIONS OF SCHOOLCHILDREN

####   A.  D.P.

58.     D.P. was nine years old and in third grade when Officer Joseph M. Margolis, Jr. seized him for involuntary examination after he became upset. According to the officer's report, the incident began when D.P. threw stuffed animals around the classroom.

59.     D.P. was eligible for ESE with exceptionalities of ASD and Language Impaired. D.P. also has a medical diagnosis of ADHD, of which the school had been informed.

60.     SDPBC has been aware of D.P.'s disabilities since at least 2013, when SDPBC identified D.P. as a child with disabilities through the district's Child Find program for preschool aged children. During his third-grade year, the 2018-2019 school year, he was placed in an ASD classroom.

61.     D.P. lives with P.S., his grandmother, who is his legal guardian.

62.     D.P. had targeted case management services in the community. SDPBC staff were aware of these services.

63.     On multiple occasions in the 2018-2019 school year, D.P. was restrained in the ASD classroom. After at least one incident, school staff documented rug burns on D.P.'s head as a result of a restraint.

64.     On October 22, 2018, P.S. met with school staff and expressed concern over D.P. getting upset in the classroom and the school's use of prone restraints on D.P., including the rug burns on D.P.'s face as a result of the restraints.

65.     On November 6, 2018, P.S. informed school staff that D.P. had a death in the family, that P.S. would be away for a few days, and that D.P. might be struggling as a result of the circumstances.

66.     According to Officer Margolis' report, on November 8, 2018, while in his ASD classroom, D.P. became upset and threw stuffed animals.

67.     D.P. said he was upset because his teacher told him he could not use the computer.

68.     There were multiple strategies that had proved effective to deescalate D.P. in the past and were known to SDPBC staff. For example, when he was upset on a prior occasion, a teacher let him leave his classroom to take a short walk by himself, which gave him time to calm down. Similarly, simply allowing him to sit by himself and calm down instead of having several people talk to him would have allowed him to deescalate. However, none of these effective strategies were tried.

69.     Instead, school staff put D.P. in a two-person prone restraint: D.P. was placed face-down on the floor, with two staff members applying pressure to his body so he could not move. The other students were removed from the room.

70.     Subsequently, D.P. calmed down, and the assistant principal left the room. D.P. got upset again and reportedly made remarks about wanting to hurt himself.

71.     The assistant principal called Officer Margolis.

72.     Officer Margolis was employed by the Town of Lantana Police Department but stationed at D.P.'s school pursuant to a Security Agreement between the Lantana Police Department and SDPBC under which SDPBC paid the Lantana Police Department to station officers at some of its schools. Under that contract, SDPBC granted Officer Margolis the "same powers and authority" as other school police and he was required to abide by the SDPBC Police Department's written policies. Officer Margolis was to receive an online orientation from the SDPBC Police Department informing him of SDPBC policies and procedures. Officer Margolis was required to cooperate with his school's principal and his performance was monitored by SDPBC police.

73.     The assistant principal told Officer Margolis that D.P. was yelling and throwing things in the room and that she was hit by a stuffed animal when she approached him. Officer Margolis then observed D.P. jumping on the desks and breaking items in the classroom.

Officer Margolis's report claims that D.P. had made statements to his teacher such as, "I wish I could shoot you in your [expletive] head," and "Right now I am thinking I want to hold my breath so I can die." Such alleged statements are not uncommon for an upset child. D.P. did not have access to a weapon and made no overt action to harm himself.

74.     Officer Margolis had no reason to believe D.P. had a mental illness.

75.     Officer Margolis had no reason to believe that D.P. posed an imminent danger of serious bodily harm to himself or others.

76.     Nonetheless, after Officer Margolis initiated the involuntary examination, P.S. was called and told that D.P. was being transported for involuntary examination. She was not asked for and did not provide her consent for D.P.'s involuntary examination.

77.     There is no documentation that any medical or mental health professional was consulted about the decision to use the Baker Act on D.P.

78.     In the Report of Law Enforcement Officer Initiating Involuntary Examination, Officer Margolis detailed the behavioral issues from the day and the statements allegedly made by D.P., along with the guardian's unavailability to pick him up. However, there was no mention of D.P.'s ASD diagnosis or placement in an ASD classroom, or other options that could have been used to deescalate D.P. There was no mention of attempts to employ de-escalation techniques identified in school records for D.P.'s disability-related behaviors.

79.     By the time transport arrived to take D.P. to the receiving facility, D.P. was calm and fully deescalated.

80.     Upon information and belief, D.P. was handcuffed in the back of the police car awaiting transport to a receiving facility.

81.     The transporting officer told D.P. that he was being taken home. D.P. did not know that he was being sent for involuntary examination until he arrived at the receiving facility.

82.     D.P. was transported to a receiving facility and handcuffed in the back of the police car for approximately 20 minutes during transport. A school counselor accompanied D.P. in the police car to the receiving facility.

83.     At the receiving facility, D.P. expressed that he was bullied at school by other students. He also said that he was upset because he could not go on a field trip.

84.     Intake documents from the receiving facility stated that D.P. did not appear to be in any acute stress, that the school explained an issue with behavior problems, and that D.P. said, "I just get mad. I don't want to hurt myself."

85.     The report from the Baker Act receiving facility psychiatrist stated that D.P. was calm and not suicidal, and had no psychosis, suicidal ideations, or homicidal ideations.

86.     D.P. and his family have suffered greatly from the trauma of SDPBC's misuse of the Baker Act on him. D.P.'s involuntary examination compounded his pre-existing traumatic experiences.

87.     After D.P.'s involuntary experience with the Baker Act, he has become more aggressive and gets upset more easily. He has had several years of therapy but requires ongoing therapy and is still afraid that police and school staff are out to get him. This harm has created lasting impacts on D.P.

**B. E.S.**

88.     E.S. was nine years old and in third grade when SDPBC Police Department Officer Jose Cuellar seized him for involuntary examination due to behavior consistent with E.S.'s ASD.

89.     E.S. was eligible for ESE with the exceptionality of Other Health Impaired.[21] E.S. had been diagnosed with ASD, ADHD, and Dyslexia.

---

[21] "Other health impaired" means "having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems. This includes, but is not limited to, asthma, attention deficit disorder or attention deficit hyperactivity disorder, Tourette

90.     E.S.'s school was aware of his disability-related behavioral needs and had some supports in place to address them, including placement in a smaller classroom designed to address the needs of children with ASD with a paraprofessional to support the primary teacher.

91.     E.S.'s mother provided a board-certified behavioral analyst ("BCBA" or "behavioral aide") who worked with E.S. at school.

92.     The school's ESE coordinator and principal were aware that his mother, J.S., could successfully de-escalate E.S. when he exhibited challenging behaviors.

93.     On August 30, 2019, E.S. was in his classroom when he became upset. He was taken from the classroom to the main office by his behavioral aide.

94.     At the office, E.S. yelled. While his behavioral aide worked to de-escalate him, he swung his arm and hit her in the chest, hard enough to leave a red mark but not hard enough to injure her.

95.      Shortly thereafter, school staff contacted Officer Jose Cuellar, the SDPBC Police Department Officer assigned to E.S.'s campus that day.

96.     After Officer Cuellar arrived, E.S. hit a thick glass window but did not damage it or harm himself.

97.     According to the behavioral aide's employee incident report, Officer Cuellar tackled E.S. to the ground and said, "If you're going to act like a fool I'm going to treat you like a fool," and "You are coming with me."

98.     When E.S. was slammed to the floor by Officer Cuellar, E.S.'s knees were scraped.

99.     After E.S. was restrained by Officer Cuellar and another SDPBC employee, he allowed Officer Cuellar to put handcuffs on him.

---

syndrome, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and acquired brain injury." Florida Administrative Code, 6A-6.030152.

100.    Even though E.S. at that point deescalated, Officer Cuellar decided to initiate an involuntary examination under the Baker Act.

101.    The behavioral aide whom E.S. had struck in the chest disagreed with Officer Cuellar's decision to initiate an involuntary examination and stated in her report that "the tantrum behavior had ceased and was under control."

102.    J.S. was not contacted by the school principal until after Officer Cuellar had decided to initiate an involuntary examination of E.S.

103.    J.S. was not asked for consent to the Baker Act by the school principal and did not provide consent.

104.    Officer Cuellar removed the handcuffs while he completed the Baker Act paperwork.

105.    E.S. remained calm for at least ten minutes while waiting for transportation, even after the handcuffs were removed.

106.    Another school police officer arrived, handcuffed the calm and compliant E.S. again, and took him away in a police car to the Baker Act receiving facility.

107.    Officer Cuellar contacted J.S. after E.S. had left in a police car and told her that, regardless of E.S.'s disability, he would have initiated an involuntary examination under the Baker Act. Officer Cuellar also stated that there was "no point" in J.S. racing to the hospital because she was not going to be allowed to see E.S.

108.    After examination, the Baker Act receiving facility told J.S. that E.S. was not a danger to himself or others, and she was allowed to take him home the same day.

109.    E.S. returned to school after several days.

110.    After the incident, J.S. requested that the school district investigate the school and the officer's conduct. Office Cuellar told department investigators that he knew E.S. had a diagnosis of ASD.

111.    Officer Cuellar had no reason to believe that E.S. had a mental illness.

112.    Officer Cuellar had no reason to believe that E.S. was at imminent risk of causing serious bodily harm to himself or others.

113.    No mobile response team or other medical professional was consulted about the decision to initiate an involuntary examination under the Baker Act on E.S.

114.    E.S.'s behavioral aide stated she did not think the involuntary examination under the Baker Act was appropriate.

115.    SDPBC did not employ the Baker Act on E.S. again, but he was repeatedly suspended and physically restrained by school personnel.

116.    After some time J.S. lost trust in the school's ability to ensure her son's education and keep him safe and placed E.S. in a private school. If that trust is restored, she would be interested in exploring his return to SDPBC.

**C.  W.B.**

117.    W.B. was ten years old and in fourth grade when SDPBC Police Department Officer Johnny Brown seized him for involuntary examination without consent from his parent.

118.    W.B. was eligible for ESE with exceptionality of Emotional/Behavioral Disability ("EBD") and SDPBC had placed him in a direct instruction cluster class for EBD students. SDPBC staff knew of accommodations that were effective to address W.B.'s disability-related behaviors and were documented in W.B.'s school records.

119.    W.B. was receiving therapy three times a week from the school counselor.

120.    Prior to the 2020-2021 school year, W.B.'s parents informed SDPBC that he was taking medication for Oppositional-Defiant Disorder and that he did not like to be touched by anyone, especially men.

121.    On December 16, 2020, W.B. got into a fight with another child in the EBD unit. L.H., W.B.'s mother, was concerned about safety in the classroom and the teacher's lack of control and intervention in the classroom, as well as the teacher's lack of ESE certification.

122.    L.H. shared her concerns with SDPBC. On January 7, 2021, SDPBC shared that a plan was devised to provide additional training and support for the EBD classroom teacher.

123.    On January 13, 2021, L.H. expressed concerns about another altercation with the same student in the EBD unit and the teacher's lack of intervention. L.H. shared these concerns with SDPBC.

124.    On February 16, 2021, W.B. became upset and began throwing chairs. He ran outside the school and attempted to climb a fence.

125.    School staff successfully convinced W.B. to stop trying to climb the fence.

126.    At that point the school police officer, Officer Brown, became involved. Officer Brown was not the normal police officer assigned to W.B.'s school; he was filling in for another officer. About two minutes after reaching the fence, Officer Brown handcuffed W.B., even though school staff were aware W.B. had an aversion to touch. W.B.'s mother, LH., was called and came to the school. W.B.'s father also tried to enter the school but was not permitted to enter.

127.    The administrator and principal's secretary were waiting with W.B. When she entered the room, L.H. saw her son sitting on a chair with his hands handcuffed behind his back. He was angry and upset but not getting up. He expressed that he wanted his handcuffs removed, but they were not.

128.    No school staff contacted W.B.'s school counselor or the doctor who prescribed his medications. School staff called the mobile response team, but hung up because the police officer had already decided to use the Baker Act on W.B.

129.    The school refused to allow L.H. or W.B.'s father to take W.B. home.

130.    Officer Brown's report states that W.B. wanted to commit suicide by jumping off a building and that he wanted to take the police officer's supervisor's gun and kill people. School staff were aware that W.B. made empty threats and that W.B. could be deescalated if they did not react to those threats.

131.   Officer Brown's report states that L.H. said that W.B. commented he had been looking up ways to kill people on the internet. W.B.'s mother never stated that W.B. had been looking up ways to kill people on the internet. She later searched all devices at their home and did not find any records of the alleged searches referenced in the report.

132.   The school was aware of many successful and documented de-escalation strategies that they did not use on the day W.B. was transported for involuntary examination, yet Officer Brown did not take action to deescalate W.B. Officer Brown had no reason to believe that W.B. posed an imminent danger of serious bodily harm to himself or others.

133.   Instead, Officer Brown transported W.B., handcuffed, in his police car, to a receiving facility for involuntary examination. This facility is more than 50 miles away and takes an hour to drive to without traffic.

134.   As of the next day, W.B. was still in a "hold department" and not admitted because there were no beds available. He spent the previous day and night in a reclining chair in front of the television in the emergency room. His parents were not permitted to visit him at the facility.

135.   Once W.B. was finally moved to the children's department, he was involuntarily detained for another day before he was finally examined by a doctor.

136.   After W.B. was evaluated and released, the only change to his mental health treatment was a slight increase in his existing medication—medication that school staff were aware he was already prescribed.

137.   W.B. expressed that he did not want to go back to the Baker Act facility and that he did not like being away from his family.

138.   Because of SDPBC's unnecessary use of the Baker Act against him, W.B. missed a significant amount of school and L.H. missed days of work.

139.   W.B. and his family have suffered from the SDPBC's use of involuntary examinations under the Baker Act. The trauma of being handcuffed, taken away from his

family in a police car, and locked away from them for days has created tremendous harm for W.B.

**D. M.S.**

140.    M.S. was eleven years old and in sixth grade when she was transported in handcuffs from her school for involuntary examination under the Baker Act.  M.S. is a student with a disability who has a Section 504 plan.

141.    M.S. lives with her parents S.S. and R.S.

142.    Over the course of 2020, M.S. experienced a number of traumatic events.

143.    On January 27, 2021, S.S. and R.S. were called to M.S.'s school by the school's assistant principal to create a school safety plan for M.S. They were told that there had been a student report of M.S. engaging in self-harm.

144.    After creating the safety plan, S.S. and R.S. were informed that a sheriff's deputy from the Palm Beach County Sheriff's Office was initiating an involuntary examination of M.S. under the Baker Act. M.S. was transported in handcuffs to a receiving facility for involuntary examination by the sheriff's deputy.

145.    After M.S.'s release from the January 27, 2021 involuntary examination, her mother S.S. had a phone conference with the school counselor. During the conference, S.S. requested that, if M.S. was ever transported for involuntary examination again, the school transport her using an ambulance instead of police car because the police car transport had been very traumatic for M.S..

146.    On February 22, 2021, S.S. and R.S. were called by the school assistant principal to come to the school for a meeting about M.S. S.S. and R.S. promptly came to the school and met with the assistant principal, a behavioral health professional, a school police officer, and a mobile response team counselor. S.S. and R.S. informed the meeting attendees of a recent event that had triggered M.S. and that M.S. would see her therapist more often in response. M.S. was sent home with her parents and was seen by her therapist later on the same day at their home.

147.    On February 25, 2021, S.S. and R.S. were called by the school. S.S. and R.S. were told that SDPBC was going to initiate an involuntary examination of M.S. under the Baker Act. S.S. and R.S. asked if the SDPBC Police Department officer could wait to transport M.S. to the receiving facility until her parents could come to the school. They were told that the officer could not wait for them to arrive at school because he needed to return to lunch duty.

148.    The police report for the February 25, 2021 incident, prepared by a SDPBC Police Department officer, states that M.S. was examined by a "mental health professional," who said that M.S. had "attempted suicide" using "the sharpened edge of her student ID card."

149.    Officer Jordan Lauginiger and Officer James O'Sullivan were called to M.S.'s school to transport her to a receiving facility. Officer Lauginiger handcuffed M.S., placed her in the back of the police vehicle, and buckled her seat belt. Officer Lauginiger and Officer O'Sullivan, along with the school's assistant principal sitting in the back seat next to M.S., transported M.S. to the receiving facility.

150.    Officer Lauginiger knew that it was not necessary to handcuff M.S. during the at least ten-minute transportation to the receiving facility. M.S. was calm and compliant while awaiting transport and while walking to the marked police car that transported her to the receiving facility.

151.    S.S. and R.S. went to the receiving facility to see M.S. immediately upon learning that she was being transported there.

152.    After this incident, S.S. and R.S. decided to keep her at home for virtual instruction due to fear of another involuntary examination under the Baker Act and M.S. being handcuffed and transported in a police car again.

153.    M.S. had previously received As and Bs in school. After this incident, her grades dropped precipitously and she was at risk of being ejected from her visual arts program of study.

154.    M.S. and her family have suffered greatly from this trauma. M.S. has told her mother that she felt a lot of guilt and shame, because she thought she was treated like a criminal in front of her classmates when she was taken to the receiving facility. After M.S.'s experience with the Baker Act, she has become withdrawn and gets upset more easily. This harm has created lasting impacts on M.S.

**E.  Other Children**

155.    SDPBC's treatment of D.P., E.S., W.B., and M.S. is sadly typical of its use of the Baker Act on youth. Review of other police reports written by SDPBC police officers to justify their use of the Baker Act reveals that, even if their narratives are taken as factual and complete: many children whose involuntary examination under the Act was initiated by school police did not in fact meet the statutory criteria; SDPBC police officers routinely failed to seek input from a mental health professional; and SDPBC police officers routinely failed to attempt to identify less restrictive means to deescalate the child.

156.    In addition, while the Baker Act requires that handcuffs and other restraints only be used when necessary to protect the person subject to involuntary examination or others, Fla. Stat. § 394.459(1), SDPBC policy provides that officers shall handcuff and restrain children both while at school and during transportation to the receiving facility.

157.    For example:

a.    School police seized a nine-year-old for involuntary examination after he allegedly threatened to hurt others with what the report describes as a "white plastic fork."

b.    A seven-year-old was sent for involuntary examination at the recommendation of his school's mental health counselor after he "threw books and kicked chairs" even though he denied wanting to hurt himself or others.

c.       After a police officer learned that a thirteen-year-old girl had been treated by the school nurse for scratching her wrist with a plastic knife, he took her for involuntary examination. The officer made the decision without consulting a mobile response team even though the student had an appointment with her counselor later that day and had documented trauma from a past experience with the Baker Act.

d.       An eight-year-old who made comments suggesting a desire to self-harm was taken for involuntary examination by school police against the recommendations of SDPBC's own mobile response team.

e.       School police used the Baker Act on a twelve-year-old boy, without the involvement of a mobile response team, after he left class without permission and was "defiant" toward staff when they tried to restrain him. The police report gives no reason to think he had a mental illness.

f.       A school police officer and a mobile response team member employed the Baker Act on a seven-year-old boy after he told an officer that he wanted to "tie up [his teacher] by the legs and punch her repeatedly" because "she wouldn't let him attend a pizza party."

g.       An officer was called to observe the search of an eleven-year-old boy's backpack because he had been seen "in possession of a black plastic knife." The boy communicated that he needed to have the knife "because he needed it to protect himself from other students he alleged were 'plotting against him.'" Though no knife was found, he was sent for involuntary examination on the recommendation of a mobile response team member because she had previously interviewed him at a different school he then attended, and he had then made threats to self-harm.

h.       A ten-year-old girl told an officer that she "ha[d] thoughts of harming herself multiple times." But all of her attempts were "performed by using her finger nails [sic] and scraping her wrist multiple times," and her wrists did not show any signs of scratching. Nonetheless, the mobile response team was called and recommended use of the Baker Act.

i.       A seven-year-old boy described as "hostile, aggressive, and in full rage" was flipping and throwing classroom furniture and books. There was no indication that the student desired to harm himself or that he actually had the physical capacity to harm anyone else. Nonetheless, a mobile crisis unit member recommended use of the Baker Act and the officer complied because he believed the student "was in need of professional intervention."

j.       A ten-year-old boy left class without permission, hit his teacher on the arm, and shoved her. When a school police officer took him to the assistant principal's office, he yelled, tried to leave, knocked some items off her desk and kicked her twice. Even though he at no time threatened to harm himself or posed any danger of serious bodily harm to anyone, the officer then initiated an involuntary examination under the Baker Act.

k.       An officer was called to an elementary school classroom for children with disabilities where an eight-year-old boy had "tossed and thrown around" chairs and desks and attempted to bite his teacher. He was initially "defiant" until the officer played dinosaur videos on YouTube, which "calmed him down and allowed [SDPBC staff] to make contact with his mother and mobile crisis." According to the report, when the mobile response team arrived, the boy said, "shut up, I'll punch you in the face." Even though the boy had been able to deescalate by watching a dinosaur video, the mobile response team recommended that the child be sent for involuntary examination, and the officer complied.

l.       A thirteen-year-old girl was taken for involuntary examination by an SDPBC police officer because she had reportedly cut her arm with a plastic knife the night before. The student told the officer that she would calm down if she could see her eighteen-year-old sister, but the sister was not contacted. The Baker Act was used even though the parents already had a session scheduled with the child's counselor and caseworker for the same day.

m.       SDPBC police officers seized a twelve-year-old boy for involuntary examination because he had scratched himself on the wrist with a pencil and "seemed to be upset."

158.    These incidents, and the many more like them in SDPBC's records, show that SDPBC's misuse of the Baker Act on D.P., E.S., W.B., and M.S. were not aberrations but instead consistent with its routine practice.

**IV.    SDPBC'S INADEQUATE POLICIES, PROCEDURES AND TRAININGS RESULTED IN ITS EXCESSIVE AND ILLEGAL USE OF THE BAKER ACT AND WILL CONTINUE TO DO SO**

159.    In the period from July 2019 to March 2020, before SDPBC switched to remote instruction due to the Covid-19 pandemic, SDPBC police seized 286 students for involuntary examination on 323 occasions.[22] Before remote instruction began, SDPBC was on track to initiate involuntary psychiatric examination of students more than 400 times by the end of the academic year.



**PALM BEACH COUNTY IN-SCHOOL BAKER ACTS PER YEAR:**

*In person instruction for the school year ended on March 13, 2020, at which time 132 of the scheduled 179 days of instruction had occurred and the District had Baker Acted 323 children. Had the District continued to Baker Act children at the same rate it would have done so 438 times.*

160.    From July 2019 to March 2020, 62 Baker Act incidents involved elementary school students and 103 involved middle school students. D.P., at just nine years old, is far from the youngest child SDPBC subjected to the Baker Act that year. Indeed, SDPBC initiated involuntary examination of children younger than nine a total of 17 times in the 2019-2020 school year: four six-year-olds, nine seven-year-olds, and six eight-year-olds.

---

[22] These figures do not include the small number of children seized for examination by officers, like Officer Margolis, employed by other police departments and stationed at SDPBC schools.

161.    The 2019-2020 school year is not an anomaly. SDPBC Police Department officers used the Baker Act 401 times in 2018-2019 (including on 36 children under age nine, one of whom was just five); 236 times in 2017-2018 (including on 10 children under age nine, three of whom were five); and 257 times in 2016-2017 (including on 23 children under nine-years-old, four of whom were five).

162.    SDPBC data also shows troubling racial disparities. Of the 323 children SDPBC Police Department officers subjected to the Baker Act in the 2019-2020 school year, 24 percent were non-Hispanic White and 40 percent were Black. Comparatively, the Palm Beach County student population is 33 percent non-Hispanic White and 28 percent Black. In total, SDPBC used the Baker Act on Black children at twice the rate of White children.

163.    Even more concerningly, 40 out of 59, or 68 percent, of the five, six, and seven-year-olds who SDPBC Police Department officers seized for involuntary examination over the last four years were Black children—consistent with data that shows adults routinely see Black children as older and more threatening.[23] In total, SDPBC Police Department officers removed Black children from school through involuntary examinations under the Baker Act at twice the rate of White children.

164.    SDPBC employs involuntary examination in many instances when it is not necessary, and even when it is prohibited by statute.

165.    A review of police reports from all Baker Acts initiated by SDPBC Police Department officers in the 2018-2019 and 2019-2020 school years, obtained through public records requests, shows that, according to the narrative written by the officer initiating an involuntary examination:[24]

---

[23] Phillip Atiba Goff et. all, *The Essence of Innocence: Consequences of Dehumanizing Black Children*, 106 J. of Personality and Soc. Psych. (2014), https://www.apa.org/pubs/journals/releases/psp-a0035663.pdf.

[24] The percentages are based on analysis of complete police reports provided by SDPBC. Twenty-six incomplete reports were excluded because the narrative portion of the police report was missing. Seventeen police reports of involuntary examinations initiated at charter schools were also excluded.

a.     In about 60 percent of cases, there is no evidence that a mobile response team was contacted.

b.     Where the report indicates that the school had knowledge of the child's treatment provider, fewer than half of those cases document any attempt to contact the existing treatment provider.

c.     In about 10 percent of cases, there was evidence the child had been involuntarily examined under the Baker Act previously.

166.    SDPBC's disproportionate and inappropriate use of the Baker Act is unfortunately unsurprising given the inadequate and inaccurate information about the law the district provided to its employees.

167.    Police officers employed or contracted by SDPBC initiated involuntary examination under the Baker Act of children independently or, more typically, after they were contacted by teachers or school administrators. Despite assigning police to determine when young children will undergo the traumatic experience of involuntary psychiatric examination, SDPBC provided its police employees and contractors with inaccurate information about the legal standard for involuntary examination and inadequate training on applying that legal standard accurately and without discrimination against children with disabilities.

168.    Throughout the time of the child plaintiffs' involuntary examinations, SDPBC policy governing Baker Act use was an August 10, 2018 "Bulletin" entitled "Baker Act Decision Tree Protocol," approved and signed by SDPBC Superintendent Donald Fennoy. Superintendent Fennoy was authorized by the School Board to issue bulletins like this one. SDPBC staff were required to follow the Bulletin.

169.    The Bulletin states that "[c]riteria for an involuntary exam are that the individual: presents a danger to self or others; and/or appears to have a mental illness as determined by a licensed mental health professional." This short statement contains multiple false claims and crucial omissions about the Baker Act. The use of the term "and/or" is patently incorrect, as *both* of the identified factors are required to legally initiate a Baker Act.

The statement also omits the statutory requirements that the danger posed by the person subject to the Baker Act must be "in the near future," "evidenced by recent behavior," and constitute "serious bodily harm." Fla. Stat. § 394.463(1)(b)2.

170.    The Bulletin tells school officials to "make every effort to include the parents/guardians in all phases of the process" but does not instruct schools officials to give parents the option of taking their children home instead of using the Baker Act, even when doing so would be safe and prevent the need for an involuntary examination.

171.    The Bulletin does not clarify that behavior that is the result of a developmental disability is not a legal basis for use of the Baker Act.

172.    The 2018 Bulletin also includes a "Baker Act Decision Tree." This document suggests that police will make the final decision to employ the Baker Act, even when mental health professionals are involved or disagree: it states that after the "school contacts District Response Team/School Police" and the "student remains in crisis and exhibits behaviors which potentially meet Baker Act criteria" then either "School Police determines behavior does not meet Baker Act criteria" or "School Police/licensed staff initiate Baker Act, if criteria met."

173.    Under the Bulletin, contacting parents is "recommended," but there is no suggestion that parental consent be sought or obtained before a child is transported to a receiving facility. Instead, the Baker Act Decision Tree includes parents in only two steps. First, after learning of a potential Baker Act situation, the Tree indicates that a principal should contact the parents but does not suggest that they be involved further nor that their involvement might change the course of the situation. Second, the Baker Act Decision Tree provides that after a school police officer or licensed staff has initiated an exam under the Baker Act, a "School Designee contacts and informs parent(s)/legal guardian(s) and informs them that the decision has been made to BA and is being transported."

174.    SDPBC staff also received inadequate training on the Baker Act. Staff members, including those in its Behavioral Health Department directly responsible for Baker

Act policy and decision-making, generally could not correctly state the Baker Act criteria. They believed and continue to believe that parental consent for involuntary examinations is irrelevant and that children can be sent for involuntary examination for behavior that is not due a mental illness, including behavior that is due to ASD.

175.    SDPBC policy continues to the present to be contrary to law. SDPBC Policy 5.20, adopted by the School Board in 2021 after Plaintiffs filed their Complaint and slightly modified in 2022 and 2023, does not include any requirement that parental consent be sought or obtained or that parents be asked to participate in any way in the decision whether an involuntary examination will be initiated for a child. It contains no ban on the use of handcuffs on children being transported to an involuntary examination under the Baker Act, providing only vaguely and without further explanation that transport be via the "least restrictive means." It has no provisions regarding transport in vehicles other than marked police cars or by nonuniformed officers. It calls for the CAPE team to be consulted in some circumstances and, for the first time, allows its members to initiate involuntary examinations, but also provides that police officers continue to be authorized to initiate involuntary examinations without consulting mental health professionals so long as they get a supervisor's authorization. Finally, the policy does not include a requirement that each involuntary examination be reviewed to determine if it was necessary or preventable.

176.    Moreover, while Policy 5.20 calls for new training, many staff remain unaware of the changes it made to SDPBC's Baker Act policy or believe it made no substantial changes. As a result of inadequate training, staff remain generally unaware of key aspects of the Baker Act, including that an involuntary examination can only be initiated for behavior that is due to mental illness and cannot be used on children for behavior that is due to ASD.

177.    SDPBC has provided and continues to provide its police officers and contractors with plainly inadequate training on determining when it is legal and appropriate for young children to undergo the traumatic experience of involuntary psychiatric examination.

178.     During the time of the Plaintiffs' involuntary examinations, the primary Baker Act training the district provided to its police officers was a single 23-minute video entitled "Mental Health Crisis & Appropriate Interventions." The fifteen minutes of the video that actually address the Baker Act misstate the law and omit critical information about when the Baker Act can legally and appropriately be used. For instance, the video says that the Baker Act can be used on "individuals who have a mental illness, *or* who may harm or neglect themselves or others" (emphasis added). Like the language in the Bulletin, this a serious misstatement of the law. In reading the statute out loud, the instructor entirely omits the mental illness requirement. The video also states that "[y]oung children that [sic] cannot regain control AND are putting themselves at significant risk" are "candidates" for the Baker Act, but does not mention any of the other statutory requirements such as mental illness, substantial bodily harm, or imminence. Finally, the instructor recommends that officers contact mobile response teams only "if you are unsure of whether to Baker Act a person." Upon information and belief, throughout the time relevant to this litigation, SDPBC has not provided its police officers and contractors with any other training that correctly stated the Baker Act.

179.     SDPBC has conducted no training specific to the use of handcuffs or restraints during Baker Act transport and no training on the harms of unnecessary involuntary examination.

180.     SDPBC Police Department's policy on the Baker Act in place during the time D.P., E.S., W.B., and M.S. were involuntary examined, General Order 11.17 versions 2 and 3, was similarly inadequate. It quoted the statutory criteria for Baker Act initiation but gave officers no other guidance on when to use the Baker Act. It did not define any of the terms in the Baker Act or give any examples of situations in which it could be appropriately used. It did not address the Baker Act's requirement that handcuffs and other restraints only be used when necessary for safety purposes. Fla. Stat. § 394.459(1). Finally, the policy said that parents will be contacted when involuntary examination under the Baker Act is initiated but

did not suggest or require that this occur before the child is transported to a receiving facility or that parents be involved in the decision to do so.

181.     SDPBC Police Department's policy on handcuffing, General Order 1.5, has remained unchanged from prior to 2018 until the present and has always been the only SDPBC Police Department policy which addresses handcuffing during Baker Act transport. It has an initial "discussion" section that states that officers have discretion about when to handcuff persons "in custody" but a later section that specifically states that handcuffs "should" be used for involuntary examinations under the Baker Act.

182.     Version 4 of General Order 11.17, issued in 2022, adds discussion about the procedure for determining whether to use the Baker Act but further confuses the legal standard, stating that because "[t]he Baker Act is a civil law, not a criminal one; probable cause is not required." Officers in the SDPBC Police Department, including those responsible for Baker Act policy and training, understand this to mean what it says: that that they must meet a lower standard of evidence to determine that someone meets the Baker Act criteria and initiate an involuntary examination than the standard of evidence they must meet to believe someone has committed a crime before arresting them. It also states that law enforcement officers have discretion about whether to "turn the juvenile over to a parent or guardian or go forward with an involuntary examination."

183.     As a result of these policies, practices, and trainings (or lack thereof), SDPBC police officers and contractors did not and do not know the legal requirements for use of the Baker Act. Many of them believe that they are required to handcuff children during Baker Act transport and that they may do so in marked police cars. They believe that they are never required to obtain parental consent before initiating an involuntary examination.

184.     Throughout the time of the individual Plaintiffs' Baker Acts, while SDPBC contracted with mental health professionals, including "mobile response teams" designed to address youth mental health crises, there were issues with both quality and implementation of those services. SDPBC's contract with South County Mental Health for "mobile response

services" does not impose any training or credential standards on members of the teams and the teams did not always include a licensed mental health provider. SDPBC's own CAPE team included and still includes staff members who did not know the criteria for involuntary examination, including that it is impermissible to use the Baker Act on children for behavior that is due to ASD.

185.    Moreover, the mobile response and CAPE teams were often left out of the Baker Act process: in many cases, the teams were never called.

186.    Even when they were consulted, mobile response and CAPE teams sometimes recommended use of involuntary examination in situations where less restrictive alternatives were available. And even when mobile response teams correctly recommended against involuntary examinations, school police officers could and sometimes did initiate involuntary examinations anyway.[25]

187.    SDPBC had and has no policy or practice of conducting after-the-fact reviews of involuntary examinations initiated by SDPBC staff.

## V.    THE SCHOOL BOARD HAS KNOWINGLY FAILED TO TAKE ACTION TO PREVENT ILLEGAL AND INAPPROPRIATE USE OF THE BAKER ACT AGAINST CHILDREN

188.    The School Board of Palm Beach County has long been aware that SDPBC has been misusing the Baker Act.

189.    As early as October 10, 2012, the School Board held a workshop where the School Health Advisory Council presented data that showed that Baker Acts had increased from the prior year. One School Board member remarked that "Baker Act numbers going up [wa]s not a good thing."

190.    In April of 2014, a report on Palm Beach County mental health resources presented to the School Board found that schools were not adequately identifying and helping

---

[25] In a small number of cases mobile response team members who do have mental health credentials have initiated examinations themselves in SDPBC schools, leaving children to be transported by police.

students with mental illnesses and other behavioral challenges. "As a result," the report wrote, "the number of children who are being Baker Acted from school is increasing."

191.   The Superintendent's Annual Report issued in 2018 identified "reduc[ing] unnecessary Baker Act admissions" as a goal.

192.   In 2019, a School Board member requested that Baker Act data from the past three years be provided to the School Board because she was "alarmed" by reports that use of the Baker Act was increasing.

193.   In early 2020, data from 2016 through 2020 showing a huge increase in the number of Baker Acts of SDPBC students was provided to all of the School Board members.

194.   SDPBC employees have also been made aware of inappropriate use of the Baker Act in numerous individual instances by medical experts and child advocates over the intervening years, including some it employs itself.

195.   SDPBC employees have collected and possessed data showing increasing rates of Baker Act use from 2016-2020, yet took no effective actions to address it.

196.   Upon information and belief, SDPBC employees have expressed concerns with SDPBC's use of the Baker Act to School Board Members, including at School Board meetings, and yet SDPBC took no effective actions to address it throughout the 2016-2021 school years.

197.   Over the 2018-2019 and 2019-2020 school years, the SDPBC's Police Department conducted two Internal Affairs investigations of officers who initiated involuntary examinations, including the case of E.S. Both were conducted only after the child's parents made a complaint.

198.   In E.S.'s case, the involuntary examination was inappropriate: E.S.'s behavior was due to his ASD and he was not a danger to himself or others in any respect—let alone an imminent danger or a danger of serious bodily harm. Despite the complete absence of any evidence that E.S. met the legal criteria, the Internal Affairs investigation found that Officer Cuellar was not in violation of SDPBC's Baker Act procedures. The Internal Affairs report

also found that Officer Cuellar's use of force was not "excessive" due to "resistance" by E.S., a nine-year-old.

199.    In the other case, which occurred in 2018, an officer responded to a report of an elementary school student with ASD who was attempting to hit students and shove food from a lunch box into their faces. The officer successfully contacted the child's mother, who said she was coming to the school. School staff knew from prior experience that she was often able to deescalate the child when school officials could not. While she was en route, the child again attempted to hit a school employee. Even though the child was nine years old, and the supposed adult victim was 6'3' and weighed 275 pounds, the officer concluded that the child was a danger to others and placed him in handcuffs and "hobble restraints."

200.    While the officer was taking the child to his police car for transportation to a receiving facility, the child apologized to the school employee he had hit. The officer did not view the child's apology as a sign that he was no longer a danger to others, if he had ever been. He instead concluded that, unlike other children with ASD whom he perceived as "in their own world," this child was "cognizant of his actions." The officer's statement suggests that he thought the child's behavior deserved punishment because his actions were "calculated" and that he viewed use of the Baker Act as a form of punishment.

201.    While the Internal Affairs investigator found that the officer had not violated department policies, the SDPBC Police Chief overruled the decision.

202.    In both Internal Affairs investigations, the investigator identified "concerns which should be addressed through training, with regards to Baker Acts involving students with Autism [ASD]." At the conclusion of both investigations, it was recommended that "supervisors and school-based police officers, particularly those who are assigned to schools with ASD cluster sites, have up-to-date training regarding ASD and Baker Acts." The Internal Affairs investigator also "recommended that school-based officers and supervisors understand the importance of contacting parents or guardians of ASD children."

203.    SDPBC has not acted on these recommendations for increased training.

204.    SDPBC has also been aware of illegal use of involuntary examination under the Baker Act through a recording, first made public by the Palm Beach Post in 2021 but known to SDPBC prior to that date. The recording was made by a SDPBC school police officer during a 2017 incident where an elementary school principal attempted to pressure the officer into using the Baker Act on a seven-year-old girl.[26]

205.    On that same day, the police officer sent the audio recording to his supervisor raising concerns that "the Principal, Staff and even the Crisis Response try to push for a (child) to be Baker Acted, for throwing things, books against the wall . . . . I'm certain the incident does not meet the criteria for a Baker Act."

206.    As revealed by that recording, the officer, the principal, a teacher, and a representative of the mobile response team met and spoke about a seven-year-old girl, who was also present. The other adults urged the officer to initiate an involuntary examination under the Baker Act of the student, who had allegedly "kicked" and "slapped" a teacher and then laid down on the floor and refused to follow directions.

207.    The officer explained that the girl could not be sent for involuntary examination because she did not meet the Baker Act criteria: there was no indication she wanted to harm herself, and she did not pose an actual risk of harm to the adults around her, since she was seven years old and physically incapable of hurting them.

208.    The principal eventually admitted that she wanted the girl sent for involuntary examination because she was frustrated with the child's mother for not working with the school and with previous failed interventions. The principal asked, "How is she going to learn? How am I supposed to put her in an academic setting?" The officer replied that he was not there to make the child learn, but to see if she was a danger to herself or others. The principal then made clear that the real reason she wanted an involuntary examination was to

---

[26] Sonja Isger, *Should school use Baker Act on 7-year-old? A look inside one case*, The Palm Beach Post (May 14, 2021), https://www.palmbeachpost.com/story/news/2021/05/14/should-7-year-old-baker-acted-school-look-inside-one-case/5054465001/.

get the student to leave the school, saying that "this is not the right placement for her." The officer countered that teaching a child a lesson or trying to convince her mother to move her to another school are not legal bases for use of the Baker Act.

209.    The school staff remained undeterred: the teacher said that "I'm not saying she wants to kill herself," but the teacher thought "the Baker Act will be a wake-up call."

210.    Even more disturbingly, the mobile response team member also recommended use of the Baker Act, despite not being able to articulate any reasons the child posed a danger to others aside from the fact that she was "throwing things around."

211.    While the officer in this case did not use the Baker Act, the audio tape reflects that SDPBC officials have pressured school police and other staff to use the Baker Act even when its use is known to be unlawful. As described above, other officers have subsequently used the Baker Act on children in similar circumstances.

212.    Even worse, instead of elevating the officer's concerns when he shared the recording with his supervisor, SDPBC referred the incident to the State Attorney's Office for criminal prosecution. The State Attorney's Office declined to press charges but SDPBC subsequently opened an Internal Affairs investigation into the officer's actions.

213.    In March 2021, the Southern Poverty Law Center ("SPLC") and others issued a report identifying Baker Act misuse in Palm Beach County and throughout the state.

214.    At least one School Board member was aware of the issue long before the report; multiple community members have informed this School Board member about the inappropriate use of the Baker Act on children, especially Black children in the District.

215.    In October 2017, an email from a reporter was sent to an email distribution list that is delivered to School Board members. The reporter was requesting a comment from the SDPBC "regarding a Barton Elementary student who was handcuffed and Baker Acted by School Police earlier [that] week." The student was reportedly in kindergarten.

216.    In December of 2018, an email from an SDPBC parent was sent to an email distribution list that is delivered to all School Board members regarding the involuntary

examination of her 10-year-old son. She wrote that on September 26, 2018, her son was involuntary examined after he told his teacher that he would jump out the window if he had to do any more math. The school was aware that her son had a diagnosis of ADHD, an existing mental health provider, and that his parents were willing to make arrangements to pick him up from school. However, without seeking parental consent, the school police officer initiated an involuntary examination of her son. Because no psychiatrist was available at the receiving facility, her son was admitted and spent the night at the receiving facility. Her son was released the next morning after the psychiatrist was finally able to examine him, telling her that her son "should never have been admitted to begin with." On January 21, 2019, the parent email was forwarded to one of the School Board members again.

217.    On February 21, 2020, a concerned parent emailed two School Board members an article from Boca News Now[27] titled, "New Omni bullying: autistic child 'Baker Acted' by school cop." The article described the involuntary examination of an 11-year-old boy with diagnoses of ADHD and ASD known to SDPBC. The school police officer initiated an involuntary examination of the boy after he was allegedly defending himself from a bully. The boy was handcuffed and transported in a police vehicle to the receiving facility. Upon arriving at the receiving facility, the boy was released right away with medical staff telling the boy's guardian that the involuntary examination was "absurd." The officer who initiated the involuntary examination was still on probationary status and was later terminated for reasons unrelated to the involuntary examination.

218.    Boca News Now reached out to SDPBC for comment on the involuntary examination but was told that "[b]ecause of student privacy regulations, the District [was] not at liberty to speak specifically to media questions regarding specific cases involving children."

---

[27] "New Omni Bullying: autistic child 'Baker Acted' by school cop," Boca News Now (Feb. 21, 2020), https://bocanewsnow.com/2020/02/21/new-omni-bullying-autistic-child-baker-acted-by-school-cop.

219.    Nonetheless, despite repeatedly being made aware of Baker Act misuse, SDPBC has sent an increasing number of children for involuntary examination through at least 2020.

220.    Superintendent Fennoy responded to the SPLC report by saying, falsely, that the data was "three to four years old" when in fact the March 2021 report's data included the 2019-2020 school year. He also acknowledged that there was a grave risk of increased use of involuntary examination under the Baker Act as soon as SDPBC schools reopened fully.

221.    When challenged in the press on its Baker Act use, SDPBC staff have asserted, falsely, that SDPBC has already taken steps sufficient to reduce inappropriate Baker Act use and/or that its use of the Baker Act is in fact appropriate and therefore no corrective action is needed. For instance, in a statement quoted in a March 30, 2021 article on cbs12.com, a spokesman for SDPBC claimed that "[t]he School District relies on the Baker Act statute as a last resort when children are in danger of hurting themselves or others," even as School Board members conceded that was not the case.[28] In another CBS12 article, Deputy Superintendent Keith Oswald again defended SDPBC's Baker Act use: "'[I]s a Baker Act a traumatic experience for a child? Absolutely,' Oswald said. 'But nothing is worth the cost of life.'"[29] SDPBC staff also continued Superintendent Fennoy's attempt to describe the issue as one that had been solved, pointing to increased mental health resources in schools funded in a 2018 referendum. But while these new mental health resources were fully in place by mid-2019, SDPBC used the Baker Act at a record rate in the 2019-2020 school year.

222.    SDPBC has a history of using involuntary examination under the Baker Act for disability-related behaviors that are not related to a mental illness and/or do not require

---

[28] "Palm Beach County School District 'Excessively' Baker Acts students, study says," CBS 12 News (Mar. 30, 2021), https://cbs12.com/news/local/palm-beach-county-school-district-excessively-baker-acts-students-study-says.
[29] "Palm Beach County School District says Baker Act report left out critical information," CBS 12 News (Apr. 29, 2021), https://cbs12.com/news/local/palm-beach-county-school-district-says-baker-act-report-left-out-critical-information.

treatment in a restrictive environment; of seizing children for involuntary examination under the Baker Act without reasonable belief that the children met the statutory criteria for involuntary examination; of handcuffing all children transported for involuntary examination regardless of any individualized determination; of disregarding or denying its own stark Baker Act data; and of failing to develop policies and practices to ensure legal and appropriate use of the Baker Act. This history shows that SDPBC cannot and will not remedy its Baker Act issues without court oversight. Instead, SDPBC's abuse of the Baker Act use will only end with comprehensive injunctive relief.

**CAUSES OF ACTION**

**<u>COUNT 1</u>**

**D.P., W.B., E.S., and Disability Rights Florida against Defendant School Board: Violation of the Americans With Disabilities Act**

223.    Plaintiffs re-allege paragraphs 14-19, 22-139, and 155-222.

224.    Defendant School Board is a public entity subject to Title II of the ADA and is officially responsible for supervising the operations of a public entity subject to Title II of the ADA. 42 U.S.C. § 12131(1).

225.    D.P., E.S., W.B., and constituents of DRF are, or are suspected of being, qualified individuals with disabilities within the meaning of Title II of the ADA and meet the essential eligibility requirements for the receipt of services, programs, or activities of Defendant School Board. *Id.* § 12131(2). Through the acts and omissions set forth above, Defendant School Board violates Title II of the ADA and discriminates against Plaintiffs by reason of their disability by:

      a.    Failing to reasonably modify the Defendant's programs and services as needed to avoid discrimination against Plaintiffs; and

      b.    Using methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of the Defendant School Board's programs with respect to the Plaintiffs.

45

226.    D.P., E.S., W.B., and constituents of DRF did not and do not pose a significant risk to the health or safety of others, or any risk posed could have been or could be eliminated by the provision of reasonable modifications and/or non-discriminatory services.

227.    Thus, Defendant School Board has deprived D.P., E.S., W.B., and constituents of DRF and has placed them at significant risk of further deprivation of participation in or the benefits of services, programs, or activities of a public entity.

228.    Defendant School Board has demonstrated deliberate indifference, in that it was aware of substantially likely harm to D.P., E.S., W.B., and constituents of DRF federally protected rights under Title II of the ADA and failed to act upon that likelihood.

229.    As a result of Defendant School Board's violations, D.P., E.S., W.B., and constituents of DRF have suffered and are at a significant risk of suffering irreparable harm, including substantial losses of educational opportunities, and they have no adequate remedy at law.

230.    Due to Defendant School Board's ongoing violations of Title II of the ADA, injunctive and declaratory relief are appropriate remedies.

## COUNT 2

**D.P., W.B., E.S., and Disability Rights Florida against Defendant School Board:
Violation of Section 504 of the Rehabilitation Act of 1973**

231.    Plaintiffs re-allege paragraphs 14-19, 22-139, and 155-230.

232.    Defendant School Board has been and is a recipient of federal financial assistance sufficient to invoke the coverage of Section 504. *Id.* § 794(b)(3).

233.    D.P., E.S., W.B., and constituents of DRF are, or are suspected of being, qualified individuals with disabilities within the meaning of Section 504 and are or may be otherwise qualified to participate in or receive benefits from Defendant School Board's programs or activities. 29 U.S.C. § 794(a).

234.    By reason of their disabilities, D.P., E.S., W.B., and constituents of DRF are subjected to discrimination by Defendant School Board, including through Defendant's

refusal to reasonably modify its programs and services to avoid discrimination against D.P., E.S., W.B., and constituents of DRF.

235.   As set forth above, Defendant School Board's actions and omissions violate Section 504 of the Rehabilitation Act of 1973.

236.   Defendant School Board has demonstrated a deliberate indifference in that they were aware of substantially likely harm to D.P., E.S., W.B., and constituents of DRF federally protected rights under Section 504 and failed to act upon that likelihood.

237.   As a result of Defendant School Board's violations, D.P., E.S., W.B., and constituents of DRF have suffered and are at significant risk of suffering irreparable harm, including substantial losses of educational opportunities, and they have no adequate remedy at law.

238.   Due to Defendant School Board's ongoing violations of Section 504 and implementing regulations, injunctive and declaratory relief are appropriate remedies.

## **COUNT 3**

**Plaintiff M.S. against Defendant School Board: Violation of the Americans With Disabilities Act**

239.   Plaintiffs re-allege paragraphs 20-21, 31-46, 48-49, 52, 54-56, 140-156, 158, 175, 179-181, 183, 187, 188, 197-199, 213-215, and 217-222.

240.   Defendant School Board is a public entity subject to Title II of the ADA and is officially responsible for supervising the operations of a public entity subject to Title II of the ADA. 42 U.S.C. § 12131(1).

241.   M.S. is, or is suspected of being, a qualified individual with a disability within the meaning of Title II of the ADA and meets the essential eligibility requirements for the receipt of services, programs, or activities of Defendant School Board. *Id.* § 12131(2). Through the acts and omissions set forth above, Defendant School Board violated Title II of the ADA and discriminated against Plaintiff M.S. by reason of her disability by:

    a.     Failing to reasonably modify the Defendant's programs and services as needed to avoid discrimination against M.S.; and

    b.     Using methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of the Defendant School Board's programs with respect to M.S.

242.    M.S. did not pose a significant risk to the health or safety of others while being transported from her school to a receiving facility, or any risk posed by M.S. could have been or could be eliminated by the provision of reasonable modifications and/or non-discriminatory services.

243.    Thus, Defendant School Board has deprived Plaintiff M.S. and has placed her at significant risk of further deprivation of participation in or the benefits of services, programs, or activities of a public entity.

244.    Defendant School Board has demonstrated deliberate indifference, in that it was aware of substantially likely harm to Plaintiff M.S.'s federally protected rights under Title II of the ADA and failed to act upon that likelihood.

245.    As a result of Defendant School Board's violations, Plaintiff M.S. has suffered and is at a significant risk of suffering irreparable harm, including substantial losses of educational opportunities, and has no adequate remedy at law.

246.    Due to Defendant School Board's ongoing violations of Title II of the ADA, injunctive and declaratory relief are appropriate remedies.

## <u>COUNT 4</u>

**Plaintiff M.S. against Defendant School Board: Violation of Section 504 of the Rehabilitation Act**

247.    Plaintiffs re-allege paragraphs 20-21, 31-46, 48-49, 52, 54-56, 140-156, 158, 175, 179-181, 183, 187, 188, 197-199, 213-215, 217-222, and 239-246.

248.    Defendant School Board has been and is a recipient of federal financial assistance sufficient to invoke the coverage of Section 504. *Id.* § 794(b)(3).

249.     Plaintiff M.S. is, or is suspected of being, a qualified individual with a disability within the meaning of Section 504 and is or may be otherwise qualified to participate in or receive benefits from Defendant School Board's programs or activities. 29 U.S.C. § 794(a).

250.     By reason of her disabilities, Plaintiff M.S. was subjected to discrimination by Defendant School Board, including through Defendant's refusal to reasonably modify its programs and services to avoid discrimination against M.S.

251.     As set forth above, Defendant School Board's actions and omissions violate Section 504 of the Rehabilitation Act of 1973.

252.     Defendant School Board has demonstrated a deliberate indifference in that it was aware of substantially likely harm to Plaintiff M.S.'s federally protected rights under Section 504 and failed to act upon that likelihood.

253.     As a result of Defendant School Board's violations, Plaintiff M.S. has suffered and is at significant risk of suffering irreparable harm, including Plaintiff M.S.'s substantial losses of educational opportunities, and she has no adequate remedy at law.

254.     Due to Defendant School Board's ongoing violations of Section 504 and implementing regulations, injunctive and declaratory relief are appropriate remedies.

## **COUNT 5**

**D.P., E.S., W.B., and Disability Rights Florida against Defendant School Board: Violation of the Florida Educational Equity Act**

255.     Plaintiffs D.P., W.B., E.S., and Disability Rights Florida re-allege paragraphs 14-19, 22-139, and 155-238.

256.     The Florida Educational Equity Act ("FEEA") prohibits discrimination "on the basis of race, ethnicity, national origin, gender, disability, religion, or marital status against a student or an employee in the state system of public K-20 education." Fla. Stat. § 1000.05(3)(d).

257.     By reason of their disabilities, D.P., E.S., W.B., and constituents of DRF are subjected to discrimination by Defendant School Board, which has inappropriately and unlawfully used the Baker Act against them.

258.     By failing to establish appropriate safeguards to prevent the Baker Act from being used inappropriately against students with disabilities and by failing to ensure that students with disabilities, including D.P., E.S., and W.B., have access to reasonable accommodations including while initiation of an involuntary examination under the Baker Act is contemplated and during transport for an involuntary examination, Defendant School Board has acted with deliberate indifference, in violation of the FEEA.

259.     As a result of Defendant School Board's violations, D.P., E.S., W.B., and constituents of DRF have suffered and are at significant risk of suffering irreparable harm, including substantial losses of educational opportunities, and they have no adequate remedy at law.

260.     Due to Defendant School Board's ongoing violations of the FEEA, injunctive and declaratory relief are appropriate remedies.

## **COUNT 6**

**M.S. against Defendant School Board: Violation of the Florida Educational Equity Act**

261.     Plaintiff M.S. re-alleges paragraphs 20-21, 31-46, 48-49, 52, 54-56, 140-156, 158, 175, 179-181, 183, 187, 188, 197-199, 213-215, 217-222, and 239-254.

262.     The Florida Educational Equity Act ("FEEA") prohibits discrimination "on the basis of race, ethnicity, national origin, gender, disability, religion, or marital status against a student or an employee in the state system of public K-20 education." Fla. Stat. § 1000.05(3)(d).

263.     By reason of her disability, Plaintiff M.S. was subjected to discrimination by Defendant School Board, which has inappropriately and unlawfully used excessive force against her during transportation for an involuntary examination under the Baker Act.

264.     By failing to establish appropriate safeguards to ensure that students with disabilities, including M.S., have access to reasonable accommodations during transportation for involuntary examination, Defendant School Board has acted with deliberate indifference, in violation of the FEEA.

265.     As a result of Defendant School Board's violations, Plaintiff has suffered and is at significant risk of suffering irreparable harm, including substantial losses of educational opportunities, and has no adequate remedy at law.

266.     Due to Defendant School Board's ongoing violations of the FEEA, injunctive and declaratory relief are appropriate remedies.

## COUNT 7

**P.S., J.S., and L.H. against Defendant School Board: §1983 Procedural Due Process Claim for Deprivation of Parental Right to Custody and Control Seeking Declaratory and Injunctive Relief**

267.     Plaintiffs re-allege the paragraphs 14-19, 31-139, and 155-222.

268.     Parents have a fundamental right to the care, custody, and control of their children.

269.     Parents cannot be deprived of this fundamental right without constitutionally sufficient due process under the Fourteenth Amendment.

270.     Plaintiffs P.S., J.S., and L.H. ("Plaintiff Parents") bring this claim against Defendant School Board because its employee and contractor school police officers took D.P., E.S., and W.B. into their custody and transported them to a receiving facility, where they were denied contact with their parents, without notifying or seeking consent from their parents and/or over their parents' objections.

271.     No actual or perceived emergency existed that would justify Defendant School Board depriving Plaintiff Parents of their fundamental rights without any due process protections.

272.     The failure to provide any type of notice or consent requirement prior to removing D.P., E.S., and W.B. from their parents' custody and control is constitutionally insufficient and violates Plaintiff Parents' procedural due process rights.

273.     These violations of Plaintiff Parents' rights by police officers working in Defendant School Board's schools were the result of longstanding SDPBC policies adopted by, ratified by, acquiesced to and endorsed by Defendant School Board. SDPBC's Baker Act policies still provide that parents need not even be asked for their opinion, let alone consent, about whether their children should be sent for involuntary examination.

274.     These violations were also the result of Defendant School Board's failure to supervise and train its police employees and contractors to seek parental consent before initiating a Baker Act examination. Despite being aware that hundreds of children were being Baker Acted and that many of those Baker Acts could be prevented by contacting children's parents, the Defendant School Board failed to train their officers to do so.

275.     These violations interfered with the Plaintiff Parents' relationship with their children at a time those children needed them most. This caused Plaintiff Parents and D.P., E.S., and W.B. great distress. Without adequate relief Plaintiffs are at significant risk of suffering similar harms in the future.

276.     Due to the Defendant School Board's violations and ongoing violations of the Fourteenth Amendment, P.S., J.S., and L.H. are entitled to damages, and injunctive and declaratory relief.

## **COUNT 8**

**P.S., J.S., and L.H. against the Defendant School Board: § 1983 Procedural Due Process Claim for Control Over Medical Decision-Making Under the Fourteenth Amendments Seeking Declaratory and Injunctive Relief**

277.     Plaintiffs re-allege paragraphs 14-19, 31-139, and 155-222.

278.     Parents have a fundamental right to the care, custody, and control of their children.

279.    Parents cannot be deprived of this fundamental right without constitutionally sufficient due process under the Fourteenth Amendment.

280.    The fundamental right of parents to the care, custody, and control of their children encompasses right to make medical decisions for their children.

281.    Plaintiffs P.S., J.S., and L.H. ("Plaintiff Parents") bring this claim against the Defendant School Board because its employees and contractors initiated involuntary examinations of D.P., E.S., and W.B. under the Baker Act without notifying or seeking consent from Plaintiff Parents, and/or over the Plaintiff Parents' objections.

282.    No actual or perceived true emergency existed that would justify Defendant School Board depriving Plaintiff Parents of their fundamental rights without any due process protections.

283.    The failure to provide any type of notice or consent requirement prior to initiating an involuntary examination under the Baker Act on D.P., E.S., and W.B. is constitutionally insufficient and violates Plaintiff Parents' procedural due process rights.

284.    These violations of Plaintiff Parents' rights by police officers working in SDPBC schools were the result of longstanding policies adopted by, ratified by, acquiesced to and endorsed by Defendant School Board. SDPBC Baker Act policies still provide that parents need not even be asked for their opinion, let alone consent, about whether their children should be sent for involuntary examination.

285.    These violations were also the result of the Defendant School Board's failure to supervise and train its police employees and contractors to seek parental consent before initiating a Baker Act examination. Despite being aware that hundreds of children were being seized for involuntary examination under the Baker Act and that many of those Baker Acts could be prevented by contacting children's parents, Defendant School Board failed to train their officers to do so.

286.    These violations interfered with Plaintiff Parents' ability to make the best medical decisions for their children, harming the interests of both parents and children in

ensuring that children's medical needs are met adequately. Without adequate relief Plaintiffs Parents are at significant risk of suffering similar harms in the future.

287.     Due to Defendant School Board's violations and ongoing violations of the Fourteenth Amendment, P.S., J.S., and L.H. are entitled to damages, and injunctive and declaratory relief.

## COUNT 9

**D.P., E.S., W.B., and DRF against the Defendant School Board: § 1983 Claim for Violation of Due Process Right to be Free of Unreasonable Seizures under the Fourth and Fourteenth Amendments Seeking Declaratory and Injunctive Relief**

288.     Plaintiffs re-allege paragraphs 14-19, 22-56, 58-139, and 155-222.

289.     The Fourth Amendment prohibits unreasonable seizures in the context of involuntary psychiatric examinations. *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1126 (11th Cir. 2021). It also applies to searches and seizures by school authorities. *N.J. v. T.L.O.*, 469 U.S. 325, 337 (1985).

290.     Seizure for involuntary examination is legal only if there is probable cause to believe a person meets the criteria listed in Florida's Baker Act. *Khoury*, 4 F.4th at 1126.

291.     Under the Baker Act an officer may initiate an involuntary examination only if they have "reason to believe that the person has a mental illness and because of . . . her mental illness . . . [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm . . . to herself or others in the near future, as evidenced by recent behavior." Fla. Stat. § 394.463(1)(b)(2). "Vague notions about what a person might do—for example, a belief about *some* likelihood that without treatment a person *might* cause *some* type of harm at *some* point—does not meet this standard." *Khoury*, 4 F.4th at 1126 (emphasis in original).

292.     SDPBC employees regularly seize children for involuntary examination who plainly do not meet the criteria of the Baker Act. Specifically, school staff, typically police officers, seize children by sending them for involuntary examination when they do not have a reasonable belief that the children have a mental illness and/or when they do not have a

reasonable belief that the children are at imminent risk of causing serious bodily harm to themselves or others.

293.    Under these circumstances, seizure of a child for involuntary examination is unreasonable and unconstitutional.

294.    SDPBC does not accurately train its staff or contractors on the law concerning when and on who the Baker Act may legally be used. It does not conduct any after-the-fact review of its employees' or contractors' use of the Baker Act. And when abuses of the Baker Act are reported, it takes no corrective action.

295.    As a result of these unreasonable seizures of children, D.P., E.S., W.B., and constituents of DRF have suffered and continue to suffer emotional distress, pain, and humiliation. They continue to experience fear, distrust, and anxiety, as well as other impacts on their education.

296.    Due to the Defendant School Board's ongoing violations of the Fourth Amendment, injunctive and declaratory relief are appropriate remedies.

## **COUNT 10**

**D.P. against the Defendant School Board: § 1983 Claim for Violation of Due Process Right to be Free of Unreasonable Seizures under the Fourth and Fourteenth Amendments**

297.    Plaintiffs re-allege paragraphs 14-15, 31-56, 58-87, and 155-222.

298.    The Fourth Amendment prohibits unreasonable seizures in the context of involuntary psychiatric examinations. *Khoury*, 4 F.4th at 1126. It also applies to searches and seizures by school authorities. *T.L.O.*, 469 U.S. at 337.

299.    Seizure for involuntary examination is legal only if there is probable cause to believe a person meets the criteria listed in Florida's Baker Act. *Khoury*, 4 F.4th at 1126.

300.    Under the Baker Act an officer may initiate an involuntary examination only if they have "reason to believe that the person has a mental illness and because of . . . her mental illness . . . [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm . . . to herself or others in the near future, as evidenced by recent

behavior." Fla. Stat. § 394.463(1)(b)(2). "Vague notions about what a person might do—for example, a belief about *some* likelihood that without treatment a person *might* cause *some* type of harm at *some* point—does not meet this standard." *Khoury*, 4 F.4th at 1126 (emphasis in original).

301.    ASD is not a mental illness under the Baker Act, Fla. Stat. § 394.455(29), and hence it is not lawful to seize a person for involuntary examination for behavior that a police officer has reason to believe is due to ASD.

302.    Officer Margolis' seizure of D.P. was not justified at its inception because Officer Margolis did not reasonably believe that D.P.'s behavior posed an imminent risk of serious bodily harm to himself or others, which is required for a legal seizure under the Baker Act. Specifically, nine-year-old D.P.'s behavior allegedly consisted of throwing objects, including a stuffed animal, pushing furniture, and breaking items.

303.    Even if Officer Margolis' seizure of D.P. was justified at its inception, the seizure as actually conducted was excessively intrusive in light of D.P.'s age and his behavior. D.P. was handcuffed while awaiting transport and during the approximately 20-minute transport in a police car to the receiving facility.

304.    Officer Margolis violated the Fourth Amendment prohibition on unreasonable seizures.

305.    Defendant School Board is liable for Officer Margolis' actions because he was placed at the school pursuant to a contract they approved, was required to abide by the policies they approved, and operated at the direction of SDPBC employees. It knew that Officer Margolis was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by officers working in SDPBC schools, additional training and supervision were necessary to prevent further violations, and it made a deliberate choice not to provide additional training or supervision to Officer Margolis.

306.     Specifically, Officer Margolis was not trained by SDPBC in the kind of behavior that could reasonably lead to an inference that a child is a danger to himself or others or that the Baker Act could not be legally used for behavior that is a manifestation of a child's ASD. On information and belief, he did not receive such training from the Town of Lantana Police Department or SDPBC and the Defendant School Board knew or reasonably should have known this. His failure to obtain and follow the recommendations of mental health professionals about whether D.P. should be examined was consistent with SDPBC Policies adopted or ratified by Defendant School Board. Had Defendant School Board supervised school employees' and contractors' use of the Baker Act appropriately, it could have identified overuse of the Baker Act, including on children with ASD, and taken steps that would have prevented D.P.'s involuntary examination under the Baker Act.

307.     As a result of Defendant School Board's unreasonable seizure of him, D.P. has suffered and continues to suffer emotional distress, pain, and humiliation. D.P. underwent more than two years of therapy and continues to require additional counseling. D.P. also became more aggressive and became upset more easily after the event. D.P. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

308.     Due to Defendant School Board's violation of D.P.'s right to be free from unreasonable seizures, D.P. is entitled to damages.

## COUNT 11

**E.S. against the Defendant School Board: § 1983 Claim for Violation of Due Process Right to be Free of Unreasonable Seizures under the Fourth and Fourteenth Amendments**

309.     Plaintiffs re-allege paragraphs 16-17, 31-56, 88-116, and 155-222.

310.     The Fourth Amendment prohibits unreasonable seizures in the context of involuntary psychiatric examinations. *Khoury*, 4 F.4th at 1126. It also applies to searches and seizures by school authorities. *T.L.O.*, 469 U.S. at 337.

311.    Seizure for involuntary examination is legal only if there is probable cause to believe a person meets the criteria listed in Florida's Baker Act. *Khoury*, 4 F.4th at 1126.

312.    Under the Baker Act an officer may initiate an involuntary examination only if they have "reason to believe that the person has a mental illness and because of . . . her mental illness . . . [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm . . . to herself or others in the near future, as evidenced by recent behavior." Fla. Stat. § 394.463(1)(b)(2). "Vague notions about what a person might do—for example, a belief about *some* likelihood that without treatment a person *might* cause *some* type of harm at *some* point—does not meet this standard." *Khoury*, 4 F.4th at 1126 (emphasis in original).

313.    ASD is not a mental illness under the Baker Act, Fla. Stat. § 394.455(29), and hence it is not lawful to seize a person for involuntary examination for behavior that there is reason to believe is due to ASD.

314.    Officer Cuellar knew that E.S.'s behavior was due to ASD, a developmental disability, and not due to mental illness as defined in the Baker Act. He did not reasonably believe that E.S.'s behavior was due to mental illness. As a result, seizure under the authority of the Baker Act was not legal and Officer Cuellar's seizure of E.S. was not justified at its inception.

315.    In addition, because Officer Cuellar did not reasonably believe that E.S.'s behavior posed an imminent risk of serious bodily harm to himself or others, seizure under the authority of the Baker Act was not legal and Officer Cuellar's seizure of E.S. was not justified at its inception.

316.    Even if Office Cuellar's seizure of E.S. was justified at its inception, the seizure as actually conducted was not reasonably related to the objectives of the seizure and was excessively intrusive in light of E.S.'s age and his behavior. Nine-year-old E.S.'s behavior consisted of hitting an adult and a thick glass window. In response, in the process of

seizing E.S., Officer Cuellar slammed E.S., a nine-year-old boy, on a couch and on the floor, scuffing his knees, and he handcuffed him.

317.    Officer Cuellar violated the Fourth Amendment prohibition on unreasonable seizures. The Defendant School Board is liable for Officer Cuellar's actions because it knew that Officer Cuellar was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision was necessary to prevent further violations, and it made a deliberate choice not to provide additional training or supervision to Officer Cuellar.

318.    Specifically, Officer Cuellar was not trained by SDPBC in the kind of behavior that could reasonably lead to an inference that a child is a danger to himself or others or that the Baker Act could not be legally used for behavior that is a manifestation of a child's ASD. His failure to obtain and follow the recommendations of mental health professionals about whether E.S. should be examined was consistent with SDPBC Policies adopted or ratified by Defendant School Board. Had Defendant School Board supervised school staff's use of the Baker Act appropriately, they could have identified overuse of the Baker Act, including on children with ASD, and taken steps that would have prevented E.S.'s involuntary examination under the Baker Act.

319.    As a result of Defendant School Board's unreasonable seizure of him, E.S. has suffered and continues to suffer emotional distress, pain, and humiliation. E.S. eventually had to leave public school entirely to feel safe. E.S. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

320.    Due to Defendant School Board's violation of E.S.'s right to be free from unreasonable seizures, E.S. is entitled to damages.

## COUNT 12

**W.B. against the Defendant School Board: § 1983 Claim for Violation of Due Process Right to be Free of Unreasonable Seizures under the Fourth and Fourteenth Amendments**

321.    Plaintiffs re-allege paragraphs 18-19, 31-56, 117-139, and 155-222.

322.     The Fourth Amendment prohibits unreasonable seizures in the context of involuntary psychiatric examinations. *Khoury*, 4 F.4th at 1126. It also applies to searches and seizures by school authorities. *T.L.O.*, 469 U.S. at 337.

323.     Seizure for involuntary examination is legal only if there is probable cause to believe a person meets the criteria listed in Florida's Baker Act. *Khoury*, 4 F.4th at 1126.

324.     Under the Baker Act an officer may initiate an involuntary examination only if they have "reason to believe that the person has a mental illness and because of . . . her mental illness . . . [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm . . . to herself or others in the near future, as evidenced by recent behavior." Fla. Stat. § 394.463(1)(b)(2). "Vague notions about what a person might do—for example, a belief about *some* likelihood that without treatment a person *might* cause *some* type of harm at *some* point—does not meet this standard." *Khoury*, 4 F.4th at 1126 (emphasis in original).

325.     Officer Brown's seizure of W.B. was not justified at its inception because Officer Brown did not reasonably believe that W.B.'s behavior posed an imminent risk of serious bodily harm to herself or others, which is required for a legal seizure under the Baker Act. Specifically, ten-year-old W.B.'s behavior consisted of throwing chairs and pushing staff.

326.     Even if Officer Brown's seizure of W.B. was justified at its inception, the seizure as actually conducted was not reasonably related to the objectives of the seizure and was excessively intrusive in light of W.B.'s age and behavior. Officer Brown handcuffed W.B. for at least 40 minutes, both at the school and while he was transported to a receiving facility.

327.     Officer Brown violated the Fourth Amendment prohibition on unreasonable seizures.

328.     The Defendant School Board is liable for Officer Brown's actions because it knew that Officer Brown was inadequately trained and supervised and knew that, based on at

least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and it made a deliberate choice not to provide additional training or supervision to Officer Brown.

329.    Specifically, Officer Brown was not trained by SDPBC in the kind of behavior that could reasonably lead to an inference that a child is a danger to himself or others and he acted according to SDPBC Policies adopted or ratified by Defendant School Board. His failure to obtain and follow the recommendations of mental health professionals about whether W.B. should be examined was consistent with SDPBC Policies adopted or ratified by Defendant School Board. Had Defendant School Board supervised school staff's use of the Baker Act appropriately, they could have identified overuse of the Baker Act and taken steps that would have prevented W.B.'s involuntary examination.

330.    As a result of Defendant School Board's unreasonable seizure of him, W.B. has suffered and continues to suffer emotional distress, pain, and humiliation. The stress of being involuntarily detained and held away from his family caused him emotional distress that lasted long after he was released. W.B. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

331.    Due to Defendant School Board's violation of W.B.'s right to be free from unreasonable seizures, W.B. is entitled to damages.

## **COUNT 13**

**D.P., E.S., W.B., M.S., and DRF against the Defendant School Board: § 1983 Claim for Excessive Force under the Fourth and Fourteenth Amendments Seeking Injunctive and Declaratory Relief**

332.    Plaintiffs re-allege paragraphs 14-49, 52, 55-56, 58-154156, 158, 175, 179-181, 183, 187, 188, 197-199, 213-215, and 217-222.

333.    The Fourth Amendment prohibits the use of excessive force by police officers in conducting arrests and other seizures.

334.     To determine where force is excessive, courts examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.

335.     As a matter of policy, SDPBC police officers employ handcuffs and/or hobble restraints on every child transported to a receiving facility for involuntary examination under the Baker Act.

336.     Because the District's policy mandates handcuffing even when there is no need for any application of force, it violates the Fourth Amendment.

337.     The unnecessary and excessive handcuffing of vulnerable children is traumatic, humiliating, and has caused and continues to cause long-lasting harm to D.P., E.S., W.B., M.S., and constituents of Disability Rights Florida subjected to it.

338.     Due to the Defendant School Board's ongoing violations of the Fourth Amendment, injunctive relief and declaratory relief are appropriate remedies.

<u>**COUNT 14**</u>

**D.P. against the Defendant School Board: § 1983 Claim for Excessive Force under the Fourth and Fourteenth Amendments**

339.     Plaintiffs re-allege paragraphs 14-15, 31-49, 52, 54-56, 58-87, 156, 158, 175, 179-181, 183, 187, 188, 197-199, 213-215, and 217-222.

340.     The Fourth Amendment prohibits the use of excessive force by police officers in conducting arrests and other seizures.

341.     To determine where force is excessive, courts examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.

342.     D.P. was handcuffed in the process of being seized. The handcuffs remained on nine-year-old D.P. prior to and during transportation to the receiving facility for more than 20 minutes.

343.     The use of force was clearly excessive and unreasonable because D.P. did not pose an immediate safety threat and D.P. did not try or threaten to escape custody, or to harm himself, either at the school or during transport.

344.     D.P. was psychologically injured by the use of handcuffs.

345.     Defendant School Board's employee officers and contractors, while acting under color of law, intentionally committed acts which violated D.P.'s right not to be subjected to excessive or unreasonable force, and this conduct caused injuries to D.P.

346.     Defendant School Board's employee officers and contractors subjected D.P. to excessive force.

347.     Defendant School Board is liable for its employees' and contractors' use of excessive force because it knew that they were inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by police officers working in SDPBC schools, additional training and supervision was necessary to prevent further violations, and it made a deliberate choice not to provide or require additional training or supervision to its employees.

348.     Defendant School Board is also liable because its official policy or custom of requiring handcuffing during transportation to receiving facilities directly caused D.P.'s injuries. As a result of Defendant School Board's use of excessive force against him, D.P. has suffered and continues to suffer emotional distress, pain, and humiliation. D.P. underwent more than two years of therapy and continues to require additional counseling. D.P. also became more aggressive and upset more easily after the event. D.P. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

349.     Due to Defendant School Board's violation of D.P.'s right to be free from excessive force, D.P. is entitled to damages.

## COUNT 15

**E.S. against the Defendant School Board: § 1983 Claim for Excessive Force under the Fourth and Fourteenth Amendments**

350.    Plaintiffs re-allege paragraphs 16-17, 31-49, 52, 54-56, 88-116, 156, 158, 175, 179-181, 183, 187, 188, 197-199, 213-215, and 217-222.

351.    The Fourth Amendment prohibits the use of excessive force by police officers in conducting arrests and other seizures.

352.    To determine where force is excessive, courts examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.

353.    In the process of seizing E.S., Officer Cuellar slammed E.S., a nine-year-old boy, on a couch and on the floor, scuffing his knees, and then handcuffed him.

354.    E.S. did not pose an immediate safety threat to Officer Cuellar, himself, or others.

355.    The force used against E.S. was clearly excessive and unreasonable given his age, size, and behavior; the amount of force used was greatly disproportionate to the circumstances.

356.    E.S. was physically injured due to the scuffing of his knees and psychologically injured by the use of excessive force.

357.    Accordingly, Officer Cuellar subjected E.S. to excessive force.

358.    In the process of seizing E.S., Officer Cuellar handcuffed him.

359.    The use of force was clearly excessive and unreasonable because E.S. did not pose an immediate safety threat to Officer Cuellar, himself, or others and E.S. did not try or threaten to escape Officer Cuellar's custody, or harm himself. After Officer Cuellar removed the handcuffs, E.S. was calm and compliant. Nonetheless, a second SDPBC officer, Sergeant Brown, arrived at the scene and handcuffed E.S. again to transport him to a receiving facility.

The handcuffs remained on while E.S. was transported in Sergeant Brown's marked police car.

360.    The use of force by Sergeant Brown was clearly excessive and unreasonable because E.S. did not pose an immediate safety threat to Sergeant Brown, himself, or others and E.S. did not try or threaten to escape Sergeant Brown's custody, or harm himself.

361.    Office Cuellar and Sergeant Brown, while acting under color of law, intentionally committed acts which violated E.S.'s right not to be subjected to excessive or unreasonable force, and this conduct caused injuries to E.S.

362.    Accordingly, Officer Cuellar and Sergeant Brown subjected E.S. to excessive force.

363.    Defendant School Board is liable for Officer Cuellar and Sergeant Brown's use of excessive force because it knew that Officer Cuellar and Sergeant Brown were inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and it made a deliberate choice not to provide additional training or supervision to Officer Cuellar and Sergeant Brown.

364.    Defendant School Board is also liable because its official policy or custom of requiring handcuffing during transportation to receiving facilities directly caused E.S.'s injuries.

365.    As a result of Defendant School Board's use of excessive force against him, E.S. has suffered and continues to suffer emotional distress, pain, and humiliation. E.S. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

366.    Due to Defendant School Board's violation of E.S.'s right to be free from excessive force, E.S. is entitled to damages.

## COUNT 16

**W.B. against the Defendant School Board: § 1983 Claim for Excessive Force under the Fourth and Fourteenth Amendments**

367.    Plaintiffs re-allege paragraphs 18-19, 31-49, 52, 54-56, 117-139, 156, 158, 175, 179-181, 183, 187, 188, 197-199, 213-215, and 217-222.

368.    The Fourth Amendment prohibits the use of excessive force by police officers in conducting arrests and other seizures.

369.    To determine where force is excessive, courts examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.

370.    In the process of seizing W.B., Officer Brown handcuffed him at his school. The handcuffs remained on ten-year-old W.B. during transportation to the receiving facility, a more than 50-mile journey, for at least 40 minutes.

371.    The use of force was excessive and unreasonable because W.B. did not pose an immediate safety threat to Officer Brown, himself, or others and W.B. did not try or threaten to escape Officer Brown's custody, or harm himself, either at the school or during transport.

372.    W.B. was psychologically injured by the use of handcuffs.

373.    Office Brown, while acting under color of law, intentionally committed acts which violated W.B.'s right not to be subjected to excessive or unreasonable force, and this conduct caused injuries to W.B.

374.    Accordingly, Officer Brown subjected W.B. to excessive force.

375.    Defendant School Board is liable for Officer Brown's use of excessive force because it knew that Officer Brown was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and it made a deliberate choice not to provide additional training or supervision to Officer Brown.

376.     Defendant School Board is also liable because its official policy or custom of requiring handcuffing during transportation to receiving facilities directly caused W.B.'s injuries.

377.     As a result of Defendant School Board's use of excessive force against him, W.B. has suffered and continues to suffer emotional distress, pain, and humiliation. The stress of being involuntarily detained and held away from his family caused him emotional distress that lasted long after he was released. W.B. continues to experience fear, distrust, and anxiety, as well as other impacts on his education.

378.     Due to Defendant School Board's violation of W.B.'s right to be free from excessive force, W.B. is entitled to damages.

## COUNT 17

**M.S. against the Defendant School Board: § 1983 Claim for Excessive Force under the Fourth and Fourteenth Amendments**

379.     Plaintiffs re-allege paragraphs 20-21, 31-49, 52, 54-56, 140-154, 156, 158, 175, 179-181, 183, 187, 188, 197-199, 213-215, and 217-222.

380.     The Fourth Amendment prohibits the use of excessive force by police officers in conducting arrests and other seizures.

381.     To determine where force is excessive, courts examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.

382.     In the process of seizing eleven-year-old M.S., Officer Lauginiger handcuffed M.S. and kept the handcuffs on M.S. while he transported her to the receiving facility for at least ten minutes.

383.     The use of force was excessive and unreasonable because M.S. did not pose an immediate safety threat to Officer Lauginiger, herself, or others and M.S. did not try or threaten to escape Officer Lauginiger's custody, or harm herself, either at the school or during transport.

384.    M.S. was psychologically injured by the use of handcuffs.

385.    Officer Lauginiger, while acting under color of law, intentionally committed acts which violated M.S.'s right not to be subjected to excessive or unreasonable force, and this conduct caused injuries to M.S.

386.    Accordingly, Officer Lauginiger subjected M.S. to excessive force.

387.    Defendant School Board is liable for Officer Lauginiger's use of excessive force because it knew that Officer Lauginiger was inadequately trained and supervised and knew that, based on at least one earlier materially similar instance of unconstitutional conduct by SDPBC police officers, additional training and supervision were necessary to prevent further violations, and it made a deliberate choice not to provide additional training or supervision to Officer Lauginiger.

388.    Defendant School Board is also liable because their official policy or custom of requiring handcuffing during transportation to receiving facilities directly caused M.S.'s injuries.

389.    As a result of Defendant School Board's use of excessive force against her, M.S. has suffered and continues to suffer emotional distress, pain, and humiliation, as well as impacts on her education. Since the incident she has become withdrawn and is more easily upset. She has told her family that she feels guilt and shame from being treated like a criminal in front of her classmates.

390.    Due to Defendant School Board's violation of M.S.'s right to be free from excessive force, M.S. is entitled to damages.

## PRAYER FOR RELIEF

391.    **WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor and grant the following relief:

a. Adjudge and declare that Defendant School Board's actions, policies, practices, and procedures regarding use of the Baker Act violate the rights of Plaintiffs as set forth above in this Second Amended Complaint;

b. Award actual damages to the individual Plaintiffs for harms suffered due to Defendant School Board's illegal actions;

c. Enjoin Defendant School Board, its successors in office, agents, employees and assigns, and all persons acting in concert to:

1) Immediately discontinue all actions, policies, practices, and procedures that do not comply with the laws cited above in this complaint;

2) Create and broadly disseminate to SDPBC teachers, administrators, other district and school-site staff (including SDPBC Police Department staff and contracted police officers), and families a School Board-approved written policy statement that (a) explains accurately and in detail the circumstances in which the Baker Act may and may not be legally used against students; (b) accurately states the probable cause standard for use of the Baker Act; (c) describes the ways in which inappropriate Baker Act use harms students; (d) directs that no student may be referred for involuntary examination under the Baker Act unless: absent a "true emergency," parental consent for involuntary examination has been obtained or the child has been taken into custody pursuant to Fla. Stat. § 39.401; the student's existing mental health provider and/or Individualized Education Program ("IEP") team, if applicable, has been consulted; one or more mental health providers authorized to initiate involuntary examinations have been consulted and agree that no less restrictive alternative can sufficiently mitigate the risk to self or others and that the student meets the statutory criteria for involuntary examination under the Baker Act; (e) specifies that if an involuntary examination of a student is initiated under the Baker Act, the student shall not be handcuffed, placed in hobble restraints, or otherwise restrained absent a true and immediate physical threat to

self or to the person(s) transporting, or transported in a police vehicle; (f) prohibit telling parents that they must take their child for involuntary examination as a condition of attendance at school or as an alternative to a school employee initiating involuntary examination; and (g) require transportation by non-uniformed personnel in a vehicle other than a marked police car;

3) Maintain written documentation of all referrals for involuntary examination under the Baker Act;

4) Create a committee (including at least one member from District ESE, School Psychology Guidance, and one external expert approved by the Court), to review the file of, and consult with school staff regarding, any student who has been subjected to an involuntary examination under the Baker Act more than once during the prior or current school year, to identify any services and supports that should be provided to the child, and to prevent against repetitive, unnecessary, traumatic referrals for involuntary examination;

5) Make the deidentified, aggregated data available to families and to the public on the SDPBC website and school-site websites regarding the number of involuntary examinations under the Baker Act initiated by school staff;

6) Conduct after-the-fact reviews of all involuntary examinations under the Baker Act to determine whether the use of involuntary examination was necessary, appropriate, or could have been prevented, and include all involved school staff and the student's parent or guardian in that process; and, either separately or as part of this process, convene a School Based Team ("SBT") or Child Study Team ("CST") meeting, whichever is appropriate, that includes a District ESE Behavior Resource Teacher, Behavior Health Professional, School Psychologist, and parents/guardians, and, for students with a dependency team, the dependency team and the Multi-Agency Network for students with Emotional/Behavioral

Disabilities, to review the situation and ensure a supported, successful return to school;

7)  Implement improved practices as recommended by experts approved by the parties or the Court and engage in ongoing monitoring and evaluation by experts, in the following areas:

   i)   SDPBC-wide timely access to mental and behavioral health services, supports, programs, and activities for all students in the most integrated setting appropriate, including positive behavioral supports, trauma-informed de-escalation practices, trauma-informed crisis management systems, universal mental health prevention and promotion interventions and programs, multi-tiered services and supports, targeted interventions, and social-emotional learning programs;

   ii)  SDPBC-wide availability of effective alternatives to the use of involuntary examination under the Baker Act, including ensuring that school arrests are not substituted for involuntary examination under the Baker Act;

   iii) Use of and procedures for involuntary examination under the Baker Act for students, particularly students with disabilities and students of color, including in relation to disproportionate use of the Baker Act and the elimination of traumatic aspects of transport for involuntary examination;

   iv)  Reasonable accommodations and/or modifications to policies and procedures to avoid discrimination against students with disabilities and students of color and to avoid unnecessary traumatization of students;

   v)   Policies, procedures, and training to ensure parents and guardians rights to make medical decisions about mental health treatment for their children are protected, and that parents/guardians are provided with a meaningful opportunity to support de-escalation prior to referral for involuntary examination under the Baker Act;

vi)      Training, accountability, and ongoing development for SDPBC personnel (including school police and contracted police officers) regarding: the statutory criteria for use of the Baker Act; developmentally appropriate, trauma-informed crisis response practices; trauma-informed classroom practices; how to appropriately identify and distinguish behaviors that may indicate a serious, imminent risk of harm; understanding of the impact of trauma (including family separation and interaction with police) on child and adolescent development; and limiting the use of the Baker Act, including through provision of appropriate school-based and community-based interventions for students at risk of involuntary examination under the Baker Act;

vii)     SDPBC's collection and regular review of data regarding use of the Baker Act; and Policies, procedures, and training to ensure transport for Baker Act examination occurs in the least restrictive means, including limits on use of handcuffs or other forms of restraint;

viii)    Effective use of mobile crisis response or CAPE  teams in responding to and assessing students' mental health needs and making connections to developmentally appropriate treatment in the least restrictive setting and effective training for these teams; and

ix)      A process for complaints from members of the public regarding use of involuntary examination.

d.  Order any other actions appropriate to prevent further violations of Plaintiffs' constitutional and statutory rights;

e.  Appoint a monitor to track compliance with this order;

f.  Retain jurisdiction of this case until Defendant School Board has fully complied with the orders of this Court, and there is reasonable assurance that Defendant School Board will continue to comply in the future absent continuing jurisdiction;

g.  Award Plaintiffs reasonable costs and expenses, including attorney's fees, as authorized by law; and

h.  Grant such other and further relief as the Court deems just and proper.

SECOND AMENDED COMPLAINT

Dated: March 13, 2023          Respectfully submitted,

/s/ Carli Sean Raben

BACARDI JACKSON (Florida Bar No. 47728)
SAM BOYD (Florida Bar No. 1012141)
CARLI SEAN RABEN (Florida Bar No. 1036013)
Southern Poverty Law Center
P.O. Box 12463
Miami, FL 33101
Tel: 786-347-2056
Fax: 786-237-2949
bacardi.jackson@splcenter.org
sam.boyd@splcenter.org

ANN MARIE CINTRON-SIEGEL (Florida Bar No. 166431)
MOLLY J. PARIS (Florida Bar No. 90486)
Disability Rights Florida, Inc.
1930 Harrison St. Ste. 104
Hollywood, FL 33020
Tel: 800-342-0823
Fax: 850-617-6647
anns@disabilityrightsflorida.org
mollyp@disabilityrightsflorida.org

SHAHAR PASCH (Florida Bar No. 580971)
Pasch Law Group
1806 Old Okeechobee Road, Suite B
West Palm Beach, FL 33409
Tel: 561-599-7400
Fax: 561-258-8243
shahar@paschlaw.com

MELISSA DUNCAN (Florida Bar No. 796921)
Legal Aid Society of Palm Beach County, Inc.
423 Fern St., Ste. 200
West Palm Beach, FL 33401-5839
Tel: 561-655-8944
Fax: 561-655-5269
mduncan@legalaidpbc.org

HANNAH BENTON EIDSATH (admitted pro hac vice)
NINA MONFREDO (admitted pro hac vice)
National Center for Youth Law

818 Connecticut Avenue NE, Ste. 425
Washington, D.C. 20002
Tel: 202-868-4781
Fax: 510-380-7603
hbenton@youthlaw.org

JEAN STROUT (admitted pro hac vice)
RACHEL VELCOFF HULTS (admitted pro hac vice)
National Center for Youth Law
1212 Broadway, Ste. 600
Oakland, CA 94612
Tel: 510-835-8098
Fax: 510-835-8099
jstrout@youthlaw.org
rvelcoff@youthlaw.org

JOSHUA C. TOLL (admitted pro hac vice)
CAROLINE JOZEFCZYK (admitted pro hac vice)
King & Spalding LLP
1700 Pennsylvania Ave. NW, Ste. 200
Washington, D.C. 20006
Tel: 202-737-8616
Fax: 202-626-3737
jtoll@kslaw.com
cjozefczyk@kslaw.com

SECOND AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of

Civil Procedure.

Dated: March 13, 2023                    Respectfully submitted,

                                         */s/ Carli Sean Raben*

                                         _____

                                         BACARDI JACKSON (Florida Bar No. 47728)
                                         SAM BOYD (Florida Bar No. 1012141)
                                         CARLI SEAN RABEN (Florida Bar No. 1036013)
                                         Southern Poverty Law Center
                                         P.O. Box 12463
                                         Miami, FL 33101
                                         Tel: 786-347-2056
                                         Fax: 786-237-2949
                                         bacardi.jackson@splcenter.org
                                         sam.boyd@splcenter.org
                                         carli.raben@splcenter.org

                                         ANN MARIE CINTRON-SIEGEL (Florida Bar No. 166431)
                                         MOLLY J. PARIS (Florida Bar No. 90486)
                                         Disability Rights Florida, Inc.
                                         1930 Harrison St. Ste. 104
                                         Hollywood, FL 33020
                                         Tel: 800-342-0823
                                         Fax: 850-617-6647
                                         anns@disabilityrightsflorida.org
                                         mollyp@disabilityrightsflorida.org

                                         SHAHAR PASCH (Florida Bar No. 580971)
                                         Pasch Law Group
                                         1806 Old Okeechobee Road, Suite B
                                         West Palm Beach, FL 33409
                                         Tel: 561-599-7400
                                         Fax: 561-258-8243
                                         shahar@paschlaw.com

                                         MELISSA DUNCAN (Florida Bar No. 796921)
                                         Legal Aid Society of Palm Beach County, Inc.
                                         423 Fern St., Ste. 200
                                         West Palm Beach, FL 33401-5839
                                         Tel: 561-655-8944
                                         Fax: 561-655-5269
                                         mduncan@legalaidpbc.org

                                         HANNAH BENTON EIDSATH (admitted pro hac vice)
                                         NINA MONFREDO (admitted pro hac vice)
                                         National Center for Youth Law

SECOND AMENDED COMPLAINT

712 H Street NE, DPT #32020
Washington, D.C. 20002
Tel: 510-899-6559
Fax: 510-380-7603
hbenton@youthlaw.org
nmonfredo@youthlaw.org

JEAN STROUT (admitted pro hac vice)
RACHEL VELCOFF HULTS (admitted pro hac vice)
National Center for Youth Law
1212 Broadway, Ste. 600
Oakland, CA 94612
Tel: 510-835-8098
Fax: 510-835-8099
jstrout@youthlaw.org
rvelcoff@youthlaw.org

JOSHUA C. TOLL (admitted pro hac vice)
King & Spalding LLP
1700 Pennsylvania Ave. NW, Ste. 200
Washington, D.C. 20006
Tel: 202-737-8616
Fax: 202-626-3737
jtoll@kslaw.com

SECOND AMENDED COMPLAINT