IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CV-81099 (Cannon/Reinhart)

D.P. *et al.*,

       Plaintiffs

   vs.

SCHOOL BOARD OF PALM BEACH COUNTY *et al.*,

       Defendant.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND
AMENDED COMPLAINT**

I.      **INTRODUCTION**[1]

Defendant School Board of Palm Beach County's[2] Motion to Dismiss Plaintiffs' Second

Amended Complaint ("Mot.") [ECF No. 154] can have no effect but to delay these proceedings

and forestall resolution of this case on the merits. Discovery has been completed for months.

Defendant was two days away from filing its summary judgment motion when this Court

adopted [ECF No. 148] Magistrate Judge Reinhart's Report and Recommendation ("R&R")[3]

[ECF No. 73] on Defendant's Motion to Dismiss ("First MTD") [ECF No. 45] Plaintiffs' First

Amended Complaint ("FAC") [ECF No. 31]. Plaintiffs were required to file a Second Amended

Complaint ("SAC") [ECF No. 150] to proceed on certain claims dismissed solely on procedural

shotgun pleading grounds [R&R 12–15]. Though the SAC merely conforms to the R&R, to

which neither party objected [ECF Nos. 74, 75], Defendant still chose to file this Motion.

Defendant's attempt to relitigate the same questions this Court has already resolved is

improper both procedurally, as Defendant has not even attempted to argue it has met the high bar

for motions to reconsider, and substantively, as Defendant's arguments were correctly rejected

by the Court just weeks ago. Defendant also offers new arguments that could have been raised in

its first Rule 12(b)(6) motion in violation of Federal Rule of Civil Procedure 12(g). Finally,

---

[1] Plaintiffs have a pending motion [ECF No. 156] to convert Defendant's Motion to Dismiss to a motion for summary judgment or, in the alternative for an extension of the page limit for this opposition to 40 pages, the same length as Defendant's Motion. As today is the deadline for their opposition, Plaintiffs file this brief of no more than 40 pages while their motion remains pending.
[2] The School Board operates schools in the county. Hence, any references to the School District of Palm Beach County ("SDPBC" or "the District") are references to the Board.
[3] As the Court adopted Judge Reinhart's R&R without modification except as to certain parties not at issue in this Motion, Plaintiffs cite directly to the R&R when discussing the Court's holding to avoid unnecessarily complicated citations.

Defendant raises exhaustion under the Individuals with Disabilities Education Act ("IDEA"), an affirmative defense properly raised through a responsive pleading, not a motion to dismiss.

## II.    ARGUMENT

### A.    Defendant's Motion is Procedurally Barred

Defendant's Motion is improper. After the Court adopted the R&R, Plaintiffs amended their complaint to (1) replead claims that had been dismissed on shotgun-pleading grounds; (2) remove dismissed claims and parties; (3) correct allegations that had been shown to be incomplete in discovery; and (4) update and clarify some allegations. Defendant, critically, does not rely on any of these revisions. Instead, it attempts to relitigate issues it already lost, asserts new arguments it failed to raise before, and raises an affirmative defense not suited for resolution on a motion to dismiss. All three strategies are improper.

*1.    Defendant inappropriately seeks reconsideration of the Court's Order adopting the R&R despite failing to object to it.*

Defendant, as detailed below, repeatedly tries to relitigate questions decided just weeks ago by the Court's Order adopting the R&R. It does not acknowledge that the Court has already ruled on these same questions or that it filed a notice of non-objection to the R&R [ECF No. 75]. By simply repeating the same arguments the Court has already rejected, Defendant, in effect, seeks reconsideration of this Court's previous rulings. While the Court may of course reconsider its prior Order, Defendant has not attempted to meet the high standard for such a request. "A motion for reconsideration 'is an extraordinary remedy to be employed sparingly.'" *Campero USA Corp. v. ADS Foodservice, LLC*, 916 F. Supp. 2d 1284, 1290–91 (S.D. Fla. 2012) (quoting *Colomar v. Mercy Hosp., Inc.*, 242 F.R.D. 671, 684 (S.D. Fla. 2007)). It is only appropriate where a moving party can "satisfy a high burden involving facts or law of a strongly convincing nature that would induce a court to reverse its prior decision." *1550 Brickell Assoc. v. QBE Ins.*

*Corp.*, No. 07-22283-CIV, 2010 WL 2775064, *1 (S.D. Fla. July 13, 2010) (internal quotations

omitted; citing *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1369 (S.D.

Fla. 2002)). "Three grounds justify reconsideration: (1) an intervening change in controlling law;

(2) the availability of new evidence, or (3) the need to correct clear error or prevent manifest

injustice." *Campero*, 916 F. Supp. 2d at 1291. Defendant has cited no such grounds here. Its

Motion should be denied in whole on that basis alone.

> 2.    *Defendant violates Rule 12(g) by raising arguments for the first time which it could have raised in its first motion to dismiss.*

In addition to rehashing old, rejected arguments, Defendant impermissibly raises several

new arguments it could have made, but failed to make, previously. Rule 12(g)(2) is clear: "a

party that makes a motion under this rule must not make another motion under this rule raising a

defense or objection that was available to the party but omitted from its earlier motion." Fed. R.

Civ. P. 12(g)(2). This rule is intended "'to prevent piecemeal litigation in which a defendant

moves to dismiss on one ground, loses, then files a second motion on another ground.'" *Brooks

v. Warden*, 706 F. App'x 965, 969 (11th Cir. 2017) (quoting *Ennenga v. Starns*, 677 F.3d 766,

773 (7th Cir. 2012)); *see also* Fed. R. Civ. P. 12(g) advisory committee's note to 1966

amendment (Rule 12(g)(2) "works against piecemeal consideration of a case").

Courts within this Circuit thus routinely hold that "it is not proper for Defendants" to

"raise [an] argument in their second 12(b)(6) motion" where, as here, they could have but failed

to raise that argument in their first 12(b)(6) motion. *Club Exploria, LLC v. Aaronson, Austin,

P.A.*, No. 6:18-cv-576-Orl-28DCI, 2019 WL 5328738, at *3 (M.D. Fla. Oct. 21, 2019),

*reconsideration denied*, 2020 WL 686010 (M.D. Fla. Feb. 11, 2020); *see also, e.g., Triton II,

LLC v. Randazzo*, No. 18-cv-61469-BLOOM/Valle, 2019 WL 1777726, at *3 (S.D. Fla. Apr. 23,

2019) (refusing to permit defendant "to advance arguments previously available to him" in

earlier motion to dismiss); *Sherman v. Quest*, No. 18-60973-CIV-Altman/Reid, 2020 WL 6791100, at *8 (S.D. Fla. Nov. 19, 2020) ("Rule 12(g)(2) requires defendants to raise *any* non-jurisdictional Rule 12 arguments in their *first* Rule 12 motion.").

Indeed, the Eleventh Circuit has reversed when district courts have entertained such new arguments. *See*, *e.g.*, *Brooks*, 706 F. App'x at 969 (Where defendant failed to properly raise a defense in his first motion to dismiss, "he has forfeited the ability to raise the defense now, and the District Court should not have considered it."); *Aero Techs., LLC v. Lockton Cos. Int'l, Ltd.*, 406 F. App'x 440, 440 (11th Cir. 2010) ("[defendant] waived venue by failing to raise the forum selection clause issue in its initial Rule 12 motion"). Accordingly, Plaintiffs respectfully request that this Court not consider any of Defendant's new arguments unless they could not have been raised before.

3.     *Defendant's IDEA exhaustion argument cannot be raised on a motion to dismiss.*

The IDEA exhaustion requirement "is not jurisdictional." *N.B. by D.G. v. Alachua Cnty. Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir. 1996); *see also Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1851 (2019) (holding that Title VII's administrative exhaustion requirement is not jurisdictional but is, instead, a mandatory claim-processing rule); *Jones v. Bock*, 549 U.S. 199, 211, 212 (2007) ("[M]ost courts view failure to exhaust as an affirmative defense" and "the usual practice under the Federal Rules is to regard exhaustion as an affirmative defense.").[4] An individual's failure to first exhaust their administrative remedies is "normally considered to be an

---

[4] Like the IDEA, Title VII requires plaintiffs to exhaust their administrative remedies prior to bringing a lawsuit in court; courts have looked to *Davis* in holding that the IDEA exhaustion requirement is not jurisdictional. *See, e.g.*, *K.I. v. Durham Pub. Sch. Bd. of Educ.*, 54 F.4th 779, 792 (4th Cir. 2022) (citing to *Davis* and holding that "the IDEA's exhaustion requirement is not a jurisdictional requirement but a claims-processing rule").

affirmative defense" and is treated as such in the IDEA context. *Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 533 (7th Cir. 2006) (treating IDEA exhaustion as an affirmative defense). Because of this, "the earliest possible time to consider [the affirmative defense of failure to exhaust] would normally be after the answer has been filed[.]" *Id.* Where a plaintiff's alleged failure to exhaust IDEA administrative remedies does not appear anywhere on the face of the complaint, the issue is "more properly addressed in a Motion for Summary Judgment[.]" *Alboniga v. Sch. Bd. of Broward Cnty.*, No. 14-60085-CIV-ZLOCH, 2014 WL 11706441, at *1 (S.D. Fla. Aug. 26, 2014).

Here, Defendant does not argue failure to exhaust appears on the face of the complaint, nor could it [Mot. 33–37; *see also, generally,* SAC]. Accordingly, this affirmative defense must be raised in a responsive pleading and it is not appropriate to raise on a motion to dismiss.

**B.      The SAC States Claims for Which Relief Can be Granted**

Defendant's arguments are not only procedurally barred, but they are also substantively wrong. Defendant repeatedly takes the facts in the light least, not most, favorable to Plaintiffs, misstates the law, and ignores the ways the Court has already rejected the arguments it repeats.

1.      *Plaintiffs D.P., E.S., and W.B. were unconstitutionally seized.*

The Court previously found that D.P., E.S., and W.B. stated claims that Defendant unconstitutionally seized them under the Baker Act in violation of the Fourth and Fourteenth Amendments [R&R 31]. The SAC realleges those same claims without substantial changes [*compare* FAC ¶¶ 320–343, 355–365 *with* SAC ¶¶ 297–331]. Defendant attempts to undo this holding[5] by arguing (1) that the Court previously applied the wrong legal standard and (2) that

---

[5] Defendant does not challenge DRF's injunctive relief claims regarding unlawful seizures in its argument that Counts 9 through 12 should be dismissed [Mot. 3–19].

Plaintiffs have not shown they were illegally seized under the standard Defendant asserts should

apply. Neither argument has merit.

> a)      *Police officers need probable cause to seize a child in school under the Baker Act.*

As the Court has ruled, initiating a Baker Act examination without probable cause to

believe a person meets the Baker Act criteria violates that person's Fourth Amendment

protection against illegal seizures:

> For an officer to detain someone properly under the Baker Act, adult or child, the officer must have "reason to believe that the person has a mental illness and because of . . . her mental illness . . . [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm . . . to herself or others in the near future, as evidenced by recent behavior." Fla. Stat. § 394.463(1)(b)(2). If a reasonable officer, based on the information before them, believes that the person before them meets the criteria for involuntary examination, then the officer, without violating the Fourth Amendment, can take that person "into custody and deliver the person or have . . . her delivered to an appropriate, or the nearest facility . . . for examination." Fla. Stat. § 394.463(2)(a)(2). "Vague notions about what a person might do—for example, a belief about *some* likelihood that without treatment a person *might* cause *some* type of harm at *some* point—does not meet this standard."

[R&R 30–31(quoting *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1126 (11th Cir.

2021))].

Defendant agrees with Plaintiffs and the Court that officers normally need probable cause

to initiate a Baker Act exam. But Defendant argues that in schools, uniquely, police officers can

initiate an involuntary psychiatric examination with a lower standard of evidence, citing a line of

cases addressing other Fourth Amendment issues, like searches of school students or short-term

detentions [Mot. 4 (citing *Couture v. Bd. Of Educ. Of Albuquerque Pub. Sch.*, 535 F.3d 1243,

1250 (10th Cir. 2008) (applying standard to placing a disruptive first-grader in an empty timeout

room); *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985); *Gray ex rel. Alexander v. Bostic*, 458

F.3d 1295, 1304 (11th Cir. 2006)]. However, Defendant points to no case applying this standard

to arrests or involuntary psychiatric examinations. Moreover, the reasonableness standard

announced in *T.L.O.* was intended to avoid "unduly interfer[ing] with the maintenance of the swift and informal disciplinary procedures needed in the schools." *T.L.O.*, 469 U.S. at 340. Involuntary examinations under the Baker Act, in contrast, involve immediate transportation out of the school and cannot be used for disciplinary purposes.[6]

b)      *Officers Margolis Cuellar did not have a reason to believe D.P.'s or E.S.'s behavior was due to mental illness.*

Use of the Baker Act is only lawful where an officer has "reason to believe" the person has a mental illness (not a developmental disability such as Autism, *see* §§ Fla. Stat. 394.455(29), 393.063(5)) and because of that mental illness they pose a danger of "serious bodily harm" "without care or treatment" in the "near future." Fla. Stat. § 394.463(1). Defendant seeks reconsideration of the Court's prior finding that "[w]hen viewing the facts in the light most favorable . . . , the record does not support a finding that these officers would have reason to believe that any of these children had a mental illness" [R&R 31]. The SAC alleges that D.P. and E.S. had Autism and were placed in classrooms for children with Autism [SAC ¶¶ 59–60, 66, 74–76, 89–90, 110], from which a reasonable officer would have concluded that their behaviors were due to their Autism, not a mental illness. The officers, therefore, did not have "reason to believe" that the children's behavior was due to a mental illness [R&R 31–32].

---

[6] The two standards would also have the same practical effect. Under *T.L.O.*, whether a search was reasonable depends upon a two-step inquiry: "first, one must consider 'whether the . . . action was justified at its inception'; second, one must determine whether the search as actually conducted was 'reasonably related in scope to the circumstances which justified interference in the first place.'" *Bostic*, 458 F.3d at 1304 (alteration in original; quoting *T.L.O.*, 469 U.S. at 341). If a child does not meet the Baker Act criteria at the time they are seized for involuntary examination, then that seizure cannot be "justified at its inception." An officer's only legal authority to detain someone for purposes of involuntary examination comes from the Baker Act.

Defendant counters that certain behaviors gave Officer Margolis and Officer Cuellar reason to believe that D.P. and E.S. had a mental illness. But, taking the facts in the light most favorable to Plaintiffs, the officers knew or should have known those behaviors were caused by Autism, which the officers knew or reasonably should have known Plaintiffs had and would reasonably have concluded was causing their behaviors. As the Court previously explained, "[d]evelopmental disability is not synonymous with mental illness and, under the circumstances presented to each of the officers, they would not have a reasonable basis to believe that [three] young children who were acting out in their classrooms were mentally ill" [R&R 31–32]. Defendant's argument that both children were also diagnosed with ADHD is irrelevant [Mot. 6–8]. Even if ADHD was a mental illness,[7] that would not mean that the officers had any reason to believe it, rather than Autism, was the cause of the children's behavior. Moreover, Defendant's argument assumes that only the District police officers' actions are relevant to Plaintiffs' claims. But here the District is the Defendant, and the actions of all of its employees are relevant. District employees knew the children's behavior was due to Autism, yet neither District policies nor training had informed them that it was unlawful for D.P. and E.S. to be involuntarily examined for behavior that was due to Autism [SAC 59–60, 89–90, 171, 306, 318].

Finally, Defendant argues that the individual officers did not have an obligation to determine if Plaintiffs' behavior was due to Autism because it was not "immediate and

---

[7] It is a question of fact whether ADHD can qualify as a mental illness for purposes of the definition of mental illness under the Baker Act. Defendant cites the legislative summary for a bill concerning state mental health funding, which includes ADHD under the definition of "mental disorders," but that is irrelevant to whether ADHD is a "mental illness" as that term is defined by the Baker Act. Defendant points to no judicially noticeable definitions of ADHD or case law that determines if ADHD could cause "impairment of the mental or emotional processes that exercise conscious control of one's actions or of the ability to perceive or understand reality, which impairment substantially interferes with the person's ability to meet the ordinary demands of living." Fla. Stat. § 394.455(29).

conclusive evidence" that could have been "exculpatory" [Mot. 8]. But as the cases Defendant cites show, that is exactly what Plaintiffs' Autism was. *See Washington v. Rivera*, 939 F.3d 1239, 1246 (11th Cir. 2019) ("officers 'should not be permitted to turn a blind eye to exculpatory information that is available to them'" (quoting *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004))); *see also Huebner v. Bradshaw*, 935 F.3d 1183, 1190 (11th Cir. 2019) ("[N]ot looking for scratches when making an arrest for a crime that doesn't require them just isn't the same as not looking for drugs or alcohol when making an arrest for DUI."). Because the Baker Act statute specifically exempts developmental disorders, an officer who knows that a student has a developmental disorder that is consistent with the student's behavior but initiates an examination anyway ignores "easily discoverable, readily verifiable" [Mot. 8] facts that would negate probable cause. Nor does it require extensive investigation. The officers who initiated the Plaintiffs' examinations could simply have asked any of the District staff members familiar with each Plaintiff if their behavior was due to their Autism [SAC ¶¶ 59, 60, 78, 89, 90].

> c) *The police officers had no reason to believe that there was a "substantial likelihood" that D.P., E.S., or W.B. would harm others.*

Even if the officers had reason to believe that D.P., E.S., or W.B.'s behaviors were due to a mental illness, the Court previously found that the officers did not have probable cause to believe that there was a substantial likelihood that without care or treatment the children would have caused serious bodily harm to themselves or others in the near future:

> I have before me four children under ten years old, each of whom was very upset and became physically aggressive, verbally aggressive, or both. However, the children did not have weapons or dangerous objects, did not have imminent access to weapons or any item that could be said to cause 'serious bodily injury,' they did not have a meaningful opportunity or access to carry out their threats, and did not make many overt acts to harm themselves.

[R&R 32]. The R&R emphasized that even if the child plaintiffs "could *potentially* cause some type of harm at some point, that does not satisfy the probable cause standard" [R&R 32 (citing *Khoury*, 4 F.4th at 1126)].

Defendant argues that the Plaintiffs' statements were not "vague notions," arguing that their inability to "immediate[ly] . . . carry out an act of harm is not the standard" because "[t]he temporal components of the pertinent criterion in the Baker Act are that the harm will occur 'in the near future, as evidenced by recent behavior'" [Mot. 9–10]. Defendant then defines "near future" and "recent," but does not argue that the children had "weapons or dangerous objects … imminent access to weapons or any item that could be said to cause 'serious bodily injury', … [or] a meaningful opportunity or access to carry out their threats" or that they took any "overt acts to harm themselves" in that period [R&R 32].

Moreover, Defendant glosses over the "substantial likelihood" element of the Baker Act criteria, never explaining how there is a "substantial likelihood" that any of the children would have been able to cause "serious bodily harm" in the "near future." D.P. was upset but had completely de-escalated before transport arrived and, as he later told the receiving facility staff, "I just get mad. I don't want to hurt myself" [SAC ¶¶ 79, 84]. He also lacked access to any weapons or "the ability to "hold [his] breath until [he] dies" [SAC ¶72–76]. E.S. made no verbal threats to cause harm to himself or others [SAC ¶¶ 88–116]. He did strike a "thick glass window" and his behavioral aide, but he left only a red mark on the latter and suffered no harm from the former, showing he did not in fact can cause harm, let alone serious bodily harm [SAC ¶¶ 96–116]. W.B. also made threats that he did not have the ability to carry out [SAC ¶ 130]. Moreover, he reacted after being restrained—something he was especially sensitive to given his disability, which District employees working at his school knew [SAC ¶¶ 119, 126– 27]. Making

matters worse, Officer Brown was not the typical police officer assigned to W.B.'s school and initiated an involuntary examination of him against the recommendations of District staff working at his school that knew him best [SAC ¶¶ 126, 130, 132].

2.     *Plaintiffs have adequately pled* Monell *liability for the unlawful seizure claims.*

Under *Monell v. Dep't of Soc. Sers.*, 436 U.S. 685 (1978), to hold a municipality liable "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). This may be demonstrated through either a formal policy, a custom (also known as an informal policy), or failure to train. A formal policy is simply "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). Defendant does not dispute that, as the Court found, the August 10, 2018 Baker Act Bulletin ("Bulletin") is an official policy of the School Board [Mot. 13–14; R&R 33–34]. Rather, it argues that that policy did not lead to the violations of Plaintiffs' federal rights, that Plaintiffs have not otherwise adequately alleged an informal policy, and that Plaintiffs have not adequately alleged failure to train.

a)     *Plaintiffs have adequately alleged that District policy injured them.*

The Court reached only the official policy basis for *Monell* liability on the unlawful seizure claims in the FAC because it is a sufficient basis to establish liability [R&R 26–28]. The Court has held that the FAC (and hence the SAC) adequately alleged that "the misstatement of the law in the Baker Act Bulletin that was administered to District staff is sufficient to establish, for purposes of surviving a motion to dismiss, that an official policy of the School Board caused the deprivation of D.P., E.S., and W.B.'s fundamental right to be free from unreasonable seizure

under the Fourth and Fourteenth Amendments" [R&R 34–35]. These facts were realleged, and expanded, in the SAC [SAC ¶¶ 159–222].

Defendant seeks reconsideration of this finding with two arguments: (1) Plaintiffs have not pled explicitly that police officers were required to follow the Bulletin; and (2) the inaccurate text of the Baker Act Bulletin did not cause the involuntary examinations of Plaintiffs D.P., E.S., and W.B. Both are at odds with the Court's prior findings and fail on their own terms.

First, Plaintiffs pled that District staff were required to follow the Bulletin [SAC ¶ 168], which included a Decision Tree [SAC ¶¶ 72, 172]. Plaintiffs also pled that District school police officers are employed by the District[8] [SAC ¶¶ 1, 34, 40]. Therefore, under a plain reading of the SAC, District school police are District staff. As for Defendant's argument that police officers are not required to follow the Bulletin and/or Decision Tree, that is the end of the inquiry:[9] the SAC, taken in the light most favorable to the Plaintiffs, alleges that District police officers and all other District staff were bound by the Bulletin and the Decision Tree contained within. Moreover, police officers were not the only District staff whose actions resulted in illegal seizures of the child Plaintiffs. Other District employees were involved [SAC ¶¶ 64–71, 73, 92–95, 124–129]. The SAC alleges that these employees, too, followed an inaccurate policy [SAC ¶¶ 168–176]. The District is responsible for the behavior of all its employees, not just police officers.

_____

[8] Officer Margolis was a District contractor but was similarly required to follow District policy [SAC ¶ 72].
[9] Defendant argues that because the SAC also mentions another policy that governs District school police officers [SAC ¶ 180], which accurately quoted the statutory text, it follows that officers were not required to follow the Bulletin. But this is reading the SAC in the light least, not most, favorable to Plaintiffs.

Second, Defendant's attempt to minimize the errors the Court found in the Decision Tree are unpersuasive. Plaintiffs also allege that there are multiple inaccuracies in the Bulletin [SAC ¶¶ 169–171]. The Court concluded that Plaintiffs' allegations about the misstatements in the Bulletin, together with its allegations surrounding the seizures of D.P., E.S., and W.B., were sufficient to establish causation for the purpose of a motion to dismiss [R&R 33–35]. Nor is Defendant correct in its argument that the Bulletin's inaccurate statement of the criteria for Baker Act examinations is immaterial because it was merely a "summary" and District staff could have found the accurate criteria by looking up the full text of the Baker Act statute [Mot. 14, 19]. Even if there were any basis to characterize the Bulletin as a "summary," (which Defendant does not provide) a policy that inaccurately "summarizes" the legal criteria for detention is just as likely to cause illegal detentions as one which inaccurately states them. Defendant argues that the inaccuracy of the Bulletin is irrelevant because "the correct criteria can be ascertained by reference to the statute" and in the fine print of a form officers must sign [Mot. 19]. But under this theory, a governmental entity could teach its employees to violate the law and then shirk responsibility when employees go on to do so by blaming them for not conducting their own legal research. That cannot be the law.

> b)  *Plaintiffs have adequately alleged an informal custom of unlawful Baker Act examinations.*

Because the Court concluded that Plaintiffs had adequately pled *Monell* liability under an official policy, it did not need to reach Plaintiffs' allegations regarding District custom or training. However, despite conceding the existence of an official policy, Defendant now challenges these bases in its Motion. Defendant argues that Plaintiffs have not alleged a sufficiently widespread practice of unlawful involuntary examinations [Mot. 15]. Plaintiffs alleged numerous specific facts which show that Defendant "has long been aware that SDPBC

14

has been misusing the Baker Act" [SAC ¶ 188]. Most directly, the District Superintendent himself admitted in 2018 that the District was conducting "unnecessary Baker Act" examinations [SAC ¶ 191]. Defendant argues that not all unnecessary examinations are unconstitutional, and so disregards this allegation [Mot. 15–16]. But any reasonable decision maker witnessing a sharp rise [SAC ¶ 193] in "unnecessary" seizures of children would naturally be on notice that at least some of these children did not meet the Baker Act criteria and were seized illegally.

Moreover, Plaintiffs alleged District policy makers were aware of several prior instances of similar unconstitutional conduct [*see* SAC ¶¶ 188–222]. Defendant challenges some of these examples individually but ignores their cumulative effect: any reasonable policy maker would have known that the District was initiating involuntary examinations under the Baker Act for children who did not meet the criteria. Defendant also ignores some of the incidents alleged in the SAC, failing to explain, for example, why a 2018 incident in which a parent emailed a School Board member, informing her that a 10-year-old had been seized by school police under the Baker Act without parental consent even though, in the words of the psychiatrist who examined him at the receiving facility, he "should never have been admitted to begin with" is not evidence of a pattern [SAC ¶ 216].

Defendant's attempts to distinguish individual cases are also unconvincing. It cites *Khoury* several times in an effort to argue that prior individual incidents do not show a pattern that amounts to an informal policy. *Khoury*, however, actually shows the opposite. The *Khoury* court held that the prior incidents the plaintiff alleged, which Defendant argues are similar to those alleged in the SAC, actually "suggest[ed] there may have been an issue with the School Board improperly Baker Acting students 'to dilute arrests.'" *Khoury*, 4 F.4th at 1132. *Khoury* went on to hold that this pattern did not show there was such a policy in place when the plaintiff

15

was involuntarily examined only because *all* the examples were three years old, the police chief in place at the time had left, and the new chief "appear[ed] to have remedied any problem stemming from that administration." *Id.*[10] Here, there is no such intervening change in policymaker nor policy between the relevant prior instances and Plaintiffs' cases.

The SAC points to two internal investigations of involuntary examinations of students conducted by school police officers, which support the finding that Defendant was aware of a pattern of illegal and inappropriate Baker Acts within the District [SAC ¶¶ 197–203]. Defendant seeks to discredit one of these two examples because the District police chief determined that the officer had violated the department's policies, citing *Khoury* as holding that "discipline of an officer 'suggests that [the officer's] actions were inconsistent with [the police department's] goals and training'" [Mot. 16]. In fact, *Khoury* does not hold this, instead it includes that language only in a parenthetical after a *cf.* citation to *Skop v. City of Atlanta*. 485 F.3d 1130, 1145 (11th Cir. 2007)). In that case, though, it was the officer who violated the plaintiff's rights who was disciplined. Here, none of the officers who violated the Plaintiffs' rights were disciplined or found to have violated department policy (the officer who was found to have violated policy Baker Acted a child who is not a part of this case [SAC ¶¶ 199–201]). Indeed, as the SAC alleges, the officer who initiated an examination of E.S. was investigated and found *not* to have violated department policy [SAC ¶ 198].[11] The internal affairs investigator in both cases

---

[10] Moreover, Defendant ignores that *Khoury* was decided on summary judgment, not a motion to dismiss. While "[o]ne or two incidents . . . is generally insufficient" to meet plaintiffs' burden, "on a motion to dismiss, allegations of anything more than that are generally sufficient[.]" *Williams v. Fulton Cnty. Sch. District*, 181 F. Supp. 3d 1089, 1122 (N.D. Ga. 2016).

[11] The other officer was found to have violated department policies, but the SAC does not allege that the policies he was found to have violated concerned whether to initiate an examination [SAC ¶ 201].

(of E.S. and the student not part of this case) recommended additional training for school police officers on Autism and the Baker Act [SAC ¶ 202].[12] These recommendations suggest that the actions of the investigated police officers were actually in line with the training, or lack thereof, provided by the District. Defendant did not act on these recommendations for increased training [SAC ¶ 203].

Defendant also urges the Court to disregard an incident where a principal tried to get an officer to initiate an involuntary examination under the Baker Act of a child who did not meet the criteria [SAC ¶¶ 204–211] because the officer refused to initiate the involuntary examination. However, this incident shows how District staff pressured that officer to violate the Fourth Amendment. Moreover, the Department's response to the incident was to refer the officer for prosecution for making a recording of the incident [SAC ¶ 212].

Defendant's attempt to distinguish some of Plaintiffs' examples of prior unconstitutional conduct ignores the pattern they paint as a whole: District policymakers knew Baker Acts were rising dramatically [SAC ¶¶ 189, 190, 192–93, 196]; they knew that many Baker Acts were unnecessary [SAC ¶¶ 191, 194, 196, 214–218]; they knew that their officers needed more training [SAC ¶¶ 177–79, 202]; they knew that their staff didn't understand the Baker Act; [SAC ¶¶ 169, 171, 174, 177–79]; they knew that school police officers were seizing children with Autism for involuntary examination under the Baker Act [SAC ¶¶ 202, 217]; and they knew of specific instances where children were subjected to the Baker Act for ridiculous reasons, like

---

[12] Defendant argues that since Plaintiffs do not allege the precise content of the needed training no inferences can be drawn from the fact that training was recommended. However, reading the SAC in the light most favorable to the Plaintiffs, it is obvious that training to address "concerns" about an examination would necessarily address when examinations, particularly of children with developmental disabilities, are appropriate.

saying if they have to do any more math they will die [SAC ¶ 216]. Yet policymakers did

nothing, and, as a result, Plaintiff children and their families have been traumatized by the Baker

Act. It hardly requires an inference, let alone taking these facts in the light most favorable to

Plaintiffs, to conclude that all these incidents and Defendant's total inaction in response shows a

pattern of indifference and a willingness to violate the rights of these children.

c)   <em>Plaintiffs have adequately alleged failure to train.</em>

Finally, Defendant argues that Plaintiffs have not alleged constitutionally inadequate

training. First, Defendant challenges Plaintiffs' assertion that police officer training provided by

the School District included inaccurate information about the Baker Act criteria [Mot. 17–18].

Plaintiffs allege that a Powerpoint slide from the training states that "the Baker Act can be used

on 'individuals who have a mental illness, *or* who may harm or neglect themselves or others'"

[SAC ¶ 178]; it is undisputed that the statute actually requires both elements. Rather than

defending this language, Defendant simply notes that other language on that slide *might* be

interpreted constitutionally. Defendant also argues that providing inaccurate training about Baker

Act criteria is not enough to give rise to liability [Mot. 18]. But this is not a case where, as

Defendant states, additional training "would have been helpful" [Mot. 18 (quoting *Connick v.*

*Thompson*, 563 U.S. 51, 68 (2011))]. This is a case where Defendant trained its employees,

contrary to the law, that they could lawfully use the Baker Act on children who had either a

mental illness or posed a danger to themselves or others, not only those who met both elements

[SAC ¶¶ 174–183]; Defendant's employees then went on to do exactly that. Moreover,

Defendant ignores that it failed to train its employees that developmental disabilities such as

Autism could not be a lawful basis for use of the Baker Act [SAC ¶¶ 171, 174, 176–78, 202–03].

As a result of this lack of training, Defendant's employees were not aware of this exclusion to

the Baker Act criteria and acted in accordance with that understanding when deciding to use the

18

Baker Act on Plaintiffs D.P. and E.S. [SAC ¶¶ 306, 318]. Also, as noted above, its internal affairs investigators made recommendations for further training arising from specific instances of Baker Act use upon which the District did not act [SAC ¶ 202].

              *d)*        *Plaintiffs have adequately pled causation.*

Finally, Defendant argues that even if it did have a policy or practice of using the Baker Act on children who did not meet the Baker Act criteria, or if it failed to train staff not to do so, its actions did not cause school police officers to initiate involuntary examinations of the Plaintiff children. But the consequences to Plaintiff children naturally follow from the Defendant's policies, practices, and failure to train. If a department had a policy, practice, or trained its officers that probable cause was not needed for arrests (as indeed the District now tells its officers it is not required for Baker Acts) it would be absurd for it to claim that that policy did not cause the later arrest of someone without probable cause—what other effect could such a policy and training possibly have? Defendant quotes *McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir. 2004), for the proposition that "where the 'municipal action itself violates federal law, or directs an employee to do so . . . issues of fault and causation [are] straightforward[.]'" But that is precisely this case: the Bulletin, department practice, and officer training directed officers to use the Baker Act on children when they had a mental illness *or* posed a danger to themselves or others. The fact that it didn't require them to do so in every instance is irrelevant. Where an officer does precisely what policy permits, it is absurd for the municipality to turn around and deny that the policy caused that outcome.

              *3.*       *P.S., J.S., and L.H. were deprived of their parental rights.*

On the first motion to dismiss, the Court held that Plaintiffs "have pled a plausible claim under Section 1983 for Parent Plaintiffs P.S., J.S., . . . and L.H.," [R&R 29], but dismissed the claims "without prejudice to Plaintiffs realleging them more clearly should they be granted leave

to amend" solely because they were "shotgun pleadings" [R&R 15 & n.5]. The SAC cures that singular deficiency both by more clearly specifying the plaintiffs (only P.S., J.S., and L.H.) and the defendant (only the School Board) [SAC ¶¶ 267–287]. It also adds new specific allegations from discovery about relevant actions by the School Board.

Rather than argue Plaintiffs' amendment was insufficient, Defendant improperly tries to relitigate the appropriate legal standard for a deprivation of parental rights. This Court previously held that the state may "constitutionally remove a child from their parents' custody without consent or a court order only in 'true emergencies' where 'there is probable cause to believe the child is threatened with imminent harm.'" [R&R 20 (quoting *Doe v. Kearney*, 329 F.3d 1286, 1294–95 (11th Cir. 2003))]. Similarly, the Court held that "parents can only be deprived of their rights to make medical decisions for their children if there is a true or reasonably perceived emergency" [R&R 26] (citing *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990)). Defendant fails to identify any intervening change in controlling law that might warrant reconsideration of those rulings.

Defendant instead argues the Court's decision was wrong because *Kearney* and *Bendiburg* are distinguishable on their facts [Mot. 21–23]. But while *Kearney* happened to involve the child welfare system, it balanced the same interests (as Defendant now urges) at issue in this case, explaining that the proper inquiry is "whether an objectively imminent danger justified the state's removal of a child without prior judicial authorization." 329 F.3d at 1295; *see id.* at 1294 ("[b]y limiting warrantless removals to true emergencies, the law 'seeks to strike a balance among the rights and interests of parents, children, and the State'" (citation omitted)). This balancing of the danger to the child with the parent's interests is far more analogous to the Baker Act context than Defendant's preferred analogy, warrantless seizure for a "violation of

20

law," Fla. Stat. § 985.101(1)(b). Involuntary examination of children is not a punishment (like an arrest), but instead serves parents' interests in preventing children from harming themselves or others. *Cf. O'Connor v. Donaldson*, 422 U.S. 563, 576 (1975) ("a State cannot constitutionally confine" a person under involuntary commitment laws "without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends"); *J.H. v. State*, 344 So. 3d 616, 620 n.3 (Fla. 1st DCA 2022) (discussing how failure to notify parents can lead to a *Miranda* violation).

Defendant's attempts to distinguish *Bendiburg* likewise fail. *Bendiburg* concerned when a state can "willfully disregard the right of parents to generally make decisions concerning the [medical] treatment to be given to their children." 909 F.2d at 470. Nothing in *Bendiburg* turned on the fact that the medical decision at issue there concerned a medical procedure, as opposed to a medical examination. Because an examination is part and parcel of any medical treatment, it too "fall[s] within the realm of a retained parental right." *Id.* at 469. On Defendant's contrary view, a state could subject a child to an involuntary medical examination *any time it wanted* without interfering with any parental rights: that is not the law. *See Parham v. J. R.*, 442 U.S. 584, 603 (1979) ("Simply because the decision of a parent . . . involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state.").

Finally, Defendant wrongly asserts there are no allegations that any medical treatment "was provided without an emergency or their parents' consent" [Mot. 23]. In fact, the SAC specifically alleges that the involuntary examinations were initiated without "consent from Plaintiff Parents," [SAC ¶ 281] and details why there was no true emergency [SAC ¶¶ 58–139]. As this Court previously explained, "[e]ach one of these [three] incidents, although surely

stressful and alarming, d[id] not rise to the level of a true emergency . . . because there were

ample alternatives to Baker Acting these children before seeking approval from their parents"

[R&R 24]. Defendant offers no basis for reconsidering that ruling.[13] To the extent the facts in the

SAC might differ minimally from those alleged in the FAC, they are not significant enough to

alter the Court's true emergency analysis. Further, the Court held in the R&R that even if E.S,

W.B. and D.P. were not calm at the time of their seizures, there was still no true emergency

because the school was aware of and could have used other strategies like de-escalation

techniques, calling a counselor or mobile crisis team, or placing the child in a secure, supervised

location until a parent arrived [R&R 21–24].

    *4.    D.P., E.S., W.B., and M.S. were subjected to excessive force and Plaintiffs have alleged that District Policy causes the use of excessive force.*

    Defendant's arguments on excessive force again rely on this Court reversing its prior

rulings. Specifically, Defendant asks the Court to dismiss the excessive force claims of M.S.,

W.B., D.P., and E.S. on the basis that the handcuffing of these children by District police officers

constituted *de minimis* force[14] even though this Court has already found the opposite.

---

[13] Defendant repeats briefly an argument it made at greater length in its first motion to dismiss and which the Court rejected there—that the Baker Act provides adequate post-deprivation process [Mot. 23, R&R 24–25]. Here, Defendant frames this argument as Plaintiffs not having "challenge[d] the constitutionality of the Baker Act" [Mot. 23]. But Plaintiffs have in fact argued that whether or not Defendant followed the Baker Act (which, in any event, does not *forbid* getting parental consent) their rights were violated. Hence, they have stated a claim. U.S. Const. art. VI, cl. 2 (Supremacy Clause); *cf. Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222 (10th Cir. 2009) (Gorsuch, J., concurring) (state defendants' argument that they complied with Colorado law not a defense to federal claims for disability discrimination).

[14] Defendant also argues that "Plaintiffs have not sufficiently alleged a custom or policy of using 'hobble' restraints" [Mot. 24]. However, Plaintiffs have not brought any claim that rests solely on the use of hobble restraints. Defendant's argument might be appropriate in a motion to strike matter from the pleadings, but it is inapposite here.

In assessing excessive force claims, courts apply the standard set forth by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). This requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the "countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). In evaluating the reasonableness of a seizure, the factors to be considered include (1) "the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396. The Eleventh Circuit has also considered "(4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury." *Patel v. City of Madison*, 959 F.3d 1330, 1339 (11th Cir. 2020) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1197–98 (11th Cir. 2002); *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019)).[15]

The Eleventh Circuit has specifically held that handcuffing children around the ages of M.S., W.B., D.P., and E.S., without more, can constitute excessive force. In *Gray v. Bostic*, it held that it was clearly established that handcuffing a nine-year-old child (who had physically threatened her gym teacher but posed no safety concerns) for at least five minutes constituted excessive intrusion for reasons including her age. 458 F.3d 1295, 1306–07 (11th Cir. 2006) ("[H]andcuffing Gray, a compliant, nine-year-old girl for the sole purpose of punishing her was an obvious violation of Gray's Fourth Amendment rights"); *see also Richmond v. Badia*, 47

---

[15] The Eleventh Circuit recently noted that it has not decided whether *Graham* or *T.L.O.* applies in school excessive force cases. *J.I.W. by & through T.W. v. Dorminey*, No. 21-12330, 2022 WL 17351654, at *5 (11th Cir. Dec. 1, 2022) ("We have never addressed whether *T.L.O* or the *Graham* standard applies to a school resource officer's use of force in school, and we need not do so here.").

F.4th 1172, 1182–83 (11th Cir. 2022) (considering student's age in determining that school police officer's actions constituted excessive force and were not entitled to qualified immunity and noting that in the absence of a legitimate law enforcement purpose for the use of force even *de minimis* force may be constitutionally impermissible). *Gray* also clarified that if a seizure is illegal, as Plaintiffs allege was the case for D.P., W.B., and E.S., then *any* use of force is also illegal and entitles Plaintiffs to damages. *Id.* at 1304.

Despite *Gray*'s clear holding that handcuffing children can constitute excessive force, Defendant claims, as it did previously [First MTD 21–22], that handcuffing, without more, constitutes *de minimis* force, and that "exceptional circumstances" are required to make handcuffing an excessive use of force [Mot. 27]. None of Defendant's cited authorities supports this claim or could overturn *Gray*. The only cited Eleventh Circuit case that actually contains the phrase "exceptional circumstances" is *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019). However, that case, unlike *Gray* and this one, concerned an adult, and its discussion of exceptional circumstances arose only in the distinct context of qualified immunity (*i.e.* whether the violation was clearly established, not whether there was a violation).[16] Other authority cited by Defendant makes clear that its preferred rule is exactly backwards: children of Plaintiffs' age "fall[] squarely within the tender age range for which the use of handcuffs is excessive *absent* exceptional circumstances." *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 182 (4th Cir. 2018) (emphasis added). Finally, Defendant relies on *J.I.W. by & through T.W. v. Dorminey*, an unpublished qualified-immunity case where a police officer broke a thirteen-year-old's arm

---

[16] In *Sebastian*, the Court did in fact find that the plaintiff had stated a claim for excessive force and rejected the officer's defense of qualified immunity.

while handcuffing him. No. 21-12330, 2022 WL 17351654, at *6 (11th Cir. Dec. 1, 2022). But that unpublished case explicitly distinguished cases where the person being handcuffed was not resisting, noting favorably authority that handcuffing in such cases could be excessive force.[17] *Id.*

Defendant also states that it does not 'concede' that psychological injuries are sufficient to sustain an excessive force claim [Mot. 27–28]. This Court has explicitly rejected Defendant's position and ruled that psychological harm may be weighed in determining whether the use of force was excessive, including in the absence of physical injury [R&R 39–40, 44, 46, 47].

The Court has already conducted a detailed analysis of the circumstances surrounding the handcuffing of M.S., W.B., D.P., and E.S. using the Eleventh Circuit's six factors, and found that each Plaintiff has successfully stated a claim. As to M.S., the Court found that the FAC stated that she did not commit any crime; attempt to harm or threaten the officer or anyone else; attempt to resist or evade the officer's custody; and that there was no need for force at all, let alone handcuffing, because she was unarmed, compliant, and accompanied by two adults [R&R 46–47]. The Court also found that M.S. had sufficiently alleged psychological harm [R&R 47]. The facts alleged about M.S.'s excessive force claim are virtually identical in the FAC and SAC. The same is true for W.B. The Court weighed the totality of the relevant circumstances, which have not changed, and found that W.B. stated a claim for excessive force [R&R 44–46].

As to D.P., there have been minor factual changes, but they weigh in D.P.'s favor. The Court previously found that five of the excessive force factors weighed in D.P.'s favor, with the

---

[17] *J.I.W.* was issued after Judge Reinhart issued the R&R but before the Court adopted it. Defendant did not bring it to the Court's attention in that intervening period. J.I.W. was also two to four years older than Plaintiffs at the time of the incidents. Unlike Plaintiffs, J.I.W. was "aggressively or threateningly" moving towards the officer at the time the force was used and continued to struggle against the officer's multiple attempts to restrain him without handcuffs.

exception of the harm of the seizure, as D.P. had not alleged any harm specifically as the result of handcuffing [R&R 40]. D.P. now alleges that he "was psychologically harmed by the use of handcuffs" [SAC ¶ 344]. The SAC also adds the allegation that, like M.S, D.P. was accompanied in the police car by a school counselor, further reducing the need for physical restraints like handcuffs. This supports the Court's previous finding that force was not necessary [SAC ¶ 82]. While the SAC also revises the amount of time that D.P. was handcuffed, from thirty minutes to twenty minutes [SAC ¶ 82], the R&R noted that there was no "need for any force to be applied to D.P. while he was being transported in the back of a locked and secure police vehicle without access to any weapons and without evidence of an intent to injure himself" [R&R 39]. Given that no force was necessary, a ten-minute change in the length of handcuffing should not change the outcome of the court's analysis. Therefore, all six excessive force factors weigh in D.P.'s favor, and, by the Court's already articulated reasoning D.P. has stated a claim for excessive force.

As to E.S., the facts in the SAC have also changed, but still do not call the Court's ruling into question. Specifically, Plaintiffs have clarified that E.S. was handcuffed twice on the day of his involuntary examination. First, E.S. was slammed to the ground, restrained, and then handcuffed by Officer Cuellar [SAC ¶¶ 97–99]. After Officer Cuellar removed the handcuffs, E.S. was calm and compliant for at least ten minutes while awaiting transportation to the Baker Act facility [SAC ¶¶ 104–105]. At that point, a second District police officer arrived, and handcuffed a calm and compliant E.S. again solely for the purpose of transportation [SAC ¶ 106]. The handcuffs remained on E.S. while he was transported to the facility [SAC ¶ 106].

The Court has already considered the first handcuffing of E.S., by Officer Cuellar, and found that the facts alleged in the FAC stated a claim for excessive force. While Plaintiffs have alleged some new facts surrounding this handcuffing, they should not lead to a different

outcome. As to the first factor, the severity of the crime committed, the Court has already concluded that the fact that E.S. hit an adult without injuring her weighs in his favor [R&R 41; SAC ¶ 94]. As to the second factor, the alleged facts show that E.S. did not pose an immediate threat to the safety of officers or others. E.S. hit one adult once without injuring them, and a window without harming himself or breaking the window [SAC ¶¶ 94, 96].[18] The SAC contains no allegation of additional attempts to harm Officer Cuellar or any other person. Therefore, the safety threat factor weighs in his favor.

There are also no allegations in the SAC that E.S. was actively resisting arrest or attempting to evade arrest. While Officer Cuellar did "slam" E.S. to the ground and then restrain him with another District employee working at the school, the SAC alleges that E.S. then "*allowed* Officer Cuellar to put handcuffs on him" [SAC ¶¶ 97–99 (emphasis added)]. Even if the Court assumes that E.S. did initially resist Officer Cuellar, the facts clearly state that he allowed himself to be handcuffed, indicating that his resistance had ended. Accordingly, the third factor weighs in E.S.'s favor.

Reading the facts in the light most favorable to Plaintiffs, there was no need for force, including Officer Cuellar tackling E.S. to the ground and restraining him with another staff member, because the only behaviors E.S. allegedly engaged in were yelling, hitting a behavioral aide once, and hitting a window [SAC ¶¶ 94–99]. Even if some amount of force was appropriate to restrain E.S. prior to the handcuffing, the fact that this restraint was successful and that E.S.

---

[18] Defendant highlights the fact that that the SAC clarifies that it was a "thick glass" window as opposed to just "a window" [*compare* FAC ¶ 108 *with* SAC ¶ 96] in an apparent attempt to argue that the SAC has increased the danger to E.S. of this action [Mot. 28]. But windows are ordinarily made of glass, so the allegation that it was "thick" actually shows that E.S. was in less danger than he might have been from striking simply "a window."

then *allowed* Officer Cuellar to handcuff him shows that the additional use of force of handcuffing was not necessary. Therefore, the fourth and fifth factors regarding the need for and amount of force weigh in E.S.'s favor.

Finally, the SAC, like the FAC, "alleges that E.S. experienced both physical and psychological injuries in the form of ongoing emotional distress, pain, fear, humiliation, distrust, anxiety, as well as scuffed knees" [SAC ¶¶ 356, 365]. The Court found in its R&R that the severity of injury weighed in E.S.'s favor, and there are no changed facts that would support a different conclusion now [R&R 42].

Defendant provides its own analysis of Eleventh Circuit's six factors and comes to a different conclusion. In doing so, Defendant repeatedly makes inferences and reads the facts in the light most favorable to the School Board. For instance, Defendant argues that "Plaintiffs do not clearly allege that E.S. was not resisting Cuellar's efforts to gain control of the situation," and that "it can be inferred that the force [used by Cuellar] was used to gain control of the situation" [Mot. 29–30]. At the motion to dismiss stage, the facts must be read in the light most favorable to Plaintiffs. Defendant's suggested inferences must therefore be disregarded, and the Court should find that Plaintiffs have stated a claim as to Officer Cuellar's handcuffing of E.S.

Defendant does not argue that E.S. has failed to state a claim that his second handcuffing constituted excessive force, instead ignoring it completely. For that reason alone, even if E.S. fails to state a claim as to the first handcuffing claim, E.S.'s second handcuffing claim stands. Considering the second handcuffing alone all six factors clearly weigh in E.S.'s favor. As the Court noted in the R&R, the first *Graham* factor—the severity of the crime at issue—weighs in nine-year-old E.S.'s favor because, at worst, he committed a misdemeanor battery by hitting an adult without injuring her [R&R 41]. By the time the second officer arrived and handcuffed E.S.,

he was calm and compliant; he did not pose an immediate safety threat or actively resist or try to evade the officer [SAC ¶ 106]. Under these circumstances, there was no need for any force to be applied, and the handcuffing was therefore unreasonable. E.S. has also alleged psychological harm as a result of the handcuffing [SAC ¶ 365]. Looking at the totality of the circumstances, the Court should find that E.S. has stated a claim as to the second incidence of handcuffing.

5. *Plaintiffs have sufficiently pled* Monell *liability against the School Board for Office Cuellar's use of excessive force.*

Defendant contends that E.S. has not sufficiently pled *Monell* liability as to Officer Cuellar's use of force prior to handcuffing E.S.—specifically tackling E.S. to the ground and restraining him. In other words, Defendant attempts to separate Officer Cuellar's actions prior to handcuffing E.S. from the handcuffing itself, for the purpose of *Monell* analysis.

However, Officer Cuellar's handcuffing of E.S. is inextricable from the series of restraints he employed in order to put handcuffs on E.S., and from the involuntary examination process generally. The SAC alleges that Officer Cuellar was inadequately trained and supervised, and that these failures resulted in the use of excessive force against E.S [SAC ¶¶ 363–364]. Attempting to divide the incident into separate claims based on the exact moment the handcuffs were applied undermines the spirit of the Fourth Amendment's protections and attempts to shield the District from the fact that E.S. was restrained in a particularly violent and unnecessary manner in the process of being handcuffed. Defendant does not cite any case law endorsing this siloed approach to excessive force claims. In fact, the Eleventh Circuit recently analyzed all of a school police officer's actions during one encounter with a student as a whole in order to determine whether excessive force was used. *Richmond*, 47 F.4th at 1187.

This Court has already found that Plaintiffs have sufficiently alleged facts for excessive force *Monell* liability [R&R 48–53]—and those facts are only strengthened and provided in more

detail in the SAC [¶¶ 175–76, 179, 181, 183, 217]. Therefore, reading the facts in the light most favorable to the Plaintiffs, the Court's conclusion that Plaintiffs have pled *Monell* liability as to Officer Cuellar's use of excessive force against E.S should remain undisturbed.

> 6.     *Plaintiffs pled facts sufficient to state a claim for disability discrimination due to defendant's failure to provide reasonable accommodations and modifications.*

As the Court has already held, Plaintiffs have identified reasonable accommodations and modifications that the Defendant knew or should have known would prevent discrimination against the Plaintiffs [R&R 63–71]. Under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), a qualified plaintiff with a disability states a failure-to-accommodate claim by pleading that the plaintiff experienced discrimination by reason of the defendant's failure to provide a reasonable accommodation. 42 U.S.C. § 12132; 29 U.S.C. § 794; 28 C.F.R. § 35.130; *See, e.g.*, *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Bennett–Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454–55 (5th Cir. 2005) ("[B]oth the ADA and [Section 504] impose upon public entities an affirmative obligation to make reasonable accommodations. . . . Where a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant." (footnote omitted)).[19]

Here, Plaintiffs have identified reasonable modifications and accommodations that the Defendant knew or should have known would prevent discrimination against Plaintiffs. For example, Plaintiffs have alleged that, instead of subjecting Plaintiff children to the trauma and exclusion of an involuntary examination under the Baker Act, Defendant could have, but did not,

---

[19] Defendant does not separately address Plaintiffs' claims under the Florida Education Equity Act, Counts 5–6, apparently conceding that they rise and fall with Plaintiffs' other disability discrimination claims [Mot. 33–41].

employ multiple strategies known to deescalate the child Plaintiffs [SAC ¶¶ 68, 78, 88–92, 100–01, 132]. Defendant could have contacted mental health and case management providers working with the Plaintiff children or appropriately trained mental health or medical staff working for the District [SAC ¶¶ 62, 76–78, 91, 101, 113, 120, 128, 145–46]. Defendant could also have released Plaintiff children to the care of their parents, guardians or emergency contacts [SAC ¶¶ 76, 78, 102–03, 107, 129].

Defendant seeks reconsideration of the Court's prior ruling that Plaintiffs have pled a failure to accommodate claim, arguing that Plaintiffs did not demand accommodations; that the accommodations requested by Plaintiffs were not reasonable; and that Plaintiffs did not adequately plead deliberate indifference to their disability discrimination. None of these arguments are meritorious. Indeed, this Court explicitly found that Plaintiffs had plausibly alleged "(1) various school [District] staff members were aware of alternative de-escalation tactics that had been successfully used in the past with Student Plaintiffs; (2) various school [District] staff members were aware that they could or should contact either the Student Plaintiffs' mental health and case management providers or the mobile crisis team member and follow their professional advice; and (3) various school [District] staff members were aware of some of Parent Plaintiffs' requests to take their children home to de-escalate" [R&R 69 (citations omitted)]. Defendant does not argue that any of the allegations in the SAC regarding any of these findings of the Court have changed. Indeed, Plaintiffs' allegations on these requested accommodations and modifications did not materially change between the First and Second Complaint [*Compare* FAC ¶¶ 75, 81, 91–93, 102–06, 112–113, 116, 125, 157–160, 165–66, 169, 183 *with* SAC ¶¶ 62, 68, 76–78, 88–92, 100–101, 107, 113, 120–23, 128–29, 132, 145].

The R&R adopted by this Court also explicitly found that the requested modifications were reasonable [R&R 69–70.] A requested accommodation may be unreasonable if it imposes "undue financial or administrative burdens" or requires a "fundamental alteration in the nature of the program." *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 288 n.17 (1987). Here, the Court has already found that none of these reasonable accommodations pose undue financial or administrative burdens nor do they require a fundamental alteration of the program: "all three of the proposed modifications are reasonable" [R&R 69–70].[20]

      6.      *As this Court has already held, Plaintiffs do not need to allege discriminatory intent for a failure-to-accommodate claim under the ADA or Section 504.*

Because Plaintiffs do not seek monetary damages for the District's violations of the ADA or Section 504, Plaintiffs are not required to allege deliberate indifference. Defendant's argument to the contrary is yet another thinly veiled attempt to request reconsideration of this Court's previous ruling [R&R 70]. Just as Defendant's did in the First MTD, this argument conflates the proper legal standard for a claim for injunctive relief with the standard for a claim for damages.[21]

---

[20] Plaintiffs do not understand Defendant to challenge Plaintiffs' allegations that Defendant's methods of administration have subjected Plaintiffs to discrimination, including through a blanket policy requiring handcuffing of Plaintiff children without any consideration of reasonable modifications to that policy to avoid discrimination against Plaintiff children [Mot. 32 n.7]. To the extent they argue that any argument that requires them to do more than Florida law requires constitutes a fundamental alteration, as Plaintiffs successfully argued in response to Defendant's First MTD [R&R 69–70], their claims are appropriate because they merely ask that the Baker Act be implemented in accordance with federal requirements [Pl.'s Opp. To Def.'s First MTD, ECF No. 50, at 20–21]. Defendant cannot violate the Constitution or federal law in the process of implementing state law.

[21] In the Eleventh Circuit, ADA and Section 504 claims are governed by the same substantive standard of liability. *See, e.g., Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000). To the extent that the Florida Educational Equity Act may have a different standard, this Court has already held that Defendant has waived any arguments regarding deliberate indifference under the Florida Educational Equity Act [R&R 72–73].

Deliberate indifference is one way that a plaintiff can show intentional discrimination to establish liability for damages under the ADA and Section 504. *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012). However, here, Plaintiffs no longer seek damages under the ADA and Section 504 [SAC ¶¶ 230, 238, 246, 254, 260]. In conformity with this Court's ruling [R&R 71], Plaintiffs only seek injunctive and declaratory relief under the ADA and Section 504.[22] Because Plaintiffs do not seek monetary damages for the District's failure to accommodate their disabilities, neither the ADA nor Section 504 requires Plaintiffs to plead the heightened standard of deliberate indifference. *See Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 830–31 (11th Cir. 2017) (violation of the ADA and Section 504 permits "only injunctive relief" unless the plaintiff can prove deliberate indifference to recover monetary damages); *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019) ("In the ordinary course, proof of a Title II or § 504 violation entitles a plaintiff only to injunctive relief. To get damages . . . a plaintiff must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of 'deliberate indifference.'" (internal citations omitted)).

Defendant's focus on the deliberate indifference standard for intentional discrimination is irrelevant to Plaintiffs' claims that Defendant failed to provide Plaintiffs with reasonable modifications and accommodations. Failure to provide reasonable modifications and accommodations is an independent basis for liability under both the ADA and Section 504. *Alboniga v. Sch. Bd. of Broward Cnty. Fla.*, 87 F. Supp. 3d 1319, 1332 (S.D. Fla. 2015) (citing

---

[22] For the same reason, Defendant's arguments about respondeat superior liability [Mot. 41] are irrelevant.

*Bennett–Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (for the proposition that "the only material difference between the rights and remedies afforded plaintiffs under Title II and Section 504 lies in their respective causation requirements, but that this difference [is] immaterial where the plaintiff's claims are based on a failure to make reasonable accommodations for [individuals with disabilities]").[23]

Defendant does not cite any Eleventh Circuit case law that requires Plaintiffs to allege intentional discrimination through deliberate indifference for a failure-to-accommodate claim that seeks only injunctive and declaratory relief. Instead, Defendant cites two cases where the Eleventh Circuit was only considering the appropriate standard for monetary damages under the ADA and Section 504. *See Ingram v. Kubik*, 30 F.4th 1241, 1257 (11th Cir.) (considering of claims for "money damages for the purposeful or deliberately indifferent conduct of its employees," not claims for injunctive or declaratory relief); *Henry v. Okeechobee Cnty. Sheriff's Off.*, No. 21-12520, 2023 WL 239817, at *4 (11th Cir. Jan. 18, 2023) (describing deliberate indifference as an "additional hurdle" for a plaintiff who seeks monetary damages under the ADA and Section 504). Because Plaintiffs do not seek monetary relief for their claims of disability discrimination under the ADA and Section 504, these cases are irrelevant, and, indeed, hold that Plaintiffs do not need to meet the heightened pleading standard of deliberate

---

[23] *See also Schwarz v. City of Treasure Island*, 544 F.3d 1201,1201, 1212 n.6 (11th Cir. 2008) (noting in dicta that both the ADA and Section 504 recognize reasonable accommodation theories as well as intentional discrimination); *J.A.M. v. Nova Se. Univ., Inc.*, No. 0:15-cv-60248-KMM, 2015 WL 4751149, at *4 (S.D. Fla. Aug. 12, 2015), *aff'd*, 646 F. App'x 921 (11th Cir. 2016) ("Even in the absence of disparate treatment, a defendant will be liable for failing to reasonably accommodate [an individual with a disability] . . . as a failure to accommodate is an independent basis for liability under the ADA and [Section 504]" (citing *Meyer v. Sec'y, U.S. Dep't of Health & Human Servs.*, 592 F. App'x. 786, 791 (11th Cir. 2014) (unpublished)).

indifference. Plaintiffs have adequately pled claims for injunctive and declaratory relief under

the ADA and Section 504, as this Court has already held [R&R 71].

> 7.      *The child Plaintiffs and Disability Rights Florida were not required to exhaust*
> *under the IDEA before bringing ADA and Section 504 claims.*

Even if the Court permits Defendant to raise IDEA exhaustion for the first time on its

second motion to dismiss, exhaustion was not required here. Plaintiffs are not required to exhaust

their claims through IDEA's administrative exhaustion process when the "gravamen of the

plaintiff's suit is something other than the denial of the IDEA's core guarantee—what the Act

calls a 'free appropriate public education.'" *Fry v. Napoleon Community School*, 137 S. Ct. 743,

748 (2017). If a § 504 or ADA claim does not seek relief for the denial of a FAPE, then the claim

is not subject to the exhaustion requirement even if in some way it implicates a child with a

disability's education. *Durbrow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1190 (11th Cir. 2018).

Courts should remember that "while IDEA guarantees students with disabilities an appropriate

educational program tailored to their specific needs, § 504 and the ADA prohibit discrimination

in schools as well as in other federally funded programs and public entities." *Id.*

To be subject to the requirement of administrative exhaustion, the suit "must seek relief

for the denial of a FAPE, because that is the only 'relief' the IDEA makes 'available.'" *Fry*, 580

U.S. at 165; *see also Perez v. Sturgis Public Schools*, 143 S. Ct. 859, 864 (2023) (relief for the

denial of FAPE is the only relief that IDEA's administrative processes can supply). "[A] FAPE

comprises 'special education and related services'—both 'instruction' tailored to meet a child's

'unique needs' and sufficient 'supportive services' to permit the child to benefit from that

instruction." *Id.* at 158 (quoting 20 U.S.C. §§ 1401(9), (26), (29)). The Court explained:

> One clue to whether the gravamen of a complaint against a school concerns the
> denial of a FAPE, or instead addresses disability-based discrimination, can come
> from asking a pair of hypothetical questions. First, could the plaintiff have brought
> essentially the same claim if the alleged conduct had occurred at a public facility

that was not a school—say, a public theater or library? And second, could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

*Id.* at 171.

The statutory language does "not, as a stricter exhaustion statute might, [ask] whether the suit 'could have sought' relief available under the IDEA (or, what is much the same, whether any remedies 'are' available under that law)." *Id.* at 169. Instead, under the IDEA, "the plaintiff [is] 'the master of the claim.'" *Id.* The Eleventh Circuit has recognized in a post-*Fry* decision that a claim that "could be brought as a FAPE violation for failure to follow [the] IEP" can also be "cognizable as a separate claim for [] discrimination under the ADA and § 504." *J.S. v. Houston Cnty. Bd. Of Educ.*, 877 F.3d 979, 986 (11th Cir. 2017).

Plaintiffs were not required to exhaust through the IDEA for at least three reasons. First, Plaintiffs did not allege deficiencies in their educational program or services provided to them to allow them to make educational progress. Second, applying the *Fry* factors shows that the gravamen of Plaintiffs' allegations do not concern their educational program: Plaintiffs could have brought failure to accommodate claims against police officers outside of the school setting, and an adult who was subject to the Baker Act in a school could have brought failure to accommodate claims against the District. Third, Plaintiffs do not seek relief that could be offered under IDEA.

### a) Plaintiffs did not allege deficiencies in FAPE.

Plaintiffs did not allege deficiencies in their educational programs or services provided to them to allow them to make educational progress. Although the District argues that Plaintiffs'

allegations concern the denial of FAPE [Mot. 37], its motion does not cite to any claims in the SAC regarding deficiencies in Plaintiffs' educational programs or services provided to allow them to make educational progress. That is because Plaintiffs do not make any allegations regarding their educational progress or lack thereof [*see generally* SAC]. If the District wants to assert that it denied Plaintiffs a FAPE, it of course is free do so. But Plaintiffs themselves make no allegations regarding their ability to "benefit from [] instruction" and make educational progress. *See Fry*, 580 U.S. at 158. This means that Plaintiffs—who the IDEA treats as "the master of [their] claim[s]"—do not allege a violation of FAPE. Claims regarding reasonable accommodations that do not impact the District's provision of FAPE do not require exhaustion through the IDEA. *See Alboniga*, 87 F. Supp. 3d at 1329 (Exhaustion not required because "Plaintiff does not claim that A.M.'s IEP is in any way deficient. Plaintiff does not claim that A.M.'s service animal is educationally necessary, or that the School Board's provision of A.M.'s education would be impacted by the presence of the service animal.").

Here, like in *Alboniga*, Plaintiffs "do[] not claim that [their] IEPs [were] in any way deficient." It is true that Plaintiffs allege that District staff were aware of de-escalation strategies that were effective for D.P., W.B., and E.S., and that those strategies were documented in school records [*See* SAC ¶¶ 78 (D.P); 118, 119, 130, 132 (W.B); 92 (E.S.)]. But Plaintiffs do not claim that any of the common-sense accommodations that the District failed to provide were "educationally necessary" or that Plaintiffs' "education would be impacted" in any way by the provision of the accommodations. *See Alboniga*, 87 F. Supp. 3d at 1329. Instead, Plaintiffs argue that they were psychologically and, in some cases, physically harmed by the discrimination they experienced [*See* SAC ¶¶ 86–87 (D.P); 98, 115–116 (E.S.); 137–139 (W.B.)]. Even if Plaintiffs' claims regarding failure to provide accommodations while a Baker Act is contemplated *could* be

brought as a FAPE violation for failure to follow a student's IEP, that does not mean that the claim is not separately cognizable as a claim for discrimination under the ADA and § 504. *See J.S.*, 877 F.3d at 986.

> b) *Applying the* Fry *factors shows that Plaintiffs' allegations do not concern their educational program.*

Here, applying the *Fry* factors shows that Plaintiffs' allegations do not concern FAPE. Police interactions with individuals in the community are subject to the protections of the ADA and Section 504 and their requirement to provide reasonable accommodations. *See Bircoll v. Miami-Dade County*, 480 F.3d 1072 (11th Cir. 2007) (considering whether the police officer had failed to make a reasonable accommodation given the circumstances presented); *Rylee v. Chapman*, 316 F. App'x 901, 905–06 (11th Cir. 2009) (applying Title II of the ADA to a detainee's "arrest, booking, and first appearance" and explaining that arrestee may proceed with claims based either on "disparate treatment" or on a "failure to make reasonable accommodations"); *Rada v. Miami-Dade Cnty.*, No. 05-23126-CIV, 2006 WL 8432708, at *10 (S.D. Fla. May 4, 2006) (denying motion to dismiss the plaintiff's ADA claim of failure-to-accommodate when officers, who had been called to transport the plaintiff to a mental health crisis center, "knew that [he] was mentally ill" and the plaintiffs' calm behavior indicated that exigent circumstances were not present).

As a result, Plaintiffs could bring claims regarding the failure of law enforcement officers to provide reasonable accommodations when contemplating the initiation of an involuntary examination under the Baker Act outside of the school setting. If, for instance, a library or a public theater had a routine policy of initiating the Baker Act against children with disabilities without providing reasonable and obvious accommodations, Plaintiffs could bring failure to accommodate claims challenging that conduct as they do here. If library or theater staff knew—

as Plaintiffs allege District staff knew—of effective de-escalation strategies and failed to implement them, Plaintiffs could bring failure to accommodate claims on that basis [*See* SAC ¶¶ 78 (D.P); 118, 119, 130, 132 (W.B); 92 (E.S.)]. Similarly, adults, too, could bring failure to accommodate claims about inappropriate Baker Act use under the ADA or Section 504.

Defendant cites to an unpublished and non-precedential opinion where the court applied the *Fry* factors differently in a case regarding restraint at school that ultimately resulted in the student being seized for involuntary examination under the Baker Act [*See* Mot. 34 (citing *D.L. by & through S.L. v. Hernando Cnty. Sheriff's Off.*, No. 8:22-CV-35-JLB-AEP, 2022 WL 16779550 (M.D. Fla. Nov. 8, 2022))]. The *D.L.* court concluded that the plaintiff's claims were primarily concerned with FAPE. But as explained above, the answer here to both the *Fry* hypotheticals is clearly "yes." Importantly, the *D.L.* court characterized that student's claims as involving "discipline" and emphasized that the plaintiff's ADA claims "focus[ ] precisely on the adequacy of the educational program the School District offered [him]" because "the essence of D.L.'s ADA claims is that the HCSB denied D.L. a FAPE by failing to appropriately tailor its disciplinary tactics to his disability." *D.L.*, 2022 WL 16779550, at *4 (internal quotations and citations omitted). The court explained that "students with disabilities' right to not be subject to a particular type of discipline is closely related to the provision of an educational plan that can meet those students' learning goals." *Id.* Here, unlike in *D.L.*, Plaintiffs' claims do not concern "disciplinary tactics."[24] The essence of Plaintiffs' § 504 and ADA charges was not that the

_____

[24] Separately, on April 7, 2023, the defendant in *D.L.* conceded that in light of *Perez*, "Plaintiff can bring a suit under the ADA without needing to exhaust [administrative] remedies under the IDEA, so long as the suit is seeking a remedy that IDEA cannot provide." Case. No. 8:22-cv-00035-JLB-AEP, ECF No. 67 at 3. *See infra* section 7(c).

District denied Plaintiffs a FAPE; Plaintiffs do not "complain that [their] course of study was not appropriately tailored to [their] disability[ies]." *See Durbrow*, 887 F.3d at 1191.

c)      *Plaintiffs also do not seek relief that could be offered under IDEA.*

Finally, Plaintiffs do not seek relief that could be offered under the IDEA because the IDEA does not contemplate the type of harm that Plaintiffs experienced and Plaintiffs seek structural, systemic reforms. As the Supreme Court recently clarified, the IDEA's "administrative exhaustion requirement applies only to suits that see[k] relief . . . also available under IDEA." *Perez*, 143 S. Ct. at 864. "[R]elief for the denial of a free and appropriate public education . . . is the only relief IDEA's administrative processes can supply." *Id.* at 865. The IDEA's exhaustion requirement does not apply otherwise. *Id.*

As already explained, Plaintiffs simply do not seek relief for the denial of a FAPE and make no allegations regarding the denial of FAPE [*See generally* SAC]. Instead, Plaintiffs argue that they were psychologically and, in some cases, physically harmed by the discrimination they experienced [*See* SAC ¶¶ 86–87 (D.P); 98, 115–116 (E.S.); 137–139 (W.B.)]. It is true that Plaintiffs point to their educational records as evidence of the District's awareness of their disabilities and obvious accommodations [*See* SAC ¶¶ 78, 118, 119, 130, 132]. But Plaintiffs cannot seek relief "also available under the IDEA" when they do not allege a denial of a FAPE. Instead, Plaintiffs seek a variety of structural, systemic reforms as remedies, such as new training for District staff and the involvement of parents in Baker Act decisions, that could not be obtained under IDEA. Accordingly, the IDEA's administrative processes cannot supply a remedy for Plaintiffs' ADA and Section 504 claims and the IDEA's administrative exhaustion requirement does not apply.

Additionally, because Plaintiffs do not allege denial of a FAPE, exhaustion would be plainly futile or inadequate to address harm experienced by Plaintiffs. The Eleventh Circuit

40

recognizes two exceptions to exhaustion: where resort to the administrative process would be "futile or inadequate." *Ass'n for Retarded Citizens of Alabama, Inc. v. Teague*, 830 F.2d 158, 160 (11th Cir. 1987). "For example, courts have not required exhaustion of administrative remedies when the administrative procedure is incapable of granting the relief requested." *Id.* at 161. "Administrative remedies are generally inadequate where structural, systemic reforms are sought." *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1309 (9th Cir. 1992).

For the reasons explained above, the administrative procedures under the IDEA are futile or inadequate to address the harm experienced by Plaintiffs. Plaintiffs seek structural, systemic reforms for disability discrimination experienced, not violations of FAPE. Additionally, Plaintiff DRF has organizational standing as a protection and advocacy organization and is not required to exhaust. *See New Jersey Prot. & Advoc., Inc. v. New Jersey Dep't of Educ.*, 563 F. Supp. 2d 474, 486 (D.N.J. 2008) (explaining that statewide advocacy organizations did not need to exhaust their IDEA claims because they "d[id] not seek individual remedies necessary to make themselves or their constituents whole"). Hence, DRF's ADA and Section 504 claims are not subject to exhaustion and should be allowed to proceed.

## III.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be denied.


Dated: April 13, 2023                           For Plaintiffs,

                                                */s/ Carli Sean Raben*
                                                _____

                                                BACARDI JACKSON (Florida Bar No. 47728)
                                                SAM BOYD (Florida Bar No. 1012141)
                                                CARLI SEAN RABEN (Florida Bar No. 1036013)
                                                Southern Poverty Law Center
                                                P.O. Box 12463
                                                Miami, FL 33101

Tel: 786-347-2056
Fax: 786-237-2949
bacardi.jackson@splcenter.org
sam.boyd@splcenter.org

ANN MARIE CINTRON-SIEGEL (Florida Bar
No. 166431)
MOLLY J. PARIS (Florida Bar No. 90486)
Disability Rights Florida, Inc.
1930 Harrison St. Ste. 104
Hollywood, FL 33020
Tel: 800-342-0823
Fax: 850-617-6647
anns@disabilityrightsflorida.org
mollyp@disabilityrightsflorida.org

SHAHAR PASCH (Florida Bar No. 580971)
Pasch Law Group
1806 Old Okeechobee Road, Suite B
West Palm Beach, FL 33409
Tel: 561-599-7400
Fax: 561-258-8243
shahar@paschlaw.com

MELISSA DUNCAN (Florida Bar No. 796921)
Legal Aid Society of Palm Beach County, Inc.
423 Fern St., Ste. 200
West Palm Beach, FL 33401-5839
Tel: 561-655-8944
Fax: 561-655-5269
mduncan@legalaidpbc.org

HANNAH BENTON EIDSATH (admitted pro hac
vice)
NINA MONFREDO (admitted pro hac vice)
National Center for Youth Law
818 Connecticut Ave NW, Suite 425
Washington, D.C. 20006

Tel: (202) 868-4781
Fax: 510-380-7603
hbenton@youthlaw.org
nmonfredo@youthlaw.org

JEAN STROUT (admitted pro hac vice)
RACHEL VELCOFF HULTS (admitted pro hac vice)
National Center for Youth Law
1212 Broadway, Ste. 600
Oakland, CA 94612
Tel: 510-835-8098
Fax: 510-835-8099
jstrout@youthlaw.org
rvelcoff@youthlaw.org

JOSHUA C. TOLL (admitted pro hac vice)
King & Spalding LLP
1700 Pennsylvania Ave. NW, Ste. 200
Washington, D.C. 20006
Tel: 202-737-8616
Fax: 202-626-3737
jtoll@kslaw.com