**EXPERT WITNESS REPORT**

Kristin M. Kosmerl, Ed.D., BCBA-D, IBA, CAS, CTRP, ADHD-CE, LBS, LBA
Kosmerl Consulting, LLC

In the Matter of:

***D.P., et al., v. School Board of Palm Beach County, et al.***

United States District Court for the Southern District of Florida
Case Number: 21-810990-CIV-CANNON

November 30, 2022

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

Terms of Reference and Certification ...........................................................................1

Professional Background and Qualifications ...............................................................2

Scope of Opinions ........................................................................................................3

Standard to Which Opinions are Given........................................................................4

Basis of Opinions .........................................................................................................4

Limitations of Opinions ...............................................................................................5

Executive Summary ......................................................................................................5

BACKGROUND ...................................................................................................... 6

W.B.'s Past Behaviors..................................................................................................7

Timeline on February 16, 2021 ...................................................................................9

OPINIONS ............................................................................................................. 13

Policy Deficiencies.....................................................................................................13

Training of School District Personnel .......................................................................16

   Professional Crisis Management (PCM) and De-escalation Training...................... 16

   Trauma .................................................................................................................. 20

Training Antecedent Strategies: Structure and Engagement.....................................20

W.B.'s History of Dysregulated Behaviors in School ...............................................22

Verbal Aggression as a Coping Mechanism ..............................................................24

Behavioral Incident on February 16, 2021 ................................................................25

Awareness of Students' Disabilities...........................................................................27

Accommodations Which District Personnel Should Have Known, According to the FBA, BIP, and IEP ........................................................................................................................28

   Proactive (Antecedent) Strategies to Prevent Behavior for W.B. from BIP ......................... 29

   Other Accommodations for W.B. From BIP .......................................................................... 29

   What to Do if Problem Behaviors Occurs Per BIP ............................................................... 30

   EBP Accommodations that School Staff Should Have Been Aware of And Implemented .. 31

   Evidence-Based Replacement Behaviors that Should Have Been Taught to W.B. .............. 32

   Evidenced Based Consequence Strategies for Physical and Verbal Aggression: ................ 32

Detrimental Effects of Handcuffing Children ............................................................33

SUMMARY AND CONCLUSIONS ..................................................................... 34

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

APPENDIX A: Curriculum Vitae ................................................................ 37

APPENDIX B: History of W.B.'s Dysregulated Behaviors in the Educational Domain ............. 56

APPENDIX C: Analysis of Daily Behavior Sheets 1/4/2021-2/16/2021 .................................... 59

APPENDIX D: PCM De-Escalation Strategies for Pre-Crisis Behaviors ................................... 68

APPENDIX E: Records Reviewed ................................................................ 70

APPENDIX F: Common Abbreviations (Alphabetical Order) .................................................. 73

APPENDIX G: References ................................................................ 74

APPENDIX H: Works Consulted ................................................................ 77

# INTRODUCTION

## Terms of Reference and Certification

I, Dr. Kristin M. Kosmerl, BCBA-D, IBA, CAS, CTRP, ADHD-CE, LBS, LBA of Kosmerl Consulting, LLC, developed and wrote this expert report for King & Spalding et al., in the case of D.P., et al., Plaintiffs, vs. School Board of Palm Beach County, et al., Defendants, United States District Court, Southern District of Florida, case no.: 21-810990-CIV-CANNON.

The written report, reviews and opinions presented herein throughout, are mine exclusively based on over 21 years in the fields of applied behavior analysis and education.

I am compensated for my expert services related to this case at a rate of $275 per hour for investigation analysis, report preparation, deposition, trial preparation, deposition testimony and court appearances. Compensation for aforementioned work related to this matter is not dependent on a certain opinion or outcome of this litigation.

I have personal knowledge of the facts set forth herein, and if called upon as a witness I would testify to this report under oath in a deposition and/or testimony.

I certify under penalty of perjury that the opinions expressed in this expert report are true and correct to the best of my knowledge and ability as a board-certified behavior analyst-doctorate, international behavior analyst, certified autism specialist, attention deficit hyperactivity disorder-certified educator, licensed behavior specialist and licensed behavior analyst, with prevailing scientific standards of practice.


/s/ Kristin M. Kosmerl
_____

Kristin M. Kosmerl, Ed.D., BCBA-D, IBA, CAS, CTRP, ADHD-CE, LBS, LBA


November 30, 2022
_____

Date

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

**Professional Background and Qualifications**

My name is Dr. Kristin M. Kosmerl. I am a Board-Certified Behavior Analyst-Doctorate

(BCBA-D), International Behavior Analyst (IBA), Certified Autism Specialist (CAS), Certified

Trauma & Resilience Practitioner (CTRP), Attention Deficit Hyperactivity Disorder-Certified

Educator (ADHD-CE), Pennsylvania Licensed Behavior Specialist (LBS) and Texas Licensed

Behavior Analyst (LBA).  Currently, the State of Florida does not license behavior analysts.

I received a Bachelor's of Science in Education (B.S.E.D.) in Elementary Education from

West Chester University of Pennsylvania, a Master's in Elementary Education (M.Ed.) from the

University of Central Florida, a Post-Master's Certificate in Applied Behavior Analysis

(Certificate in ABA) from Pennsylvania State University and a Doctorate in Education

Administration (Ed.D), with a dissertation titled "A Comparative Investigation of General and

Special Education Elementary Teachers' Beliefs About Including Students with an Educational

Disability of Autism in the General Education Setting" from Widener University.

I also hold the following Pennsylvania Department of Education Certifications:

elementary education K-6, special education N-12, Supervisor of Special Education, and

Supervisor of Curriculum & Instruction. These certifications are inactive due to not receiving the

required Pennsylvania Act 48 continuing education credits, as I live in Florida, but they are

considered in good standing.

I have over 12 years of public education experience in Pennsylvania and Florida. My

previous positions include the titles of general education kindergarten teacher, general education

third-grade teacher, and autistic support special education teacher.  I was also a Board-Certified

Behavioral Analyst (BCBA), an exceptional student specialist (including overseeing special

education classrooms, 504 plans, and gifted programming), and a Supervisor of Special

Education.  I have 21 years of experience in applied behavior analysis (ABA) and the assessment

and treatment of severe behavioral disorders.

In 2012, I started my private practice part-time, consulting on severe behavioral

disorders. In 2014, I left public education and in 2015, transitioned to private practice full-time.

In my private practice, I provide direct service for all behavioral disorders using the evidenced-

based method of ABA.  I also provide educational advocacy services nationwide, including

attending Individualized Education Program (IEP) meetings, Section 504 of the Rehabilitation

Act (504) meetings, eligibility meetings and manifestation determination (MD) meetings.  I also

conduct independent educational evaluation, functional behavior assessments (IEE FBAs) and provide expert witness opinions and testimony.  I provide consultations and individualized training to school districts, businesses, and first responders through my private practice. In the past four years, I have testified at a 2021 Due Process Hearing in Florida, *Student vs. Escambria County*.  My publications for the past 10 years are in my curriculum vitae, attached at **Appendix A**.

### Scope of Opinions

The plaintiffs have requested an expert opinion report in the case of D.P., et al., Plaintiffs vs. School Board of Palm Beach County, et al., Defendants, specifically in the case of W.B., a ███, ████ grade ██████ student with a DSM-V diagnosis of Oppositional Defiant Disorder (ODD) and educational disability category of emotionally behaviorally disturbed (EBD), who was  removed from school for involuntary examination from a School District of Palm Beach County (the "District") ██████ school on February 16, 2021, by a District police officer pursuant to the Baker Act.  Specifically, Plaintiffs requested that I complete a qualitative review and analysis of records to opine on the actions or inactions of school district personnel, including Officer Brown, on February 16, 2021 in response to W.B.'s dysregulated behaviors.[1]

The plaintiffs requested that I opine on whether the accommodations listed W.B.'s educational records were provided as written, as well as what other accommodations should have been provided on February 16, 2021, to prevent W.B.'s involuntary examination.

This Report also opines as to whether the handcuffing of an elementary student with a disability and the involuntary transport from school due to behaviors related to the student's disability is trauma inducing or invoking. While Plaintiffs did not initially request an opinion on this subject, as a BCBA-D, CTRP, and certified teacher/administrator in the education domain, upon review of records, I identified a repeated theme of the trauma that W.B. experienced—as a ██████, elementary school student with disabilities—when he was handcuffed behind the back and placed in the back of a police car to be transported for involuntary examination, for

---

[1] Dysregulated behaviors refer to the maladaptive responses of emotions a person experiences (Vogel et al., 2022). These are negative behaviors exhibited in response to non-preferred stimuli. The dysregulated behaviors of physical aggression, including throwing objects, hitting/kicking towards peers and adults (but not connecting), and the verbal threats of self-harm/ harm to others were of specific concern for W.B. on this date.

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

behaviors that were, at that time, well-documented in his educational records to be due to his disabilities.

**Standard to Which Opinions are Given**

The opinions contained within this Report are based on my experience of over 20 years in the implementing the science of applied behavior analysis (ABA) and my work in public education.

ABA is an evidenced-based practice (EBP), which is a "model of professional decision making in which practitioners integrate the best available evidence with client values/ context and clinical expertise in order to provide services for their clients" (Slocum et al., 2014).  By focusing on the analysis of data to determine treatment and progress, ABA provides a framework for using the best available information in complex settings to make behavioral treatment decisions (Slocum et al., 2014).

I am also a Certified Trauma and Resilience Practitioner (CTRP) who is trained to not only recognize trauma, but also to address previous trauma when creating plans to prevent and respond to behaviors related to behavioral and mental health disabilities. Trauma-informed training and implementation in public schools is an evidenced-based practice to meet the needs of all students in a school and decrease significant behaviors that impede learning. Students cannot learn if they do not feel safe (Minahan, 2019).

**Basis of Opinions**

The information used in forming opinions contained within this report is of the type reasonably relied upon by experts in the fields of ABA, education, and trauma-informed practices in the educational and clinical domains. Information I reviewed includes:

- Florida's Baker Act Law, S.394.463, F.S. Ch. 65E-5.280, FAC;
- The Professional Crisis Management (PCM) Practitioner Manual with a copyright date of 2008 published by Professional Crisis Management Association (PCMA), which focuses on evidenced-based practices (EBP) of trauma-informed ABA and de-escalation prior to the use of physical interventions for crisis; and
- The District's Exceptional Student Education Policies and Procedures (SP&P) for the school years 2020-2021 through 2022-2023 for the District, which states that

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

the District uses PCM for Exceptional Student Education (ESE) and that at least 4 people must be trained in PCM for schools that are ESE cluster sites.

School records and depositions reviewed are included in **Appendix E** and specific documents cited throughout this Report are presented in internal citations based on American Psychological Association (APA) format and are included in **Appendix G.** The additional references reviewed, but not cited are found in **Appendix H.** A list of common abbreviations found through the expert report is found in **Appendix F**, for easy reference.

### Limitations of Opinions

My areas of expertise include behaviors; the implementation of ABA in the educational and clinical domains; behavior evaluations and plans, including functional behavior assessments (FBAs), behavior intervention plans (BIPs) and individual education plans (IEPs); and how to prevent and respond to dysregulated behaviors, including physical aggression, verbal aggression and other crisis behaviors.

It is out of my scope to determine eligibility of DSM-V diagnoses as this is related to diagnostic evaluations.

### Executive Summary

My opinions, which are detailed throughout this Report, are as follows:

- District staff at ▮▮▮▮▮▮ Elementary, including Mr. Curtis Brown, Ms. Maria Sumner, and Ms. Robera Walker, knew W.B.'s history of exhibiting dysregulated behaviors in the form physical and verbal aggression at school. The District failed to adequately and consistently train staff in EPB in recognition of a behavioral/mental health crisis and de-escalation procedures. District staff erroneously treated W.B.'s physical and verbal aggression on February 16, 2021 as if it was at crisis level. Had District staff received consistent training in the application and follow through of EBP crisis management, they would have collectively ascertained that W.B.'s behaviors that day were not continuous and were not an immediate threat, therefore not meeting the criteria of a crisis. Accordingly, they should not have responded to W.B.'s dysregulated behaviors as a crisis.

- W.B.'s dysregulated behaviors were successfully de-escalated in the past without SRO or mobile crisis involvement. But despite extensive documentation in W.B.'s

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

educational record, school personnel had limited knowledge on W.B.'s mental health diagnosis, educational disability, and needs. Because school staff were uninformed, they failed to implement interventions, accommodations and other de-escalation strategies specific to W.B. This lack of knowledge regarding W.B.'s disabilities and appropriate interventions, strategies, and other accommodations, led to a significant breakdown in communication between school district staff, including, Officer Brown, who was the substitute officer on duty on February 16, 2021. Had W.B.'s disabilities, interventions, accommodations and strategies been effectively communicated between staff, W.B. would have been significantly less likely to be handcuffed and transported for an involuntary examination.

- Additionally, there were other obvious accommodations and interventions that school staff could have implemented to safely de-escalate W.B.'s dysregulated behavior before it escalated to the point of a perceived crisis. The utilization of these accommodations and interventions would have also reduced the probability of W.B. being transported for an involuntary examination.

## BACKGROUND

On February 16, 2021, W.B., a ▉▉▉ ▉▉▉ grade student with educational disability of emotionally behaviorally disturbed (EBD) and DSM-V diagnosis of Oppositional Defiant Disorder (ODD), was transported for involuntary examination pursuant to Florida's Baker Act Law, from ▉▉▉ Elementary School by Officer Johnny Brown (School District of Palm Beach County [SDPBC], IEP 5/1/2020; SDPBC, FBA 1/24/2020; Incident Report, 2021). He was transported for exhibiting dysregulated behaviors. W. B. was removed from his elementary school grounds, handcuffed behind his back and placed in the rear of a caged, marked patrol car. He was transported in this manner to JFK North Hospital, approximately 40-65 minutes away from school, alone without parent or known safe person (Brown Dep. 113:1-17; 115:10-12). He remained at JFK North until February 22, 2021. W.B.'s discharge diagnoses were listed as disruptive mood dysregulation disorder (DMDD), attention deficit hyperactivity disorder combined typed (ADHD-Combined) and Nocturnal Enuresis (JFK North, 2021, p. 3).

Officer Brown testified that he, along with Sgt. Burrus, who arrived after W.B. was handcuffed, made the determination to transport W.B. for involuntary examination due to

physical aggression, verbal aggression and making threats to harm himself and others while in an escalated state (Brown Dep. 98:21 - 99:10).  W.B. had regularly engaged in these behaviors in in school prior to this date (SDPBC, IEP 5/1/2020; SDPBC, FBA 1/24/2020; Incident Report, 2021).

### W.B.'s Past Behaviors

Voluminous documentation in W.B.'s educational record describes W.B.'s behavioral challenges beginning in kindergarten. This documentation includes evaluations, data collection and discipline referrals, 504 documentation, a functional behavior assessment (FBA[2]), a behavior intervention plan (BIP[3]), and an individual education plans (IEP) (SDPBC, FBA 1/24/2020; SDPBC, BIP 1/31/2020; SDPBC, IEP 5/1/2020).

On February 16, 2021, there were three legal documents to address W.B.'s "target behavior"[4]—the behavior which school staff wanted to decrease—of physical aggression: an FBA, a BIP and an IEP.

The completion of a FBA should yield a provable hypothesis statement.[5]  The hypothesis should be based on analysis of collected data, including antecedent and consequence data, by the school team and describe why the student's target behavior is occurring.  In W.B.'s FBA, the hypothesis statement focused on the target behavior of physical aggression,[6] which it defines as throwing objects and hitting others and self when angry.  It hypothesized that W. B. would likely exhibit the target behavior of physical aggression when he doesn't get his way (antecedent); that

---

[2] An FBA is a scientific process to identify the reasons behind and factors contributing to someone's behaviors (United States Department of Education Office of Special Education and Rehabilitative Services [OSERS], 2022, p. 8).

[3] A BIP is developed using the data analyzed and the hypothesis statement from the FBA.  The BIP is designed to decrease dysregulated behaviors and increase desired behaviors.

[4] "Target behavior" is the term used in the school setting; such behaviors are often referred to a dysregulated behaviors in the field of ABA.  It is  imperative that the target behavior is specific in definition, observable, and measurable, increase the student's functioning in the school domain.  If the target behavior is not defined in measurable and observable terms, data collection will be inconsistent and difficult to analyze for trends throughout the implementation of the BIP.

[5] The FBA hypothesis statement is a data-driven, educated guess about the functions of the target behavior (Pennsylvania Training and Technical Assistance Network [PaTTAN], 2009, p.1).  It states what the target behavior is, when it is most likely to occur, and what the student gets from exhibiting the target behavior.  Hypothesis statements are simply that, hypotheses.  However, it is very important to determine the function of the behavior and test the hypothesis through data collection and analyzation.  This is essential to design an effective and valid behavior intervention plan (BIP) (PaTTAN, 2009, p.1).  A hypothesis is not to be accepted as an absolute truth, but through continued data collection on the target behavior, the hypothesis will either be accepted or rejected.

[6] W.B.'s FBA had an assessment start date of 10/03/2019, meeting date of 01/24/2020 and implementation date of 01/27/2020.

this physical aggression was being reinforced or maintained due to attention from peers and adults; and that the function of the behavior (i.e., the reason he was engaging in the target behavior) was attention from peers and adults (SDPBC, FBA 1/24/2020). W.B.'s BIP also outlines procedures for preventing the target behavior and what should be done if the target behavior occurs. (SDPBC, BIP 1/31/2020). FBAs should contain all target behaviors which are of concern in the school domain due to their impact on education. Unfortunately, verbal aggression was not a target behavior for reduction in W.B.'s FBA, despite the fact that W.B.'s educational record indicates that verbal aggression, including threats of self-harm and to others, had been an issue since kindergarten (SDPBC, FBA 1/24/2020, p. 2).

My opinion is that it is concerning that W.B.'s FBA only addresses physical aggression despite his history of verbal aggression dating back to kindergarten. (SDPBC, FBA 1/24/2020). For instance, Mr. Curtis Brown testified that he has heard W.B. say he was going to kill someone before, sometimes frequently, but never took him seriously because he would say it during times of anger. (Brown, C. Dep. 49:13-22). Verbal aggression and threatening statements should have been identified and addressed for W.B. when he was found eligible for ESE services. Had the District employed evidence-based interventions to address these types of statements, W.B.'s verbal aggression should have decreased.

The target behavior of physical aggression was also noted in W.B.'s BIP.[7] Prior to W.B. being found eligible for ESE services, the District also engaged in the response to instruction and intervention (RtII)[8] process and data collection, which focused on both physical and verbal aggressions as detailed in his Initial Psychoeducational Evaluation report (SDPBC, Psych-Ed Evaluation, 12/18/2019). But the District failed to consider this data in the subsequent FBA (SDPBC, FBA 1/24/2020). Please see appendix for a review of these behaviors.

The final legal documents that were in effect on February 16, 2021 were W.B.'s BIP and IEP.[9] The IEP listed the following behavior goals based on W.B.'s FBA and BIP:

---

[7] W.B.'s BIP had an assessment start date of 10/03/2019, meeting date of 01/31/2020, and implementation date of 02/03/2020 (SDPBC, BIP 1/31/2020, p. 1).
[8] Response To Intervention, or RTI, is data based multi-tiered approach to early identify students who have behavior and/or learning needs (RTI Action Network, n.d.).

[9] The IEP in effect was dated May 1, 2020.

1. W.B. "will decrease physical aggression given when feeling frustrated or angry at or with by 50%";

2. W.B. "will reduce the time to de-escalate given supports and structure at or with by 50%";

3. W.B. "will independently begin and complete a task given when presented with a non-preferred activity at or with 80% of all opportunities." (SDPBC, IEP 5/1/2020, pp. 3-4).

All three documents—the FBA, BIP, and IEP—in effect on the day W.B. was involuntarily transported from school in handcuffs pursuant to the Baker Act note a target behavior of physical aggression (SDPBC, FBA 1/24/2020; SDPBC, BIP 1/31/2020; SDPBC, IEP 5/1/2020).

I reviewed five depositions in the preparation of this expert report. The depositions I reviewed were of W.B.; Officer Johnny Brown, school resource officer; Mr. Curtis Brown, then the behavioral intervention assistant (BIA) for ████████ Elementary; Ms. Maria Sumner, assistant principal of ████████ Elementary; and Ms. Robera Walker, principal of ████████ Elementary.  However, the testimony in each deposition was not clear on what led to W.B.'s transport for involuntary examination on February 16, 2021, from public school.

Timeline on February 16, 2021

The following timeline is created based on Officer Johnny Brown's deposition transcript and his police report from February 16, 2021 regarding W.B's involuntary examination pursuant to the Baker Act.  These reports were used for the basis of the timeline, as Officer Brown stated he was the one who decided to transport W.B. for involuntary examination due to his physical and verbal aggression (Brown Dep. 106:4-8; Incident Report, 2021). However, there are significant contradictions between the depositions of Officer Brown, Mr. Curtis Brown, Ms. Maria Sumner, Ms. Robera Walker, and W.B.  The conflicting statements from the above depositions and other documents are referenced below to show there was a lack of communication and knowledge of W.B.'s needs to regulate his behaviors.

It is important to note that Officer Brown was not the assigned school police of ████ ████ Elementary; he was the substituting school police officer on February 16, 2021, and that neither Officer Brown, Mr. Curtis Brown, Ms. Sumner, nor Ms. Walker, were in the classroom when W.B. first started exhibiting physical aggression that day (Brown Dep. 98:11-16; Brown,

C. Dep. 39:24 – 40:2; 61:23-25; Sumner Dep. 97:8-15; Walker Dep. 89:14; 137:6). The behaviors from the classroom were not observed by school staff who interacted with him outside of the classroom.

Officer Brown testified that on February 16, 2021, at 10:39 am, he was called by administration on the radio to a student crisis (Brown Dep. 98:13-16). Officer Brown testified that when he arrived in W.B.'s classroom, Mr. Curtis Brown, the teacher, and students in the classroom were present (Brown Dep. 100:1-10). Officer Brown testified that Mr. Curtis Brown identified the student in crisis as W.B., and stated the student was in a physical altercation with another student (Brown Dep. 98:18-20). Officer Brown stated he saw student W.B. being aggressive towards others, "throwing chairs in the direction of the other kids causing a danger for them" (Brown Dep. 98:18-23).

However, Mr. Curtis Brown testified that he did not see W.B. have an altercation with another student, as W.B. was already by himself when he came to the classroom. (Brown, C. Dep. 61:21-24). Mr. Curtis Brown also testified that he did not see W.B. throwing chairs in the classroom or making verbal threats to harm himself or others on that day (Brown, C. Dep. 44:16-18; 62:1-11).

According to Officer Brown, Mr. Curtis Brown blocked W.B. from the other students and walked him into the hallway (Brown Dep. 101:4-8). Officer Brown stated he saw W.B. run out of the school (Brown Dep. 101:11-12), and "Mr. [Curtis] Brown and some more staff took off running towards him." (Brown Dep. 101:19-20). Officer Brown stated in his deposition that from the time he arrived at the classroom, after being radioed at 10:39 am, to the time W.B. was running towards the fence was "about one minute" (Brown Dep. 105:7-10).

Officer Brown testified that he heard W.B. say he wanted to commit suicide by jumping off a building (Brown Dep. 98:25-99:3). At various points in the deposition, he identified this as occurring while W.B. was in the hallway, then running towards the fence (Brown Dep. 101:23-25-102:4) or while being walked back from the fence (Brown Dep. 103:8-10).

Officer Brown testified that once outside, W.B. ran towards and tried to jump the school's back fence (Brown Dep. 101:18-20). Ms. Sumner arrived at this time and reported that she was trying to de-escalate W.B. by joking around, talking about his shoes and outfits, but he wasn't responding (Sumner Dep. 97:8-11; 99:23-100:8). Ms. Sumner stated that even knowing W.B. was trying to climb the fence, he was not going to be able to go anywhere due to the

construction of the fence (Sumner Dep. 99:1-9). Ms. Sumner stated that the situation "wasn't a danger" (Sumner Dep. 99:11). Ms. Sumner testified that W.B. was saying "I hate this school. I hate everybody. I'm going to hurt someone," but he did not say who (Sumner Dep. 100:9-12).

Officer Brown stated W.B. was "pulled off" the fence by school staff. (Brown Dep. 102:15-20). However, Mr. Curtis Brown testified he was able to get W.B. off the fence by using "verbal praise" and that W.B. was not pulled off the fence (Brown, C. Dep. 41:25-42:4). Mr. Curtis Brown stated that W.B. was de-escalated and "calm" when he climbed down the gate/fence (Brown, C. Dep. 42:9), and that at that point Officer Brown showed up and began interacting with W.B. (Brown, C. Dep. 42:14-16). Ms. Sumner agreed that Office Brown arrived at the fence after she and Mr. Curtis Brown (Sumner Dep. 101:3-5). Ms. Sumner stated that when Officer Brown came out and interacted with W.B., she gave W.B. his space, but he was still angry and Officer Brown was engaging in verbal dialogue with W.B which was not part of their de-escalation tactics (Sumner 100:17-22).

Officer Brown stated that while walking back to the school student W.B. made threats to kill himself and started to pull away from school staff, while getting aggressive. (Brown Dep. 103:8-10). Officer Brown explained he intervened with W.B. by trying to "calm him down and once he didn't calm down, I placed him in hand restraints [handcuffs] and went into the police office at that point and separated him from everybody" (Brown Dep. 103:15-18).

At this point of handcuffing, Officer Brown described W.B. as "still aggressive" with behaviors of "verbally abusing staff, he was punching towards Mr. [Curtis] Brown, kicking towards anybody that would come close to him. He was looking for objects to throw." (Brown Dep. 103:21-25). Officer Brown stated that W.B. was kicking and punching in the air towards Mr. Curtis Brown, but W.B. did not make physical contact with anyone while he was exhibiting this behavior (Brown Dep. 104:7-10). He was not kicking and punching towards Officer Brown but others.

Ms. Sumner stated that she was on the walkie making sure that W.B.'s mom knew about the situation when she saw Officer Brown handcuff W.B. (Sumner Dep. 105:18-19). Just before the handcuffing she heard W.B. say "I hate you or I'm going to kill you or I'm going to do something to you . . . he was going to kill himself, something like that in that realm." (Sumner Dep. 105:9-13). Mr. Curtis Brown stated that he did not see W.B. take any actions to attempt to harm himself or others on February 16, 2021, other than trying to climb the gate, and did not

hear him say anything about harming himself or others on that day (Brown, C. Dep. 44:16-22.)
He stated that he did not know what Officer Brown said or did to W.B. after leaving the fence,
because they walked away from him (Brown, C. Dep. 42:22-23).

Officer Brown testified that about two minutes passed between when W.B. exited the
classroom and when Officer Brown handcuffed him (Brown Dep. 105:17).  By Officer Brown's
own estimation, he interacted with W.B. for three minutes before handcuffing him (Brown Dep.
105:21).

Maria Sumner testified that after W.B. was handcuffed, she commented to Officer Brown
that mobile crisis or the District's Crisis, Assessment, Prevention, Education and Support
(CAPE) Team was not called and de-escalation strategies were not tried (Sumner Dep. 104:2-8).
According to Ms. Sumner, Officer Brown responded with "nope" about calling mobile crisis or
the CAPE Team (Sumner 104:8).  She then stated she tried to explain that is not the Baker Act
process and Officer Brown again responded, "he said what he said. We are good." (Sumner Dep.
104:8-10).

Ms. Sumner then stated she called for a code yellow because W.B. was in handcuffs and
could possibly be seen by others (Sumner Dep. 104:13-14).  Ms. Sumner stated she "cover(ed)
him (W.B) up because no children has to – you know, they have to witness that." (Sumner Dep.
104:15-16).  A jacket was then used to cover W.B.'s hands as he walked through the halls
(Sumner Dep. 104:17).

Officer. Johnny Brown stated that someone called W.B.'s parents, but he did not know
who (Brown Dep. 106:21-24).

W.B. was taken to the police office (Sumner Dep. 104:17-19), and Sergeant Burrus and
W.B.'s mother, L.H., arrived within a few minutes.  Officer Brown stated that he heard W.B. say
that he would "take his gun and kill people" in reference to Sgt. Burrus' gun (Brown Dep. 99:5-
6).  This led to Officer Brown believing that W.B. "wanted to die, I think" (Brown Dep. 101:23-
25).  Officer Brown testified that W.B. did not attempt to reach for Sgt. Burrus' gun, as he was
already handcuffed. (Brown Dep. 106:10-20).

Ms. Sumner testified that she believes W.B.'s mother was in agreement with the Baker
Act because she was having a difficult time getting W.B. services (Sumner Dep. 111:18-112:3).
Ms. Sumner also stated that she believed W.B.'s mother gave consent because "she didn't say
no" (Sumner Dep. 113:5-6).  However, it should be noted that Ms. Sumner did not specifically

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

speak to L.H. about the involuntary examination pursuant to the Baker Act (Sumner Dep. 114:10-14).

Officer Johnny Brown stated that he removed the handcuffs from W.B. to allow him to use the restroom (Brown Dep. 112:21-25). Officer Brown testified that he put W.B. in handcuffs again after he used the restroom (Brown Dep. 113:1-3).

Ms. Sumner had a different recollection of the handcuffing. Ms. Sumner stated W.B. said "get this off of me" in reference to the handcuffs (Sumner Dep. 111:6-7).  Officer Brown then responded, "If you are not going to run away, then I will take it off" and he did (Sumner Dep. 111:8-9).  He was not handcuffed when L.H. was present (Sumner Dep. 111:10-11).  Ms. Sumner stated that at that point, de-escalation techniques were not tried because he "wasn't irate in the office.  He was calm." (Sumner Dep. 111:15-18).

Officer Brown estimated that W.B. waited about 10-15 minutes before they left for involuntary transport (Brown Dep. 112:14-17).  Ms. Sumner estimated in her deposition that W.B. was in the police office for about an hour before transportation (Sumner Dep. 112:12-14).

Officer Brown testified that when he was walking W.B. to the police car, he was not resisting but was verbally abusive (Brown Dep. 113:23-114:4).  Ms. Sumner and Mr. Curtis Brown testified that W.B.'s demeanor was calm when he was walking to the police car (Sumner Dep. 113:23-24; Brown, C. Dep. 50:9-14).  Mr. Curtis Brown recalled W.B. being handcuffed, while Ms. Sumner did not (Sumner Dep. 113:17-19; Brown, C. Dep. 50:9-14).

According to Google Maps, the estimated time to get to JFK North on 45th Street from ▮▮▮▮▮ Elementary School during normal traffic conditions is at least 57 minutes and can be up to 1 hour and 14 minutes, without any traffic difficulties Google. (n.d.).

Therefore, W.B. remained in handcuffs in the back of a caged police car for at least 57 minutes while being transported for an involuntary examination pursuant to the Baker Act to JFK North.  At different points in the deposition, Officer Brown estimated the length of the drive to forty minutes and one hour and 15 minutes (Brown Dep. 115:7-9; 61:13-15).

## OPINIONS

### Policy Deficiencies

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

I reviewed two District policy documents that were in effect on the day of W.B.'s involuntary examination:  the FY21 Quick Reference Guide that was approved for the 2020-2021 school year, as well as the 2018 Baker Act Decision Tree.[10]  My opinion is that the focus of the District's crisis response policies and procedures should be on trained professional involvement throughout the entire process at the first sign of a crisis or perceived crisis, instead of "putting kids in hospitals or prescribing medications" (Weir, 2016).  Both the FY21 Quick Reference Guide and the 2018 Baker Act Decision Tree are severely deficient because they fail to emphasize immediate contact with trained mental and behavioral health professionals for de-escalation and evaluation purposes.

Involuntary transport can have lasting traumatizing effects for any student, let alone a student with a documented disability and behavior disorder.  Accordingly, the decision to involuntarily transport should not be taken lightly and should be made by highly trained personnel.  The policies and practices the District had in place at the time of W.B.'s involuntary examination fail to fully recognize the potential trauma of a Baker Act.  As Dr. Stephen Bloomfield, a clinical psychologist states, "The real issue in my opinion is that the Baker Act is supposed to be an intervention of last resort, not first resort" (Collins 2022).  The Baker Act is not treated as an intervention of last resort in the 2018 Baker Act Decision Tree.

School district policies should ensure that decisions to transport students for involuntary examination are made in conjunction with practices that safeguard the wellbeing of students with disabilities and mental health needs.  The decision to involuntarily transport students—including students with disabilities—for psychiatric crises should not be made by sworn police officers or other school district personnel who have, at best, very limited and non-continuous training in recognizing, de-escalating and responding to behavioral and mental health crises.

My opinion is that District policies should instead focus on the involvement of trained and licensed mental health professionals throughout the entire process.  Mobile crisis services that are staffed by trained and licensed mental health professionals are one way to bring in mental and behavioral health professional expertise.  They "conduct an independent assessment to determine if the individual may safely be diverted from involuntary examination" (Florida Department of Children and Families [DCF], 2021, p. 14).  According to Substance Abuse and

---

[10] Ms. Sumner testified that this document was still in effect during the 2020-2021 school year (Sumner Dep. 25:9-14; 33:22-25).

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

Mental Health Services Administration (SAMHSA) (2020, p. 19) the purpose of mobile crisis is for the person in crisis experience relief as quick as possible from their symptoms and behaviors and resolve crisis situations, when possible.  Mobile crisis services that are staffed by trained and licensed mental health professionals provide an individual who is in purported crisis with a comfortable environment and appropriate care and evaluation, in stark contrast to emergency department evaluation or law enforcement involvement.

Mobile crisis were neither called nor did they come out to ███████ Elementary School for W.B. on February 16, 2021 (Sumner Dep. 104: 6-10).  Had trained and licensed mental health professionals intervened for W.B., they could have evaluated the behaviors and overall situation, giving their trained, objective opinion regarding the purported crisis level based on observations of W.B.  Trained and licensed mental health professionals would have also consulted with Officer Brown, Mr. Curtis Brown, Ms. Sumner, and W.B.'s mother.  In the past, L.H., W.B.'s mother, had been able to de-escalate W.B. when called by the school by talking with him (Sumner Dep. 92:10-21).

Based on my review of the documentation, if trained and licensed mental or behavioral health personnel were called and allowed to evaluate the situation, they likely also would have found W.B. not to be "in crisis" and thus not in need of involuntary examination.

Transportation for involuntary examination is only for imminent danger to self or others Involuntary transports are not to access services.   Ms. Sumner did not seem to understand this, and testified that while she did not believe that W.B. met the criteria for the Baker Act, she thought that involuntary examination would help W.B. access mental health services and medication (Sumner Dep. 114:15-25).  But a child does not need to be traumatized through an involuntary examination pursuant to the Baker Act in order to access services.  As Mr. David Daniels, Operations Manager for Big Bend Community Based Care, which manages social services and mental health in North Florida states, "If you can wait an hour [for mobile crisis], take the hour."  He goes on to state how important this is for preventing trauma.  Mr. Daniels states, "That way you're [preventing] that trauma to a kid of being put in a police car" and waiting hours in the waiting room to be evaluated at a Baker Act receiving facility (Hatter, 2020).

Unfortunately, in the case of W.B., Officer Johnny Brown made his decision to involuntarily transport in a few minutes. Ms. Sumner cancelled her call to Mobile Crisis when

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

Officer Brown said there was no need for the call (Sumner Dep. 115:6-17) because he had already made the decision, based on extremely limited training and knowledge, to involuntarily transport W.B. to JFK North.

### Training of School District Personnel

<u>Professional Crisis Management (PCM) and De-escalation Training</u>

My opinion is that it is imperative for school staff to understand that behaviors are a form of communication and that often children use dysregulated behavior as a form of communication, and that at the very least, school police should be trained in the same de-escalation strategies as ESE staff.  My opinion is that Officer Brown's lack of such training contributed to W.B.'s escalation and ultimately his involuntary examination.

The District utilizes a crisis management certification procedure called Professional Crisis Management (PCM), which is used for training some staff who work with students receiving ESE services (SDPBC, 2022).  PCM is a crisis management system based on a trauma-informed behavior analytic model of intervention which utilizes established scientific techniques for de-escalating confrontative, disruptive and aggressive behaviors" (Professional Crisis Management Association [PCMA], 2004, p. 1).[11]  It is a not a therapeutic or treatment program (Fleisig, 2008, p. 1-5).  PCM is based on scientifically verified principles commonly referred to as applied behavior analysis (PMCA, n.d.(a)).  PCM has four guiding principles, based on the 6 principles of trauma-informed care.[12]  The four guiding principles of PCM are: "maximize dignity and respect, eliminate pain and minimize distress, minimize restriction and offer choice and give feedback and provide alternatives" (PCMA, n.d.(a)).  The PCM crisis intervention program focuses on prevention, noting more than 100 crisis prevention strategies that take into account both the individual and practitioner's experiences using trauma-informed measures (PCMA, n.d.(a)).

---

[11] PCM limits its crisis intervention management to school age individuals and individuals with special needs.  The crisis management system is specifically for children, teens and adults with disabilities, but is not to be used in law enforcement or correction populations (Fleisig, 2008, p. 1-5). This means while it is acceptable to use in schools and residential facilities for people with disabilities, it is not acceptable to use in incarceration settings.

[12] Trauma-informed care shifts the practitioner's perspective from "What's wrong with you?" to "What happened to you?" to obtain a complete picture of a person's situation and life — past and present. This approach is *fundamental* to ABA and understanding the crisis continuum.

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

The PCM manual defines crisis as "one or more of the following physical behaviors: continuous aggression, continuous self-injury, and/or high-magnitude disruption." It further clarifies, "noncontinuous behaviors, while possibly dangerous, are not considered a crisis" (Fleisig, 2008, p. 1-5). Only behaviors that meet the crisis definition under PCM should involve the use of physical intervention. The program provides practitioners with a variety of non-physical strategies for when non-continuous, pre-crisis behavior is exhibited (Fleisig, 2008, pp. 1-5). For pre-crisis behaviors these interventions are clearly stated in the PCM Manual (Fleisig, 2008, pp. 7-40 – 7-50).

There are four levels in the PCM crisis continuum, each with their own description of behavior, thinking, feeling and physiology (Fleisig, 2008, p. 3-2). By identifying an individual's level on the crisis continuum, the PCM practitioner can identify how to most effectively intervene. The PCM practitioner's understanding of the individual's functioning based on the four levels of the crisis continuum is imperative in determining the most appropriate form of interaction (Fleisig, 2008, p. 3-2). The four levels of the PCM crisis continuum and their quantifiable descriptions have been put into table format below for reference purposes.[13]

De-escalation strategies are to be used when an individual demonstrates pre-crisis behaviors to decelerate behavioral and emotional responses (Fleisig, 2008, p. 7-41). PCM describes de-escalation as means to help an individual who is almost in a crisis situation, return to a stable condition (PCMA, n.d.(b)).

| | Behavior | Thinking | Feeling | Physiology |
|---|---|---|---|---|
| Level 1: Stable Functioning | On task | Reasonable | Appropriate | Relaxed |
| Level 2: Precrisis | Off-task | Unreasonable | Inappropriate | Heightened |
| Level 3: Crisis | Continuous aggression, and/or self-injurious and/or disruptive at a | Irritational | Inappropriate | Maximum arousal |

---

[13] The below table is not found in the PCM Practitioner Manual, but was created for easy reference of the behavior, thinking, feeling and physiology of the four levels of the PCM crisis continuum ███████████, 2008).

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

| | high magnitude | | | |
|---|---|---|---|---|
| Level 4: Post-crisis | On-task | Reasonable | Neutral or negative | Heightened or subdued |

Despite the fact that school police are often called for behavioral escalations and crisis for ESE students and, per the FY21 Quick Reference Guide, they were to be contacted if a student was experiencing a moderate and continuous behavioral and/or mental health crisis (SDPBC, FY21 Quick Reference Guide 9/21/2020), the District does not train them in PCM (SDPBC, Exceptional Student Education Policies & Procedures, 2020-2021 through 2022-2023, p. 10). It is distressing that the District would call someone to respond to a student in crisis who is not trained in mental and behavioral health, as well as de-escalation procedures.

My opinion is that at the very least, school police should be trained in the same de-escalation strategies as ESE staff. Indeed, it is a wonder why all staff, including general education teachers, bus drivers, paraprofessionals, cafeteria workers, and custodians are not trained in the evidenced based de-escalation procedures of PCM. Training all staff in basic prevention and de-escalation would foster inclusivity, but most importantly, prevent crisis behaviors from occurring in the school setting. [14]

Students with behavioral and mental health needs are learning to manage their emotions and feelings. When responding to physical and verbal aggression, it is essential that all adults in contact with the student have the ability to remain calm. If adults are unable to do so, they will likely escalate the situation, possibly to crisis levels. To that end, even if the District did not train all staff in PCM, training all staff in some de-escalation techniques is necessary. De-escalation training may focus on communication methods, both verbal and non-verbal, and early intervention practices (Clearinghouse, 2021, p. 5). De-escalation training should focus on creating a safe environment, using positive instead of negative measures, and preventing power struggles (Clearinghouse, 2021, p. 6). My opinion is that it is imperative for school staff to understand that behaviors are a form of communication and often children use dysregulated

---

[14] As a former special education administrator we trained all of our bus drivers, bus aides, cafeteria workers and others in basic de-escalation strategies to prevent crisis behaviors and not escalate an individual if they are heightened.

behavior as a form of communication (OSERS, 2022, p. 8).  It is hard for some school staff, whether due to lack of training, inexperience, or other reasons, to not take physical and verbal assaults personally, but it important that this is recognized (Clearinghouse, 2021, p. 6).

It is my opinion that Officer Brown's lack of training in PCM contributed to W.B.'s escalation and ultimate involuntary examination.  W.B.'s February 16, 2021 interaction with school police would have been less harmful and would not have resulted in an involuntary examination if the District trained school police in PCM and trauma-informed, evidenced-based ABA principles focusing on de-escalation techniques before behavior reaches crisis levels. Unfortunately, this was not the case, Officer Brown did not have specific training on mental health or ABA de-escalation techniques, and his inappropriate response escalated W.B.  This led to W.B. being handcuffed and involuntarily transported for the same types of dysregulated behaviors he had often exhibited at school in the past and which had been successfully de-escalated many times before.

While Curtis Brown and Maria Sumner were trained in PCM, Officer Brown was not. Officer Brown testified that he took a crisis intervention training in 2010, but "had no knowledge of what happened" because it was so long ago (Brown Dep. 49:21-50:11).  He stated that he had never been trained specifically on the de-escalation of children, and that he did not recall receiving any de-escalation training from the School District of Palm Beach County. (Brown Dep. 56:7-21).  Instead of using de-escalation strategies from PCM or noted in W.B.'s BIP, Officer Brown verbally engaged in back and forth conversation with W.B., which only further escalated his behavior. Ms. Sumner stated in her deposition that she had to say "settle down" when Officer Brown and W.B. were talking, because this back-and-forth was not part of de-escalation procedures (Sumner Dep. 105:16-18).

Officer Brown also stated that he did not recall receiving any trainings about working with students with disabilities (Brown Dep. 49:2-7).  Officer Brown was also not provided any training on mental illness (Brown Dep. 74:14-16).  When asked what a mental illness is he stated, "that's maybe bipolar or schizophrenia or other like Alzheimer's or something else" (Brown Dep. 74:20-22).  He was unsure if autism was characterized as a mental illness (Brown Dep. 74:24).

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

If Officer Brown was trained in working with students with disabilities and mental health needs and in PCM, he would have been able to use de-escalation strategies[15] that are trauma informed and based on ABA to prevent crisis behaviors (PCMA, n.d.(a)).

### Trauma

My opinion is that all school personnel should be trained in the signs of childhood trauma and behavioral strategies for addressing and preventing trauma.  Past trauma of children greatly affects their mental health and their behaviors in the classroom.  It is imperative for all school personnel to be trained on behaviors, prevention, and de-escalation and to use trauma-informed practices because trauma-informed schools, which often incorporate applied behavior analysis, report less behaviors, are safer, more successful, and support stronger communities (Crisis Prevention Institute, 2021).

Starr Commonwealth (2019) notes the following could be signs of trauma in children: constant state of alert, recurrent conflict with peers, irritability and outbursts of anger, and acting as if the traumatic event is recurring, even if it is not (p. 13).  Some of these signs of trauma, W.B. has exhibited repeatedly in school.

The PCM training, described above, is based on 6 principles of trauma-informed care: safety, trust and transparence, peer support, collaboration, empowerment, and humility & responsiveness (PCMA, n.d.(a)).  The PCM Practitioner Manual recognizes the effect of past and present trauma has on behaviors and trains the practitioners that traumatic events, such as physical or sexual abuse, and witnessing violence, may cause someone to experience negative feelings and rage (Fleisig, 2008, p. 3-2).  Training all staff in PCM would be one way to provide training on trauma-informed ABA practices.

## Training Antecedent Strategies: Structure and Engagement

ABA principles can be used with all students to provide positive reinforcement of desired behaviors, teach and maintain desired behaviors and provide immediate feedback (consequence) during academic instruction (Pennsylvania Training and Technical Assistance Network [PaTTAN], n.d., p. 4).  PaTTAN explains that ABA can be used in both general education and special education to manage classroom behavior and reduce behavior problems for specific

---

[15] See Appendix D for PCM de-escalations strategies when someone is in pre-crisis behaviors.

students by teaching basic communication and language skills as replacement behaviors (PaTTAN, n.d., p. 2).

My opinion is that some of these techniques would have been effective for W.B., who, like many students with behavioral concerns, responds well to structure.  L.H. stated in her functional assessment interview (FAI) for the functional behavior assessment, completed on 1/10/2020, that when "things aren't planned or in order the behavior tends to show up," meaning that if W.B.'s day is not structured and there are surprises, he will exhibit dysregulated behavior (SDPBC, FAI 1/10/2020, p.1).

Additionally, like many students with social, emotional, and behavioral concerns, W.B. responds well to positive reinforcement for desired behaviors.  This includes engaging with teachers, building a relationship, and teachers immediately recognizing when a student exhibits desired behavior.  For instance, in a January 9, 2020 student assisted interview for his functional behavior assessment, W.B. self-reported that he liked when his teacher rewards him, when she would say "good job" and when he could get something from the treasure box when he is "good" (SDPBC, FBA Student Assisted Interview, 1/9/2020, p.1).  In the same student interview, W.B. reported that he did not like when other students criticized him and "when his time is wasted in school" (p.1).

W.B.'s EBD classroom at the time he was subject to involuntary examination was not structured.  In Ms. Walker's deposition, she explained that there was a complaint made to the school about the emotionally behaviorally disturbed classroom W.B. was placed in to Ms. Amy Brown, the Area ESE Coordinator.  The complaint was made in an effort to "have more structured activities and that he's (teacher) keeping the kids engaged throughout the day." (Walker Dep. 84:23-25).  This was after L.H stated that she was concerned about the structure of the EBD classroom at an ESE meeting.  The ESE contact stated that the teacher had to be more structured and  more engaging (Walker Dep. 85:2-18).  Amy Brown also stated on January 8, 2021, that she had met with the instructional superintendent and the school principal and that training should begin for the EBD teacher, the district would be placing a BIA in the classroom, an additional ESE teacher would come into the classroom, additional training for the teachers, and daily checking by the ESE contact would occur (Walker Dep. Exhibit 7).

My opinion is that it is troubling that a teacher in a self-contained ESE EBD classroom who had little training. The emotional, behavioral, and social needs of students who are placed in

a self-contained EBD classroom are significant.  Over half the school year was completed when Ms. Amy Brown sent this email.  That means that, for over half of the year, the EBD teacher was not providing a structured and engaging classroom to the students in this self-contained classroom.  Providing structure and ample amounts of positive reinforcement is an evidence-based ABA practice to prevent behaviors, and was specifically noted in W.B.'s paperwork when planning for behaviors.  Routines and structure are reported in BIPs as an antecedent strategy to prevent dysregulated behaviors.  Structure and engagement is needed for all students, especially those with emotional and behavioral needs, such as W.B.

The EBD classroom teacher was untrained, and did not provide this structure or engagement with high rates of positive reinforcement for W.B.  My opinion is that this chaotic environment was very stressful for W.B., who needed ample amounts of positive reinforcement/attention and structure to be successful in the educational domain.

**W.B.'s History of Dysregulated Behaviors in School**

At the time of W.B.'s involuntary examination, the District had access to extensive information regarding effective de-escalation strategies that would have been effective for W.B.'s known dysregulated behaviors.  My opinion is that school staff knew how to de-escalate W.B. and that W.B.'s behaviors on February 16, 2021 did not constitute a crisis according to the PCM Practitioner Manual.

First, the District was aware of a history of dysregulated behavior—going back to kindergarten—that it had successfully de-escalated in the past without involuntary examination.  The District had historically had in place a BIP that was supposed to help W.B. learn the skills and replacement behaviors necessary to reduce these dysregulated behaviors.

W.B. has a history of physical and verbal aggression in the educational domain, dating back to the beginning of his kindergarten year. Physical aggression is defined by Kaye & Erdely in the Encyclopedia of Child Development as "behavior causing or threatening physical harm towards others. It includes hitting, kicking, biting, using weapons, and breaking toys or other possessions" (Kaye & Erdley, 2011, p. 1100). W.B.'s FBA defined his physical aggression as "throwing objects, hitting others and self when angry" (SDPBC, FBA 1/24/2020).

W.B. also exhibited verbal aggression, including threats of self-harm when escalated in the school setting prior to the threats made on February 16, 2021.  In fact, Mr. Curtis Brown,

stated that he has heard W.B. weekly or bi-weekly say verbally aggressive statements about harming himself or others in the past in the educational domain, but never took him seriously because "it was out of just aggression and anger" (Brown, C. Dep: 48:9-24).  Verbal aggression is not considered to be a crisis or crisis behavior. Verbal aggression, including verbal threats of harm against self or others, is often used as a coping mechanism, which becomes part of the individual's behavior when escalated (Webb, 2022).  PCM refers to inconsequential verbal assault as "junk behavior" (Fleisig, 2008, p. 7-46).  The adults around the person exhibiting verbal assaults need to respond in a non-reactive manner (Fleisig, 2008, p. 7-47).  Despite a significant history of W.B. exhibiting verbal aggression, verbal aggression was not included as a target behavior in his FBA.

Second, it is clear from W.B.'s records that interventions that were designed to reduce the incidence of dysregulated behaviors in the school environment were not provided with consistency.  Tools described in his BIP were inconsistently provided in a way that undermined their efficacy.  He did not have access to a structured classroom, positive reinforcement, or someone who was paying attention to his behavior and accurately recording it (SDPBC, Conference/Staffing Record 5/11/2017; SDPBC, Behavior Charts 1/2021 & 2/2021).

Third, the lack of accurate and valid data on W.B.'s daily behavioral charts, from the weeks immediately prior to the February 16, 2021 involuntary examination, means that these charts are limited in their utility.  There are no details of antecedents, behaviors, consequences or duration of dysregulated behavior included in any of the 26 daily behavior charts for W.B. Behavior was not specifically noted or defined on these sheets when W.B. exhibited dysregulated behaviors.  Additionally, the data was collected inconsistently and not analyzed for trends to make data driven behavior decisions.  The lack of tracking details regarding what led to the specific behaviors and how long his behavior persisted each time limits the usefulness of these charts.  For physical and verbal aggression, what happens right before and after are important variables that need to be tracked to determine maintaining antecedents and consequences.  In addition, specific times and duration of behaviors are used to determine appropriation antecedent and consequence strategies for dysregulated behaviors of physical and verbal aggression.  Additionally, rewards to provide positive reinforcement for W.B. were not implemented consistently or with fidelity as there were a lot of empty data spaces.

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

My opinion is that it is incomprehensible that the data was not analyzed for a student in an EBD classroom who was having extreme behaviors in physical and verbal aggression throughout his elementary education schooling.  It is concerning that W.B. was placed in an EBD classroom, with a teacher who did not have training in structure, engagement and the knowledge how to collect valid behavior data.  Data was not collected with validity and the reinforcement was not provided with fidelity.  The data being collected inconsistently on a regular basis and the descending trend of desired behaviors on the behavioral data for W.B. from 1/4/2021 through 2/16/2021 would have easily been identified if someone was reviewing and analyzing the data

It would be nearly impossible to consistently provide rewards as intended for positive reinforcement without consistent data collection and review of data.  Moreover, an analysis of data would have prompted a phase change to adjust interventions, one of which should have been an increase in reinforcement.  This is all the more unfortunate since, after Winter Break, W.B.'s behavior on the charts was highly desirable. The first three days of data collection provided shows that W.B. received 100% for the day, meaning he met all four expectations throughout the 6 hours of data collection. However, as he continued in an unstructured classroom environment where he did not receive necessary interventions, supports and reinforcements, his physical and verbal aggression increased.

Implementing plans with fidelity and collecting data with validity is key for shaping desired behavior in the educational domain. This includes thorough data collection analysis and review on a consistent basis.

Please see the appendix for a history of discipline referrals provided by the Palm Beach County School District that are listed in order beginning with his kindergarten year in the district, as well as other behavioral incidents that the District was aware of and an analysis of behavioral charts from January 4, 2021 through the date of the involuntary examination on February 16, 2021.  Please see the appendix for a detailed analysis of data collection for W.B. from January 4, 2021 through and including February 16, 2021.

**Verbal Aggression as a Coping Mechanism**

Those who use verbal aggression, including verbal threats of harm against self or others, often use it as a coping mechanism, which becomes a pattern when escalated (Webb, 2022). While clearly a defective coping mechanism, a person who uses these threats do not realize the

harm they are doing to themselves just by stating something in frustration. Fagen (2021) describes two reasons young children may say suicidal statements: 1) they have heard it at home (added: tv, social media, school, etc.) or 2) "they cannot handle the intense emotional turmoil they are experiencing" at the current moment (para. 2). Webb (2022) describes 4 factors of people who use suicidal thoughts or verbalizations as coping mechanisms: 1) romanticizing the thought (not recognizing the finality of suicide); 2) minimize damage; 3) unaware that they are using a suicidal fantasy as coping; and 4) doing untold damage to themselves when using verbal threats of suicide as coping.

My opinion is that W.B. likely stated that he wanted to harm himself or others as a defective coping mechanism when very frustrated and angry, since he has a long history of exhibiting this dysregulated behavior when escalated (and it is exhibited not when he is de-escalated). Due to the inconsistencies in the testimony of Officer Brown, Curtis Brown, and Marie Sumner about the verbal threats of self-harm by W.B., including what was said, to who, and where, it is difficult to determine if the statements even rose to the level of a defective coping mechanism, let alone valid threats which warranted an involuntary psychiatric commitment from school in handcuffs.

**Behavioral Incident on February 16, 2021**

There were three to four people involved in the escalation of W.B. on February 16, 2021. While their testimony states that at some point W.B. was outside and by a fence, everyone had a different recollection of how W.B. got outside, who was present, when and what threats were made, and who was at the gate/fence with W.B. My opinion is that based on any of the accounts, W.B. was not in a behavioral or mental health crisis that day.

Officer Brown testified that he observed W.B. inside the school, throwing chairs and making statements about wanting to kill himself, leading Officer Brown to think W.B. wanted to die. However, both Mr. Curtis Brown and Ms. Sumner stated that Officer Brown first interacted with W.B. at the fence after Ms. Sumner, Mr. Curtis Brown and another school employee had already been at the fence (Brown, C. Dep. 40:6-7; Sumner Dep. 97:12-15; 101:3-5). There is further discrepancy in witness testimony regarding W.B.'s behavior once he was off the fence. According to Mr. Curtis Brown, W.B. was calm, while Ms. Sumner's recollection was that he was angry, stating that he hated school and everybody, but not making specific threats of harm

(Brown, C. Dep. 42:8-24; Sumner Dep. 100:9-10). In contrast, Officer Brown described W.B. at this point as "still aggressive, he was verbally abusing staff, he was punching towards Mr. Brown, kicking towards anybody that would come close to him" (Brown Dep. 103:21-25).

These three accounts do not align. More importantly, even taking the most severe account of these events as true, they fail to demonstrate W.B. was in a behavioral or mental health crisis.

The PCM Practitioner Manual, which is used to train staff at ESE cluster sites, defines a crisis as "one or more of the following behaviors: continuous aggression,[16] and/or continuous self-injury,[17] and/or continuous high magnitude disruptions;"[18] "non continuous behaviors, while possibly dangerous, are not considered a crisis." The PCM specifically notes that damage to property is not a high magnitude disruptive behavior, and that throwing/toppling objects that are heavy, such as chairs and tables, are only if the actions are continuous and repeated (PCMA, 2008, pp.11-1). In PCM, only crisis behaviors result in the use of physical interventions." (PCMA, 2008, pp. 1-5).

Despite school district personnel referring to W.B.'s dysregulated behavior as a "crisis," these behaviors do not meet the crisis definition above therefore are considered pre-crisis behaviors according to PCM. While W.B. was exhibiting verbal aggression, he did not attempt to harm himself after making the verbal threats, therefore PCM does not recognize this behavior as a crisis, but pre-crisis behaviors (Fleisig, 2008, p. 1-5). Verbal aggression or threats is not a crisis behavior if the person is not actively trying to repeatedly injure themselves. The verbal aggression W.B. exhibited on February 16, 2021, did not include any attempts to intentionally harm himself or someone else. The physical aggression that was noted by Officer Brown also did not meet the PCM criteria for crisis as W.B. was not harming anyone and he did not make physical contact with others, despite many adults and peers around him when he first was escalated in the classroom according to Officer Brown (Brown Dep. 100:2-25). He did not make contact when kicking or hitting in the air towards people outside (Brown Dep. 104:7-10). Even Officer Brown's description of W.B.'s physical and verbal aggression does not meet the criteria

---

[16] The PCM defines continuous aggression as "repeated demonstration of behaviors that are potentially injurious to others. Examples include continuous hitting, kicking, head butting or use of any other part of the or an object to injure another person" (Fleisig, 2008, p.11-1).
[17] The PCM describes continuous self-injury as repeated demonstration of behaviors that may potentially injure oneself, such as heading banging and face slapping (Fleisig, 2008, p. 11-1).
[18] The PCM defines continuous high magnitude disruptive behavior as "repeated demonstration of behaviors that are potentially damaging to the environment" (Fleisig, 2008, p. 11-1).

of a crisis.  And the dysregulated behaviors reported by Ms. Sumner and Mr. Curtis Brown on February 16, 2021, certainly do not demonstrate that W.B. was in crisis nor were they concerned about his safety and welfare or those around him.

While school district personnel repeatedly referenced W.B.'s behavior on February 16, 2021 as a crisis or crisis behavior, these dysregulated behaviors were in actuality behavior that were known to staff and that W.B. had engaged in many times.  They were clearly documented in the BIP and FBA, and school staff knew how to de-escalate W.B. when he engaged in these dysregulated behaviors.  The physical and verbal aggression W.B. exhibited on February 16, 2021, were not near crisis levels based on the definition in the PCM manual nor were they extraordinary in that he has exhibited the behaviors in the educational domain numerous times before.

**Awareness of Students' Disabilities**

It is imperative that all staff working with students have full knowledge of the strengths and needs of each student.  This knowledge is even more critical when implementing behavioral and mental health interventions that are specific to an individual student to either prevent or respond to crises.  Unfortunately for W.B., the staff who responded to his dysregulated behaviors on February 16, 2021 failed to implement the de-escalation strategies they should have known to use from his BIP, IEP, and the PCM because they did not even know that W.B. was a student with a disability.

Mr. Curtis Brown stated that he was not aware that W.B. had a disability or any other diagnosis (Brown, C. Dep. 38:5-8), despite the fact that W.B.'s FBA clearly stated that he had oppositional defiant disorder (ODD).  Mr. Curtis Brown was also not aware of W.B. receiving any special services, even though he was placed in an emotionally behaviorally disturbed classroom (EBD) and had structured behavior plan on his IEP.  (Brown, C. Dep. 38:11-13). Although Mr. Brown "assumed" W.B. had an IEP on February 16, 2021, he did not ever see or review the document (Brown, C. Dep. 38:16-20).   He was also unaware of whether W.B. was receiving outside mental health services or medication management at the time of the involuntary examination on February 16, 2021 (Brown, C. Dep. 38:21-39:3).

Officer Brown did not know on February 16, 2021 if W.B. had a disability or mental illness (Brown Dep. 95:6-8; 95:12-14).  He also did not know if he had a mental illness after the

Baker Act, but stated that W.B. "could suffer from mental health issues" but did not know any specific diagnosis (Brown Dep. 95:19-23). Officer Brown testified that in general he only asks if the situation has happened before and if the child is medicated properly (Brown Dep. 36:9-14). Officer Brown did not ask pertinent questions regarding W.B.'s behaviors or needs, which would have helped de-escalate the situation. Officer Brown further testified that in general, he does not consider a student's disability when deciding to handcuff them for a Baker Act (Brown Dep. 83:20). He did not know if he ever Baker Acted a student with a disability from school, but clearly, he did, as W.B. is a student with a disability._In my opinion, it is concerning that a police officer would involuntarily transport a student from school without knowing if they had mental illness or disabilities and without follow-up (SDPBC, FY21 Quick Reference Guide 9/21/2020). But Officer Brown did just this.

It is my opinion that the mental health diagnosis of Oppositional Defiance Disorder (ODD) for W. B., the fact that he was a special education student placed in an emotionally behaviorally disturbed special education, has a history of physical and verbal aggression from W.B.'s legal documents should have been immediately conveyed in detail to the substitute law enforcement officer, Officer Johnny Brown, when he first interacted with W.B. This communication may have prevented the involuntary examination of W.B.

It would have been helpful for Officer Brown to know that W.B. had a history of these behaviors in the education domain when escalated, especially since Officer Brown was not usually assigned to ▇▇▇▇▇▇ Elementary. Additionally, had school staff advocated for the use of evidenced based de-escalation strategies and strategies that had worked in the past, the pre-crisis behaviors W.B. was known to exhibit could have been de-escalated. Instead, Officer Brown took the lead on W.B.'s incident, despite not having background on W.B., his behaviors, diagnosis, or strategies in his BIP or IEP, and put W.B. in handcuffs within 3 minutes of his arrival to W.B.'s incident. Communication regarding W.B. and his behavioral needs would have prevented the trauma of being handcuffed involuntarily transported in a caged, marked police car pursuant to the Baker Act on February 16, 2021.

**Accommodations Which District Personnel Should Have Known, According to the FBA, BIP, and IEP**

School staff who regularly interacted with W.B. should have been aware of W.B.'s IEP, FBA and BIP, including his documented dysregulated behaviors and the

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

documented plan to ensure safety and de-escalate W.B. Officer Brown was unfamiliar with W.B.'s IEP, FBA, and BIP.  The information contained in these documents would have been beneficial for Officer Brown.  For instance, it was specifically stated numerous times in the reports that W.B. does not like to be touched, especially by males, and that he needs space. Despite Ms. Sumner and Mr. Curtis Brown being present outside when Officer Brown began interacting with W.B., information regarding W.B.'s disabilities and accommodations were not offered to Officer Brown, nor did Officer Brown inquire.  Someone should have notified Officer Brown immediately that W.B. does not like to be touched, especially by males.  It was predictable that a male police officer putting W.B. in handcuffs within three minutes of his involvement and not him giving space, escalated the situation, especially when according to Mr. Curtis Brown, W.B. was calm when he got down from the fence, prior to interacting with the officer (Brown, C. Dep 42:8-16).

It is my opinion that District staff did not implement accommodations listed in W.B.'s FBA, BIP and IEP and other known de-escalation strategies related to W.B.'s dysregulated behaviors on February 16, 2021.

### Proactive (Antecedent) Strategies to Prevent Behavior for W.B. from BIP

School staff failed to implement the following accommodations from W.B.'s BIP to prevent escalation of his behaviors:

- "Check for understanding of directions when given (allow 5 seconds of wait time, then check to make sure directions are understood)"
- "Remain non-reactive when negative behaviors occur."
- "Access to safe place/ safe person if feeling frustrated."
- "If removed from class please have him back within 5-10 minutes"

These accommodations are documented in the BIP (SDPBC, 1/31/2020, p. 2) and were not used by the school team.

### Other Accommodations for W.B. From BIP

Additional accommodations and strategies, listed as "replacement behaviors" in the IEP and that were part of the BIP teaching strategy that should have been prompted when W.B. began to escalate:

- Prompt "6 sides of breathing;

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

- Prompt "lazy 8 breathing;"
- Prompt for W.B. to "identify the size of the problem;" and
- Presented with and prompted for use of "calm down bin" (SDPBC, BIP 1/31/2020, p. 3).

These strategies were supposed to be taught to W.B. for over a year.  If W.B. was prompted to use the strategies and he responded, he would have been immediately reinforced for using replacement behaviors (SDPBC, BIP 1/31/2020, p. 5). Unfortunately, W.B. was not prompted to use his de-escalation strategies and instead resorted to using physical and verbal aggression, which led to his involuntary transport pursuant to the Baker Act Law.

### What to Do if Problem Behaviors Occurs Per BIP

The BIP states what should be done if W.B. exhibits the target behavior of physical aggression (SDPBC, BIP 1/31/2020). The protocols listed below (p.5) were not implemented by school staff, including Officer Brown:

- "Remind student of the expected behaviors."
- "Remind student of the rewards he can be earning."
- "Remind student to use his coping strategies when he is frustrated."
- "District-approved crisis management can be implemented if needed."

These strategies should have been employed as soon as W.B. began to exhibit physical aggression in the classroom.  These protocols would have also been effective in de-escalating W.B.'s verbal aggression.  Officer Brown did not use any de-escalation procedures other than "calm down" and asking questions (Brown Dep. 104:22-24).  Officer Brown did not give time for W.B. to go through his de-escalation behavior chain or apply the consequence strategies in his BIP prior to placing him in handcuffs behind his back 3 minutes after his interaction with W.B. began (Brown Dep. 105:18-21).

If the protocols from W.B.'s BIP related to his dysregulated behavior were implemented throughout the incident on February 16, 2021, it is conceivable that W.B. would not have exhibited physical or verbal aggression, or would have de-escalated, as he had in the past based on the plan.  Instead, unwanted physical and verbal aggression were inadvertently reinforced, rather than replacement behaviors.  If the BIP was effectively used, W.B. would have been able to de-escalate and return to class as he had in the past.

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

### EBP Accommodations that School Staff Should Have Been Aware of And Implemented

There were many missed opportunities to quickly de-escalate the situation and help W.B. return to stable functioning.  De-escalation procedures from PCM training, his BIP, and other evidence-based applied behavior analysis interventions were not used to immediately de-escalate W.B. and ensure his safety. Instead, interventions that were not EBP were used, which led to a further escalation of behaviors.  As a result, W.B. was handcuffed and involuntarily transported pursuant to the Baker Act using a caged, marked police car, in the same manner as someone arrested on a criminal charge.

There are additional accommodations and strategies that should have been used on February 16, 2021 to prevent or de-escalate W.B.'s behaviors. The below accommodations and strategies are based on the recommendations of trauma-informed applied behavior analysis, an evidence-based science to address dysregulated/ problematic behaviors.

In the past, as both a BCBA/BCBA-D, special education consultant, special education teacher, and special education administrator, these accommodations based on EBPs have been successfully implemented in the public education domain to address both physical and verbal aggression.

**Antecedent strategies** that would have been of use for W.B to prevent physical and verbal aggression:

- A paired choice between two items, objects, people, location, assignment, etc. whenever possible.
- Limit to 2 questions at a time when talking with W.B.
- Use few words when checking for comprehension.
- Decreased sensory stimuli in the classroom and surrounding environment.
- Multiple people in the building should have been effectively paired with W.B. Pairing is the specific building of specific relationships (Minahan, 2019).
- Staff should have had known who W.B's safe/preferred person, including the person's name written and contact information written for easy reference.
- School district personnel who worked with W.B. on a consistent basis should have been trained in the specifics and implementation of W.B.'s BIP, FBA and IEP. They also should have read these documents and had confidential access to them for review as needed.

- ABC (Antecedent, Behavior, Consequence) data should have been collected and analyzed weekly for trends.

**Evidence-Based Replacement Behaviors that Should Have Been Taught to W.B.**

- Requesting should have been focused on as it is pertinent for a student with disabilities to get there wants and needs met.  W.B. should have been taught to request the following, prior to dysregulated behaviors being exhibited and immediately reinforced.
  - Requesting peers and adults to give him space
  - Requesting a break
  - Requesting access to a preferred person
  - Requesting environmental changes, such as going to a quiet place in the building
  - Requesting help

**Evidenced Based Consequence Strategies for Physical and Verbal Aggression:**

- Ensure the safety of W.B. by using the least restrictive measures, including access to a safe space, with limited people around.
- Staff should have been non-reactive and genuine in their interaction with W.B. when escalated. (Clearinghouse, 2021, p.7).
- Dr. Gregory Hanley's "My Way Protocol" in which aggressive behaviors are immediately reinforced to ensure safety and dignity, then shaped when returned to stable functioning (Hanley, 2021).
- When W.B. was exhibiting physical or verbal aggression, should have immediately given space and stop verbally engaging with him. It should have been quiet, with least amount of people around for W.B. to de-escalate.
- W.B.'s movement or freedom should not have been restricted, including blocking him in the classroom or putting him in handcuffs (Hanley, 2021).
- Instead of moving W.B. from the classroom when he was demonstrating physically aggressive behaviors, the other peers should have been immediately removed.  It is easier and safer to move a class of non-escalated students than it is to move an escalated student into the hall where exits to the outside and people in the hall cannot be controlled.
- Ensured W.B. was away from exit doors.
- Access to open spaces, such as outside, should have only been given after a return to stable functioning, not in attempt to de-escalate.
- W.B. should have had an alternative way to communicate his requests and needs when escalated.  This could have been a visual such as a list or a print choice board (non pictorial).  If this was used, W.B. would have been immediately reinforced for using his replacement behaviors.
- Staff should not have engaged verbally when W.B. was escalated.
- If physical aggression was targeted towards a certain person, such as Mr. Brown or Officer Brown, they should have removed themselves from the immediate area, and substituted with someone else who W.B. was not physically aggressing towards.
- Decreased sensory stimuli, such as noise, people and bright lights.

- Staff should have ignored the specific verbal threats of self harm or harm to others while validating feelings (sorry you are feeling that way… upset, etc.) (Fagen, 2021). Verbal aggressive threats are not considered crisis behaviors therefore should have been addressed when W.B. de-escalated and returned to stable functioning.
- When W.B. exhibited verbal aggression, including threats of harming self or others, someone who is trained in a valid threat scale such as Columbia Rating Scales and SAD persons should conduct assessment to determine validity of threat of self-harm and harm to others.
- Data, including A-B-C data should have been collected whenever W.B. exhibited physical or verbal aggression, including quotes of specific verbal threats.
- A well-defined crisis plan specific to W.B., including what a crisis looks like should have been developed and included in the BIP.  Components that should have been included in the crisis plan:
  - Keep safe while giving him space
  - Called his "safe person" and staff trained in PCM, as well as W.B.'s BIP.
  - Called mom
  - Only use PCM transportation or restraint protocols, when physical behavior meets the definition of crisis, which is continuous and immediate danger to self or others.
  - Specifically, stated when mobile crisis and/or District CAPE team should be called based on W.B.'s history of behaviors.

**Detrimental Effects of Handcuffing Children**

My opinion is that handcuffing a student, such as W.B., who has disabilities and is displaying dysregulated behaviors at school, putting them in the back of a caged, marked police car and transporting them to a Baker Act receiving facility 40-60 or more minutes away, without parents/safe person is not only scary but also traumatizing to the child.

One of most distressing physical restraints for a student with disabilities are handcuffing and head control according to Emily Aklan, founder of a children's welfare provider in the United Kingdom (Aklan, 2021).  Unfortunately, this is exactly what W.B. experienced on February 16, 2021.  Officer Brown escalated W.B. by engaging in back and forth conversation with W.B.  Ms. Sumner had to intervene tell Officer Brown to "settle down" as he was not participating in de-escalation strategies (Sumner Dep. 103:18, Sumner Dep. 105:16). Within three minutes, W.B. was in handcuffs.

Aklan states, "Handcuffing and physically restraining children leaves a mental scar which takes years to heal, long after the red marks around their wrists have faded" (2021).  Officer

Brown's testimony demonstrates that he does not understand the potentially harmful and traumatizing effects of handcuffing and involuntarily transporting a student such as W.B.  He testified that Baker Acting and handcuffing children does not cause them harm (Brown, J. Dep. 82:16-83:10).

Ms. Sumner had concerns about W.B. being handcuffed behind his back, where other people could see.  Ms. Sumner stated that once she realized W.B. was handcuffed, she looked for a jacket and put a shirt over W.B.'s hands, which were handcuffed behind his back (Sumner Dep. 109:4-6).  Ms. Sumner stated she then called for a "code yellow," which means everyone stays in the school where they are, no one is allowed in the hallways and all classroom door blinds are shut (Sumner Dep. 104:22-105:2), in an effort to shield others from seeing W.B. handcuffed.  Ms. Sumner rightfully tried to shield others from seeing W.B. handcuffed, but she did not advocate for the handcuffs to be removed, leading to W.B. walking through the hallway of the school handcuffed.

Unfortunately, W.B.'s experiences interacting with school police are all too familiar to many students with disabilities. Students with disabilities were four times more likely to be arrested at school compared to those who do not have disabilities, based on CBS News' analysis of Department of Education Data from the 2017-2018 school years (Hacker et al., 2022).[19]  It is imperative that when police officers interact with students who have disabilities, they do not exhibit aggressive behaviors themselves, as this will escalate a situation.  When a police officer uses forceful language and aggressive behavior, adolescents will result in defiant behavior (Dudley, 2015, p. 7).

## SUMMARY AND CONCLUSIONS

W.B., a ███████████-grade public elementary student with disabilities-was handcuffed and involuntarily transported pursuant to the Baker Act Law from ███████████ Elementary School on February 16. 2021.  There are inconsistencies in the depositions of Officer Johnny

---

[19] Students with disabilities are much more likely to end up in the juvenile justice system due to behaviors exhibited at school. Many of these students with disabilities, those whose behavior is severe, already have a behavior intervention plan (BIP) to address the behavior of concern (Shaver & Decker, 2017, p. 231).

When police officers come across those affected by developmental disorders, they have to instill safety quickly.  (Dudley, 2015)

Brown, Ms. Robera Walker, Ms. Maria Sumner, and Mr. Curtis Brown regarding the severity of W.B.'s behaviors and facts leading up to the involuntary transport of W.B. on February 16, 2021.

W.B.'s disabilities, including educational disability of EBD and his outpatient mental health diagnosis of ODD, were not communicated to Officer Brown. W.B.'s disabilities and needs from his legal educational documents were not considered on the day Officer Brown decided to involuntary transport pursuant to the Baker Act.

Adequate and uniformed evidenced based training on disabilities and de-escalation strategies were not provided to the District staff who interacted with W.B. Due to this lack of training, District staff erroneously determined that W.B.'s physical and verbal aggression were crisis behaviors. His behaviors on this day did not reach crisis level, as they were not continuous and were not of immediate harm to himself or others. This proved detrimental to W.B. during the behavioral incident as there was not only a lack of understanding, but also a severe lack of communication amongst staff about his needs.

There were many missed opportunities to use the de-escalation strategies in his educational record and other known evidenced based practices, including ABA practices, for the treatment of escalated behaviors.

The District staff, including Officer Brown, do not recognize the severity of the choices they made on February 16, 2021 and how they affected W.B. Being placed in handcuffs by a school police officer and then involuntarily transported in the back of a caged marked police car to a Baker Act receiving facility over an hour away from school is a traumatic event.

The decision to involuntarily transport a student with disabilities from the public education domain must be made by trained professionals specializing in the mental and behavioral health fields. The school personnel involved with escalated behavior from students with disabilities must realize the importance of appropriately identifying the stages of escalated behavior and applying appropriate de-escalation strategies at each stage. District staff must be adequately and uniformly trained. They must communicate during an escalation and implement evidenced based strategies to ensure safety and de-escalate behaviors. Unfortunately, this did not happen for W.B. on February 16, 2021. Instead, he experienced the trauma of being handcuffed and transported in the back of a caged, marked, police car for involuntary examination under the Baker Act.

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

**APPENDIX A: Curriculum Vitae**

# Curriculum Vitae

*Kristin M. Kosmerl Ed.D., BCBA-D, IBA, CAS, CTRP, ADHD-CE, LBS, LBA*

Board Certified Behavior Analyst- Doctorate BCBA-D

International Behavior Analyst (IBA)

Certified Autism Specialist (CAS)

Certified Trauma and Resilience Practitioner (CTRP)

Attention Deficit Hyperactivity Disorder- Certified Educator (ADHD-CE)

Licensed Behavior Specialist in Pennsylvania (LBS)

Licensed Behavior Analyst in Texas (LBA)

Lake Worth, FL 33462

610-763-7661 (cell)

1-877-283-4022 (fax)

drkosmerl@kosmerlconsulting.com

**Professional Certifications**

- Board Certified Behavior Analyst- Doctorate (BCBA-D), August 2012 to present
- Board Certified Behavior Analyst (BCBA) March 2007- August 2012 (converted to BCBA-D)
- International Behavior Analyst (certified) (IBA) March 2020 to
- Certified Autism Specialist (CAS)- IBCCES- April 2018 to Present
- Present Certified Trauma and Resilience Practitioner (CTRP) September 2021 to Present
- Attention Deficit Hyperactivity Disorder- Certified Educator (ADHD-CE) Evergreen, May 2022 to present
- Pennsylvania Licensed Behavior Specialist, July 2013
- Business approved by BACB as a Type II CEU provider, June 2017 to Present
- BACB Supervisory Status Eligible as of October 2014

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

- I received letters of eligibility from the Florida Department of Education for teaching certification in elementary education, special education, and all administrative areas in June 2016, but was never issued certificates, as I was not employed by a public school district in Florida.
- Approved as an individual by BACB as a Type II CEU provider in February 2014
- Pennsylvania Supervisory  Certification in Special Education, April 2011 (inactive as of 4/2019 due to Act 48 hours but in good standing)
- Pennsylvania Supervisory Certification in Curriculum & Instruction, April 2011 (inactive as of 4/2019 due to Act 48 hours but in good standing )
- Pennsylvania Teaching Tenure received October 2010 within the School District of Lancaster
- Pennsylvania Teaching Instructional II Certification in elementary education, K-6 (2009) and special education N-12 (2009); a highly qualified teacher under No Child Left Behind (NCLB) (inactive as of 4/2019)
- American Heart Association BLS/ Heartsaver/ Bloodborne Pathogens Instructor December 2021- Present

## Education, Graduate and Undergraduate

**Widener University**                                      August 2007- August 2011

One University Place, Chester, PA 19013; 610-499-4000

- Ed.D. in School Administration, Pupil Services Track
- Graduation Date: August 2011; dissertation published August 2011
- *Dissertation title*:  A Comparative Investigation of General and Special Education Elementary Teachers' Beliefs about Including Students with an Educational Disability of Autism in the General Education Setting
- Passed Supervisory Praxis June 2010

**University of Central Florida**                                      June 2003- May 2004

400 Central Florida Blvd., Orlando, FL 32816; 407-823-2000

- M.Ed. in Elementary Education; minor in Literacy Education

**Pennsylvania State University**                                      August 2002- August 2003

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

114 Kern Blvd., University Park, PA 16802; 814-865-1795

- Post-master's Certificate in Applied Behavior Analysis (ABA)
- Passed BACB © Boards: March 2007 to become a Board Certified Behavior Analyst (BCBA)

**West Chester University of Pennsylvania**                    January 2005- July 2005

302 Recitation Hall, West Chester, PA 19318; 610-436-1000

- PA Certification in Special Education K-12
- M. Ed Program in Elementary Guidance                    January 2002- December 2002
  Counseling (21 credits, degree not awarded)
- B.S.Ed. Elementary Education, PA certification, Cum Laude       August 1998- May 2001
  Minors in Reading and Psychology

<u>**Specialized Training**</u>

- Certified as an International Behavior Analyst
- Certified Trauma and Resilience Practitioner, a trauma specialist
- Certified as an Autism Spectrum Disorder specialist
- Certified as an ADHD-CE specialist
- Certified as a practitioner of the following ABA programs:
  - Promoting Emergence of Advanced Knowledge (PEAK), Level 1
  - Acceptance Identify and Move (AIM), Level 1
  - Dr. Hanley's PFA/ SBT process, Level 1
  - CANVAS ABA art curriculum, Level 1
- Training in the use and implementation of applied behavior analysis (ABA) techniques for over 21 years
- Specialized training in the use and implementation of VB[20] techniques for over 21 years
- In-depth training over 16 years in special education law and compliance, federal and state
- Previous Safety Care Trainer; trained school district staff in de-escalation strategies for severe problem behaviors

---

[20] Verbal Behavior

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

- Autism specialist, working with children who are diagnosed on the autism spectrum for over 20 years, specializing in severe behaviors and non-communicative children.

**Current Employment**

**Kosmerl Consulting, LLC**                                                    May 2022- Present

**President/ Owner, BCBA-D, IBA, CAS, CTRP, ADHD-CE, LBS, LBA**

- Provide educational advocacy services for parents/students by reviewing paperwork and attendance at IEP[21], 504, and MDT[22]/ evaluation meetings
- Sister company to parent company Autism & Behavioral Consulting, LLC
- Provide educational advocacy services nationwide (504, IEP, GIEP[23])
- Develop and provide webinars for BACB Type II CEUs[24] for other BCBAs and BCaBA[25]
    - Offered free of charge if CEUs are not needed
- Consult with attorneys regarding behavior and advocacy
- Provide expert witness opinions
- Testify as an expert witness in the fields of behavior, trauma, and education
- Develop and provide customized training for school districts, companies, and first responders on inclusion, EBP[26] in behavior management, including de-escalation strategies and mental and behavioral health behaviors
- Provide consultation and mentorship for other BCBAs on trauma-informed, ethical behavior analysis, business consulting
- Supervise trainees who are studying to become BCBAs and BCaBAs

**Autism & Behavioral Consulting, LLC**                                        June 2010- Present

**President/ Owner, BCBA-D, IBA, CAS, CTRP, ADHD-CE, LBS, LBA**

---

[21] Individualized Education Plan
[22] Multi-disciplinary Team
[23] Gifted IEP
[24] Continuing Education Units
[25] Board Certified assistant Behavior Analyst
[26] Evidenced Based Practice

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

- Secure contracts with public school districts to provide BCBA/BCBA-D services, including consulting, conducting FBA[27]s, and developing BIPs [28]

- Provide ABA[29] and VB[30] in the natural environment of the client, including home, school, and community

- Development of EBP treatment plans using trauma-informed ABA and focusing on positive behavior supports for clients with dysregulated behavior, following medical necessity guidelines

- Preferred provider of leading commercial insurance companies in FL to provide ABA to children with an ASD[31] diagnosis

- Interview and hire BCBAs and RBTs; train according to protocol

- Development of HIPAA Handbook, Employee Handbook, and Operational Manuals; train staff and check for competency

- Instruct social skills groups using evidenced-based practices for clients with autism and other severe behaviors; focused on dysregulated behavior and life skills

- Evaluate clients when they exhibit severe physical aggression, which is causing imminent harm, suicidal/ homicidal ideations, or attempts using C-SSRS[32] and SAD Persons[33]

- Provide training for school districts and agencies specifically tailored to individual needs

- Conduct IEE[34] FBAs and other behavioral assessments

- Provide expert witness opinions

- Testify as an expert witness in due process hearings

- Consultation on educational programming and IEPs

- Specialized speaking engagements for agencies and non-profit organizations

- Signed contracts with agencies and school districts to complete VB-MAPP [35]evaluations and development of specific ABA and VB programs

---

[27] Functional Behavior Assessment
[28] Behavior Intervention Plans
[29] Applied behavior analysis
[30] Verbal behavior
[31] Autism Spectrum Disorder
[32] Columbia Suicide Severity Rating Scale
[33] A non-valid scale that can help quantify risk when used with valid measures
[34] Independent Education Evaluation at Public Expense
[35] Verbal Behavior Milestones Assessment and Placement Program

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

- Supervisor for BCBAs and BCaBAs in training as per the guidelines set forth by the BACB, including completion of the 8 hours of supervisor training required by the end of 2014
- Develop and create training for BCBA/BCaBAs CEUs as per BACB guidelines
- Training and competency exam mastery for RBTs [36]per BACB guidelines
- Provide specialized training to companies and organizations on inclusion, behavior, autism, de-escalation strategies, antecedent strategies, and consequence strategies
- Provide educational advocacy services for educational advocacy clients, attending IEP and 504 meetings
- Became a trainer of Safety Cares to train staff in safe de-escalation, physical management, and restraint procedures
- Provided BCBA-D consultation, including staff development, conducting FBAs and BIPs from August 2017 through December 2018 to a public charter school for children with autism in Palm Beach County, Florida

**School District Administrative Experience**

**Penn-Delco School District**                                      July 2012- August 2014

**Supervisor of Special Education**

2821 Concord Rd, Aston PA, 19014; 610-497-6300

- Supervised teachers and para-educators throughout the district in grades K-12
- Oversaw the implementation of legal processes and compliance of teachers and administrators, including paperwork and instructional practices
- Testified in multiple due process cases as an administrator and as a BCBA-D
- Consulted and advised teachers, administrators, school resource officers, and para-educators regarding students and their individual needs and how to meet these needs throughout the entire educational environment
- Developed and delivered EBP training for teachers, administrators, and para-educators on topics related to special education, FBAs, BIPs, LRE[37] , and special education law

---

[36] Registered Behavior Technician
[37] Least restrictive environment

- Established educational and behavioral curriculum development implementation for low-incidence disabilities within the district; students who were previously educated in out-of-district placements, including the opening of MDS[38], ES[39], and AS[40] classrooms, were offered and provided FAPE in district neighborhood schools
- Interviewed and hired special education teachers and staff as part of the human resources team
- Assisted in the writing of 504 plans through the support specialists and guidance counselors and training general education teachers on strategies listed on the plan
- Consulted with teachers on gifted education, writing of GIEPs, and implementation of GIEPs through differentiated instruction instead of self-contained gifted services
- Trained by PATTAN[41] in SaS[42] toolkit for LRE per Gaskin's Settlement to provide appropriate curriculum and behavior accommodations and modifications in the LRE
- Became a trainer of Safety Cares De-escalation training; trained all self-contained special education teachers and paraprofessionals in de-escalation and restraint procedures; trained bus drivers, paraprofessionals, cafeteria workers, and school resource officers in de-escalation procedures only

**<u>Teaching Experience</u>**

**School District of Lancaster**                                          August 2007- July 2012

**Exceptional Student Specialist (ESS) (Special Educational Consultant)**

251 S. Prince Street, Lancaster, PA 17602; 717-291-6141

- Employed under a teacher's contract. I consulted with teachers and administrators throughout the day from my designated office.
- Attended IEP meetings as LEA[43] and approved services in the IEPs
- Consulted with general education teachers regarding special education needs and behavioral needs in the LRE

---

[38] Multiple Disabilities Support
[39] Emotional Support
[40] Autistic Support
[41] Pennsylvania Training and Technical Assistance Network/ PA Department of Education
[42] Supplementary Aids and Services
[43] Local Education Agency

- Finalized all IEPs, which included reviewing IEP and related documents for compliance within special education law: IDEA 2004, Ch. 14 (PA Special Education Statute), Ch. 16 (PA gifted statute), and Gaskins Settlement in PA regarding LRE
- Consulted with district administrators, the dean of students, and the school resource officer regarding special education law, positive behavior supports, RtII[44] for behaviors and social skills, data collection, and school-wide positive behavior supports
- Consulted with the school-based IEP team, teachers, administrators, school psychologists, nurses, speech therapists, physical therapists, occupational therapists, and other related support staff on procedures, data review, and problem-solving
- Developed and provided professional development to general and special education teachers, paraprofessionals, and district administrators in using EBP in the fields of behavior management, de-escalation of behaviors, autism, special education law, and inclusionary practices
- Managed gifted caseload, including writing GIEPs, and consulting with general education teachers who were implementing the GIEP
- Developed ABA programs and schedules for the inclusion of all special education students, including autistic support, diagnostic kindergarten, life skills, and itinerant students
- Consulted with general and special educations teachers to develop effective lesson plans and schedules based on state standards and anchors to maximize student learning

**School District of Lancaster**                    **August 2010- July 2012**

**251 S. Prince Street, Lancaster, PA 17602; 717-291-6141**

**Board Certified Behavior Analyst (BCBA)**

- Oversaw behavior programming in three elementary schools and one middle school
- Completed observations of students in classrooms and collected data, which was then analyzed and presented to school teams
- Trained teachers and paraprofessionals on appropriate data collection procedures

---

[44] Response to Intervention and Instruction

- Developed functional behavior assessments and evidenced-based positive behavior support plans for students with IEPs
- Analyzed and graphed data collected by classroom staff to look for trends in behavior
- Collected inter-observer agreement data with staff, which was then analyzed to make data-informed behavior decisions
- Consulted with district administrators, school resource officers, and the dean of students regarding special education law, positive behavior supports, RtII for behaviors and social skills, data collection, and school-wide positive behavior supports
- Attended IEPs, and wrote the behavior sections of the IEP for students who had a FBA and BIP; presented functional levels of behaviors based on collected data and graphed data; wrote behavior, accommodations, and supports for school personnel
- Developed crisis plans for students who exhibited severe behavior in the school
- Contacted mobile crisis, communicated with the school-based team and parent/ guardian if a student exhibited severe behavioral crises; helped mobile crisis assess using the Columbia Scales and SAD Persons;
- Certified in Safety Cares De-Escalation Training

**Reading Area School District**                                    August 2006- August 2007

**Behavior Support Specialist/ Internal Verbal Behavior Coach**

800 Washington Street, Reading, PA 19601; 610-372-5612

- Employed under a teacher's contract
- Consulted with teachers and administrators on behavior management, FBAs, and behavior plans
- Worked as an integral part of the team, including administrators, speech occupational, physical, vision, hearing, mobility, and orientation therapists, as well as parents, special education supervisors, and the director of special education to decrease dysregulated behavior in the school setting
- Completed student observations and analyzed data, developed FBAs and PBSPs based on collected data

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

- Attended IEP meetings, wrote the present functioning levels, goals, and accommodations for IEPs
- Conducted FBAs
- Developed and presented workshops and training for all special education teachers and administrators in the district
- Attended specific training in verbal behavior at the state level; trained teachers and paraprofessionals in verbal behavior; updated and assessed students within the verbal behavior classroom as the district's internal verbal behavior coach through PATTAN's Verbal Behavior Project

**Easter Seals of Southeastern PA**                                    July 2005- August 2005

**ESY teacher, Multiple Disabilities ages 15-21**

3975 Conshohocken Ave, Philadelphia PA, 19131; 215-879-8424

- Developed and implemented lesson plans for individual students with severe physical and behavioral disabilities
- Completed IEP monitoring and data collection for each student and engaged in daily communication with parents
- Worked with therapists in classrooms to coordinate the required and appropriate services and education for each student

**Daniel Boone Area School District**                          February 2005- June 2005

**Long Term Sub., Primary Autistic Support**

2144 Weavertown Lane, Douglassville, PA 19518; 610-689-6200

- Taught in verbal behavior classroom; communicated weekly with verbal behavior consultants and BCBAs; updated verbal behavior programs daily; used applied behavioral analysis techniques for dysregulated behaviors
- Completed daily, individual lesson planning for students, as well as coordination of paraprofessionals using VB-MAPP
- Responsible for the development and implementation VB programs, IEPs, FBAs and BIPs
- Consulted daily with itinerant autistic support students who were included within the general education classroom, as well as their teachers, paraprofessionals, and therapists

- Collected and Analyzed data daily from the classroom

**Brevard County School District; Melbourne, FL**                September 2003- May 2004

**University Park Elementary Magnet School**

**Third Grade Teacher**

2700 Judge Fran Way, Viera Fl, 32940; 321-633-1000 x 500

- Responsible for creative and authentic daily lesson plans and instruction based on the Sunshine State Standards and grade level expectations as required by the district
- Prepared students for the state-mandated FCAT[45]
- Created and maintained open lines of communication between teachers, parents, administrators, therapists, and district officials
- Started an after-school reading club for all students in third grade who enjoyed reading and writing

**Phoenixville Area School District**                August 2001- December 2001

**Long-Term Substitute Kindergarten Teacher**

1120 S. Gay St., PO Box 804, 19460; 484-927-5000

- Planned for everyday design and implementation of constructive and creative lesson plans based on state standards for both morning and afternoon classes
- Maintained open lines of communication with parents and principal to enhance the educational experience of students
- Emphasized authentic learning experiences, including scaffolding social skills in the natural environment
- Implemented IEPs in the general education environment
- Collected data for student support teams

**St. Gabriel's Hall**                June 2001-August 2001

**ESY Title 1 Reading and Math Teacher**

227 N. 18th St, Philadelphia, PA 19103; 215-665-8777

- Designed the daily planning and implementation of lessons for twelve adjudicated residential male juveniles with severe emotionally dysregulated behavior

---

[45] Florida Comprehensive Assessment Test

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

- Coordinated with residential staff and director regarding level behavior modification system and work farm experiences, including the use of positive behavior supports
- Completed specific documentation of behaviors and grades for Title 1 and court purposes
- Provided authentic learning experiences and instructed students on topics that would be beneficial based on identified needs based on residential placement, emotional awareness, and life skills needed

**Other Relevant Work Experience:**

**Youth Advocate Programs**                                    September 2005- January 2007

**Behavioral Specialist/ Lead Autism Consultant**

2851 Centre Ave, Reading PA 19605; 610-921-9070

- Lead clinical therapist on all assigned cases specializing in severe behaviors with non-communicative and verbal autistic children
- Developed and delivered master's level training programs used at the state level for the agency to train other master's level clinicians in ABA and FBAs
- Developed individualized treatment plans for clients, trained staff and caregivers on appropriate implementation of each treatment plan
- Provided clinical supervision weekly for bachelor's level therapists implementing ABA programs
- Created and updated VB and ABA programs for autistic clients; trained staff, including school staff who requested training and parents on proper implementation and basics of autism and positive behavior supports

**Milestones Community Health Care (Now New Story)**       September 2004- September 2005

**Behavioral Specialist Consultant and Mobile Therapist**

354 N. Wyomissing Blvd., Reading PA 19610; 610-736-6940

- Developed comprehensive individualized treatment plans addressing behavioral and communicational deficits for newly diagnosed autistic clients

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

- Trained bachelor's level therapists and families on basic principles of ABA and VB; provided consultation in various domains of the client, including school staff who requested this service as well as agency staff who were required to undergo training
- Provided mobile therapy as a mobile therapist services in the home for families and siblings of autistic clients; including therapy and crisis assessment

**KidsPeace National Organization**                    May 2004- September 2004

**Behavior Specialist Consultant/Mobile Therapist**

8th & Hay Ave, Temple, PA 19605; 610-929-4686

- Responsible for the design and management of client behavioral treatment plans and management of interagency team meetings
- Provided clinical supervision to bachelor's level therapist
- Managed mobile therapist and therapeutic staff support as a lead clinician on cases
- Provided mobile therapy, including therapy and crisis management to clients and families

**Published Dissertation**

**Kosmerl, K.M. (2011). A comparative investigation of general and special education elementary teachers' beliefs about including students with an educational disability of autism in the general education setting. Doctoral Dissertation. Widener University, UMI Proquest: 3486409.**

**Other Publications:**

**Kosmerl, K. (2022, September 1).  Education and Advocacy for School-Based BCBAs. *Kosmerl Consulting, LLC.*  Webinar. 2 BACB Credits.**

**Kosmerl, K. (2022, September 1).  Ethics for Behavior Analyst in Schools. *Kosmerl Consulting, LLC.* Webinar. 2 BACB Credits.**

**Kosmerl, K. (2022, September 1).  FBAs for School-Based BCBAs. *Kosmerl Consulting,***

*LLC.* **Webinar. 2 BACB Credits.**

**Kosmerl, K. (2022, September 1).  BIPs in School for BCBAs.** *Kosmerl Consulting, LLC.*
**Webinar. 2 BACB Credits.**

**Kosmerl, K. (2019, May 8).  Restraints and Seclusions in Schools: What you Need to Know
as a Behavior Analyst.** *Autism & Behavioral Consulting, LLC.* **Webinar. 2 BACB
Credits.**

**Kosmerl, K. (2019, March 16).  Understanding IDEA 2004: Behavior Implications in
Special Education Law.** *Autism & Behavioral Consulting, LLC.* **Webinar. 2 BACB
Credits.**

**Kosmerl, K. (2018, December 24).  Ethically Thinking: Responsibilities to the BACB Code
of  Ethics.** *3 Pie Squared.* **Webinar. 2 BACB Ethics Credits.**

**Kosmerl, K. (2017, June 8).  ABA Applications in PA & Nationally; Lessons Learned and
ABA as a Discipline.** *ABA in PA Conference.* **Live, 3 BACB Credits.**

**<u>Invited Speaker</u>**

**Kosmerl, K. (2022, May 22). Education Advocacy for BCBAs.** *Do Better Collective.*

**Kosmerl, K. (2021, June).  Behavior Analyst Ethics. Invited speaker, Florida Atlantic
University, ABA class, Dr. Ortiz.**

**Kosmerl, K. (2021, May 13). Mindfulness, Acceptance, and Commitment Therapy (ACT)
& the use of Accept Identify and Move (AIM) programs for teens on the autism
spectrum,** *Cigna Autism Awareness Series for Parents.*

**Kosmerl, K. (2020, April 9). Teens and developing social skills.** *Cigna Autism Awareness*

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

*Series for Parents.*

Kosmerl, K. (2020, March).  Implementing ABA via telehealth due to COVID-19). *Do Better Collective.*

Kosmerl, K. (2020, March 7). VIP of BIP. *Autism Notebook Conference.*

Kosmerl, K. (2019, September 7).  Functions of behaviors in the educational domain. *Autism Notebook Conference.*

Kosmerl, K., Wolpert, S. & and Mueller, P.  (2018, March 20) Special education rights: What parents should know. *Timoney Knox Law Firm.*

Kosmerl, K. (2015, June 8).  Summer survival. *Autism Society Association of Berks County.*

Kosmerl, K. (2015, April 21).  Behaviorally speaking. *Supporting Parents of Exceptional Learners for Life (SPELL).*

Kosmerl, K. (2015, February 5). Supporting students with ASD in the inclusive class. *The Inclusive Class Podcast.*

Kosmerl, K. (2014, November, 7). Parents and teachers as partners. *The Inclusive Class Podcast.*

Kosmerl, K. (2013, October, 18).  Positive behavior supports in the IEP in the inclusive setting. *The Inclusive Class Podcast- Blog Talk Radio.* Podcast retrieved from

Kosmerl, K. (2013, July 11). Diagnosing developmental delays early. CDC 44th Autism Society National Conference and Exposition: Critical Opportunities for Public Health Policy to Improve Screening of Young Children for Developmental Disabilities.

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

**Kosmerl, K. (2012, June, 15).  The art of successfully including students with autism. *The Inclusive Class Podcast- Blog Talk Radio.* Podcast.**

**Kosmerl, K. (2010, October).  Autism spectrum disorders in schools. Widener University counseling graduate course.**

## Developed and Presented Workshops for School Districts

| | |
|---|---|
| **FBA's, BIP's and Data Collection** | August 2018 |
| Connections Education Center Charter School | |
| **Functional Behavior Assessments in the Educational Domain** | January 2015 |
| Exeter Township School District | |
| **Introduction to Inclusion** | August 2013 |
| Penn-Delco School District, Paraprofessionals | |
| **Paraprofessional 20-hour training** | August 2012-2013 |
| Penn-Delco School District, Paraprofessionals | |
| **Safety Cares Initial and Recertification Training** | August 2013 |
| Penn-Delco Staff | |
| **Developing Legally Defensible FBAs and PBSPs** | July 2013 |
| Penn-Delco School District Teachers | |
| **VB-MAPP Scoring** | May 2013 |
| Penn-Delco School District, Teachers | |
| **Behavior Modification and Data for General Education Teachers** | January 2013 |
| Penn-Delco School District, Teachers | |

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

**Autism & Educational Programming**

Penn-Delco School District, Para Educators                                 August 2012

**Autism 101**

School District of Lancaster Parent Academy                               April 2011

**Autism Basics**                                                          October 2011

School District of Lancaster Parent Academy

**Being a Friend to Someone with Autism**                                 October 2011

School District of Lancaster Middle School Students

**How to Help Your Child with Special Education Needs**                   October 2011

School District of Lancaster Parent Academy

**Inclusion Strategies K-5**                                              August 2011

School District of Lancaster teachers and administrators

**Autism 101**                                                            October 2010

School District of Lancaster- teachers, and paraprofessionals

**Basic Principals of Autism- What You Need to Know**                     April 2010

Widener University- Doctoral Class, substituted for Dr. McNiff at her request

**Autism 101- Basics of Autism in the Educational Environment**          October 2009

School District of Lancaster- paraprofessionals

Presented with Tiffany Brunner, M.Ed., BCBA

**Behavioral Data Training and Gaskins Overview- Price**                  March 2009

School District of Lancaster

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

Presented with Courtney Dever, School Psychologist, to the staff of Price Elementary

**Functional Behavior Assessment and PBPS Training**                October 2008

School District of Lancaster- Special Education Coordinators, Consultants (10-15-08), and teachers/ paraprofessionals (10-31-08)

Presented with Tiffany Brunner, M.Ed., BCBA

**Basic Principles of Behaviors**                May 2008

School District of Lancaster- paraprofessionals

**Autism and Behaviors- Best Practices in PBS**                April 2008

School District of Lancaster- teachers/ paras

**Functional Behavior Assessments and**                November 2007
**Behavior Invention Plans: Using Positive Behavior Supports**

School District of Lancaster- special education teachers

**Extinction and Planned Ignoring-**                April 2007
**Useful Implications in the Classroom for Increasing Positive Behavior**

Reading School District- special education teachers and administrators

**Environmental Manipulations-**                April 2007
**Strategies for the Classroom to Help Prevent Behaviors in all Children**

Reading School District- special and regular education teachers and administrators

**Pairing and Manding-**                February 2007
**What Exactly is it, and How Does it Apply to the classroom?**

Reading School District- special education teachers and administrators

**Verbal Behavior: The Basics**                December 2006

Reading School District- special education teachers and administrators

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

**Functional Behavior Assessment-**                                        March 2006

**What it is and What it Means to You as a BSC**

Youth Advocate Programs- Harrisburg

## Parent Training

**Increasing Social Skills Naturally**                                        February 26, 2020

Autism & Behavioral Consulting, LLC

**Behavior 101**                                        January 22, 2020

Autism & Behavioral Consulting, LLC

## Professional Memberships

| | |
|---|---|
| Florida Association of Behavior Analysts (FABA) | September 2016 to Present |
| ABA in PA Board Member, BCBA Leader | August 2014 to August 2016 |
| Dissemination of Behavior Analysis Special Interest Group (DBA-SIG) | November 2014 to 2016 |
| Association of Professional Behavior Analysts | March 2007 to Present |
| CPH and Associates BCBA Liability Insurance | October 2010 to Present |
| Autism Society of America | March 2001 to 2016 |
| Autism Society of America- Berks Chapter | March 2001 to 2016 |

## Community Service

| | |
|---|---|
| Miami Dolphins Volunteer/ Consultant | January 2020 |
| Miami Marlins Sensory/Behavior Consultant | April 2017 |
| Board Member for Rizon West Condo Association- Treasurer | December 2020 to 2022 |
| Board Member for Rizon West Condo Association | December 2019 to 2022 |
| Women's Junior League | August 2013- June 2017 |
| President Heather Court Condo Association | May 2014- October 2017 |
| Vice President Heather Court Condo Association | May 2013- May 2014 |
| Elks Club Member | May 2010- May 2012 |

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

## APPENDIX B: History of W.B.'s Dysregulated Behaviors in the Educational Domain

Below is a table of reference for the school years, grades and schools that W.B. attended throughout his enrollment in Palm Beach County School District.

| School Year | Grade | School |
|---|---|---|
| 2016-2017 | Kindergarten | ██████████████ |
| 2017-2018 | 1st | ██████████████ |
| 2018-2019 | 2nd | ██████████████ |
| 2019-2020 | 3rd | ██████████████ |
| 2020-2021 | 4th | ███████████- EBD classroom |

W.B. has a history of dysregulated behavior in the educational domain, dating back to his kindergarten year of schooling.  The history of behaviors is significant as District personnel has been documenting his behaviors in reports and data collection since 2016.

Table demonstrating W.B.'s history of dysregulated behaviors:

| Date | Time | Location | Dysregulated Behavior |
|---|---|---|---|
| 5/23/2017 | 3:00 pm | Classroom | Pushed chair down; shoved another student |
| 9/10/2017 | 10:30 am | Classroom | Ran around room, while laughing loudly |
| 9/22/2017 | 8:15 am | Classroom | Punched the boy sitting next to him; kicked student walking in front of him; tried to knock same student over by wrapping his arms and legs around him |
| 1/29/2018 | 10:00 am | Classroom | Chased a student; grabbed her by shirt and "slung" to ground<br><br>Punched Ms. Redden in stomach<br>Said "I hate this stupid school.  I hate you." |
| 1/30/2018 | 09:00 am | Classroom | Slapped another student;Said, "Shut up! I didn't do anything to you!" |
| 2/18/2018 | 08:30 am | Classroom | Attempted to fight another student; Yelling and running around classroom |
| 2/4/2019 | 12:40 pm | Classroom | Stomping on another student's backpack; pushed the next student then fought with first student |
| 2/13/2019 | 7:59 am | Hallway | Got out of line; Pushed another student |

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

| 3/11/2019 | 1:35 pm | Classroom | Punched another student in head, threw to floor; he had to be physically restrained |
| 4/16/2019 | 1:50 pm | Hallway | Threw shoe at Mr. Nieves as he wanted him to go to the office |
| 4/25/2019 | 2:00 pm | Classroom | Attempted to pick up another student and drop him in trash can; then kicked him |
| 5/2/2019 | 1:15 pm | Classroom | W.B. fought with another student after he was throwing pencils at the student.<br><br>Physically restrained after trying to hurt himself by hitting head on door and wall<br><br>Cursed at the foster grandparent in the room |
| 5/15/2019 | 10:30 am | Classroom | Pushed and hit another student |
| 5/22/2019 | 12:05 pm | Cafeteria | W.B. was hitting and choking another student<br>Tried to walk out of office; called adult a liar |

Other examples of documented dysregulated behavior include:

On 10/24/2016 there was a meeting to discuss W.B.'s behavior, which is "off task". Teacher reported that he might be "acting out" to get sent to time out. He also states that he does not like school and doesn't care about it.

Problem Solving/ School Based Team Initial referral completed on 12/22/2016 states that W.B. walks out of class without permission, disrupts the class by having outbursts and making loud noises. It also stated that he throws objects around the classroom and often hits other children.

A Conference Staffing/Report dated 12/9/2016 states that he was sent to a "buddy room" several times. He is defiant and disrespectful when in buddy room. He cannot keep his hands to himself, and the teacher has concerns about social skills. It also states that he walked out of class and around the classroom.

A Conference Staffing/Report dated 2/20/2017, L.H. mom requested gifted testing. His behavior continues to be a concern, there are discipline referrals, but no suspensions. According to the teacher he goes to time out a lot.

At times since kindergarten, W.B. has had a stated goal in his records of "using kind words" due to his verbally dysregulated behavior. These goals for "kind words" were added

back to his programming and data collection in kindergartendue to his verbally dysregulated behavior.  Based on behavior sheets reviewed from 5/23-6/1/2017 (suspended 5/24 & 5/25/2017) "I can use kind words and actions" as well as "I can keep my hands and feet to myself" were being tracked at the end of the school year. One of his goals from his Academic/Behavior Intervention Plan dated 4/4/2019, states he will use "kind words", which initially was addressed through the same document with a date of 10/3/2017 (SDPBC, 4/4/2019; SDPBC, 10/3/2017).

In a Conference/Staffing Record dated 4/4/2019 (the same as the Academic/Behavior Intervention Plan) the second sentences states, "A lot of fighting and verbally aggressive" (p. 1) Also stated that it takes up to 25 minutes to calm down (p. 2)

Mr. Curtis Brown stated that he has heard W.B. state, "I'm going to kill that person." Or "I'm going to punch you in the face."  (Brown, C. Dep. 48:13-15).  Mr. Curtis Brown stated that he did not take these verbal threats of harm seriously as W.B. would say them every week or two and that they were said "out of aggression and anger" (Brown, C. Dep. 48:16-20). However, Mr. Curtis Brown, did not hear W.B. stated he was going to kill himself February 16, 2021 (Brown, C. Dep. 62:7-8).

## APPENDIX C: Analysis of Daily Behavior Sheets 1/4/2021-2/16/2021

W.B.'s daily behavior charts from 1/4/2021 to 2/16/2021 were reviewed. No other data sheets were reviewed for the 2020-2021 school year.  There were 26 dates of sheets provided, including 2/16/2021.

The behavior chart has 6 one-hour blocks, broken down into half hour increments.  These time blocks were 8-8:30 & 8:30-9; 9-9:30 & 9:30-10; 10-10:30 & 10:30-11; 11-11:30 & 11:30-12; 12:00-12:30 & 12:30-1; 1-1:30 & 1:30-2.

He can earn up to 8 "yes" in each 1 hour block.  It states, "6 out of 8 earns reward". However, the reward is not stated.

There are four expectations he can get "yes" for in each half hour block.  They are

1. "I followed directions"
2. "I kept hands and feet to myself"
3. "I remained in my area"
4. "I was nice to others"

The four expectations are not clearly defined, which is expected for the behavior chart to be implemented with fidelity and the data to be collected with validity. These expectations are too broad, specifically what directions, what area is W.B. expected to stay in and what is quantified as being "nice".

The rewards are not defined as well, including what rewards W.B. can work for and when he can have access to the rewards.

Not one of the 26 daily charts were scored every half hour or had a daily percentage marked. This means there was no reviewing of the data and looking for trends.

There were 6 blocks of 8 opportunities for a maximum score of 48.

If W.B. met the expectation for each half block, a yes was to be circled.  If he did not, a "no" was to be circled.

If he earned 6/8 for each hour, he received a reward.  However, since the half hour blocks were not added up or tracked daily, the question as to whether or not he received his hourly reward for meeting expectations is warranted. In addition, if the data was not added up or given a percentage daily, it was not being reviewed to see if the behavior plan was appropriately modifying W.B.'s behavior and if there were trends in his behavior.

There were 13/27 days, in which some blocks were left blank.  Data collection with empty blocks means that the data was not collected with validity since there is no reason given for the empty data collection area. The behavior being tracked either was observed or not observed.  The only way a block should have been empty was if W.B. was not present in school. However, it was not marked or noted why there were missing data blocks in these days.

For the purpose of my data analysis, if nothing was circled and a block was left empty, this was not counted towards the 48 opportunities as there is no reason for "yes" or "no" not to be circled.  This is noted with the data for possible opportunities on the specific days.  There are times where it states he was removed from class and went to another class (1/8/2021 12:00-2:00 pm) for 2 hours.  However, the data collection and opportunity to earn rewards as stated should have been afforded to W.B. as he was still in school.

It is troubling that a student was removed from his EBD classroom for behaviors for 2 hours, and no data collection was provided. This also means that W.B. did not have the opportunity to earn rewards as designed.  W.B. was still in school and moved to another classroom, school personnel should have implemented the behavior modification system and collected data as designed.

Below is a chart representation of the information noted above.

| Date: | Anecdotal quotes from the daily behavior sheet: |
|---|---|
| 01/04/2021 100% (48/48) | |
| 01/05/2021 100% (48/48) | "W.B. had a great day today" ☺ (smiley face included) "Great job W.B." |
| 01/06/2021 100% (48/48) | "W.B. you had another great day" |
| 1/7/2022 94% (45/48) | 12:30-1:00 pm "W.B. refuses to his work, he slept throughout support facilitation class with Ms. |

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

| | |
|---|---|
| | McDonald. He got upset so Mr. Joseph wanted to take him outside for a walk, but he refuses" |
| 1/8/2021 76% (22/29) | 10:30-11:30 "W.B. refuses to follow directions." "He uses profanity and threatened to fight his peers." "12pm-2p- "WB. was sent to another class so he could calm down." |
| 1/12/2021 100% (45/45) | "Today was an awesome day for W.B. He was in a very happy mood." |
| 01/13/2021 100% (45/45) | "8-8:30 W.B. was very helpful in this session (social personal).  He helped me to figure out something on my computer." "At the end of testing, W.B. found a safe place and remains productive until dismissal". |
| 1/14/2021 100% (45/45) | "[W.B] did great today, he made some extra effort to make the right choices."  "Great job W.B" |
| 1/15/2021 100% (47/47) | "Another great day for W.B…Yay!!" |
| 01/19/2021 100% (48/48) | "W.B was very cooperative in Math class. He wanted to stay longer because of the social interaction he was having with his peers." |
| 01/21/2021 90% (43/48) | "11-11:30 am W.B. walked out of class refusing to follow instructions." "W.B" ended the day on a good note as he isolated himself just in order to focus on some work (IREADY) he was told to do." |
| 1/25/2021 56% (20/36) | "8-8:30 am Told his teacher not to talk to him. Uses profanity to his classmate." "8:30-9 am Starts a fight with (redacted students)."  "Throws the desk and chairs in the class. He was taken out of the class for the safety of himself and the other children" |
| 1/26/2021 91% (39/43) | "8:30am-9:00 am. "Frequent reminders required to cease following negative behavior of peer. |

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

|  |  |
|---|---|
|  | (picking up or moving desk in place. Preoccupation with taking his winter black glove on/off. Play fighting moving about in a chair.)"<br><br>"1:30-2pm Used profanity to peers." |
| 1/27/2021 93% <br> (40/43) | "8:00-8:30 W.B. was asked to name one good thing he is going to do today. He said he's going to behave himself."<br>"9:30-10am  Disrespectful to teacher, because hwas told to get up off the floor."<br>"10:30-11 am W.B. was rewarded for his good behaviors and completion of assigned work". |
| 01/28/2021 100% <br> (48/48) | (In big letters "Great Day for W.B. 😊) |
| 1/29/2021 89% <br> (42/47) | "9-9:30 Refused to go to Math class, he sat on top of a desk even though told to sit in his designated seat."<br><br>"12-12:30 "Ran around the classroom playing."<br><br>"W.B.'s day ended on a good note, he was calmer while interacting in class activities." |
| 2/2/2021 100% <br> (24/24) | "W.B was asked to name one positive thing he was going to do for the day. He didn't respond."<br>"W.B.'s behavior for the rest of the day was not consistent.  He gave rebuttals for almost everything he was told to do."  "However for the most past; he ended the day in a good mode inspite of the challenges" |
| 2/3/2021 75% <br> (36/48) | "W.B. was actively engaged in his work. You could hardly know he was present. Great job W.B." |

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

|  |  |
|---|---|
|  | "At 12:30pm W.B. was walked to his Math class. He refused to go inside the class for no particular reason.  He walked away and went back to his class. While in the classroom, he tried break his laptop and used profanity to the teacher that spoke to him about his behavior."  "Violates social distancing guidelines." |
| 2/4/2021 100% (44/44) | "Great day for W.B." |
| 02/05/2021 92% (44/48) | "W.B. hits another boy in the head. his teacher called after him and he uses the "F" word telling him, he not his teacher." "He was very disrespectful." |
| 02/08/2021 67% (32/48) | "W.B. was asked to one positive thing he would do for the day. He said he would as told and be "focused"." "W.B. was disrespectful to his teacher. Tells a students he will shot his moma" "Threw the teacher's things on the floor." "Threw desk & chairs in class. Uses profanity to teacher." "Threatens to shoot his teachers, ripped posters from the wall. VP was to help calm him down." |
| 2/9/2021 70% (28/40) | "W.B. was asked to do a reflection on all the things he had done for earlier part of the year and tell whether or not he's a positive or negative person. He said he knows he's a negative person." "Refused to do his work in Math class & threatents to walk out of class." "Fought another student." |
| 02/10/2021 100% (48/48) | "W.B.'s positive thing for the day is to make good choices." "[W.B.] did a great job in math class." |

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

| | |
|---|---|
| 2/11/2021 75% (12/16) | "W.B was disruptive and was sent to another class." "His day ended OK." |
| 02/12/2021 83% (40/48) | "W.B. hits another student in his head and soaked his backpack in water." |
| 2/16/2021 50% (8/16) | "W.B.'s positive thing for the day is to focus, listen to his teacher and do his work." "W.B. took a keyboard from another student's laptop. It was taken from him and he got angry. Started throwing the desk and chairs. Disrespect his teachers. Pushed me and Mr. Joseph. Uses profanity to us." "He said, he was going to look up how to kill people." "W.B." was removed from the classroom for our safety." |

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

**Data Analysis**

The data sheets were not added up hourly or daily, therefore the data was analyzed to make data driven behavioral decisions.

A review of the data, from 1/3/2021- 2/16/2021 shows that the "yes" were not added up hourly or daily for a % over the 26 days of use.  Additionally, there were 13 days of data on the behavior charts that had blank data boxes.

To analyze the limited data that can be provided from these sheets, all the "yes" were added up for each hour and divided by the number of opportunities per day.  Missing or blank data boxes were not counted towards opportunities, as there was no data provided, neither "yes" or "no" was circled.  There is nothing that can be of use on this behavior data sheet to analyze the antecedent, consequence, duration and the time events began to happen.

The daily ratio of yes/total opportunities are valid, based on the minimal data provided on the daily sheets for the 26 days.

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL



An analysis of this data demonstrates that W.B.'s replacement behaviors were inconsistent at best.  Expectations 1-4 were not being met consistently on a daily basis and overtime.  W.B. was exhibiting behaviors that impeded his learning or that of others during these 26 days.

The trendline on this graph should be ascending, meaning interventions were being successful. Unfortunately, there was a descending trendline, which means there were more dysregulated behaviors instead of replacement behaviors being exhibited by W.B.

**<u>Scatterplot</u>**

There were many inconsistencies within the data collection, including not collecting data on throughout the day on 13/26 dates.  Antecedent-behavior-consequence (ABC) data was not

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

collected, even in anecdotal form.  Therefore, the ABC of the physical and verbal aggression could not be analyzed to identify antecedents and consequences maintaining or reinforcing the behavior.

A scatter plot was completed using the data on the 26 daily behavior sheets.  Data was analyzed as a percentage per each half hour block, in which W.B. was to earn rewards for meeting the four identify expectations.



A thorough analysis of the above data yields a variety of conclusions, which could have been used in developing a more effective behavior management system for W.B., including an increase in reinforcement for him to experience success.  W.B.'s behavior was not only inconsistent, but so was in the manner in which it was collected.

In the above scatterplot, the colors of mustard yellow (1:00-1:30) and medium green (1:30-2:00) are missing most frequently; these colors were missing the most data points throughout the 26 days.

### APPENDIX D: PCM De-Escalation Strategies for Pre-Crisis Behaviors

Focusing on de-escalation of pre-crisis behaviors is a cornerstone of PCM practitioner training.  These strategies for de-escalating pre-crisis behaviors according to the PCM Practitioner Manual include:

- Use gestural and verbal prompt to gain the individual's attention; not physical (PCM 2008, p. 7-40)
- Remove from a group setting (PCM 2008, p. 7-40)
  - Quieter and less stimulating
- Recommend, but not tell the individual to sit (PCM 2008, p. 7-40)
- Use an assertive, but supportive and calm tone when interacting with person in pre-crisis state (PCM 2008, p. 7-40)
- Ensure the individual is in a safe setting based on the individual's preference (PCM 2008, p. 7-41)
- Be aware of the people around an individual in pre-crisis (PCM 2008, p. 7-42)
  - If a person is known to be an aversive they should not be involved as long as others are present to ensure safety
- Give personal space (PCM 2008, p. 7-42)
- Display confidence, not fear (PCM 2008, p. 7-42)
  - People who are exhibiting pre-crisis behaviors can sense fear
- Use supportive posture which yields to using verbal de-escalation appropriately (PCM 2008, p. 7-42)
- Limit downtime and manipulate times to ensure success in returning to stable state (PCM 2008, p. 7-43)
- Remin person in pre-crisis of the goals they are attempting to achieve (PCM 2008, p. 7-44)
- Using verbal praise in pre-crisis behavior when dysregulated behavior ceases and positive behaviors are exhibited, even if minute amounts of time (PCM 2008, p. 7-44)
  - Ask a question that is easily known, in the hopes the person in pre-crisis will respond, then immediately provide positive praise

- Use tangible reinforcements, making sure the amount of reinforcement is enough and the item being obtained is reinforcing enough to de-escalate pre-crisis behaviors (PCM 2008, p. 7-44-45)
  - Example. A student receives a check mark for shaping desired behaviors, when the pre-crisis behavior ceases, immediately reinforce with a check mark for student exhibiting the replacement behavior.
- Use immediacy in providing consequences, whether positive or negative (PCM 2008, p. 7-46)
  - to not reinforce dysregulated behavior
- Be patient and listen (PCM 2008, p. 7-46)
- Acknowledge feelings immediately   (PCM 2008, p. 7-46)
- Offer help (PCM 2008, p. 7-46)
- Allow time to vent (PCM 2008, p. 7-46)
- Tell individual with dysregulated pre-crisis behaviors that you are concerned and thinking of their safety; set boundaries for safety (PCM 2008, p. 7-46)
- Be non-judgmental (PCM 2008, p. 7-46)
- Restate and clarify (PCM 2008, p. 7-46)
- Don't argue with person in pre-crisis (PCM 2008, p. 7-46)
- Do not engage in manipulation of person in pre-crisis, including giving ultimatums
- Explain while the behavior is inappropriate, using least number of words possible (PCM 2008, p. 7-47)
- Give reasonable choices (PCM 2008, p. 7-47)
  - Ex: Paired choice between two objects, items, setting or even people
- Allow sufficient time for processing of questions and language (PCM 2008, p. 7-47)
- Cognitive restructuring (PCM 2008, p. 7-48)
- Being clear and concise (PCM 2008, p. 7-49)
- Use effective prompts, usually the command type in pre-crisis de-escalation, which is simple and concise

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

# APPENDIX E: Records Reviewed

## Records Reviewed

- JFK Medical Records (DVPSBPBC-001933 to 001968)
- Psychiatry Records: Sequel Care of Florida Vero Beach (DVPSBPBC-010042 to 010081)
- COMPLAINT filed 6/22/2021 (Docket Entry 1, D.P. v. School Board of Palm Beach County et al)
- FIRST AMENDED COMPLAINT DEMAND FOR JURY TRIAL filed 7/26/2021 (Docket Entry 31, D.P. v. School Board of Palm Beach County et al)
- DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT filed 8/19/2021 (Docket Entry 45, D.P. v. School Board of Palm Beach County et al)
- Incident/Investigation Report 2/16/2021, Baker Act of WB Reporting Officer Narrative of Officer J. Brown (SBPBC-Baker_Act_0000018 to 0000020).
- Incident/Investigation Report 10/6/2020, Police Assist of Baker Act Reporting Officer Narrative of Officer J. Brown (SBPBC-Baker_Act_023774 to 023777).
- SDPBC: Bulletin #P-14782-TL/SSCI, Baker Act Decision Tree Protocol, 1/15/2014 (SBPBC-Baker_Act_2ndRFP_00006887 to 00006888)
- SDPBC: Bulletin #P 19-052 DSCOS, Baker Act Decision Tree Protocol, 11/11/2018 (SBPBC-Baker_Act_045513 to 045515)
- SDPBC: Bulletin #P 20-053 DSCOS, Behavioral Health Reference Guide, 8/21/2019 (SBPBC-Baker_Act_045049 to 045051)
- SDPBC: Bulletin #P 21-013 DSCOS, FY21 Behavioral and Mental Health Quick Reference Guide, 9/21/2020 (SBPBC-Baker_Act_021439)

## Educational Records Reviewed

- SDPBC: Behavior Point Sheet, 12/16/2019-2/18/2020 (SBPBC-Baker_Act_0002354 to 0002357).
- SDPBC: Behavior Intervention Plan, 1/31/2020, Page 1-6 (SBPBC-Baker_Act_0002318 to 0002323).
- SDPBC: Functional Behavior Assessment, 1/24/2020, Page 1-4 (SBPBC-Baker_Act_0002324 to 0002327).
- SDPBC: Student Social History, Department of Exceptional Student Education (ESE), 2/3/2020 (SBPBC-Baker_Act_0002502 to 0002507)
- SDPBC: Psycho-Educational Evaluation by School Psychologist, ██████████████, 11/8/2018, Page 1-7 (SBPBC-Baker_Act_0002586 to 0002592)
- SDPBC: Psycho-Educational Evaluation by School Psychologist, ████████ Elementary, 12/18/2019, Page 1-14 (SBPBC-Baker_Act_0002509 to 0002522)
- SDPBC: Meeting Notes (Suspension), ██████ Elementary, 2/19/2019 (DPVSBPBC-001985)
- SDPBC: Conference/Staffing Record, ██████Elementary, 2/19/2020 (SBPBC-Baker_Act_0002498-99)

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

- SDPBC: W.B. Daily Behavior Chart, 1/4/2021-2/15/2021 (SBPBC-Baker_Act_2ndRFP_00000168; 00000209; 00000211; 00000213; 00000215; 00000217; 00000219; 00000221; 00000223; 00000225; 00000227; 00000229; 00000231; 00000233; 00000235; 00000237; 00000241; 00000245; 00000247; 00000249; 00000430; 00000434)
- SDPBC: Suicide Risk Assessment, 4/12/2021 (SBPBC-Baker_Act_0002641 to 0002647)
- SDPBC: Behavioral Threat Assessment, 2/22/2021 (SBPBC-Baker_Act_0002626 to 0002632)
- SDPBC: Notice of Suspension Letter, 8/26/2021; 9/2/2021 (SBPBC-Baker_Act_0002227 to 0002234)
- SDPBC: 504/ADA Accommodation Plan – Elementary, ███████ Elementary, 10/16/2019 (WB 3rd grade) – documented disability: Oppositional Defiance Disorder; History of defiance, irritability and aggression pages 1-2 (SBPBC-Baker_Act_0002536 to 0002537).
- SDPBC: Individual Education Plan, Department of Exception Student Education (ESE), ███████ Elementary, 5/1/2020, Pages 1-17 (SBPBC-Baker_Act_0002480 to 0002496)
- SDPBC: Individual Education Plan, Department of Exceptional Student Education, ███████ ███████, 4/20/2021, Pages 1-19 (SBPBC-Baker_Act_0002442 to 0002460)
- SDPBC: Email: 1/8/2021 (SBPBC-Baker_Act_011012 to 011014).
- SDPBC: Email: 1/16/2021 (SBPBC-Baker_Act_2ndRFP_00000503 to 00000504)
- SDPBC: Email: 2/16/2021 (SBPBC-Baker_Act_010982)
- SDPBC: W.B. Conference/Staffing Record, May 11, 2017 (pages 1-2) (DPVSBPBC-001615-16)
- SDPBC: W.B. Academic/Behavior Intervention Plan, Department of Safe Schools, October 3, 2017 (DPVSBPBC-0011576)
- SDPBC: W.B. Conference/Staffing Record, November 30, 2017 (DPVSBPBC-001601)
- SDPBC: W.B. Functional Behavior Assessment Student Assisted Interview, January 9, 2020 (SBPBC-Baker_Act_0002335 to 0002336)
- SDPBC: L.H. Functional Assessment Interview: Parent/Guardian, January 10, 2020 (SBPBC_Baker_Act_0002341 to 0002344)
- SDPBC: W.B. Conference/Staffing Record, April 4, 2019, Page 1-2 (DPVSBPBC-0011582-83)
- SDPBC: W.B. Academic/Behavior Intervention Plan, Department of Safe Schools, April 4, 2019 (DPVSBPBC-0011575)
- SDPBC:  W.B. Additional Educational Records (SBPBC-Baker_Act_0002468-2610; DPVSBPBC-001541-1642)

**Depositions Reviewed**

Maria Sumner, Assistant Principal, ███████ Elementary, April 22, 2022

Robera Walker, Principal, ███████ Elementary, April 13, 2022

Curtis Brown, Behavioral Intervention Assistant, ███████ Elementary, October 7, 2022

Johnny Brown, School Police Officer, July 21, 2022

W.B., Plaintiff, March 16, 2022

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

## APPENDIX F: Common Abbreviations (Alphabetical Order)

1. Attention Deficit Hyperactivity Disorder — ADHD
2. Attention Deficit Hyperactivity Disorder- Certified Educator — ADHD-CE
3. Applied Behavior Analysis — ABA
4. Antecedent-Behavior-Consequence Data Collection — ABC
5. Behavioral Health Professional — BHP
6. Behavioral Intervention Assistant — BIA
7. Behavior Intervention Plan — BIP
8. Board Certified Behavior Analyst- Doctorate — BCBA-D
9. Certified Autism Specialist — CAS
10. Certified Trauma & Resilience Practitioner — CTRP
11. Disruptive Mood Dysregulation Disorder — DMDD
12. Emotionally Behaviorally Disturbed — EBD
13. Evidenced Based Practice — EBP
14. Exceptional Student Education — ESE
15. Functional Behavior Assessment — FBA
16. Individual Education Plan — IEP
17. International Behavior Analyst — IBA
18. Oppositional Defiant Disorder — ODD
19. Pennsylvania Licensed Behavior Specialist — LBS
20. School Resource Officer — SRO
21. Texas Licensed Behavior Analyst — LBA

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

# APPENDIX G: References

Aklan, E. (2021, February 4). The mental scars left behind when we handcuff children. *Professional Social Work.* https://www.basw.co.uk/resources/psw-magazine/psw-online/mental-scars-left-behind-when-we-handcuff-children

Clearinghouse for Military Family Readiness at Penn State Technical Assistance Team. (2021). *De-Escalation Training for School Personnel.*  https://militaryfamilies.psu.edu/wp-content/uploads/2021/07/De-Escalation-Rapid-Lit-Review.2021July.FINAL_.pdf

Collins, A. (2022, March 30).  Florida's Baker Act impacts children more than we might know, expert says. *First Coast News.* https://www.firstcoastnews.com/article/news/community/could-floridas-baker-act-traumatize-children/77-0486a7fd-1390-42b1-b693-819896e3b62b

Crisis Prevention Institute. (2021, March 31). *How Trauma-Informed Schools Help Every Student Succeed.*  https://www.crisisprevention.com/Blog/Trauma-Informed-Schools

Dudley, R.G., Jr., M.D. (2015). Childhood Trauma and Its Effects: Implications for Police. *New Perspectives in Policing Bulletin*, U.S. Department of Justice: National Institute of Justice. https://www.ojp.gov/pdffiles1/nij/248686.pdf

Fagen, S. J. (2021, September 22). Suicidal Ideation in Very Young Children. *Franciscan Children's.* https://franciscanchildrens.org/blog/suicidal-ideation-in-very-young-children/

Fleisig, N.N. (2008). *Professional Crisis Management Practitioner Manual.* Professional Crisis Management Assocation, Inc.

Florida Department of Children and Families Office of Substance Abuse and Mental Health. (2021). *Report on Involuntary Examinations of Children.* https://www.myflfamilies.com/service-programs/samh/publications/docs/Report%20on%20Involuntary%20Examination%20of%20Minors%20-%202021.pdf

Google. (n.d.). [Google map of distance by vehicle between ███████ Elementary and JFK North]. Retrieved November 16, 2022, from https://goo.gl/maps/NGAmj3xSoAQhSChF9.

Hacker, Z., Zalani, A., Sanchez, J., & Stock, S. (2022, November 18). *Handcuffs in hallways: Hundreds of elementary students arrested at U.S. schools*. CBS News. https://www.cbsnews.com/news/hundreds-of-elementary-students-arrested-at-us-schools/

Hanley, G. (2021, September 9). A Perspective on Today's ABA from Dr. Hanley. *Practical Functional Assessment.* https://practicalfunctionalassessment.com/2021/09/09/a-perspective-on-todays-aba-by-dr-greg-hanley/

Hatter, L. (2020, December 18). Committed: Improving Florida's Baker Act for children a challenge. *WUSF Public Media.*  https://wusfnews.wusf.usf.edu/health-news-florida/2020-12-18/committed-improving-floridas-baker-act-for-children-a-challenge

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

Kaye, A.J., & Erdley, C.A. (2011). Physical Aggression. In: Goldstein, S., Naglieri, J.A. (Eds.), *Encyclopedia of Child Behavior and Development. Springer* (pp. 1100-1103). Springer, Boston, MA. https://doi.org/10.1007/978-0-387-79061-9_2156

Minahan, J. (2019). Trauma-Informed Teaching Strategies. *Educational Leadership*, 77(2). https://www.ascd.org/el/articles/trauma-informed-teaching-strategies

PaTTAN. (n.d.). *An Introduction to Applied Behavior Analysis*. https://www.pattan.net/Publications/An-Introduction-to-Applied-Behavior-Analysis

PaTTAN. (2009). Functional *Behavior Assessment*. https://www.ldsd.org/cms/lib/PA09000083/Centricity/Domain/38/FBA-Flyer0309.pdfhttps://www.ldsd.org/cms/lib/PA09000083/Centricity/Domain/38/FBA-Flyer0309.pdf

Professional Crisis Management Association, Inc. (n.d.(a)). *Is your behavioral crisis management system really trauma informed?* Retrieved November 16, 2022, from https://crisisintervention.com/index.php/trauma-informed-care/https://crisisintervention.com/index.php/trauma-informed-care/

Professional Crisis Management Association, Inc. (n.d.(b)) *Our Story*. Retrieved November 16, 2022, from https://crisisintervention.com/index.php/about-pcma/

Professional Crisis Management Association, Inc. (2004). *PCM Brochure*. https://bsotr.com/pdf/PCM%20Brochure.pdf

RTI Action Network. (n.d.). *What is RTI?* Retrieved November 16, 2022, from http://www.rtinetwork.org/learn/what/whatisrti

School District of Palm Beach County. (2022, May 31). E*xceptional Student Education Policies & Procedures, 2020-2021 through 2022-2023*. School District of Palm Beach County. Retrieved November 16, 2022, from https://cdn5-ss14.sharpschool.com/UserFiles/Servers/Server_270532/Image/ESE/spp%202023.pdf

Shaver, E.A. & Decker, J.R. (2017). Decker, J. (2017). Handcuffing a Third Grader? Interactions Between School Resource Officers and Students with Disabilities. *Utah Law Review*, *2017*(2), 229-282. https://dc.law.utah.edu/cgi/viewcontent.cgi?article=1044&context=ulr

Slocum, T. A., Detrich, R., Wilczynski, S. M., Spencer, T. D., Lewis, T., & Wolfe, K. (2014). The Evidence-Based Practice of Applied Behavior Analysis. *The Behavior Analyst*. 37, 41-56, https://link.springer.com/article/10.1007/s40614-014-0005-2.

Starr Commonwealth. (2019). *Trauma-Informed Resilience-Focused Schools Guidebook*. Starr Commonwealth.

Substance Abuse and Mental Health Services Administration (SAMAHA). (2020). *National Guidelines for Behavioral Health Crisis Care, Best Practice Tool Kit*. https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf

United States Department of Education: Office of Special Education and Rehabilitative Services. (2022). *Positive, Proactive Approaches to Supporting Children with Disabilities: A Guide*

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

*for Stakeholders.* https://sites.ed.gov/idea/files/guide-positive-proactive-approaches-to-supporting-children-with-disabilities.pdf

Vogel, A.C. M.D., Brotman, M.A. PhD., Roy, A.K. PhD. (2022). Review: Defining Positive Emotion Dysregulation: Integrating Temperamental and Clinical Perspectives. *Journal of the American Academy of Child & Adolescent Psychiatry*. https://doi.org/10.1016/j.jaac.2022.06.019

Webb, J. (2022, September 27). Suicidal Thoughts are Not Always What They Seem. *Psychology Today*. https://www.psychologytoday.com/us/blog/childhood-emotional-neglect/202209/suicidal-thoughts-are-not-always-what-they-seem

Weir, K. (2016, December). Research on Suicide Overlooks Young Children; Psychologists are Working to Change That. *Monitor on Psychology, 47*(11), 28. https://www.apa.org/monitor/2016/12/ce-corner

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

# APPENDIX H: Works Consulted

Cardona, M. (2021). (rep.). *Supporting Child and Student Social, Emotional, Behavioral, and Mental Health Needs*. Department of Education.

CBS Miami. (2022, November 16). *Thousands of students committed under Baker Act*. CBS News. https://www.cbsnews.com/miami/news/thousands-of-students-committed-under-baker

Detrich, R. (2014). (rep.). *Evidence-Based Practice of Applied Behavioral Analysis*. Association for Behavioral Analysis International.

Dudley, R. G. (2015). Childhood Trauma and It's Effects: Implications for Police. *National Institute of Justice*.

Florida Association of School Psychologists. (n.d.) Position Statement on Involuntary Commitments.

Flint, D. (2020). 3 Emotional Explanations for the "Defiant" Child. *Psychology Today*.

Grant, K. (2021, April 30). Involuntary Psychiatric Holds in Kids: The Known Unknowns. *MedPage Today*.

Kennebeck, S. & Bonin, L. (2022, September 15). Suicidal Ideation in Children and Adolescents: Evaluation and Management. Retrieved November 12, 2022, from www.uptodate.com/contents/suicidal-ideation-and-behavior-in-children-and-adolescents-evaluation-and-management.

National Council of State Education Associations. (2019). (rep.). *Addressing the Epidemic of Trauma in Schools* (July 2019).

National Education Association. (n.d.). Teaching Children from Poverty and Trauma.

Position Statement on the Involuntary Commitment of Students in Schools in Florida. (n.d.). *Florida Association of School Psychologists*.

Safe School-based Enforcement Through Collaboration, Understanding, and Respect. Local Implementation Rubric (n.d.).

Safe School-based Enforcement Through Collaboration, Understanding, and Respect. State and Local Implementation Rubric (n.d.).

Trauma-Informed Care Implementation Resource Center. (n.d.). *What is Trauma-Informed Care*. Center for Health Care Strategies.

United States Department of Education. (2016, September 8). Key Policy Letters Signed by Education Secretary or Deputy Secretary. *ed.gov*.. Retrieved November 8, 2022, from www2.ed.gov/print/policy/elsec/guid/secletter/160907.html.

United States Department of Education/U.S. Department of Justice. (n.d.). *Family Educational Rights and Privacy Act. A Guide for First Responders and Law Enforcement*.

United States Department of Education: Office of Special Education and Rehabilitative Services. (2016, August 1). Washington, District of Columbia; Department of Education.

United States Department of Justice. (2016, September 8). COPS. Washington, District of Columbia; United States Department of Justice, Office of Community Oriented Policing Services.

United States Department of Justice, Office of Director. (2016, September 17). COPS. Washington, District of Columbia; US Department of Justice, Office of Community Oriented Policing.

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

Arc Educates. (n.d.). *Professional Crisis Management*. Arc Educates. Retrieved November 15, 2022, from www.arcbrowardlearning.com/professional-crisis-management

Bonin, L., & Kennebeck, S. (2022, September 15). Suicidal Ideation in Children and Adolescents: Evaluation and Management. Retrieved November 12, 2022, from www.uptodate.com/contents/suicidal-ideation-and-behavior-in-children-and-adolescents-evaluation-and-management

Cardona, M. (2021). (rep.). *Supporting Child and Student Social, Emotional, Behavioral, and Mental Health Needs*. Department of Education

Crisis Prevention Institute. (2021, March 31). How Trauma-Informed Schools Help Every Student Succeed. Retrieved November 11, 2022, from https://Crisispreventioninstitute.com/blog/trauma-informed-schools

Department of Juvenile Justice. (2006). Staff Training.  Retrieved Nov 19, 2022 from https://flrules.org/gateway/readFile.asp?sid=3&tid=742358&type=1&File=63H-1.002.htm

Division of K-12 Public Schools, Exceptional Student Education Policies and Procedures: Palm Beach (2020). Florida Department of Education. Retrieved Nov 19, 2022, from https://beessgsw.org/#/spp/institution/dea5f5c3-cc8-4b05-8d1c-6a197da66016/document/ce625ce8-1ce0-4bcb-abe3-be7a86a61daf/print/public


Dubie M. & Pratt, C. (2022). *Observing behavior using a-b-c data*. Retrieved  from https://www.iidc.indiana.edu/irca/articles/observing-behavior-using-a-b-c-data.html

Feldman, R. (2007, May 9). Restraining Students Whose Behavior May Cause Harm to Self or Others. *Board Workshop/Department of Exceptional Student Education*


*How To: Calm the Agitated Student: Tools for Effective Behavior Management*. InterventionCentral.org. (n.d.). Retrieved November 17, 2022, from www. Interventioncentral.org/behavior_calm_agitated_student

Inclusive Strategies to Address Behavioral Needs for Students with IEPs. (n.d.). *Prevention an De-escalation of Intense Behavior Responses: What Adults Can Do*

T4K ABA. (n.d.). *PCM Certification.* Retrieved November 20, 2022, from http://www.t4kaba.com/pcm-certification/


 Position Statement on the Involuntary Commitment of Students in Schools in Florida. (n.d.). *Florida Association of School Psychologists*.


https://crisisintervention.com/index.php/trauma-informed-care/https://bsotr.com/pdf/PCM Brochure.pdf

Professional Crisis Management. (n.d.). *Staff Development Component Information: Professional Crisis Management (PCM) Practitioner Certification*.

Southern Poverty Law Center. (2021). *About the Southern Poverty Law Center*. Southern Poverty Law Center.

State of Florida Department of Children and Families Mental Health Program Office. (2002). (rep.). *Baker Act. Involuntary Examination. Criteria, Process and Timeframes.*

*D.P., et al. v. School Board of Palm Beach County, et al.*
Expert Opinion Report - CONFIDENTIAL

School Board of Palm Beach County., *Palm Beach Mental Health Allocation Plan* (2020-2021)
(2021). Palm Beach, FL; Retrieved November 20, 2022 from
http://origin.fldoe.org/core/fileparse.php/18612/urlt/PalmBeach2021.pdf

Substance Abuse and Mental Health Services Administration. (n.d.). *National Guidelines for
Behavioral Health Crisis Care, Best Practice Tool Kit*.


Mitrofan et al.: Aggression in children with behavioural/ emotional difficulties: seeing aggression
on television and video games. BMC Psychiatry 2014 14:287