**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

D.P. *et al.*,

       Plaintiffs,

   vs.

SCHOOL BOARD OF PALM BEACH
COUNTY,

      Defendant.

CASE NO. 21-CIV-81099-CANNON

**<u>JOINT STATEMENT OF UNDISPUTED FACTS</u>**

**Plaintiff D.P.**

1.      D.P. is a student with a disability.   Defendant's Answer to Second Amended Complaint, ECF No. 163 ("Answer") ¶ 14.

2.      D.P. is a student with Autism Spectrum Disorder ("ASD" or "Autism").   Answer ¶ 14.

3.      D.P. was nine years old on November 8, 2018.  Answer ¶ 14.

4.      P.S. is D.P.'s grandmother and guardian.  Answer ¶ 15.

5.      On November 8, 2018, Officer Joseph Margolis initiated an involuntary examination (also referred to as a "Baker Act") of D.P.  Answer ¶ 58.

6.      On November 8, 2018, Officer Margolis was employed by the Lantana Police Department.  Answer ¶ 72.

7.      The School District of Palm Beach County ("SDPBC") contracted with the Lantana Police Department to station Lantana Police Departments officers at some SDPBC schools during the 2018-2019 school year.  Answer ¶ 72.

8.      On November 8, 2018, Officer Margolis was stationed at Lantana Elementary School pursuant to the contract between SDPBC and Lantana Police Department.  Answer ¶ 72.

9.      On November 8, 2018, D.P. was a student at Lantana Elementary School.  Ex. 1 at 4 (Deposition of Joseph Margolis Ex. 2).[1]

10.     Lantana Elementary School is part of SDPBC.  Ex. 2 at 19:10-19 (Deposition of Sharon Wladimirski); Ex. 3 at 17:7-10, 17:16-18 (Deposition of Joseph Margolis).

---

[1] Throughout this document, page numbers of exhibits refer to the pages of the document itself and not the pagination stamped at the top of the document when filed in ECF.

11.     On November 8, 2018, D.P. was a student in an Exceptional Student Education ("ESE") classroom.  Ex. 2 at 81:1-2 (Wladimirski Dep.); Ex. 4 at 40:8-12 (Deposition of Anna Kuron-Salecka); Answer ¶ 60.

12.     D.P. was placed in an ASD classroom.  Answer ¶ 60.

13.     On November 8, 2018, Sharon Wladimirski was an SDPBC employee who was a school guidance counselor at Lantana Elementary School.  Ex. 2 at 19:10-23 (Wladimirski Dep.).

14.     On November 8, 2018, Anna Kuron-Salecka was an SDPBC employee who was an ESE teacher in D.P.'s classroom.  Ex. 4 at 18:8-12, 40:8-14 (Kuron-Salecka Dep.).

15.     Exhibit 1 to the deposition of Anna Kuron-Salecka is a true and accurate copy of D.P.'s "Exceptional Student Education Individual Education Plan" dated March 29, 2018.  Ex. 5 (Kuron-Salecka Dep. Ex. 1).

16.     On November 8, 2018, D.P. became upset while at school.  Answer ¶ 66.

17.     Officer Margolis understood that a call to the mobile crisis response team, if one had been placed, had been canceled by District staff because "things were under control by the time they called back."  Ex. 3 at 146:18-147:17 (Margolis Dep.).

18.     The mobile crisis response team did not evaluate D.P. on November 8, 2018.  Ex. 3 at 147:2-20 (Margolis Dep.).

19.     After Officer Margolis made the decision to initiate the Baker Act, D.P. calmed down.  Ex. 3 at 86:5-8 (Margolis Dep.).

20.     D.P. was then "completely calm," "back to his normal self," and acting "like nothing ever happened."  Ex. 3 at 141:17-25, 152:9-13, 155:24 (Margolis Dep.).

21.     After D.P. calmed down, he did not say or do anything that indicated he was a threat to himself or anyone else.  Ex. 3 at 86:19-22 (Margolis Dep.).

22.     Officer Margolis did not reconsider his decision to initiate the Baker Act after D.P. calmed down.  Ex. 3 at 86:9-12 (Margolis Dep.).

23.     Officer Margolis spoke to P.S. for the first time "after the BA [Baker Act] was done."  Ex. 3 at 112:15-17 (Margolis Dep.); Answer ¶ 76.

24.     Officer Margolis was not sure whether District Baker Act policy required parental consent for an involuntary examination.  Ex. 3 at 199:24-200:1 (Margolis Dep.).

25.     Officer Margolis understood the criteria for the Baker Act to be "if they are a harm to themselves or others," which he explained meant, "If they say they want to die, they're going to stand in front of a train, stand in front of a car, take a bottle of pills, shoot themselves" and did not include a person just "seeing Jesus or thinking they were Jesus[.]"  Ex. 3 at 52:20-53:5, 55:10-18 (Margolis Dep.).

26.     Officer Margolis did not recall receiving training from the District police department regarding the Baker Act.  Ex. 3 at 58:13-15 (Margolis Dep.).

**Plaintiff E.S.**

27.     E.S. is a student with a disability.  Answer ¶ 16.

28.     E.S. is a student with ASD (Autism).  Answer ¶ 16.

29.     E.S. was nine years old on August 30, 2019.  Answer ¶ 16.

30.     J.S. is E.S.'s mother.  Answer ¶ 17.

31.     Officer Jose Cuellar initiated an involuntary examination of E.S. on August 30, 2019.  Ex. 6 at No. 1 (Def. Jose Cuellar's Resp. to Pl.'s Req. for Admis. ("Cuellar RFA")).

32.     On August 30, 2019, Officer Jose Cuellar was an employee of the School District of Palm Beach County.  Ex. 7 at 17:5-17, 20:1-6 (Deposition of Jose Cuellar).

33.     On August 30, 2019, Sergeant Michael Brown was an employee of the School District of Palm Beach County.  Ex. 7 at 21:9-19 (Cuellar Dep.).

34.     On August 30, 2019, E.S. was a student at Acreage Pines Elementary School.  Ex. 8 at 6 (Cuellar Dep. Ex. 7).

35.     Acreage Pines Elementary is part of SDPBC.  Ex. 7 at 20:1-6 (Cuellar Dep.).

36.     On August 30, 2019, E.S. was a student in an ESE Autism cluster classroom. Answer ¶ 90.

37.     On August 30, 2019, Darline Karbowski was an SDPBC employee who was the principal of Acreage Pines Elementary School.  Ex. 9 at 21:13-25 (Deposition of Darline Karbowski).

38.     On August 30, 2019, Bernadette Tone was an SDPBC employee who was the classroom teacher in E.S.'s ESE Autism cluster classroom.  Ex. 10 at 29:5-18 (Deposition of Bernadette Tone); Ex. 11 at 108:18-20 (Deposition of Margarita Bauder).

39.     On August 30, 2019, Margarita Bauder was an SDPBC employee who was a paraprofessional in E.S.'s ESE Autism cluster classroom.  Ex. 11 at 17:1-9 (Bauder Dep.).

40.     On August 30, 2019, Jason Lee was an SDPBC employee who was a behavioral health professional at Acreage Pines.  Ex. 12 at 16:7-21 (Deposition of Jason Lee).

41.     On August 30, 2019, E.S. had a behavioral aide who was employed at C.A.R.D. Services ("C.A.R.D. Behavioral Aide").  Ex. 13 at 66:14-67:5 (Deposition of Plaintiff J.S.); Ex. 9 at 203:3-22 (Karbowski Dep.); Answer ¶ 91.

42.     C.A.R.D. Services is an agency that provides services to children with Autism.  Ex. 9 at 203:16-22 (Karbowski Dep.).

43.     C.A.R.D. was privately retained by J.S. to provide services to E.S. in his classroom. Ex. 13 at 68:4-13 (J.S. Dep.); Ex. 9 at 203:3-9 (Karbowski Dep.); Answer ¶ 91.

44.     On August 30, 2019, E.S. was approximately four feet five inches tall.  Ex. 14 (School Health Entry Exam); Ex. 7 at 123:3-5 (Cuellar Dep.).

45.     On August 30, 2019, E.S. weighed approximately eighty pounds.  Ex. 14.

46.     According to E.S.'s Individualized Education Program dated March 15, 2019, E.S. had "outbursts and tantrums a few times a week."  Ex. 15 at 9 (Bauder Dep. Ex. 5).

47.     When E.S. was placed at Acreage Pines, Principal Karbowski was informed that E.S.'s. disability-related behaviors included outbursts and reacting negatively to non-preferred tasks.  Ex. 9 at 190:9-14 (Karbowski Dep.).

48.     Exhibit 5 to the deposition of Margarita Bauder is a true and accurate copy of E.S.'s Individual Education Plan dated December 5, 2018.  Ex. 15 (Bauder Dep. Ex. 5).

49.     Prior to August 30, 2019, District staff had experience deescalating E.S. when he was agitated.  Ex. 10 at 118:10-24 (Tone Dep.); Ex. 11 at 98:14-18 (Bauder Dep.); Ex. 9 at 193:20-194:23 (Karbowski Dep.).

50.     Prior to August 30, 2019, Principal Karbowski had sometimes been able to deescalate E.S. by providing him with Marvel superhero books or by trying to talk about some of the things he was going to be doing over the weekend.  Ex. 9 at 192:24-193:8 (Karbowski Dep.).

51.     Prior to August 30, 2019, District staff had contacted J.S. when they needed additional behavioral supports for E.S.  Ex. 9 at 201:4-11 (Karbowski Dep.).

52.     Prior to August 30, 2019, Jason Lee was aware that E.S. was diagnosed with Autism.  Ex. 12 at 75:4-6 (Lee Dep.).

53.     Jason Lee was not aware of E.S. having any other diagnosed disabilities.  Ex. 12 at 75:7-12 (Lee Dep.).

54.     On August 30, 2019, Officer Cuellar knew that E.S. had a disability and thought that E.S.'s disability was Autism.  Ex. 7 at 106:18-107:2 (Cuellar Dep.).

55.     On August 30, 2019, Officer Cuellar knew that E.S. was being educated in an ESE classroom where many of the students had Autism.  Ex. 7 at 105:23-25, 194:5-10 (Cuellar Dep.).

56.     Officer Cuellar was interviewed by a District internal affairs officer on October 3, 2019.  Ex. 16 at 1 (Redacted Excerpt of Cuellar Dep. Ex. 12).

57.     During the October 3, 2019 interview, under oath, Officer Cuellar stated "Correct" when asked whether he knew E.S. was autistic prior to August 30, 2019.  Ex. 16 at 8 (Redacted Excerpt of Cuellar Dep. Ex. 12).

58.     On August 30, 2019, E.S. became agitated in his classroom.  Ex. 11 at 110:1-7 (Bauder Dep.).

59.     E.S. was escorted into the school's office by the C.A.R.D. Behavioral Aide.  Answer ¶ 93.

60.      The adults present in the school's office included Jason Lee, the C.A.R.D. Behavioral Aide, Margarita Bauder, and Darline Karbowski.  Ex. 9 at 206:20-207:2 (Karbowski Dep.); Ex. 12 at 87:6-12 (Lee Dep.); Ex. 11 at 108:1-5 (Bauder Dep.).

61.     Jason Lee and Principal Karbowski attempted to deescalate E.S. verbally.  Ex. 9 at 207:11-15, 208:25-209:3 (Karbowski Dep.).

62.     E.S. hit the C.A.R.D. Behavioral Aide.  Answer ¶ 94.

63.     The only physical injury observed as a result of E.S.'s behavior was a "red mark" on the C.A.R.D. Behavioral Aide's chest.  Ex. 9 at 208:21-24 (Karbowski Dep.); Ex. 7 at 119:14-19 (Cuellar Dep.); Answer ¶ 94.

64.     Officer Cuellar entered the room after E.S. hit the C.A.R.D. Behavioral Aide.  Ex. 7 at 115:1-5 (Cuellar Dep.); Answer ¶ 95.

65.     On August 30, 2019, E.S. hit a thick glass window.  Answer ¶ 96.

66.     No injuries to E.S. were observed from hitting the window.  Ex. 7 at 199:19-200:1 (Cuellar Dep.).

67.     Officer Cuellar decided to initiate an involuntary examination under the Baker Act on E.S. as soon as he saw E.S. hitting the window.  Ex. 7 at 135:4-7 (Cuellar Dep.).

68.     Officer Cuellar did not think about other strategies that might have prevented E.S. from hurting himself other than use of the Baker Act.  Ex. 7 at 139:14-17 (Cuellar Dep.).

69.     Officer Cuellar did not ask about E.S.'s disabilities prior to initiating an involuntary examination under the Baker Act.  Ex. 7 at 115:24-116:1 (Cuellar Dep.).

70.     Officer Cuellar was not told anything about E.S.'s Autism or any other disabilities by other District staff.  Ex. 7 at 139:19-24 (Cuellar Dep.).

71.     Officer Cuellar did not ask if E.S.'s mother had been contacted prior to initiating an involuntary examination under the Baker Act.  Ex. 7 at 115:12-13 (Cuellar Dep.).

72.     Officer Cuellar did not ask what anybody had done to calm E.S. down prior to initiating an involuntary examination under the Baker Act.  Ex. 7 at 115:15-17 (Cuellar Dep.).

73.     Office Cuellar did not ask about anything that had worked to calm E.S. down in the past prior to initiating an involuntary examination under the Baker Act.  Ex. 7 at 115:18-20 (Cuellar Dep.).

74.     Officer Cuellar did not ask about whether there were adults E.S. trusted who could help calm him down prior to initiating an involuntary examination under the Baker Act.  Ex. 7 at 115:21-23 (Cuellar Dep.).

75.     Officer Cuellar did not discuss contacting any other mental health resources or the mobile crisis response team prior to initiating an involuntary examination under the Baker Act. Ex. 7 at 139:25-140:9 (Cuellar Dep.).

76.     Office Cuellar handcuffed E.S. in the front.  Ex. 7 at 132:13-14 (Cuellar Dep.).

77.     E.S. became calm after Officer Cuellar placed handcuffs on him.  Ex. 7 at 133:20-24 (Cuellar Dep.); Ex. 9 at 216:20-217:1 (Karbowski Dep.); Ex. 11 at 122:5-10 (Bauder Dep.).

78.     Officer Cuellar took E.S. to his office to fill out the Baker Act paperwork.  Ex. 7 at 133:20-134:4, 140:10-14 (Cuellar Dep.).

79.     E.S. remained calm while walking to Officer Cuellar's office.  Ex. 7 at 135:8-12 (Cuellar Dep.).

80.     Officer Cuellar removed the handcuffs from E.S. in his office.  Ex. 7 at 140:10-18 (Cuellar Dep.); Answer ¶ 104.

81.     E.S. remained calm after Officer Cuellar removed the handcuffs.  Answer ¶ 105.

82.     E.S. waited for at least ten minutes for transportation to a receiving facility.  Answer ¶ 105.

83.     E.S. remained calm during the ten minutes he waited for transportation to a receiving facility.  Answer ¶ 105.

84.     Sergeant Brown arrived at Acreage Pines to transport E.S.  Ex. 7 at 144:16-145:5 (Cuellar Dep.).

85.     E.S. was handcuffed in the front again by either Cuellar or Brown, or both of them. Ex. 7 at 146:5-20 (Cuellar Dep.); Answer ¶ 106.

86.     E.S. remained calm when he walked to the police car for transport to a receiving facility.  Ex. 7 at 149:17-19 (Cuellar Dep.).

87.     E.S. was placed in the car in handcuffs for transport to a receiving facility.  Answer ¶ 106.

88.     Officer Cuellar and Karbowski contacted J.S. after Cuellar's decision to initiate the involuntary examination of E.S.  Ex. 9 at 218:16-21, 219:8-17 (Karbowski Dep.); Ex. 7 at 147:12-18 (Cuellar Dep.).

89.     When Officer Cuellar contacted J.S., he informed her that E.S. was being transported for involuntary examination.  Ex. 7 at 148:5-7 (Cuellar Dep.).

90.     Officer Cuellar did not ask J.S. for her consent to the involuntary examination.  Ex. 7 at 148:25-149:2 (Cuellar Dep.).

91.     Officer Cuellar did not give J.S. the option to come and try to calm E.S. down.  Ex. 7 at 148:16-18 (Cuellar Dep.).

92.     Principal Karbowski did not ask J.S. for her consent to the involuntary examination.  Answer ¶ 103.

93.     J.S. did not consent to the involuntary examination of E.S.  Ex. 6 at No. 10 (Cuellar RFA).

94.     Officer Cuellar understood that an involuntary examination must occur if a student has exhibited some evidence of being a danger to self or others, even if the student has since deescalated or calmed down, because the student needs to see a doctor to determine why they did what they did.  Ex. 7 at 141:10-19 (Cuellar Dep.).

95.     Officer Cuellar could have waited for the mobile crisis response team to evaluate E.S. but chose not to because he had already made his decision to initiate an involuntary examination.  Ex. 7 at 143:19-144:2 (Cuellar Dep.).

96.     On August 30, 2019, Officer Cuellar did not believe that parental consent was required for involuntary examination under the Baker Act.  Ex. 7 at 42:16-20, 43:1-4 (Cuellar Dep.).

97.     Officer Cuellar understood that, when an involuntary examination might be initiated, he should contact the parent "towards the end of the situation" to prevent the parent from showing up at the school.  Ex. 7 at 40:2-9, 40:19-41:2 (Cuellar Dep.).

98.     Officer Cuellar understood that a parent had no role when an involuntary examination might be initiated for their child once he was in contact with the child until after he had determined whether to initiate an involuntary examination.  Ex. 7 at 39:20-24 (Cuellar Dep.).

99.     Officer Cuellar's practice was to contact parents of a child for whom he has initiated involuntary examination when the child was already being transported to a receiving facility.  Ex. 7 at 40:10-15 (Cuellar Dep.).

100.     Officer Cuellar understood that it was legal to Baker Act someone "when I felt that somebody was a danger to themselves or someone else."  Ex. 7 at 31:2-7 (Cuellar Dep.).

101.     Officer Cuellar understood that a "danger to themselves" means they would probably "end up hurting themselves, minor or severely."  Ex. 7 at 31:8-12 (Cuellar Dep.).

102.     Officer Cuellar understood that initiating an involuntary examination meant taking the person to see a mental health specialist at a locked psychiatric facility.  Ex. 7 at 63:21-25 (Cuellar Dep.).

103.    When asked at deposition, "Is it legal to Baker-Act someone for behavior that is due to autism?" Officer Cuellar testified under oath "Yes." Ex. 7 at 32:11-13 (Cuellar Dep.).

104.    Officer Cuellar testified that on August 30, 2019, he had most recently received Baker Act training in 2013.  Ex. 7 at 56:6-14 (Cuellar Dep.); Ex. 51 at 1 (Cuellar Dep. Ex. 1).

105.    Officer Cuellar understood that students in the District are always handcuffed when transported for the Baker Act.  Ex. 7 at 81:7-9 (Cuellar Dep.).

106.    Office Cuellar understood that the District policy in effect on the date of E.S.'s handcuffing required individuals who were being transported to a receiving facility to be handcuffed.  Ex. 6 at No. 17 (Cuellar RFA).

107.    Officer Cuellar was trained to "always handcuff children when transporting them for involuntary examination."  Ex. 6 at No. 15 (Cuellar RFA).

**Plaintiff W.B.**

108.    W.B. is a student with a disability.  Answer ¶ 18.

109.    On February 16, 2021, W.B. was ten years old.  Answer ¶ 18.

110.    L.H. is the mother of W.B.  Answer ¶ 19.

111.    On February 16, 2021, Officer Johnny Brown initiated an involuntary examination of W.B. under the Baker Act.  Ex. 17 at No. 1 (Def. Johnny Brown's Resp. to Pl.'s Req. for Admis. ("Brown RFA")).

112.    On February 16, 2021, W.B. was a student at Belle Glade Elementary School.  Ex. 18 at 3 (Deposition of Johnny Brown Ex. 5).

113.    Belle Glade Elementary is part of SDPBC.  Ex. 19 at 14:5-11 (Deposition of Robera Walker).

114.    On February 16, 2021, Officer Johnny Brown was employed by SDPBC.  Ex. 18 at 1 (Johnny Brown Dep. Ex. 5).

115.    On February 16, 2021, Robera Walker was an SDPBC employee who was the principal of Belle Glade Elementary.  Ex. 19 at 14:10-18 (Walker Dep.).

116.    On February 16, 2021, Maria Sumner was an SDPBC employee who was the assistant principal of Belle Glade Elementary.  Ex. 20 at 18:6-10 (Deposition of Maria Sumner).

117.    Prior to February 16, 2021, W.B. was known to the District as a student with an emotional or behavioral disability.  Answer ¶ 118.

118.    On February 2021, W.B. was a student in an Emotional/Behavioral Disability ("EBD") classroom.  Answer ¶ 118.

119.    On February 16, 2021, Curtis Brown was a Behavioral Intervention Assistant ("BIA") who worked in W.B.'s classroom.  Ex. 21 at 35:9-16, 37:18-20 (Deposition of Curtis Brown).

120.    Exhibit 2 to the deposition of Maria Sumner is a true and accurate copy of W.B.'s Individual Education Plan dated May 1, 2020.  Ex. 22 (Sumner Dep. Ex. 2).

121.    Pursuant to his Individual Education Plan, W.B. was provided individual therapy twice a month and group therapy weekly by school therapist Jessie Bullard.  Ex. 20 at 72:7-13, 74:2-9 (Sumner Dep.); Ex. 19 at 74:3-5 (Walker Dep.); Answer ¶ 119.

122.    Exhibit 31 to the deposition of Plaintiff L.H. is a true and accurate copy of W.B.'s Behavior Intervention Plan dated January 31, 2020.  Ex. 23 (Deposition of Plaintiff L.H. Ex. 31).

123.    A "Meeting Notes" document dated February 19, 2019, from Rosenwald Elementary School, documenting a meeting between an ESE contact and a teacher about W.B.,

included a note, "does not like to be touched, particularly by males[.]"  Ex. 24 (Feb. 19, 2019 Meeting Notes).

124.    Principal Walker knew that W.B. was "really good, like, when you give him his space. He doesn't like people to kind of crowd around him, he wants his space."  Ex. 19 at 79:20-22 (Walker Dep.).

125.    Principal Walker knew that successful de-escalation strategies for W.B. included giving him space, walking with him, breathing techniques, incentives, and giving him time to calm down.  Ex. 19 at 79:18-80:8 (Walker Dep.).

126.    On February 16, 2021, Sumner was aware that W.B. made threats and that "he just throws these things out. It's part of his vocabulary."  Ex. 20 at 65:14-24 (Sumner Dep.).

127.    Curtis Brown had heard W.B. make threats to harm others "once every week or two weeks."  Ex. 21 at 48:9-24 (Curtis Brown Dep.).

128.    Curtis Brown did not take these remarks seriously because "sometimes it was out of just aggression and anger" and did not think W.B. actually was going to try to harm anyone. Ex. 21 at 48:16-20, 49:12-14 (Curtis Brown Dep.).

129.    Assistant Principal Sumner testified that L.H. could typically deescalate W.B by talking to him and by taking away technology from him and Principal Walker testified that W.B. would typically calm down after L.H. arrived at the school.  Ex. 20 at 92:10-18 (Sumner Dep.); Ex. 19 at 82:20-22 (Walker Dep.).

130.    Prior to February 16, 2021, Curtis Brown had witnessed L.H. successfully deescalate W.B. twice.  Ex. 21 at 57:24-58:10 (Curtis Brown Dep.).

131.    On February 16, 2021, W.B. became upset while in his classroom and began throwing chairs.  Answer ¶ 124.

132.   After leaving the classroom, W.B. ran outside the school and attempted to jump or climb a fence.  Answer ¶ 124.

133.   School staff, including Curtis Brown and Sumner, were present and used some de-escalation techniques on W.B. to move him away from the fence.  Ex. 21 at 41:25-42:4 (Curtis Brown Dep.); Ex. 20 at 102:15-103:3 (Sumner Dep.); Ex. 25 at 102:24-103:2 (Deposition of Johnny Brown).

134.   District Police Officer Johnny Brown then arrived and tried to calm W.B. down by speaking to him by saying things like, "calm down, what's going on, how can we help you, what got you so upset, how can we fix it."  Ex. 25 at 104:18-24 (Johnny Brown Dep.); Answer ¶ 126.

135.   After two minutes from when W.B. was at the fence, Officer Brown handcuffed W.B. in the back.  Ex. 25 at 105:7-25 (Johnny Brown Dep.); Ex. 17 at No. 6 (Brown RFA).

136.   Officer Brown did not speak to any school staff about techniques to deescalate W.B. Ex. 25 at 110:1-3 (Johnny Brown Dep.).

137.   Officer Brown did not call the mobile crisis response team to evaluate W.B.  Ex. 25 at 109:6-10 (Johnny Brown Dep.).

138.   Officer Brown did not contact W.B.'s counselor.  Ex. 17 at No. 3 (Brown RFA).

**Plaintiff M.S.**

139.   M.S. is a student with a disability.  Ex. 26 at 196:12-20, 198:6-17 (Deposition of Crystal Clark).

140.   On February 25, 2021, M.S. was eleven years old.  Answer ¶ 20.

141.   On February 25, 2021, M.S. was a student at Bak Middle School of the Arts.  Ex. 27 at 4 (Deposition of Jordan Lauginiger Ex. 1).

142.     Bak Middle School of the Arts is part of SDPBC.  Ex. 26 at 14:18-15:3 (Clark Dep.).

143.     On February 25, 2021, Officer Donald Silva was an employee of SDPBC.  Ex. 28 at 12:1-15 (Deposition of Donald Silva).

144.     On February 25, 2021, Officer Jordan Lauginiger was an employee of SDPBC.  Ex. 29 at 17:5-24 (Deposition of Jordan Lauginiger).

145.     On February 25, 2021, Crystal Clark was an employee of SDPBC who was the assistant principal at Bak Middle School of the Arts.  Ex. 26 at 14:18-15:11 (Clark Dep.).

146.     On February 25, 2021, District Police Officer Donald Silva initiated an involuntary examination of M.S.  Ex. 28 at 196:9-11, 207:10-12 (Silva Dep.).

147.     Officer Lauginiger arrived at the school to transport M.S. to the receiving facility. Answer ¶ 149.

148.     M.S. was "deescalated" prior to Officer Lauginiger's arrival.  Ex. 28 at 209:25-210:7, 214:3-11 (Silva Dep.).

149.     Officer Silva told Officer Lauginiger that M.S. was deescalated.  Ex. 28 at 209:15-210:7, 214:3-11 (Silva Dep.).

150.     M.S. was "upset but sort of calm" when Officer Lauginiger arrived on the school and that "everything seemed to be under control."  Ex. 29 at 162:25-163:1, 163:18-19 (Lauginiger Dep.).

151.     Prior to being transported, M.S. was searched and did not have anything that could be used as a weapon when she was transported.  Ex. 28 at 212:8-16 (Silva Dep.); Ex. 29 at 160:16-161:1 (Lauginiger Dep.).

152.    Officer Lauginiger escorted M.S. to a marked police car.  Ex. 29 at 135:16-19 (Lauginiger Dep.).

153.    Officer Lauginiger saw no need to handcuff M.S. while she was being escorted to the car because she was being transported "only [for] her mental status."  Ex. 29 at 90:20-23 (Lauginiger Dep.).

154.    Officer Lauginiger did not see a need to use any control techniques to gain M.S.'s compliance because "she was fine" and "compliant."  Ex. 29 at 166:8-20, 170:1-4 (Lauginiger Dep.).

155.    Officer Lauginiger estimated that M.S.'s height came to approximately just "past [his] hip."  Ex. 29 at 145:18-20 (Lauginiger Dep.).

156.    Officer Lauginiger estimated that M.S. was "maybe between 50 and 80 pounds" at the time.  Ex. 29 at 145:21-24 (Lauginiger Dep.).

157.    Officer Lauginiger handcuffed M.S. and transported her from her school to a receiving facility for involuntary examination under the Baker Act.  Answer ¶ 149.

158.    M.S. was handcuffed for at least ten minutes.  Answer ¶ 382.

159.    There were three adults in the police car with M.S., including Assistant Principal Clark who sat in the back seat with her during the ride to the receiving facility.  Ex. 26 at 176:24-177:1 (Clark Dep.); Answer ¶ 149.

160.    M.S. remained calm during transport to the receiving facility.  Answer ¶ 150.

161.    Officer Lauginiger understood that students have to be handcuffed during transportation for involuntary examinations.  Ex. 29 at 89:25-90:3 (Lauginiger Dep.).

162.     Officer Lauginiger understood that District policy in effect on February 25, 2021, required individuals who were being transported to a receiving facility to be handcuffed.  Ex. 30 at No. 7 (Def. Jordan Lauginiger's Resp. to Pl.'s Req. for Admis. ("Lauginiger RFA")).

163.     Officer Lauginiger understood that he was required to handcuff M.S. while being transported in the back of a police car due to Police Department General Order 1.5.  Ex. 29 at 91:6-11 (Lauginiger Dep.).

164.     Officer Lauginiger understood that he was not required to handcuff M.S. while escorting her to the police car but that once she was put in the police car, he was required to handcuff her.  Ex. 29 at 91:2-5 (Lauginiger Dep.).

165.     District Police Officer O'Sullivan was training Officer Lauginiger on the day of M.S.'s handcuffing.  Ex. 31 at 236:6-17 (Deposition of James O'Sullivan).

166.     Officer Lauginiger was trained to "always handcuff children when transporting them for involuntary examination."  Ex. 30 at No. 5 (Lauginiger RFA).

167.     Officer Lauginiger was trained by his Field Training Officer ("FTO") Jim O'Sullivan to understand that it was "mandatory . . . [to] place handcuffs on an individual when we do a transport."  Ex. 29 at 137:8-12 (Lauginiger Dep.).

### DRF

168.     Disability Rights Florida's mission is to advocate, educate, investigate, and litigate to protect and advance the rights, equal opportunities, dignity, self-determination, and choices for all individuals with disabilities.  Ex. 32 at 31:23-32:3 (30(b)(6) Deposition of Plaintiff Disability Rights Florida).

169.     DRF is Florida's designated Protection and Advocacy System for individuals with disabilities.  Ex. 32 at 31:6-12 (DRF 30(b)(6) Dep.); Answer ¶ 23.

170.     DRF is congressionally appointed and authorized to pursue administrative, legal, and other appropriate remedies on behalf of all individuals in the state with disabilities.  Ex. 32 at 31:6-12 (DRF 30(b)(6) Dep.).

171.     One of DRF's priorities is to assist students with disabilities who are inappropriately disciplined, restrained, secluded, suspended, expelled, arrested, or involuntarily committed under the Baker Act.  Ex. 32 at 108:5-15 (DRF 30(b)(6) Dep.).

**District**

172.     Donald Fennoy was the superintendent of the School District of Palm Beach County from March of 2018 to October of 2021.  Ex. 33 at 18:23-19:8 (Deposition of Donald Fennoy).

173.     Keith Oswald served as Deputy Superintendent/Chief of Schools for the School District of Palm Beach County from March 2018 to July 2021.  Ex. 34 at 92:9-15, 276:15-17 (Deposition of Keith Oswald).

174.     Keith Oswald became Chief of Equity and Wellness for the School District of Palm Beach County in July of 2021.  Ex. 35 at 42:1-4 (30(b)(6) Deposition of the School District of Palm Beach County (Keith Oswald)).

175.     Mary Claire Mucenic became Director of the Department of Behavioral and Mental Health of the School District of Palm Beach County in July of 2019.  Ex. 36 at 35:3-8 (Deposition of Mary Claire Mucenic).

176.     Frank Kitzerow was the Police Chief for the Palm Beach County School District Police Department from mid-2018 to mid-2021.  Ex. 37 at 17:2-12 (Deposition of Frank Kitzerow).

177.     Michael Waites became a detective in the Behavioral Services Unit of the Palm Beach County School District Police Department in late 2018 or early 2019.  Ex. 38 at Dep. 19:11-17 (30(b)(6) Deposition of the School District of Palm Beach County (Michael Waites)).

178.     In 2019, Michael Waites was promoted to Captain in the SDPBC Police Department.  Ex. 38 at 20:5-10 (Waites 30(b)(6) Dep.).

179.     In 2020, Michael Waites was promoted to Major over the Behavioral Services Unit of the SDPBC Police Department.  Ex. 38 at 20:16-19 (Waites 30(b)(6) Dep.).

180.     Frank Fanelli is a lieutenant in the Professional Standards Division.  Ex. 39 at 7:21-22 (Deposition of Frank Fanelli).

181.     Marcia Andrews has been a member of the School Board of Palm Beach County since 2010.  Ex. 40 at 45:5-7 (Deposition of Marcia Andrews).

182.     Frank Barbieri, Jr. has been a member of the School Board of Palm Beach County for fifteen years.  Ex. 41 at 9:12-14 (Deposition of Frank Barbieri, Jr.).

183.     Karen Brill has been a member of the School Board of Palm Beach County for twelve years.  Ex. 42 at 13:24-14:1 (Deposition of Karen Brill).

184.     Barbara McQuinn has been a member of the School Board of Palm Beach County for six years.  Ex. 43 at 14:7-9 (Deposition of Barbara McQuinn).

185.     Erica Whitfield has been a member of the School Board of Palm Beach County since 2014.  Ex. 44 at 12:6-13 (Deposition of Erica Whitfield).

186.     Debra Robinson was a member of the School Board of Palm Beach County for twenty years, ending in the year 2022.  Ex. 45 at 14:16-25 (Deposition of Debra Robinson).

187.    A "bulletin" is a written directive from the SDPBC superintendent to SDPBC staff. Ex. 33 at 182:3-5 (Fennoy Dep.); Ex. 35 at 34:5-8 (Oswald 30(b)(6) Dep.); Ex. 41 at 11:21-25 (Barbieri Dep.).

188.    All District staff are required to follow District bulletins that apply to them or impact their work.  Ex. 45 at 64:8-10 (Robinson Dep.); Ex. 46 at 96:15-96:18 (30(b)(6) Deposition of the School District of Palm Beach County (Mary Claire Mucenic)); Ex. 33 at 182:14-18 (Fennoy Dep.); Answer ¶ 168.

189.    All District staff had access to bulletins through the District website, as bulletins are public information.  Ex. 33 at 181:11-15 (Fennoy Dep.).

190.    If there is a matter not addressed by School Board Policy, the Superintendent does not need Board approval to issue and sign a bulletin.  Ex. 33 at 32:6-8; 112:15-24 (Fennoy Dep.); Ex. 43 at 52:12-15 (McQuinn Dep.); Answer ¶ 168.

191.    The District's 2018 Baker Act Decision Tree Protocol ("Decision Tree Protocol") was issued through a bulletin on August 10, 2018.  Ex. 47 at 1 (Mucenic 30(b)(6) Dep. Ex. 3); Answer ¶ 168.

192.    Exhibit 3 to the 30(b)(6) deposition of Mary Claire Mucenic is a true and accurate copy of the District's 2018 Baker Act Decision Tree Protocol.  Ex. 47 (Mucenic 30(b)(6) Dep. Ex. 3).

193.    The Baker Act Decision Tree Protocol was signed by the superintendent.  Ex. 33 at 199:9-16 (Fennoy Dep.); Ex. 47 at 1 (Mucenic 30(b)(6) Dep. Ex. 3).

194.    The superintendent had final authority to sign off on the Baker Act Decision Tree Protocol bulletin.  Ex. 35 at 158:3-8 (Oswald 30(b)(6) Dep.).

195.   The superintendent did not need Board approval to update the Decision Tree Protocol Bulletin.  Ex. 40 at 124:1-7 (Andrews Dep.).

196.   The Decision Tree Protocol did not state that behavior that is the result of a developmental disability is not a legal basis for use of the Baker Act.  Answer ¶ 171.

197.   A "Behavioral and Mental Health Quick Reference Guide" was issued in August 2019.  Ex. 48 at 1 (Mucenic 30(b)(6) Dep. Ex. 4).

198.   Exhibit 4 to the 30(b)(6) deposition of Mary Claire Mucenic is a true and accurate copy of the 2019 Behavioral and Mental Health Quick Reference Guide.  Ex. 48 (Mucenic 30(b)(6) Dep. Ex. 4).

199.   The Baker Act Decision Tree Protocol was not formally rescinded.  Ex. 33 at 224:2-4 (Fennoy Dep.); Ex. 49 at 91:5-92:2 (Deposition of June Eassa).

200.   At an October 2012 Board Workshop, District Board Member Karen Brill noted that "Baker Act numbers going up is not a good thing."  Ex. 50 at 3 (10/12/2012 Revised Minutes, Board Workshop).

201.   Former Board Member Debra Robinson heard reported allegations of an unnecessary or inappropriate Baker Act from more than ten years ago and administrators at the District said that the reporting wasn't true.  Ex. 45 at 15:24-16:24 (Robinson Dep.).

202.   Exhibit 15 to the deposition of Donald Fennoy is a true and accurate copy of the Superintendent Annual Report for July 1, 2017 through June 30, 2018.  Ex. 51 (Fennoy Dep. Ex. 15.

203.   District Board Members Marcia Andrews, Barbara McQuinn, Erica Whitfield and Frank Barbieri, Jr. received and read the Superintendent's Annual Report dated July 1, 2017

through June 30, 2018.  Ex. 40 at 93:24-94:1, 94:15-17, 95:3-8 (Andrews Dep.); Ex. 43 at 99:19-25 (McQuinn Dep.); Ex. 44 at 52:8-10 (Whitfield Dep.); Ex. 41 at 49:25-50:2 (Barbieri Dep.).

204.    District Board Member Brill also received the report.  Ex. 42 at 62:7-14 (Brill Dep.).

205.    In 2019, then-District Board Member Robinson requested Baker Act data from last 3 years.  Answer ¶ 192.

206.    Then-District Board Member Robinson requested Baker Act data because she was "alarmed" by reports that use of the Baker Act was increasing.  Ex. 45 at 73:5-25 (Robinson Dep.).

207.    2016-2020 data was provided to all District Board Members several months after Robinson's request.  Answer ¶ 193.

208.    District Board Member Andrews was concerned by the data and spoke to the then-superintendent about it.  Ex. 40 at 140:18-25, 141:11-19 (Andrews Dep.).

209.    During the 2020-2021 school year, a training provided by the Department of Behavioral and Mental Health in conjunction with the ESE Department to District staff on de-escalation was not mandatory.  Ex. 46 at 151:21-152:12 (Mucenic 30(b)(6) Dep.).

210.    Exhibit 13 to the deposition of Robin Griffin-Kitzerow is a true and accurate copy of the District video titled "Mental Health Crisis and Appropriate Interventions" and was also the video played during the deposition of Dr. Nickie Zenn.  Ex. 52 (Griffin-Kitzerow Dep. Ex. 13); Ex. 53 at 138:14-23 (Deposition of Nickie Zenn).

211.    Training records produced by the District for five District police officers, including those who initiated involuntary examinations of E.S., W.B., and M.S., reflect no trainings with Baker Act in the title in the 2015-2016, 2016-2017, 2017-2018, 2017-2019, 2019-2020, or 2020-2021 school years.  Ex. 54 at 1-17 (Cuellar Dep. Ex. 1).

212.    In the 2018-2019 school year, SDPBC policy did not require parental consent to initiate a Baker Act.  Ex. 46 at 90:5-8 (Mucenic 30(b)(6) Dep.).

213.    In the 2019-2020 school year, SDPBC policy did not require parental consent to initiate a Baker Act.  Ex. 46 at 124:1-16 (Mucenic 30(b)(6) Dep.).

214.    In the 2020-2021 school year, SDPBC policy did not require parental consent to initiate a Baker Act.  Ex. 46 at 159:2-5 (Mucenic 30(b)(6) Dep.).

215.    Current School Board Policy 5.20 does not require parental consent to initiate a Baker Act.  Ex. 46 at 216:3-9 (Mucenic 30(b)(6) Dep.).

216.    School District Police officers are required to follow School Board Policies.  Ex. 38 at 29:17-20 (Waites 30(b)(6) Dep.).

217.    The District Police Chief has final decision-making authority to approve and issue General Orders.  Ex. 37 at 23:14-23 (Kitzerow Dep.); Ex. 38 at 29:25-30:5 (Waites 30(b)(6) Dep.).

218.    The Police Chief is not required to seek approval from any superiors within the District to issue a General Order.  Ex. 37 at 23:17-23 (Kitzerow Dep.).

219.    School Police Officers are required to follow General Orders.  Ex. 38 at 29:1-16 (Waites (30)(b)(6) Dep.); Ex. 37 at 24:7-10 (Kitzerow Dep.).

220.    Any SDPBC Police Officer could be disciplined or subject to an internal affairs investigation for a violation of a General Order.  Ex. 38 at 31:20-22 (Waites 30(b)(6) Dep.); Ex. 37 at 25:14-21 (Kitzerow Dep.).

221.    General Order 1.5 is the SDPBC Police Department policy regarding "Handcuffs and Physical Restraints."  Answer ¶ 181.

222.    The current version of General Order 1.5 is the fifth revision.  Ex. 55 at 2 (Waites 30(b)(6) Dep. Ex. 6); Ex. 38 at 118:17-119:1 (Waites 30(b)(6) Dep.).

223.    The fifth revision of General Order 1.5 has been effective since April 9, 2015.  Ex. 55 at 2 (Waites 30(b)(6) Dep. Ex. 6); Ex. 38 at 118:17-119:1 (Waites 30(b)(6) Dep.).

224.    Exhibit 6 to the deposition of Captain Michael Waites is a true and accurate copy of the effective version of General Order 1.5.  Ex. 55 (Waites 30(b)(6) Dep. Ex. 6).

225.    Exhibit 3 to the deposition of Captain Michael Waites is a true and accurate copy of the version of General Order 11.17, effective November 21, 2019.  Ex. 56 (Waites (30)(b)(6) Dep. Ex. 3).

226.    In April 2014, Board Member Robinson attended a conference entitled #OK2TALK with Keith Oswald, the deputy superintendent.  Ex. 57 at 5 (Robinson Dep. Ex. 2).

227.    Dr. Robinson added "OK2TALK" as a Board Discussion item on April 30, 2014.  According to the Agenda Item, "Dr. Robinson would like to discuss having a workshop to discuss the recommendation of OK2TALK including MTSS behavior coaches and possibly a pre-psychology choice program."  The Agenda Item included the Conference Report as an attachment, which discussed children being led away from schools in handcuffs and placed in police cars for transport.  Ex. 58 (Agenda Item Details 2014.04.30 Workshop - #3 Workshop Items – #3a Board Discussion; Ex. 57 (#OK2TALK Conference Report).

228.    Board Members Marcia Andrews, Karen Brill, and Erica Whitfield received an email regarding a media inquiry about an elementary school student who was handcuffed and transported under the Baker Act in 2017.  Ex. 40 at 64:22-25, 65:11-22 (Andrews Dep.); Ex. 42 at 55:19-25 (Brill Dep.); Ex. 44 at 27:3-20 (Whitfield Dep.).

229.    The District's 30(b)(6) witness on handcuffing was unaware of whether officers were provided with any training regarding whether or not students need to be handcuffed during transportation under the Baker Act.  Ex. 38 at Dep. 72:8-12 (Waites 30(b)(6) Dep.).

230.     The District 30(b)(6) witness on handcuffing was not aware of any training for school police regarding trauma of handcuffing young children.  Ex. 38 at 81:15-82:1 (Waites 30(b)(6) Dep.).

231.     The District is a public entity within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132.  Answer ¶ 224.

232.     The District receives Federal financial assistance within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a).  Answer ¶ 232.

Dated: May 19, 2023

For The School Board of Palm Beach County,
Florida
Shawn Bernard, Esquire, General Counsel,

/s/ Sean Fahey
_____

Jon Erik Bell, Esq.
Florida Bar No. 328900
Laura Esterman Pincus, Esq.
Florida Bar No. 90018
Anna Patricia Morales, Esq.
Florida Bar No. 27634
Lisa Anne Carmona, Esq.
Florida Bar No. 843490
Sean Fahey, Esq.
Florida Bar No. 0101083
Office of General Counsel
3318 Forest Hill Boulevard, Suite C-331
West Palm Beach, Florida 33406
Tel: (561) 434-8500
Fax: (561) 434-8105
jon.bell@palmbeachschools.org
merrie.mckenziesewell@palmbeachschools.org

For Plaintiffs,

/s/ Sam Boyd
_____

BACARDI JACKSON (Florida Bar No. 47728)
SAM BOYD (Florida Bar No. 1012141)
CARLI SEAN RABEN (Florida Bar No. 1036013)
Southern Poverty Law Center
P.O. Box 12463
Miami, FL 33101
Tel: 786-347-2056
Fax: 786-237-2949
bacardi.jackson@splcenter.org
sam.boyd@splcenter.org

ANN MARIE CINTRON-SIEGEL (Florida Bar No.
166431)
MOLLY J. PARIS (Florida Bar No. 90486)
Disability Rights Florida, Inc.
1930 Harrison St. Ste. 104
Hollywood, FL 33020
Tel: 800-342-0823
Fax: 850-617-6647
anns@disabilityrightsflorida.org
mollyp@disabilityrightsflorida.org

SHAHAR PASCH (Florida Bar No. 580971)
Pasch Law Group
1806 Old Okeechobee Road, Suite B
West Palm Beach, FL 33409
Tel: 561-599-7400
Fax: 561-258-8243
shahar@paschlaw.com
MELISSA DUNCAN (Florida Bar No. 796921)
Legal Aid Society of Palm Beach County, Inc.
423 Fern St., Ste. 200
West Palm Beach, FL 33401-5839
Tel: 561-655-8944
Fax: 561-655-5269
mduncan@legalaidpbc.org

HANNAH BENTON EIDSATH (admitted pro hac vice)
NINA MONFREDO (admitted pro hac vice)
National Center for Youth Law
818 Connecticut Avenue NW, Ste. 425
Washington, D.C. 20006
Tel: 202-868-4791
Fax: 510-380-7603
hbenton@youthlaw.org

JEAN STROUT (admitted pro hac vice)
RACHEL VELCOFF HULTS (admitted pro hac vice)
National Center for Youth Law
1212 Broadway, Ste. 600
Oakland, CA 94612
Tel: 510-835-8098
Fax: 510-835-8099
jstrout@youthlaw.org
rvelcoff@youthlaw.org

JOSHUA C. TOLL (admitted pro hac vice)
King & Spalding LLP
1700 Pennsylvania Ave. NW, Ste. 200
Washington, D.C. 20006
Tel: 202-737-8616
Fax: 202-626-3737
jtoll@kslaw.com