IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

D.P. by and through his next friend P.S.,               CASE NO.: 9-21-81099-CIV-CANNON
et al.,

      Plaintiffs,

v.

SCHOOL BOARD OF PALM BEACH
COUNTY,

      Defendant.

_____/


**DEFENDANT'S RESPONSE IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, the School Board of Palm Beach County, Florida ("School Board" or "District"), pursuant to Federal Rule of Civil Procedure 56, Local Rule 56.1, and related Orders of this Court (ECF Nos. 60, 162, 169, 174) files this response in opposition to Plaintiffs' Motion and Memorandum of Law in Support of Motion for Partial Summary Judgment (ECF No. 180).

## I.   Background

Plaintiffs are four students (D.P., E.S., W.B., and M.S.) who were taken into custody under the Baker Act, three of the students' parents or guardians (P.S., J.S., and L.H.), and an organization (Disability Rights Florida ["DRF"]). In their operative pleading, they bring 17 counts: discrimination in violation of (1) Title II of the Americans with Disabilities Act [ADA], (2) Section 504 of the Rehabilitation Act [Section 504], and (3) the Florida Educational Equity Act (Counts 1 through 6); and federal constitutional claims under 42 U.S.C. § 1983 relating to (1) the parents' or guardians' procedural due process rights under the Fourteenth Amendment, and (2) the students' rights to be free from unreasonable seizures under the Fourth and Fourteenth Amendments, including (3) the alleged use of excessive force against students (Counts 7 through 17).

In their motion, Plaintiffs seek summary judgment on eight points, summarized in greater detail below. ECF No. 180, p. 8.[1] The School Board opposes Plaintiffs' requests, with the exception of their eighth point, that DRF has standing to represent students with disabilities in the School District, which the School Board does not contest or address further herein.

## II.   Standard of Review

The School Board adds the following to Plaintiffs' statement about the Court's standard of review in this case. Plaintiffs seek partial summary judgment on issues for which they bear the burden of proof at trial. "When the *moving* party has the burden of proof at trial, that party must

---

[1] With the exception of deposition testimony, the School Board's references to page numbers of documents filed with the Court are to the ECF page numbers at the top of the page.

show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (quotation marks and ellipsis omitted). "In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Id.* "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* (quotation marks and brackets omitted).[2]

### III.   Argument

#### A. Fourth Amendment Illegal Seizure Claims of D.P. and E.S.

The School Board will first address Plaintiffs' third request for partial summary judgment on their Fourth Amendment illegal-seizure claims, that "[t]he District unlawfully seized child Plaintiffs D.P. and E.S. for involuntary examination in violation of their rights under the Fourth Amendment." ECF No. 180, p. 8. As with all of their constitutional claims, Plaintiffs must show that there is no genuine dispute as to any material fact on the following elements: "(1) that [their] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

> *1.  Plaintiffs are not entitled to judgment as a matter of law on whether D.P.'s and E.S.'s Fourth Amendment rights were violated.*

For purposes of this response, the School Board accepts Plaintiffs' framing of the issue as

---

[2] Throughout this response, the School Board's identification of evidence that is at least sufficient to demonstrate a genuine dispute as to material facts is not intended as a concession that there is a dispute precluding summary judgment in favor of the Board.

whether the officers had probable cause. The Court "look[s] to the 'totality of the circumstances to determine whether ... probable cause existed to detain [the plaintiff] under Florida's Baker Act.'" *United States v. Hollingsworth*, No. 22-11250, 2023 WL 2771497, at *3 (11th Cir. Apr. 4, 2023) (quoting *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1126 (11th Cir. 2021)); *accord Watkins v. Bigwood*, No. 22-10875, 2023 WL 3711827, at *3 (11th Cir. May 30, 2023).

Under the Baker Act, a law enforcement officer "**shall** take a person who **appears** to meet the criteria for involuntary examination into custody…." § 394.463(2)(a)2, Fla. Stat. (emphasis added). The pertinent criteria are that "there is reason to believe that the person has a mental illness and because of his or her mental illness" that "[t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior." *Id.* § 394.463(1).

The relevant "recent behavior" may include "causing, attempting, or threatening to do serious bodily harm." *Hollingsworth*, 2023 WL 2771497, at *4 (quotation marks and brackets omitted); *accord Watkins*, 2023 WL 3711827, at *3.[3] Such behavior "can be shown by words, deeds, or both." *Craig v. State*, 804 So. 2d 532, 535 n.3 (Fla. 3d DCA 2002) (interpreting "recent behavior" in section 394.467(1)(a)2.b.). As for "serious bodily harm," that "would include any harm that would necessitate medical treatment." *Id.* (interpreting same term in section 394.467(1)(a)2.b.). There is also a 2014 Baker Act User Reference Guide that provides a series of "Behaviors to Look For" for law enforcement, explaining that "[i]ndividuals with mental illness who may need further evaluation typically exhibit some combination of the following behaviors,

---

[3] *Hollingsworth* issued on April 4, 2023, and *Watkins* issued on May 30, 2023, so the Court did not have the benefit of those opinions and their guidance on the Baker Act criteria when the Report and Recommendation on the motion to dismiss was issued or adopted. ECF Nos. 73, 148.

or characteristics." Baker Act User Reference Guide, Appendix G-1 – G-2.[4] On the other hand, "[v]ague notions about what a person might do—for example, a belief about <u>some</u> likelihood that without treatment a person <u>might</u> cause <u>some</u> type of harm at <u>some</u> point—does not meet this standard," *Khoury*, 4 F.4th at 1126, that is, the standard in section 394.463(1)(b)2.

Plaintiffs contend that there is no genuine dispute as to any material fact about whether Officer Margolis and Officer Cuellar had reason to believe that D.P. or E.S. had a mental illness or that the "substantial likelihood" criteria were satisfied. Their arguments regarding mental illness are based on D.P. and E.S. being students with autism, and autism being excluded from the Baker Act's definition of "mental illness." *See* § 394.455(29), Fla. Stat.; § 393.063(12), Fla. Stat.

a.  D.P.

There is at least sufficient record evidence to demonstrate a genuine dispute as to the material facts about whether Officer Margolis had reason to believe D.P. appeared to meet the criteria for involuntary examination. Camel advised Margolis that D.P. had an issue in the class where he was throwing things around and yelling and screaming. Defendant's Opposition Statement to Plaintiffs' Statement of Material Facts ("DOSMF") ¶ 62. Margolis was informed that school staff were able to calm D.P. down, but he escalated again and they moved him to another classroom, at which point staff decided to get law enforcement involved. DOSMF ¶ 63. Camel relayed to Margolis that D.P. had said "he wanted to die" and "he wanted to kill the other students." DOSMF ¶ 64. Margolis's report describes D.P.'s statements as "I wish I could shoot you in your f------ head"; "I deserve to be dead"; "Shut the f--- up, before I kill you"; "I will run out of this

---

[4] 2014 Baker Act User Reference Guide: The Florida Mental Health Act. Tallahassee, FL: Department of Children and Families, Mental Health Program Office; Tampa, FL: University of South Florida, Louis de la Parte Florida Mental Health Institute, available at https://www.myflfamilies.com/sites/default/files/2023-03/2014%20Baker%20Act%20Manual_0.pdf.

school and get myself murdered"; "Grandma does not love me, nobody loves me"; and "Right now I am thinking I want to hold my breath so I can die." DOSMF ¶ 65.

Margolis also observed that D.P. said "Nobody loves him, he just wants to die, why don't we just let him die." DOSMF ¶ 66. When Camel told D.P. the school was calling his grandmother, he said, "If you let me go home with grandma, the second I'm away from here, I'm going to run out in front of a car and kill myself." DOSMF ¶ 67. D.P. also reached for a pencil holder that contained scissors. DOSMF ¶ 68.

In short, there is evidence that D.P. had engaged in "[r]elevant recent behavior," at least "threatening to do serious bodily harm." *Hollingsworth*, 2023 WL 2771497, at *4. Such behavior included both his words and his deeds. *Craig*, 804 So. 2d at 535. The harm threatened would have necessitated medical treatment (at least). *Id.* His recent behavior also included "Behaviors to Look For" from the 2014 Baker Act User Reference Guide: "acts of violence," "combative/aggressive behavior," expressing "low self-esteem with feelings of hopeless of helplessness," and "mak[ing] direct comments about dying or hurting self." Baker Act User Reference Guide, Appendix G-1 – G-2. There is evidence that the totality of the circumstances was that D.P. expressed the desire and intention to hurt himself, and appeared to try to obtain something that could be used as a weapon. That is at least enough to preclude summary judgment for Plaintiffs.

It is undisputed is that D.P. calmed down before he was transported, ECF No. 177, Joint Statement of Undisputed Facts ("JSF") ¶¶ 19-22, but that does not warrant summary judgment for Plaintiffs. The statutory determination is keyed to "recent behavior," § 394.463(1)(b)2, Fla. Stat., not current behavior. The person calming down does not mean they no longer meet the criteria. *See Hollingsworth*, 2023 WL 2771497, at *4 (concluding seizure was constitutional notwithstanding that, before the person was taken into custody, he "was generally calm, respectful,

and nonthreatening with the officers, and nothing indicate[d] he was delusional or incompetent"). There is evidence that Margolis was informed that D.P. had already been successfully calmed down earlier in the day, but had escalated again. DOSMF ¶ 63. Regardless, D.P.'s recent behavior supported the conclusion that, once outside of the school's custody and control, he could cause serious bodily harm to himself or others in the near future. This included specific threats that he would appear to be capable of carrying out, such as trying to get hit by a car.

It is likewise undisputed that Officer Margolis did not seek to have D.P. evaluated by a mobile crisis response team, JSF ¶¶ 17-18, but that is more than the Fourth Amendment requires. Officer Margolis did not have "'an affirmative obligation to seek out exculpatory information of which [he was] <u>not</u> aware' or 'track down every lead,'"—such as what an evaluation by mobile crisis response *might* have told him about D.P.—"before making a probable cause determination." *Smith v. City of Fairburn, Georgia*, 679 F. App'x 916, 924 (11th Cir. 2017) (quoting *Kelly v. Curtis*, 21 F.3d 1544, 1551–52 (11th Cir. 1994)).

> b.   E.S.

So too with E.S., there is at least sufficient record evidence to demonstrate a genuine dispute as to the material facts about whether he appeared to meet the criteria for involuntary examination. Officer Cuellar decided to initiate an involuntary examination under the Baker Act on E.S. as soon as he saw E.S. hitting the window. JSF ¶ 67. Cuellar came into the situation after having been called by the school principal for help. DOSMF ¶ 97. He believed he was being called to possibly put E.S. under control or get him to where he would not hurt himself, for E.S.'s safety and the safety of the other people that were in the room. DOSMF ¶ 98. Cuellar was informed that E.S. was involved with punching a counselor, was destroying the front office, and was trying to hurt himself punching the glass. DOSMF ¶ 99.

It is undisputed that E.S. had hit the C.A.R.D. Behavioral Aide and had hit a thick glass window, and that Cuellar decided to initiate an involuntary examination after seeing E.S. hitting the window. JSF ¶¶ 62, 65, 67. So there is evidence that Officer Cuellar reasonably believed E.S. had engaged in "[r]elevant recent behavior," namely "causing [or] attempting … to do serious bodily harm." *Hollingsworth*, 2023 WL 2771497, at \*4. Plaintiffs contend that a child of E.S.'s size and age hitting an adult or a thick glass window did not present a threat of serious bodily harm to himself or others. ECF No. 180, p. 31. But they ignore that "serious bodily harm" includes "any harm that would necessitate medical treatment." *Craig*, 804 So. 2d at 535 n.3. It was reasonable for Cuellar to conclude that E.S.'s punching the thick glass window could have at least resulted in an injury to E.S.'s hands that would have required medical treatment. DOSMF ¶¶ 100-103. And E.S.'s recent behavior also included some of the "Behaviors to Look For" from the 2014 Baker Act User Reference Guide, including "acts of violence" and "combative/aggressive behavior." Baker Act User Reference Guide, Appendix G-1 – G-2.

As with D.P., the parties agree that that E.S. calmed down before he was transported and the Officer Cuellar still proceeded with involuntary examination. JSF ¶¶ 77-83, 94. Again, however, E.S.'s recent behavior supported the conclusion that, once outside of the school's custody and control, he could cause serious bodily harm to himself or others in the near future.

c.   The exclusion of autism from the statutory definition of "mental illness."

As noted above, Plaintiffs argue that the law enforcement officers who seized D.P. and E.S. should have known that they had developmental disabilities (namely, autism) "and therefore did not have probable cause to believe that D.P. or E.S. had a mental illness." ECF No. 180, p. 29. The Court should reject this argument for two reasons.

<u>First</u>, the validity of a mental-health seizure under the Fourth Amendment is based on

whether "the officer has probable cause to believe that the seized person is a danger to himself or to others." *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022). As discussed above, there is at least sufficient evidence that D.P. and E.S.'s behavior demonstrated that they were a danger to themselves or others. To the extent Plaintiffs contend that the Baker Act prohibits seizures for behavior attributable to autism rather than mental illness as defined under the Baker Act, that is a defect under state law, not a Fourth Amendment violation. *See Hollingsworth*, 2023 WL 2771497, at *4 n.1 (rejecting argument that absence of other Baker Act criteria, "reason to believe [detainee] either had refused a voluntary examination or was unable to make that decision for himself," resulted in Fourth Amendment violation where seizure satisfied *Ingram* standard).

Second, Plaintiffs' argument that the officers could not have had reason to believe that D.P. and E.S. had a mental illness because they had autism fails under established Fourth Amendment principles. The statute only requires that the person "**appear**[] to the meet the criteria." § 394.463(2)(a)2, Fla. Stat. (emphasis added). As discussed above, D.P. and E.S. appeared to meet the criteria based on their behavior. That D.P. and E.S. also had autism was, at most, conflicting evidence or a conflicting explanation about the reason for their behavior, and officers are not 'required to sift through conflicting evidence or explanations or resolve issues of credibility' when assessing probable cause." *Hollingsworth*, 2023 WL 2771497, at *4 (quoting *Huebner v. Bradshaw*, 935 F.3d 1183, 1188 (11th Cir. 2019)); *accord Watkins*, 2023 WL 3711827, at *4.

For instance, Assistant Principal Camel testified that, other than the date of the involuntary examination, she had not heard D.P. threatening to cause harm to himself or making statements like he did that day. DOSMF ¶ 71. She also distinguished that date from multiple past incidents where restraints had been used, but D.P. had not been "Baker Acted" or hospitalized, because he had not made threats of harm to himself. DOSMF ¶ 72. It is not undisputed on this record, then,

that D.P.'s behavior that day was consistent with his known, disability-related behaviors, or that the District staff would have known or informed Officer Margolis that it was.

For E.S., it is undisputed that Officer Cuellar was aware that E.S. had autism. ECF No. 180, p. 31. But Officer Cuellar's knowledge that E.S. had autism does not lead to the conclusion, by itself, that he had no reason to believe E.S. had a mental illness. Plaintiffs then argue that "[t]he very same behavior E.S. exhibited on the day of the involuntary examination is reflected in his IEP as related to his Autism: 'outbursts and tantrums.'" *Id.* But that is not undisputed in two critical respects: the IEP did not tie such behavior to E.S.'s autism and it did not describe behavior like what precipitated the involuntary examination.

First, even if the IEP could have been said to put the school staff on notice about E.S.'s outbursts and tantrums being disability-related in general, the IEP describes E.S. as having multiple exceptionalities and diagnoses, not just Autism (ASD), but also a speech impairment, a medical diagnosis of ADHD, reading dyslexia, and being premature at 33 weeks. DOSMF ¶¶ 13. The IEP did not tie E.S.'s outbursts and tantrums to any particular disability, exceptionality, or diagnosis, such as his autism. DOSMF ¶ 13. The full context of the statement about "outbursts and tantrums" in the IEP also suggested that such behavior occurred in particular, different circumstances: that E.S. "has had outbursts and tantrums a few times a week and shouts out with the word 'NO' when asked to do a non preferred task frequently during classes." DOSMF ¶ 13. That was consistent with Karbowski's testimony, that the school was informed when E.S. arrived that "he had some outbursts and that sometimes he didn't want to do non-preferred tasks and would react negatively." ECF No. 177-9 at 190:7-14, cited in JSF ¶ 47.

Aside from the context, the mere statement in E.S.'s IEP that had "outbursts and tantrums" also did not convey that E.S. would engage in the behavior that he did on the date of the involuntary

examination, including striking an adult and appearing to attempt to hurt himself by punching the glass. For instance, Jason Lee, who was unaware of E.S. having any disabilities other than autism, JSF ¶¶ 52-53, nevertheless testified that the date of the involuntary examination was the first time he had seen E.S. appear to try to intentionally hurt someone or fail to show restraint with respect to how he was kicking the glass. DOSMF ¶¶ 87-90. For his part, Officer Cuellar could also have reasonably believed that E.S.'s behavior on the date of the involuntary examination was different from what the school staff were used to dealing with. He testified that, while there were calls to E.S.'s classroom in the past, he would a lot of times stand by in case he was needed, and he believed he was "almost like the last one to go to at that point when [E.S.] had escalated to that level." DOSMF ¶¶ 94-95. So it is not undisputed on this record that E.S.'s behavior on the date of the involuntary examination was simply another instance of his known, disability-related behaviors.

In sum, Plaintiffs have not shown that there is no genuine dispute as to any material fact about whether a reasonable law enforcement officer would have concluded that E.S.'s behavior that precipitated the Baker Act was solely due to autism, such that a reasonable law enforcement officer would have had no reason to believe that E.S. had a mental illness.

2. *Plaintiffs are not entitled to judgment as a matter of law on whether the School Board had a policy or custom that constituted deliberate indifference to the Fourth Amendment right against unreasonable seizures.*

Even if Plaintiffs could show their entitlement to judgment as a matter of law on whether D.P.'s and E.S.'s constitutional rights were violated, they cannot make such a showing about whether the School Board "had a custom or policy that constituted deliberate indifference to that constitutional right." *McDowell*, 392 at 1289.

Plaintiffs first contend that the Board had a policy, the 2018 Decision Tree Protocol, that "misstated the law." ECF No. 180, p. 32. But Plaintiffs cannot show that there is no genuine dispute as to any material fact about whether it was "an officially-adopted policy of permitting a particular

11

constitutional violation." *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 819 (11th Cir. 2017) (quotation marks omitted).

Plaintiffs contend that the Decision Tree Protocol incorrectly stated some of the criteria for initiating an involuntary examination and omitted other criteria. ECF No. 180, pp. 17, 32. For one thing, whatever its statement about the criteria, the Decision Tree Protocol did not state that an involuntary examination could be initiated under any particular circumstances. *See* DOSMF ¶¶ 39-40. What it stated, in pertinent part, was

> Judges, law enforcement officials, physicians, or mental health professionals can initiate the Baker Act. Criteria for an involuntary exam are that the individual:
>
> - presents a danger to self or others; and/or
>
> - appears to have a mental illness as determined by a licensed mental health professional.

DOSMF ¶ 39. Plaintiffs fault this "and/or" statement because they contend both elements are required to lawfully initiate involuntary examination. But the attached Baker Act Decision Tree states that "[t]he Baker Act is used to provide effective care to a student whose behavior is a danger to self and/or others," with no reference to mental illness. DOSMF ¶ 39. And that statement is consistent with the Fourth Amendment standard for mental-health seizures. *See Ingram*, 30 F.4th at 1250 ("Mental-health seizures are reasonable under the Fourth Amendment when the officer has probable cause to believe that the seized person is a danger to himself or to others."). The 2018 Decision Tree Protocol also did not state that the definition of mental illness under the Baker Act excludes developmental disabilities as defined by statute. *See* PSMF ¶ 42. Plaintiffs fail to explain, however, why the document not reciting this part of the Baker Act amounts to an official policy permitting a violation of the Fourth Amendment.

Further, in context, as part of a document providing for a series of steps to follow before initiating involuntary examination, the statements about the Baker Act make sense as a narrowing

of the circumstances where it might be appropriate (eliminating, say, "normal, childish misbehavior" or refusing to follow directions, *see* ECF No. 150 ¶¶ 6, 206), rather than an exhaustive overview of what the Baker Act does and does not allow. To that end, Oswald testified that the Decision Tree Protocol was not addressed to those who were actually making the decision whether or not to Baker Act, nor was it intended to be. DOSMF ¶ 136. The primary goal of the Decision Tree Protocol was to communicate the importance of de-escalation and supports around that. DOSMF ¶ 137. The expectation was that those who could actually make the decision to initiate an involuntary examination would have a deeper knowledge base and understanding of the Baker Act criteria. DOSMF ¶ 138. In short, Plaintiffs have not demonstrated that the Decision Tree Protocol was an official policy permitting a Fourth Amendment violation.

As for custom, for their Fourth Amendment illegal seizure claims, Plaintiffs' only argument of a custom is that the Decision Tree Protocol itself was a custom, if it was not a formal policy. ECF No. 180, p. 33 n.1. But "[a] custom requires the plaintiff to identify evidence showing '[a] pattern of similar constitutional violations.'" *Perez v. City of Sweetwater*, 770 F. App'x 967, 972 (11th Cir. 2019) (quoting *Craig v. Floyd Cty.*, 643 F.3d 1306, 1310 (11th Cir. 2011)). Plaintiffs do not attempt to demonstrate a pattern of similar constitutional violations in support of their custom argument and therefore have not carried their burden as the party moving for summary judgment. *See Four Parcels*, 941 F.2d at 1438.

Plaintiffs' final argument for Section 1983 liability is under a failure-to-train theory. "[T]o qualify as a policy, the municipality's failure to train must 'evidence[ ] a deliberate indifference to the rights of its inhabitants.'" *Sosa v. Martin Cnty., Fla.*, No. 20-12781, 2023 WL 1776253, at *7 (11th Cir. Feb. 6, 2023) (quoting *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009)). "Establishing deliberate indifference requires the plaintiff to 'present some evidence

that the municipality knew of a need to train and/or supervise in a particular area and ... made a deliberate choice not to take any action.'" *Id.* (quoting *Lewis*, 561 F.3d at 1293). "A plaintiff may do this by pointing to evidence that municipal policymakers 'are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "Generally, to satisfy this notice requirement, a plaintiff must prove a pattern of similar constitutional violations by untrained employees." *Id.* (citing *Connick*, 563 U.S. at 62). "But 'in a narrow range of circumstances,' a plaintiff may avoid the need to show a pattern of similar violations to prove deliberate indifference." *Id.* (quoting *Connick*, 563 U.S. at 63).

For the first way of establishing failure-to-train liability, Plaintiffs contend that "[t]he Board has been aware of improper seizure of students under the Baker Act for many years." ECF No. 180, p. 34. But the evidence they cite does not demonstrate awareness of unconstitutional seizures. They cite that a Board Member noted in October 2012 that "Baker Act numbers going up is not a good thing." *Id.* (citing JSF ¶ 200). Such evidence is too remote from the seizures of D.P. or E.S. in 2018 and 2019, respectively, to be probative of a policy or custom at the time of their involuntary examinations. *See Khoury*, 4 F.4th at 1132 (rejecting evidence offered in support of a custom or practice in part because it was "too remote in time," as it was from 2012, three years before the seizure at issue). In any event, evidence of an increase in Baker Act numbers is not evidence that the underlying seizures were unconstitutional. *See Buckler v. Israel*, 680 F. App'x 831, 835 (11th Cir. 2017) ("[T]he sheer number of use of force incidents, without more, does not establish a widespread custom of acquiescence to the use of excessive force."); *Giarratano v. Judd*, No. 8:10-CV-2531-T-27TGW, 2012 WL 1191145, at *2 (M.D. Fla. Apr. 10, 2012) ("The social worker's reference to a 'rash of Baker Acts by Polk County Sheriff's Department' has no probative

value, as the statement fails to establish that any involuntary commitment was in violation of the Constitution."). The same reasoning about remoteness and a lack of probative value extends to a Board Member having "heard reported allegations of an unnecessary or inappropriate Baker Act from more than ten years ago." JSF ¶ 201. Further, "administrators at the District said that the reporting wasn't true," *id.*, another reason this fact does not demonstrate that the School Board was aware that an "unnecessary or inappropriate" seizure had actually occurred.

For that matter, that a seizure may have been "inappropriate" or "unnecessary"—or even arguably preventable through use of other interventions—does not mean that it was unconstitutional. *See* ECF No. 180, pp. 34-35 (citing JSF ¶¶ 201-204, 228; ECF No. 181, Plaintiffs' Statement of Material Facts ("PSMF") ¶ 45).[5] When law enforcement officers are making the determination that the criteria appear to be met, the Baker Act does not require that they determine that other less restrictive means are not available. *See* § 394.463(2)(a)2, Fla. Stat. Further, "[t]hat a defendant is subsequently acquitted or charges are dropped against the defendant is of no consequence in determining the validity of the arrest itself." *Marx v. Gumbinner*, 905 F.2d 1503, 1507 (11th Cir. 1990). Similarly, that a Baker Act does result in an admission or is even deemed unnecessary after the fact by someone at the receiving facility—which Plaintiffs have not demonstrated a pattern of in their motion anyhow—would not demonstrate that the law enforcement officer did not reasonably believe the criteria appeared to be met when taking the

---

[5] Plaintiffs have stretched one of the jointly undisputed facts a bit. They write, "Board members were also aware of at least one media inquiry about the inappropriate use of the Baker Act in the District, including regarding the use of the Baker Act against young elementary school students and students and students with Autism." ECF No. 180, pp. 34-35. They cite JSF ¶ 228, which is that Board Members "received an email regarding a media inquiry about an elementary school student who was handcuffed and transported under the Baker Act in 2017." JSF ¶ 228. There is no indication that the media inquiry alleged that the Baker Act was inappropriate or indicated anything about students with Autism.

person into custody.

It should also be noted that the evidence about the Superintendent's Annual Report in JSF ¶ 202 fails to demonstrate deliberate indifference for an additional reason. The discussion in the Report was that action was being taken: the South County Mental Health Center was providing "[c]risis intervention, screening, and evaluation services" and the "goal [was] to reduce unnecessary 'Baker Act' admissions to the inpatient units." ECF No. 177-51 at 54. A reviewing decisionmaker would see that, even if there had been some unspecified number of unnecessary "admissions," the District was working to prevent that by contracting with the agency that then provided services to at least 66 schools and 289 students. *Id.*

The remaining evidence Plaintiffs cite in support of the Board purportedly being on notice of a pattern of violations is that Board Member Robinson requested data in 2019 because she was "alarmed" by reports that use of the Baker Act was increasing, and that such evidence was provided to the Board as a whole several months later. JSF ¶¶ 205-208. Again, concern about an increase or data showing such an increase does not demonstrate that the underlying seizures were unconstitutional. That said, while the data ultimately provided spanned a four-year period, it was not actually requested by or provided to the Board until after the seizures of D.P. and E.S. Board Member Robinson made the request on September 20, 2019. ECF No. 177-45 at 73:5-25 cited in JSF ¶ 206. And the data was provided to the School Board in early 2020. *See* ECF No. 163 ¶ 193, admitting ECF No. 150 ¶ 193, cited in JSF ¶ 207. The evidence does not demonstrate that the Board was on actual or constructive notice at the time of D.P.'s and E.S.'s seizures. JSF ¶¶ 5, 31.

In short, Plaintiffs have failed to establish a failure-to-train theory through "a pattern of similar constitutional violations by untrained employees." *Sosa*, 2023 WL 1776253, at *7. To be

entitled to summary judgment, then, Plaintiffs must establish that this case falls within the "narrow range of circumstances," where failure-to-train liability can be established without a pattern. *Id.* (quoting *Connick*, 563 U.S. at 63). "That is so when 'the unconstitutional consequences of failing to train [are] ... patently obvious,' meaning that a high likelihood exists that the situation will recur frequently and that the officer's lack of specific tools to respond to that situation will predictably violate citizens' constitutional rights." *Id.* (citation omitted) (quoting *Connick*, 563 U.S. at 64).

"The Supreme Court has identified but a single example of this situation: a municipality's failure to train officers about the constitutional limits on the use of deadly force though arming the officers with guns and expecting to use them in the course of their duties." *Id.* As a matter of law, this case does not present comparable circumstances and thus does not qualify as an exception to the general rule that failure-to-train requires a pattern of similar constitutional violations.

Even if the exception could apply here, failure-to-train liability absent a pattern "is generally reserved for those cases in which the government actor was provided no training whatsoever." *Pena v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018). Even if we narrow the inquiry to training on the Baker Act, Plaintiffs cannot demonstrate (and do not even really argue) that School Police Officers were provided no training whatsoever on the Baker Act.

Plaintiffs first challenge that the officers received "minimal, if any training on the Baker Act." ECF No. 180, p. 35. During the pertinent time period, however, there was in-person training during the Field Training Program and the onboarding of new officers, as well as a training provided by the Department of Safe Schools in the Summer of 2019. PSMF ¶ 48; *see also* DOSMF ¶¶ 48-49. At least one police officer testified that yearly training always included some training on the Baker Act. DOSMF ¶ 48. Another officer testified that he was trained about using the Baker Act in part through trainings on autism. DOSMF ¶ 49. And multiple officers testified that they

learned or were trained about the Baker Act in police academy. DOSMF ¶ 49. Plaintiffs have not demonstrated that School Police Officers were provided no training whatsoever on the Baker Act.

While it is "irrelevant what training each specific officer … was given or retained," *Lewis*, 561 F.3d at 1293, Plaintiffs also cannot demonstrate that Officers Margolis and Cuellar had no training on the Baker Act. Officer Margolis was not a School Police Officer, and he could not recall receiving training from the School District Police Department regarding the Baker Act. JSF ¶ 26. But he testified that he had received crisis intervention training before working at the school. DOSMF ¶ 59. The crisis intervention training was a week long, 40-hour course, and included how to talk to people in crisis, how to communicate with them, how to offer them help, where to offer them help, and when to Baker Act and not to Baker Act. DOSMF ¶ 60. He testified that he was also trained regarding what would justify initiating a Baker Act through field training and practice in the field at the Lantana Police Department. DOSMF ¶ 61. Officer Cuellar had received training on the Baker Act as recently as 2013. JSF ¶ 104. And training records cited by Plaintiffs also reflect that Officer Cuellar received "Autism Spectrum Disorder Line-Up Train" on April 30, 2017 and "Autism Disorder" on October 23, 2015. DOSMF ¶ 49.

That leaves Plaintiffs' other argument, that police training was inadequate because it "incorporated the incorrect standards included in the Decision Tree Protocol." ECF No. 180, p. 35. They appear to be referring to the "Mental Health Crisis and Appropriate Interventions" video training, but they do not explain how it provided inaccurate information. The video does not incorporate the standards from the 2018 Decision Tree Protocol Bulletin. It could not have, as it was produced in 2017, PSMF ¶ 52, before the Decision Tree Protocol Bulletin at issue. DOSMF ¶ 53. Even so, Plaintiffs do not explain how the video "referenc[ed]" the Decision Tree Protocol. They may be referring to a statement in the video that the Baker Act "[p]rovides individuals who

have a mental illness, or who may harm or neglect themselves or others, with an emergency service and temporary detention for psychiatric evaluation and voluntary or involuntary short-term community inpatient treatment." *See* Ex. H to DOSMF, Griffin-Kitzerow Deposition Excerpts (Nov. 17, 2022) at 127:14-21. That is a single statement made at the beginning of a discussion of the Baker Act. It is not a statement of the criteria for involuntary examination or an explanation of the circumstances under which one can be initiated.

Plaintiffs also ignore that, during the entire pertinent time period, law enforcement officers initiating an involuntary examination have been required to complete a form which walks them through the statutory criteria and requires them to confirm and to explain why they believe the criteria are met. *See* Fla. Admin. Code R. 65E-5.260, Form CF-MH 3052a (June 2016) and revised Form (July 2020) (filed at ECF No. 154-1). To that end, Griffin-Kitzerow testified that the "Mental Health Crisis and Appropriate Interventions" video was in-service training, meaning it was available to people who already been through the Police Academy, passed the State exam, and been a police officer, and who would understand what a Baker Act was. DOSMF ¶ 135. It is too far a leap, then, to conclude that the "unconstitutional consequences" of using this video were "patently obvious." *Sosa*, 2023 WL 1776253, at *7 (quoting *Connick*, 563 U.S. at 64).

Plaintiffs' evidence that the officers were provided purportedly inadequate training was that various officers and police officials allegedly could not state the Baker Act criteria correctly. ECF No. 180, pp. 36-37. At least as to Officers Margolis and Cuellar, that is disputed. *See* DOSMF ¶¶ 50-51. Plaintiffs also observe that Officer Cuellar believed it was "legal to Baker-Act someone for behavior that is due to autism." JSF ¶ 103. But his individual understanding of that issue does not prove a deficiency in the School District Police Department's training program, which is what matters. *See Lewis*, 561 F.3d at 1293 ("In resolving the issue of the City's liability, 'the focus must

be on the adequacy of the training programs in relation to the tasks the particular officers must perform,' and not merely on the training deficiencies for a particular officer.") (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).

For the other police department deponents, Plaintiffs do not assert their alleged lack of knowledge about the Baker Act criteria as an undisputed fact, instead embedding citations to deposition excerpts in their memorandum of law. ECF No. 180, p. 37. That said, Plaintiffs have not explained how various officers' or police officials' inability to state the Baker Act criteria correctly in depositions demonstrates that it was obvious that School Police Officers would commit constitutional violations. Further, just focusing on the excerpts cited by the Plaintiffs, the deponents consistently articulated at least that the seizure would require the person to be a harm, danger, or threat to themselves or others. *See* excerpts cited at ECF No. 180, p. 37. Even if all of the deponents understood nothing more (which Plaintiffs have not demonstrated), that understanding would correspond with the criteria for a mental-health seizure to be reasonable under the Fourth Amendment. *See Ingram*, 30 F.4th at 1250.

Plaintiffs also point to the testimony of Board Member Debra Robinson. *See* PSMF ¶ 46. Her testimony was that police needed more training because "police are not trained to determine the cause. They just kind of react to the behavior, traditionally" and that "it's the behavior they're going to respond to, without the underlying diagnosis." ECF No. 177-45 at 32:25 – 33:14 (cited in PSMF ¶ 46). That was the opinion of a single Board Member about the training provided to police officers. It is not sufficiently probative of what the actual training for School Police Officers was or its adequacy, particularly during the pertinent time period, nor of the understanding of the

collective School Board or high-level District officials of the adequacy of the training.[6]

In sum, Plaintiffs have not demonstrated that there is no genuine dispute as to any material fact about whether the School Board had a policy or custom that constituted deliberate indifference to students' Fourth Amendment rights against unreasonable seizures.

> 3. *Plaintiffs are not entitled to judgment as a matter of law on whether a policy or custom of the School Board caused the violation of D.P.'s or E.S.'s Fourth Amendment rights.*

Where a policy or custom exists, "the plaintiff must demonstrate the municipality's policy or custom was the 'moving force' behind the alleged constitutional violation." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1333 (11th Cir. 2021). Even if the Decision Tree Protocol amounted to a policy or custom of permitting seizures that would violate the Fourth Amendment, Plaintiffs have not demonstrated that there is no genuine dispute as to any material fact about whether it was the moving force behind the allegedly unconstitutional seizures of D.P. or E.S.

Plaintiffs contend that pertinent staff were "operating" under the Decision Tree Protocol and that it was "in effect" at the time of D.P.'s and E.S.'s involuntary examinations. ECF No. 180, pp. 17, 33. That is at least disputed. Plaintiffs cite JSF ¶ 191, but all that provides is that "[t]he District's 2018 Baker Act Decision Tree Protocol ('Decision Tree Protocol') was issued through a bulletin on August 10, 2018." JSF ¶ 191. Further, the Decision Tree Protocol was not applicable to all District staff, as District staff are required to follow bulletins that apply to them or impact

---

[6] It should also be noted that, pertinent to the Board Member's stated concern, beginning in 2018, Florida law required mental health crisis intervention training for school resource officers, those obtained by school districts through cooperative agreements with law enforcement agencies. *See* § 1006.12(1)(c), Fla. Stat. (2018). The training was to use a curriculum developed by a national organization with expertise in mental health crisis intervention and to "improve officers' knowledge and skills as first responders to incidents involving students with emotional disturbance or mental illness, including de-escalation skills to ensure student and officer safety." *Id.* The statute was amended in 2021 to also require such training for school safety officers, those appointed by district school boards and commissioned for the protection and safety of school personnel, property, and students within the school district. *See* § 1006.12(2)(c), Fla. Stat. (2021).

their work. DOSMF ¶ 36; JSF ¶ 188.

For D.P.'s case specifically, Officer Margolis was employed by the Lantana Police Department. JSF ¶ 6. He testified that he had not seen the Baker Act Decision Tree Protocol bulletin before the lawsuit. DOSMF ¶ 79. He also testified that he did not receive any training from the School District on the Baker Act Decision Tree Protocol. DOSMF ¶ 80. He also did not recall receiving training from the District police department regarding the Baker Act. JSF ¶ 26. He did not receive any School Board bulletins. DOSMF ¶ 77. He was not familiar with the requirements of the School Board relating to the Baker Act. DOSMF ¶ 78. He also believed that Lantana Police Department policy would override the School Board's policy with respect to the Baker Act. DOSMF ¶ 81. And he testified that he was following Lantana Police's Baker Act policy during the course of the incident with D.P. DOSMF ¶ 82. Margolis also testified that he understood that mental illness was required to initiate a Baker Act. DOSMF ¶ 50. This evidence at least demonstrates a genuine dispute as to the material facts about a causal connection between the Decision Tree Protocol and Margolis's decision to initiate an involuntary examination for D.P.

As for E.S., by the time of his involuntary examination, there is evidence that the Decision Tree Protocol was no longer an official policy governing Baker Act use. The "Quick Reference Guide" Bulletin had been issued on August 14, 2019. JSF ¶¶ 197-198. The parties agree that the Baker Act Decision Tree Protocol was not formally rescinded. JSF ¶ 199. But the first page of the 2019 Quick Reference Guide explained that "a Behavioral and Mental Health Quick Reference Guide has been developed with procedures regarding a potential Baker Act on your school campus." DOSMF ¶ 43. The Board's Rule 30(b)(6) witness testified that this language would relay that the Quick Reference Guide was intended to replace prior Bulletins. DOSMF ¶ 43.

Setting aside whether the Decision Tree Protocol was in effect, Officer Cuellar was not

familiar with it and had not heard of the "Baker Act Decision tree." DOSMF ¶ 104. He also testified that his training on "Baker-Acting" was based on Baker Act policies in place in the School Police Department, general orders. DOSMF ¶ 105. Whatever Plaintiffs' issues with the Decision Tree Protocol, they make no showing that the School Police Department's General Orders at the time of E.S.'s involuntary examination misstated the statutory criteria. *See* DOSMF ¶ 36. In short, there is at least a genuine dispute as to the material facts about a causal connection between the Decision Tree Protocol bulletin and the involuntary examinations of D.P. and E.S.

As for the failure-to-train theory, to establish causation, "the plaintiff must establish that a hypothetically well-trained officer would have acted in a way that would have prevented the injury to the plaintiff." *Sosa*, 2023 WL 1776253, at *8. Plaintiffs base their causation argument on Officer Margolis and Officer Cuellar testifying that the Baker Act was appropriate when a person was a harm or danger to themselves or others, and Officer Cuellar's testimony that it was "legal" to Baker-Act someone for behavior that is due to autism. ECF No. 180, pp. 36-37. As discussed above, however, it is disputed that Officers Margolis and Cuellar did not understand the Baker Act criteria, notwithstanding what particular excerpts of their testimony might suggest. *See* DOSMF ¶¶ 50-51. Plaintiffs have also not demonstrated how a hypothetically well-trained officer would have come to a different conclusion under the particular circumstances presented by D.P. and E.S.

As for Officer Cuellar's understanding of autism in relation to the Baker Act, Plaintiffs have not shown that there is no genuine dispute as to any material fact about whether a hypothetically well-trained officer would have acted differently with respect to E.S. As detailed above with respect to whether there was a constitutional violation, it is at least disputed whether E.S.'s behavior on the day of his involuntary examination was known to be autism-related behavior, and there is evidence that a reasonable officer could have believed that it was not such

behavior given school staff's inability to handle it without law enforcement assistance.

In sum, the Court should deny Plaintiffs' request for summary judgment on D.P.'s and E.S.'s Fourth Amendment claims.

B.   Fourteenth Amendment Procedural Due Process Claims of P.S. and J.S.

The School Board will next address Plaintiffs' first and second requests for summary judgment, that "[t]he District violated the parental rights of Plaintiffs P.S. and J.S. by denying them the care, custody, control and medical decision-making for their children without due process, in violation of the Fourteenth Amendment" and that "District policy on parental consent prior to the initiation of an involuntary examination under the Baker Act violates the Fourteenth Amendment." ECF No. 180, p. 8. The third element of a procedural due process claim, constitutionally inadequate process, *J.R. v. Hansen*, 803 F.3d 1315, 1320 (11th Cir. 2015), is what is at issue here.

P.S. and J.S. contend that the initiation of involuntary examinations without parental consent is unconstitutional in the absence of a true or reasonably perceived emergency. They rely in part on *Doe v. Kearney*, 329 F.3d 1286, 1294–95 (11th Cir. 2003), but *Kearney* was a case about the removal of children pursuant to a statute in circumstances where there was "probable cause to believe the child has been abused, neglected, or abandoned, or … probable cause to believe the child is in imminent danger of abuse." *Id.* at 1294. They also rely on *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990), but the pertinent provision of that case concerned "[t]he validity of … consent to surgery." *Id.* The School Board maintains that a law enforcement officer taking a child into custody under the Baker Act is not comparable to the government removing a child from her parents in abuse cases or effecting the performance of a medical procedure on a child. Instead, initiation of an involuntary examination by a law enforcement officer is a seizure subject to the Fourth Amendment. Neither case states that a Fourth Amendment seizure always requires a true

or perceived emergency to proceed without parental consent or a pre-deprivation hearing.

Instead, where Fourth and Fourteenth Amendment claims are "premised upon the same underlying facts," namely "the removal of children," then "the procedures required for a constitutional search and seizure under the Fourth Amendment are adequate to protect the parents' procedural due process rights and liberty interest in directing the upbringing of their children." *Wernecke v. Garcia*, 591 F.3d 386, 391 n.7 (5th Cir. 2009). So emergency is not the standard; at most, the standard is whether the parent's child was seized in compliance with the Fourth Amendment. If Plaintiffs are not entitled to summary judgment about whether D.P.'s and E.S.'s Fourth Amendment rights were violated, then P.S. and J.S. are not entitled to summary judgment on whether their procedural due process rights were violated.

Assuming that a Fourth Amendment violation was established for D.P. or E.S., Plaintiffs have still not shown that there is no genuine dispute as to any material fact about whether P.S. and J.S. were deprived of constitutionally adequate process or whether it was attributable to some policy or custom of the School Board.

> 1.  *Plaintiffs have not shown that there is no genuine dispute as to any material fact about whether P.S. and J.S. were provided constitutionally adequate process or whether a policy or custom of the School Board caused a constitutional violation.*
>
>     a.  P.S.

For one thing, the argument that P.S. was deprived of her parental rights without adequate process is based on P.S. purportedly not consenting to D.P. being taken into custody. But whether P.S. consented is not undisputed on this record. *See* DOSMF ¶ 11. The testimony of Margolis, Camel, and Wladimirski that P.S. was contacted before the decision was made or D.P. was transported, and that she did not object, is sufficient to demonstrate a genuine dispute about whether P.S. consented. *Cf. Bendiburg*, 909 F.2d at 470 ("There is some argument that the failure of Bendiburg to act when notified at 5 p.m. the night before surgery amounted to a consent which

defeats his claim. These facts can be fully developed at trial without the court being constrained by the limits of a summary judgment record.").

Still, even if it were undisputed that P.S. did not consent, that would not end the due process analysis. Had P.S. consented, there would be no due process issue, but her lack of consent would simply trigger the requirement for due process. *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990) ("In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*"). "Generally speaking, procedural due process requires that the state give the individual notice and an opportunity to be heard before a deprivation." *Barr v. Johnson*, 777 F. App'x 298, 301 (11th Cir. 2019). Even if there is some dispute about whether P.S.'s consent was obtained, Margolis's, Camel's, and Wladimirski's testimony at least provides evidence that P.S. was provided notice and an opportunity to be heard before D.P. was transported. DOSMF ¶ 11.

Even if P.S. could establish a constitutional violation, she cannot show that there is no genuine dispute as to any material fact about whether the School Board "had a custom or policy that constituted deliberate indifference to that constitutional right" and "that the policy or custom caused the violation." *McDowell*, 392 F.3d at 1289. Here, Plaintiffs contend that the constitutional violation as to P.S. "was caused by District policy and practice of not seeking parental consent." ECF No. 180, p. 24. There are three problems with that argument.

First, the evidence Plaintiffs cite does not demonstrate a causal connection. They cite testimony that Officer Margolis and the school's guidance counselor (Wladimirski) merely did not know whether District Baker Act policy required parental consent for an involuntary examination. *See* ECF No. 180, p. 24 (citing JSF ¶ 24; ECF No. 177-2 at 37:3-38:4). Their lack of knowledge

about a policy or practice does not demonstrate that such a policy or practice caused a due process violation as to P.S. Indeed, when asked, "what would happen if a parent says no?" Wladimirski answered, "Then I'm assuming that it wouldn't happen." ECF No. 177-2 at 37:21-24. But she had "never been in that situation," *id.* at 38:3-4, including with P.S. as discussed above. DOSMF ¶ 11.

Second, there is record evidence at least calling into question whether a policy or custom of the School Board caused the violation. Margolis testified that he was not applying District policy in his handling of the incident. DOSMF ¶¶ 77-82 He also testified to his practice with respect to parental consent, including that "if they're not going to get their child help, I tell them [the parent] they're [the child] going to be Baker Acted. Well, that's when I go back and I contact the sergeant before I make that decision." DOSMF ¶ 11. So it is not undisputed on this record that some policy or practice of the Board was the cause of P.S's consent not being sought.

Third, a policy or practice of "not seeking parental consent" would not be unconstitutional; a policy or practice of providing constitutionally inadequate process would be. *See J.R.*, 803 F.3d at 1320 (claim requires constitutionally inadequate process). As discussed above, the question is whether there was a policy or practice of not providing parents "notice and an opportunity to be heard" before depriving them of their parental rights. *Barr*, 777 F. App'x at 301. There is evidence that the pertinent actors here, Margolis and Camel, believed they were required to provide parents at least notice and an opportunity to be heard. *See* DOSMF ¶ 11.

    b. J.S.

Plaintiffs similarly argue that J.S. was deprived of her parental rights without adequate process because she did not consent to E.S. being taken into custody. It is undisputed that J.S. did not consent to the involuntary examination of E.S. JSF ¶ 93. It is also undisputed on this record that, sequentially, Cuellar had already made the decision about involuntary examination when J.S.

was contacted by Karbowski and Cuellar. JSF ¶ 88, PSMF ¶ 19. Nevertheless, there is evidence that J.S. was provided notice and an opportunity to be heard before E.S. was transported.

Plaintiffs note that "J.S. had no ability to be heard by Officer Cuellar," ECF No. 180, p. 25, but they ignore that J.S. was first contacted by Principal Karbowski. Karbowski testified that she contacted J.S. when Officer Cuellar left the office with E.S., and that she did not know at that point whether the decision had been made. DOSMF ¶ 106. Karbowski told J.S. that "they had started that process," a Baker Act of E.S., "but [she] didn't know if they were going to make that decision or not." DOSMF ¶ 107. There was a period of time of at least ten minutes between when Officer Cuellar took E.S. to his office to fill out paperwork and when E.S. was transported. JSF ¶¶ 78-83. By Karbowski's account, J.S. was notified that E.S. was potentially going to be taken into custody under the Baker Act, at which point she had an opportunity to respond.

Even if J.S. could establish a constitutional violation, however, she cannot show that there is no genuine dispute as to any material fact about whether it was caused by a policy or custom of the School Board. *McDowell*, 392 F.3d at 1289. Plaintiffs cite the undisputed facts about Officer Cuellar's understanding that parental consent and parental involvement were not required when he was involved and making his determination about involuntary examination. ECF No. 180, p. 26 (citing JSF ¶¶ 96-98). But that is only part of the picture when considering whether parents would be provided due process. To be sure, Officer Cuellar may not have sought parental consent or input about the Baker Act decision. But with respect to when she would call for police assistance, if Karbowski could not de-escalate a child, she would call the parent. DOSMF ¶ 86. She testified that if a child was not hurting themselves and she could safely stay out of harm, she would try to get the parent down to the school, but if the child was hurting themselves, then she would call for school police to keep the child safe if that was what she had to do. DOSMF

¶ 83. In other words, "the only reason" Karbowski would call for police assistance was "because that child is in imminent harm and you have no time to call anybody else." Ex. G to DOSMF at 168:12-16 (cited in DOSMF ¶ 83), which would be an emergency situation.

Even so, Karbowski testified that, for a parent whose student was potentially going to be "Baker Acted," contacting them was required, and that it was required to be done as soon as possible before the child is transported or taken off campus. DOSMF ¶ 84. She testified that she would make the call as soon as the child was safe. DOSMF ¶ 85. Karbowski's testimony demonstrates that she would only contact law enforcement in emergency situations and that, in Baker Act situations, she would provide parents notice as soon as the child was safe, which would give them an opportunity to be heard. In the case of E.S., when J.S. was contacted, the decision had already been made. But Plaintiffs have not demonstrated that was attributable to a policy or custom of not at least contacting parents before the child was transported to the receiving facility in emergency situations, or even earlier in non-emergency situations.

2.   *Plaintiffs are not entitled to a declaratory judgment that "official District policy violates parental rights under the Constitution."*

P.S. and J.S. seek a declaratory judgment that initiation of involuntary examinations by law enforcement officers under the Baker Act without parental consent, even absent a true emergency, is unconstitutional. As discussed above, a "true emergency" is not required, at least not as framed in *Kearney* and *Bendiburg*. So the Court does not have to agree that the Baker Act criteria themselves present true emergencies as described in those cases, although the School Board submits that they do.[7] At the very least, because the seizure of a child under the Baker Act is

---

[7] Plaintiffs contend that different Baker Act criteria contemplate parental involvement. *See* § 394.463(1)(b)1, Fla. Stat. Even if they are correct, this case does not involve those criteria. *See* ECF No. 150 ¶ 43. Plaintiffs have not demonstrated that the Board has a policy of not seeking parental consent when the (b)1 criteria are the sole basis for the involuntary examination. Plaintiffs also contend that, under the (b)2 criteria, parents "**may** have alternative and more effective

subject to the Fourth Amendment, "the procedures required for a constitutional search and seizure under the Fourth Amendment are adequate to protect the parents' procedural due process rights and liberty interest in directing the upbringing of their children." *Wernecke*, 591 F.3d at 391 n.7. So Plaintiffs' claim of a policy of violating parents' due process rights can travel no farther than their claim of a policy of violating Fourth Amendment rights.

That said, Plaintiffs' request for declaratory relief also fails because it presents the wrong question: a policy of not seeking parental consent would not be unconstitutional. Rather, as discussed above, the absence of parental consent before initiating an involuntary examination would mean that parental rights are potentially infringed upon by the involuntary examination. That infringement would not itself be unconstitutional under a procedural due process analysis, the failure to provide adequate process would be. *See Zinermon*, 494 U.S. at 125.

Plaintiffs have not shown that the School Board had or now has a policy of not providing notice and an opportunity to be heard for parents, *Barr*, 777 F. App'x at 301, or of not doing so in non-emergency situations. They contend that contacting parents before initiating an examination was only 'recommended' under the Decision Tree Protocol. PSMF ¶ 37. But that is disputed: the Bulletin tells school officials to "make every effort to include the parents/guardians in all phases of the process" and the Decision Tree provided as part of the second step, after staff became concerned about a student's behavior being a danger to self or others, that the school "CONTACTS PARENT(S)/LEGAL GUARDIAN(S)," without qualification or limitation. DOSMF ¶ 37.

Plaintiffs have also not shown that the School Board now has a policy of not providing due

---

methods" of obtaining care. ECF No. 180, p. 28 (emphasis added). But the (b)2 criteria do not require a consideration, as the (b)1 criteria do, about whether "such harm may be avoided through the help of willing family members or friends or the provision of other services." § 394.463(1)(b)1, Fla. Stat. There is also no requirement that law enforcement officers determine that other less restrictive means are not available. *Compare id.* § 394.463(2)(a)2 *with id.* § 394.463(2)(a)1 & 3.

process in situations other than true emergencies. They only argue, again, that current Board Policy does not require parental consent for an involuntary examination under the Baker Act. ECF No. 180, p. 27 (citing JSF ¶ 215). Yet in the testimony they cite, the Rule 30(b)(6) witness explained, "They are not required to get consent, parental consent to do an assessment **when there's a crisis.**" ECF No. 180, p. 27 (quoting ECF No. 177-46 at 216:3-9) (emphasis added). Plaintiffs also ignore the School Police Department's 2022 revisions to General Order 11.17, including the following:

> 3. If a juvenile is under evaluation for involuntary examination under F.S.S. 394.463, the juvenile may be turned over to a parent or legal guardian if appropriate, and after a conscientious explanation and disclosure for the purpose of the examination, the parent or legal guardian:
>
> > a. Does not want the SDPBCPD to take the juvenile to a mental health receiving facility, or
> >
> > b. Agrees to immediately take the juvenile to a mental health treatment facility for a voluntary examination, or
> >
> > c. The parent or legal guardian agrees to take full responsibility for the juvenile
>
> 4. While it is always preferable to turn a juvenile over to a parent or legal guardian, LEOs need to consider the individual circumstance of each situation when deciding whether to turn the juvenile over to a parent or legal guardian or go forward with an involuntary examination.

Ex. F to DOSMF at 5; *see* DOSMF ¶¶ 142-143. The Court should deny Plaintiffs' request for a declaratory judgment.

C.   Fourth Amendment Excessive Force Claims of E.S. and M.S.

The School Board next addresses the fourth and fifth requests for summary judgment, that "[t]he District unnecessarily handcuffed child Plaintiffs E.S. and M.S., subjecting them to excessive force in violation of their Fourth Amendment rights" and that "District policy requiring officers to handcuff all students who are being transported for involuntary examination violates the Fourth Amendment." ECF No. 180, p. 8. Plaintiffs cannot show that there is no genuine dispute

as to any material fact on whether E.S.'s or M.S.'s constitutional rights were violated, whether the School Board had a custom or policy that constituted deliberate indifference to that constitutional right, or that such a policy or custom caused the violation. *McDowell*, 392 F.3d at 1289.

>    1.  *Plaintiffs are not entitled to judgment as a matter of law about whether E.S.'s or M.S.'s constitutional rights were violated.*

E.S. and M.S. seek summary judgment based on the undisputed facts about their age and size; that they were calm, compliant, and not resisting the officers at the time they were transported; and, with respect to M.S., that she did not have weapons and that there were three adults in the transport vehicle. JSF ¶¶ 44-45, 81-87, 148-151, 153-156, 159-160. Those undisputed facts do not warrant judgment as a matter of law in favor of E.S. or M.S. on whether their constitutional rights were violated, because the use of handcuffs under the circumstances of these transports for involuntary examination, without more, was not unconstitutional.

The Eleventh Circuit has repeatedly noted, even in a case involving a 13-year-old school child, that "[h]andcuffing is a *de minimis* use of force." *J.I.W. by & through T.W. v. Dorminey*, No. 21-12330, 2022 WL 17351654, at *6 (11th Cir. Dec. 1, 2022) (citing *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019)). And "the application of de minimis force, without more, will not support a claim for excessive force …." *Crocker v. Beatty*, 995 F.3d 1232, 1253 (11th Cir. 2021) (quotation marks omitted). Instead, "only the most exceptional circumstances will permit an excessive force claim on the basis of handcuffing alone." *Sebastian*, 918 F.3d at 1312.

Plaintiffs contend that the Eleventh Circuit has "specifically noted the importance of a child's age in assessing reasonableness," citing *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1306-07 (11th Cir. 2006) ("*Gray II*"). ECF No. 180, pp. 38-39. *Gray II* was not an excessive force case. *See J.I.W.*, 2022 WL 17351654, at *5. And it only stands for the "fairly narrow" point of law "that a law enforcement officer, acting as a school resource officer, who 'handcuff[s] a compliant

32

nine-year-old child for purely punitive purposes' has unreasonably seized the child in violation of the Fourth Amendment." *Gray ex rel. Alexander v. Bostic*, 613 F.3d 1035, 1041 (11th Cir. 2010) (quoting *Gray II*, 458 F.3d at 1307). Here, Plaintiffs have not presented evidence that E.S. and M.S. were handcuffed for transport for involuntary examination for purely punitive purposes, nor have they presented evidence of some peculiar facts that would transform the de minimis use of force of handcuffing E.S. or M.S. into a potentially excessive one. That is enough to preclude summary judgment on their claim that the use of handcuffs was unconstitutionally excessive force.

Put another way, Plaintiffs cannot show that there is no genuine dispute as to any material fact about whether the use of handcuffs on E.S. and M.S. for transport was not "reasonably proportionate to the need for that force." *J.I.W.*, 2022 WL 17351654, at *4 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002)). Plaintiffs ignore the underlying reasons that E.S. and M.S. were being transported in the first place in their analysis. But the seizures of E.S. and M.S. presented inherent safety considerations, even if they were arguably incapable of hurting the officers transporting them or appeared calm and compliant by the time of their transports. Those safety considerations were most pronounced for the limited period of time that E.S. and M.S. were out of the immediate physical control of law enforcement officers, while they were being transported. It is perhaps arguable whether some greater use of force would have been disproportionate under the circumstances. But there is sufficient evidence on this record that the minimal use of force of handcuffing was proportionate to the safety concerns presented by the seizures of E.S. and M.S. under the Baker Act.

For E.S., he was transported after punching an adult, destroying an office, and appearing to attempt to hurt himself by punching a thick glass window. JSF ¶¶ 62, 65, 67; DOSMF ¶¶ 97-103. That E.S. had calmed down before transport did not negate the need for any force to be used

for the period he was being transported. There is also no evidence that E.S.'s handcuffing was done in an unusual manner or for purely punitive purposes.

As for M.S., Silva communicated to the officer who transported M.S., Lauginiger, that M.S. had told the school counselor that she wished to kill herself. DOSMF ¶ 128. There is record evidence that handcuffs were used on M.S. specifically because of safety concerns. Silva testified that he would not have trusted leaving M.S. in the backseat of the transport vehicle without handcuffs, for her own safety, based on the totality of the circumstances. DOSMF ¶ 130. And Lauginiger's Field Training Officer, O'Sullivan, who was present for the transport, explained that he would handcuff a child deemed to be in need of examination based on his duty to keep the child safe and deliver her in the same physical condition he received her. DOSMF ¶ 129. That is sufficient evidence that it was not unreasonable to use handcuffs on M.S. for the transport.

There is no evidence that M.S.'s handcuffing was done in an unusual manner or for purely punitive purposes. To the contrary, and also precluding a finding of excessive force here, is evidence that the transporting officers made efforts "to temper or to limit the amount of force" on M.S. *Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (U.S. 2021) (quotation marks omitted). Lauginiger exercised his discretion to handcuff M.S. in the front rather than the back. DOSMF ¶ 132. He also, before placing the handcuffs, explained to M.S. that he had to put them on her and that he would make sure it was not cutting off flow and circulation using his finger, and that they would be on for the duration of the ride. DOSMF ¶ 131. Finally, Lauginiger then placed the handcuffs on the space between the joints where the wrist meets the hand, where people put their watches, and make sure the handcuffs were properly placed and were not hurting M.S. or making her feel uncomfortable, and checked that they were double locked. DOSMF ¶¶ 133-134.

In sum, the Court should deny Plaintiffs' request for summary judgment for E.S. and M.S.

on their excessive force claims because Plaintiffs have not shown that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law about whether E.S.'s or M.S.'s constitutional rights were violated.

> 2. *Plaintiffs are not entitled to judgment as a matter of law on whether the School Board had a policy or custom that constituted deliberate indifference to the Fourth Amendment right against excessive force or that such a policy or custom caused the constitutional violations with respect to E.S. and M.S.*

Plaintiffs have also not demonstrated that there is no genuine dispute as to any material fact about whether the School Board had a policy or custom of using unconstitutionally excessive force in the use of handcuffs in Baker Act transports. They contend that there was a "pervasive district custom," but they do not explain what the custom was except of "handcuffing students during transportation for involuntary examination under the Baker Act[.]" ECF No. 180, p. 40. But handcuffing students during transportation for involuntary examination is not categorically unconstitutional. Even if the Court disagrees that the *de minimis* principle governs the use of handcuffs, Plaintiffs still do not attempt to demonstrate a custom of using handcuffs when it is not "reasonably proportionate to the need for that force," *J.I.W.*, 2022 WL 17351654, at *4 (quoting *Lee*, 284 F.3d at 1198).

Starting with the official policies that governed Baker Act transports, there were two during the pertinent time period: the General Order on the Baker Act itself (11.17) and the General Order on the use of handcuffs (1.5). The former, 11.17, was amended between the time of E.S.'s and M.S.'s Baker-Act incidents. The 2014 version of General Order 11.17 provided, "All persons will be transported with dignity, including those who face criminal charges. The individual will be searched for weapons prior to transport, and shall be handcuffed **or otherwise restrained for the individual's own safety**." ECF No. 184-32 at 4 (emphasis added). While this version of General Order 11.17 used the term "shall," on its face, it also provided for the use of handcuffs as one

restraint option, and that it should be done "for the individual's own safety."

General Order 11.17 was amended in November 2019. ECF No. 177-56 at 2. The 2019 version provided that "[a]ll persons with be transported with dignity, including those who face criminal charges. The individual will be searched for weapons prior to transport, and **may** be handcuffed or otherwise restrained **for the individual's own safety**." ECF No. 177-56 at 5 (emphasis added). The 2019 version of General Order 11.17 explicitly gave officers discretion about whether to use handcuffs during Baker Act transport. DOSMF ¶ 140. The Board's Rule 30(b)(6) witness testified that the considerations that would inform the officers' exercise of discretion would include officer safety and student safety or the state of the student during transport. DOSMF ¶ 141.

Plaintiffs point to General Order 1.5, which has been the School Police Department's General Order on "Handcuffs and Physical Restraints" during the pertinent time period. ECF No. 180, p. 17 (citing JSF ¶¶ 221-223). General Order 1.5 provides that "[h]andcuffs should be used when the following occurs … [a] Baker Act … is effected." ECF No. 177-55 at 4. The Board's Rule 30(b)(6) witness testified that the language "should be used" gives the officer discretion. DOSMF ¶ 139. O'Sullivan, who was a field training officer, JSF ¶ 167, described the use of the term "should" as an "implied order," meaning "the recommended course of conduct" that an officer would be held to, and he could identify at least one Baker Act incident where handcuffs were not used. DOSMF ¶ 56. To that end, General Order 1.5 also contains a "Discussion" section providing that "[a]ll officers should handcuff persons arrested or placed into custody except when, in the judgment of the officer, handcuffing is unnecessary," and that "[o]fficers shall determine the practicality or necessity of using handcuffs in situations involving special circumstances and/or when dealing with seriously deformed, injured or ill persons." ECF No. 177-55 at 3. In short, the

School Police Department's General Orders do not provide evidence of a pervasive custom of applying handcuffs in a manner that would not be a de minimis use of force, nor do they provide evidence of a custom of doing so without need.

Plaintiffs also point to the testimony or admissions of individual police officers or police officials. *See* ECF No. 180, pp. 41-42. That suggests that there is a genuine dispute of material fact, however, not the absence of one, in light of the evidence discussed above about General Orders 11.17 and 1.5. To that end, there is also conflicting evidence within what Plaintiffs cite. Burrus, for instance, testified that handcuffs would not be used if they did not fit or if there was another officer in the vehicle next to the child, and that the "policy does state that they **suggest** handcuffs on an individual being transported." ECF No. 180-5 at 133:1-18 (emphasis added).

In short, Plaintiffs have not shown that there is no genuine dispute as to the material facts about whether the School Board had a policy or custom of using handcuffs for Baker Act transports in a manner that would be unconstitutionally excessive force. Their argument for liability under a failure-to-train theory similarly fails in the absence of evidence of a pattern of similar constitutional violations or a showing of circumstances where a pattern is not necessary to establish liability. *See Sosa*, 2023 WL 1776253, at *7.

Plaintiffs first argue that "[f]inal policymakers in the District were aware of the contents of General Order 1.5 and the District Police Department's customary practice of handcuffing pursuant to that General Order." ECF No. 180, p. 42. But it is not undisputed that there was such a customary practice. Plaintiffs have also not demonstrated awareness by policymakers of such a custom. They point to a statement in a report about students "being led away from schools in handcuffs" and transported under the Baker Act, and an email to Board Members mentioning that a student was handcuffed in connection with the Baker Act in 2017. JSF ¶¶ 226-228. Statements

that handcuffs were being used, without more, was not evidence that the use of handcuffs was unconstitutionally excessive under the circumstances.

Absent a pattern, failure-to-train liability "is generally reserved for those cases in which the government actor was provided no training whatsoever." *Pena*, 879 F.3d at 624. Plaintiffs cannot demonstrate that School Police Officers were provided no training on handcuffing. They claim that there was no training on the "appropriate use of handcuffs **during a Baker Act**[.]" ECF No. 180, p. 44 (emphasis added). That drills down too far. *Cf. Connick*, 563 U.S. at 67 ("The *Canton* hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force. But it is undisputed here that the prosecutors in Connick's office were familiar with the general *Brady* rule."). To that end, the Board's Rule 30(b)(6) witness, when asked whether officers received or were scheduled to receive training addressing the use of handcuffs during Baker Act transport, answered that handcuffing techniques take place during defensive tactics training. DOSMF ¶ 57. Plaintiffs do not explain why training on the use of handcuffs would be inadequate for the particular context of the Baker Act. To the extent they refer to the potential trauma of handcuffing children in the Baker Act context, at least one police officer testified that he received training from the School District Police Department on the harm of the Baker Act for a child, including from handcuffing. DOSMF ¶ 57.

Plaintiffs also contend that Officers Lauginiger and Cuellar were inadequately trained. Their individual training is not dispositive, however, as "the focus must be on the adequacy of the training programs in relation to the tasks the particular officers must perform, and not merely on the training deficiencies for a particular officer." *Lewis*, 561 F.3d at 1293 (quotation marks omitted). That said, Plaintiffs point to Officer Lauginiger's testimony and admissions of his understanding that students have to be handcuffed during transportation for involuntary

examinations and that policy required that, and that he was trained to always handcuff children when transporting them for involuntary examination. JSF ¶¶ 161-163, 166-167. Yet his own Field Training Officer, O'Sullivan, described the use of the term "should" in the General Order as an "implied order," meaning "the recommended course of conduct" that an officer would be held to, and could identify at least one Baker Act incident where handcuffs were not used. DOSMF ¶ 56.

Plaintiffs also point out similar testimony and admissions by Officer Cuellar. JSF ¶¶ 105-107. Officer Cuellar also testified, however, that "[o]ther officers may have done it, maybe not. Every officer did things a little different." ECF No. 177-7 at 81:10-15. Further, he explained that he always transported with handcuffs "[f]or the safety of the child." *Id.* at 81:16-21. In other words, Plaintiffs cannot show it to be undisputed that Officer Cuellar was trained to use handcuffs even when it was disproportionate or unnecessary.

In short, Plaintiffs have not demonstrated that there is no genuine dispute as to any material fact about whether the School Board had a policy or custom of using unconstitutionally excessive force in the use of handcuffs in Baker Act transports, or whether such a policy or custom caused the constitutional violations as to E.S. and M.S.

D.  Disability Discrimination Failure to Accommodate Claims of D.P., E.S., and W.B.

Finally, the School Board addresses Plaintiffs' sixth and seventh requests for summary judgment, that "Child Plaintiffs D.P., E.S., W.B. and M.S. were qualified individuals with disabilities" under the ADA and Section 504 and that "[t]he District denied child Plaintiffs D.P., E.S., and W.B. reasonable accommodations in violation of the ADA and Section 504." [8] ECF No.

---

[8] Concerning part of Plaintiffs' sixth request, the School Board does not contest that M.S. is a qualified individual or that it is a covered entity under the ADA and Section 504. The School Board also notes that it has argued in its own motion for summary judgment that Plaintiffs' failure-to-accommodate claims for which they seek summary judgment here are barred for failure to exhaust and fail as a matter of law. ECF No. 183, pp. 54-59. The School Board does not repeat

180, p. 8. Plaintiffs must show three elements: "(1) that they are qualified individuals with disabilities; (2) that they were excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or were otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiffs' disabilities." *L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1301–02 (11th Cir. 2022) (cleaned up).

> 1.  *Plaintiffs are not entitled to judgment as a matter of law about whether D.P., E.S., and W.B. were not provided reasonable accommodations.*

For the second and third elements, Plaintiffs allege discrimination in the form of failure to make reasonable accommodations. "[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Charles v. Johnson*, 18 F.4th 686, 703 (11th Cir. 2021) (quotation marks omitted). Reasonable modifications are those "that would not fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1082 (11th Cir. 2007).

> a.  D.P.

Contrary to Plaintiffs' argument, it is not undisputed that D.P.'s known disabilities caused the behaviors "exhibited on the day of his involuntary examination." ECF No. 180, p. 46. Plaintiffs assert that "D.P.'s school records recorded communication difficulties when he was upset." PSMF ¶ 1, but the records are too general or too specific in the pertinent respects. The cited school records provided that D.P. "does shut down and will not communicate when he is upset" and that he "communicated two different versions" of an incident at recess and "ha[d] difficulty communicating the events of the incident." DOSMF ¶ 1. Another school record states that "[D.P.]

---

those arguments here, not as a waiver or abandonment of those points, but instead because, if the Court agrees with the School Board, Plaintiffs' corresponding requests for summary judgment would be moot.

can communicate with adults that he is comfortable with. Changes in environment or with adults, **at times**, [D.P.] has difficulty complying to requests." DOSMF ¶ 1 (emphasis added). Finally, Plaintiffs point out that D.P.'s school records reflected that his "[d]elayed language skills-impair[ed] communication" and "Autism Spectrum Disorder- impact[ed] cognitive abilities, impair[ed] judgement [sic]." PSMF ¶ 2. The cited school records would not have reasonably put District staff on notice that D.P. would communicate feelings of wanting to die, threaten to harm himself or others, or make an apparent attempt to do so by reaching for scissors. *See* DOSMF ¶¶ 64-68. Because it is not undisputed that District staff were on notice that D.P.'s disability-related behaviors would include what transpired on the day of his involuntary examination, his argument for summary judgment on the failure-to-accommodate claim fails.

That said, Plaintiffs also cannot show that there is no genuine dispute as to any material fact about whether District staff failed "to provide reasonable accommodations and modifications to avoid D.P.'s involuntary examination." ECF No. 180, p. 48. For instance, the statement above, about D.P.'s delayed language skills and ASD, was as an explanation for why D.P. needed an aide to monitor his safety when using school transportation. ECF No. 176-2 at 16. The known accommodation specifically tied to those issues was monitoring D.P. for safety, not using any particular de-escalation techniques. Plaintiffs also point to statements in D.P.'s IEP about providing D.P. "[f]requent breaks and an opportunity to calm down if agitated" and a "[s]afe place." PSMF ¶ 4; DOSMF ¶ 4. Again, those are not identified as de-escalation techniques. Nor does the document identify the specific circumstances in which those accommodations were to be provided for D.P beyond when he was "agitated." Nor does the IEP indicate the extent to which such accommodations were to be provided before resorting to other measures.

To that end, Plaintiffs also try to rely on District staff's experience de-escalating D.P. in

the past. PSMF ¶ 3; DOSMF ¶ 3. That experience undermines their argument. Indeed, in the relied-upon testimony from Assistant Principal Camel, she was describing incidents where restraints were used to calm D.P. down. *See* ECF No. 184-1 at 109:3-10, 110:15-111:24, 112:24-115:1. On the date of the involuntary examination, D.P. had already been restrained and released from the restraint because he was calm. DOSMF ¶ 58. Margolis testified that he was informed that school staff were able to calm D.P. down, but he escalated again and they moved him to another classroom, at which point staff decided to get law enforcement involved. DOSMF ¶ 63. On this record, then, there is evidence that previously employed strategies were used to calm D.P. down before District staff contacted law enforcement, but they were only temporarily successful. So the issue was not a failure to use known accommodations for D.P.[9]

Plaintiffs also argue that that D.P. had calmed down before transport, which is undisputed on this record. JSF ¶¶ 19-22. Officer Margolis testified that he did not reconsider the decision because of D.P.'s statements and his belief that D.P. still presented a risk of harm to himself or others. DOSMF ¶¶ 75-76. So Officer Margolis's decision was attributable to D.P.'s behavior, not how District staff had handled that behavior.

Finally, it is undisputed that a mobile crisis response team did not evaluate D.P. and that Officer Margolis understood that. JSF ¶¶ 17-18. But "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Charles*, 18 F.4th at 703 (quotation marks omitted). Plaintiffs point to no evidence that a specific demand was made on behalf of D.P. for an accommodation of his disabilities in the form of

---

[9] Plaintiffs also argue that Officer Margolis initiated an involuntary examination on D.P. prior to the school counselor attempting de-escalation. ECF No. 180, p. 47. But the school counselor testified that she did not know de-escalation techniques that worked for D.P., and that the ones she attempted after arrival (breathing techniques and attempting to talk to him) were not ones she had used with him before. DOSMF ¶¶ 73-74.

contacting mobile crisis response services or that such a service was known as an accommodation of his disability specifically. *See also Wilf v. Bd. of Regents of the Univ. Sys. of Georgia*, No. 109CV01877RLVGGB, 2012 WL 12888680, at *18 (N.D. Ga. Oct. 15, 2012) ("In order to be a reasonable accommodation, any modifications requested in a program must be related to the disability"), *report and recommendation adopted,* No. 1:09-CV-1877-RLV, 2013 WL 12156401 (N.D. Ga. Feb. 21, 2013), *aff'd,* 544 F. App'x 906 (11th Cir. 2013).

   b. E.S.

  As they did with D.P., Plaintiffs make a two-pronged argument for E.S.'s failure-to-accommodate claim: that his behaviors on the day of the involuntary examination were known to be disability-related and that staff failed to provide known accommodations for those behaviors. Plaintiffs cannot show that there is no genuine dispute as to any material fact on either point.

  As they did with E.S.'s Fourth Amendment claim, Plaintiffs point to undisputed facts about E.S.'s known autism, and about his outbursts, tantrums, or otherwise reacting negatively to non-preferred tasks. ECF No. 180, p. 48 (citing JSF ¶¶ 28, 36, 46, 47). But, as discussed above with respect to E.S.'s Fourth Amendment claims, it is not undisputed that E.S.'s behavior on the date of the involuntary examination was simply another instance of his known, disability-related behaviors. Because the evidence Plaintiffs rely upon does not support their argument that District staff knew that E.S.'s behaviors on the date of the involuntary examination were disability-related, their failure-to-accommodate argument necessarily fails as well.

  That said, Plaintiffs also cannot show that there is no genuine dispute as to any material fact about whether District staff failed "to provide reasonable accommodations and modifications to avoid E.S.'s involuntary examination." ECF No. 180, p. 50. They first point to accommodations in E.S.'s IEP. *See* PSMF ¶ 12. Those accommodations were allowing him to stand and take

movement breaks; providing positive encouragement; prompting and modeling de-escalation skills and taking a break; home school communication; providing a safe spot or break area; continuous adult supervision for safety; and allowing him to walk to another class as a distraction. *Id.* There is evidence that these either did not apply under the circumstances or were attempted before Officer Cuellar was contacted (or both).

As a preliminary point, it is unclear when Plaintiffs contend that accommodations should have been, but were not employed. They argue that E.S.'s teacher, Tone, "could only recall providing one accommodation: providing him with choices." ECF No. 180, p. 49. But that is disputed because what Tone testified was that she could only recall "I-ready and our procedure of giving him choices **and then exiting**. That's it." DOSMF ¶ 14 (emphasis added). As noted above, allowing E.S. to walk to another class as a distraction was also an accommodation listed in the IEP. In any event, Tone's testimony also did not tie providing E.S. with choices to being an accommodation or a response to any particular behavior by E.S., as she testified that she could not remember anything about E.S.'s behavior in the classroom. DOSMF ¶ 14.

Further, regardless of what Tone did in the classroom, it was E.S.'s Aide who took him out of the classroom and to the school's office, JSF ¶ 59, and that is where the precipitating incident unfolded. Karbowski testified that she did not believe that a lot of the strategies identified in E.S.'s IEP could be implemented once he was in the front office or applied to the situation that they were in, and that the school staff applied the strategies from the IEP that they could. DOSMF ¶¶ 92-93. Her testimony is supported by the IEP itself. For example, the IEP provided that "[a] break area has been designated **in each classroom**, for [E.S.] to cool down." ECF No. 176-6 at 11 (emphasis added). But E.S. was already removed from his classroom. Another accommodation was "prompting and modeling de-escalation skills," but the IEP elsewhere explained these as needs or

goals for E.S., including "to independently utilize deescalation / calming strategies." *Id.* at 10.

Plaintiffs next point to District staff's experience of de-escalating E.S. JSF ¶ 49-50. Tone testified about being calm and giving E.S. a choice and giving him a break as effective strategies. ECF No. 177-10 at 118:10-24 (cited in JSF ¶ 49). As discussed above, Tone recalled giving E.S. choices while he was still in the classroom. And the Aide effectively gave E.S. a break by removing him from the classroom. JSF ¶ 59; *see also* DOSMF ¶ 91.

Bauder, meanwhile, testified that she could "[s]ometimes, but sometimes not" calm E.S. down when he became escalated, giving the example that if she was at lunch and E.S. got agitated, she "could usually talk him out of it." ECF No. 177-11 at 98:14-18 (cited in JSF ¶ 49). So her testimony also did not establish particular de-escalation strategies that were consistently effective. To the extent her testimony identified talking to E.S. as a de-escalation strategy, it is undisputed that Lee and Karbowski attempted to deescalate E.S. verbally. JSF ¶ 61.

Karbowski similarly testified of personally using strategies that were only "[s]ometimes" effective, with no indication that they were used in circumstances similar to those in the office. ECF No. 177-9 at 192:24-193:8 (cited in JSF ¶ 50). She also testified about strategies used by other members of the school staff when E.S. was in the classroom, including preferred tasks, a reward system, a point system, taking E.S. for walks, and taking him to a different environment. ECF No. 177-9 at 193:20 – 194:23 (cited in JSF ¶ 49). Again, the preferred tasks, reward system, and point system would not seem to apply to the situation in the office, while taking E.S. for a walk or to a different environment had already been done by the Aide.

Plaintiffs next contend that the school staff "did not accommodate E.S.'s disability by allowing J.S. to come to school to de-escalate him." ECF No. 180, p. 49. The school's staff had contacted J.S. when they needed additional behavioral supports for J.S. JSF ¶ 51. Plaintiffs cite no

evidence, however, that a specific demand was made that J.S. be contacted to come to the school to de-escalate E.S. *See Charles*, 18 F.4th at 703. It is also not undisputed on this record that such an accommodation was known to the school staff for handling the particular circumstances on the date of the involuntary examination. When asked about her understanding of J.S.'s ability to de-escalate E.S., Karbowski testified, "I think most of the time she was able to de-escalate him but usually I think by the time she would arrive at campus, he would be de-escalated already." DOSMF ¶ 108. J.S.'s testimony was consistent with Karbowski's. DOSMF ¶ 109.

That leaves Officer Cuellar. Plaintiffs argue that Officer Cuellar "decided that E.S. would be involuntarily examined without considering any reasonable accommodations for E.S.'s disability." ECF No. 180, pp. 49-50. Accepting that point as undisputed, that does not mean that school staff as a whole failed to provide known, reasonable accommodations to avoid the involuntary examination, as discussed in greater detail above. As for Officer Cuellar, Plaintiffs present no evidence that he was obligated to provide particular accommodations when he became involved. Again, he testified that when there were calls to E.S.'s classroom, he would a lot of times stand by in case he was needed. DOSMF ¶ 95. He had never been involved in physically controlling E.S. prior to August 30, 2019. DOSMF ¶ 96. And he believed he was "almost like the last one to go to at that point when [E.S.] had escalated to that level." DOSMF ¶ 94. There is sufficient evidence that accommodations, at least in the form of de-escalation, had been exhausted by the time Cuellar became involved. From there, Officer Cuellar's decision was based on what was reported to him and what he observed, not how District staff handled the situation.

Plaintiffs also fault Officer Cuellar for not contacting a mobile crisis team, even though he had time to do so. As also argued above with respect to D.P., however, Plaintiffs make no argument and point to no evidence that a specific demand was made on behalf of E.S. for an accommodation

of his disabilities in the form of contacting mobile crisis response services, or that doing so was otherwise a known accommodation for his disabilities. *See Charles*, 18 F.4th at 703; *Wilf*, 2012 WL 12888680, at *18. In short, Plaintiffs have not shown that there is no genuine dispute as to any material fact about whether District staff were aware of and failed to employ known de-escalation techniques as accommodations for E.S.'s disability-related behaviors.

       c.  W.B.

Finally, for W.B., Plaintiffs again make the two-pronged argument for his failure-to-accommodate claim: that his behaviors on the day of the involuntary examination were known to be disability-related and that staff failed to provide known accommodations for those behaviors. ECF No. 180, pp. 50-51. Again, Plaintiffs cannot show that there is no genuine dispute as to any material fact on either point.

As with D.P. and E.S., there is evidence that W.B.'s critical behaviors on the date of the involuntary examination were beyond what were known to school staff as part of his disability. That day, W.B. ran outside the school and attempted to jump or climb a fence. JSF ¶ 132. Principal Walker testified, however, that she did not regard W.B. "being a runner" as having a relationship to his disability and that she did not know him "to attempt to leave campus." DOSMF ¶ 110. Further, Curtis Brown regarded W.B.'s trying to climb the gate as an attempt to harm himself. DOSMF ¶ 113. But he had not seen W.B. try to harm himself, other than the day of the involuntary examination. DOSMF ¶ 111. Plaintiffs do not point to any testimony or school documentation identifying W.B. as a "runner" or tying that behavior to his disability.

The other conduct that precipitated the involuntary examination was W.B. making statements that he wanted to commit suicide, that he just wanted to jump off of the building and kill himself, that "he was going to kill himself, he wanted to die." DOSMF ¶ 121. Even accepting

that some staff were generally aware of W.B. making threats but not acting on them, JSF ¶¶ 126-128, that evidence was not tied to the same context as what occurred on the date of W.B.'s involuntary examination. That day, W.B. had also run out of the school and tried to climb the fence, reasonably appearing to act upon his statements about harming himself at least.

In short, the specific conduct that preceded the involuntary examination and may have informed the decision—attempting to run off the campus and threatening harm to himself—was not conduct that was known by school staff to be part of W.B.'s disability. Because the evidence Plaintiffs rely upon does not support their argument that District staff knew that W.B.'s behaviors on the date of the involuntary examination were disability-related, their failure-to-accommodate argument necessarily fails as well without the need to evaluate what the staff actually did.

That said, Plaintiffs also cannot show that there is no genuine dispute as to any material fact about whether District staff failed "to even attempt reasonable accommodations and modifications to avoid W.B.'s involuntary examination." ECF No. 180, p. 51. For instance, Plaintiffs point out that W.B.'s IEP called for a highly structured behavior intervention plan. *Id.*, p. 50. True, but they do not point to any aspect of that plan that (1) described the kind of behavior that W.B. exhibited on the date of the involuntary examination or (2) provided particular accommodations for it that school staff failed to employ that day.

Plaintiffs next point out that the IEP called for staff to remain non-reactive when negative behavior occurs, to provide access to a safe place or person, and to ensure communication between parent and teacher. ECF No. 180, p. 50. They similarly point to undisputed facts from Principal Walker's testimony about giving W.B. space, walking with him, using breathing techniques, providing him with incentives, and giving him time to calm down. *Id.* (citing JSF ¶¶ 124-125).

For remaining non-reactive, Plaintiffs point to no evidence that school staff were

unnecessarily reactive to W.B.'s negative behaviors that day, and staff could not reasonably ignore W.B.'s behavior of leaving his classroom and attempting to climb a school fence. Sumner testified that school staff used techniques from the IEP, including talking, removal from the setting, speaking to him in a calm voice, and attempting to provide access to a safe place or person. DOSMF ¶ 116. She perceived that W.B. may have been outside initially to give him space. ECF No. 177-20 at 102:1-5 (cited at ECF No. 180, p. 51). When Curtis Brown reported to the classroom where the incident began, he testified that W.B. was already by himself. DOSMF ¶ 112. He used "verbal praise" in his interactions with W.B. PSMF ¶ 23, DOSMF ¶ 115. Sumner tried to deescalate W.B. by talking to him. DOSMF ¶ 114. She also testified that she contacted W.B.'s mother to make sure that she was aware that W.B. was "in crisis." DOSMF ¶ 127.

To the extent that Plaintiffs challenge Officer Brown's failure to provide accommodations, it is undisputed that Officer Brown tried to calm W.B. down by speaking to him. JSF ¶ 134. In any event, whatever Officer Brown did, it is not undisputed that school staff as a whole failed to provide known, reasonable accommodations to avoid the involuntary examination. Sumner testified that school staff employed strategies from W.B.'s IEP for 10 to 15 minutes before Officer Brown arrived. DOSMF ¶ 117. Plaintiffs present no evidence that Officer Brown was obligated to provide particular accommodations at the point he became involved. For his part, Officer Brown testified that he was letting the school take the lead and, after W.B. was down from the fence, he did not intervene until W.B. started to pull away from school staff and get aggressive toward the staff, including making statements that he wanted to kill himself. DOSMF ¶ 118. So there is at least evidence that de-escalation techniques were employed and that they were ineffective in fully de-escalating the situation. In other words, there is sufficient record evidence that Officer Brown's decision to initiate involuntary examination was based on what he saw, including the apparent

ineffectiveness of de-escalation techniques that had already been employed by school staff to that point. From there, Officer Brown's decision was based on what he observed of W.B., not how District staff handled the situation.

Plaintiffs identify that W.B., pursuant to his IEP, was provided therapy by a school therapist, and that mobile crisis and the therapist were not contacted. JSF ¶¶ 121, 137-138. But there was no specific demand that the therapist or mobile crisis be consulted as an accommodation for W.B.'s disability-related behaviors, nor would the school's awareness of those services amount to such a demand. *See Charles*, 18 F.4th at 703; *Wilf*, 2012 WL 12888680, at *18.

Plaintiffs also contend that "[s]chool staff were also aware that W.B. has an aversion to physical touch, especially by men." ECF No. 180, p. 50. The undisputed fact they cite, however, is merely a note from nearly two years before, at a different school, that W.B. "does not like to be touched, particularly by males[.]" JSF ¶ 123, 112. This record does not establish some known, disability-related accommodation. Even if it did, Plaintiffs' argument is that accommodations were not employed to avoid the involuntary examination, but they have not shown it to be undisputed that W.B. was touched by a male before the involuntary examination decision was made or he was taken into custody. Curtis Brown testified that he did not observe Officer Brown touching W.B. as the two walked away from him. DOSMF ¶ 119. Sumner testified that she did not see Officer Brown using "physical deescalation techniques" with W.B. before he was handcuffed. DOSMF ¶ 120. There is also record evidence that, at the point W.B. was handcuffed, Officer Brown had already made the decision to take him into custody under the Baker Act. DOSMF ¶¶ 122-126.

Finally, Plaintiffs contend that "District staff had witnessed L.H. successfully de-escalate W.B." ECF No. 180, p. 50 (citing JSF ¶¶ 129-130). Those undisputed facts and the evidence cited in support do not show a specific demand was made that L.H. be contacted to come to the school

to de-escalate W.B. *See Charles*, 18 F.4th at 703. Nor do they establish that L.H. had de-escalated

W.B. under similar circumstances to what transpired on the date of the involuntary examination.

      In sum, Plaintiffs have not shown that there is no genuine dispute as to any material fact

about whether District staff were aware of and failed to employ known de-escalation techniques

as accommodations for W.B.'s disability-related behaviors to avoid involuntary examination.

      2.   *Plaintiffs have not demonstrated that there is no genuine dispute as to any material*
           *fact about whether D.P., E.S., and W.B. were qualified individuals with disabilities.*

      Alternatively, the above analysis shows that Plaintiffs have not demonstrated that there is

no genuine dispute as to any material fact on the first element, that D.P., E.S., and W.B. were

qualified individuals with disabilities. *L.E.*, 55 F.4th at 1301-02. Specifically, Plaintiffs cite no

evidence in support of the allegations in their Second Amended Complaint that D.P., E.S., and

W.B. "did not … pose a significant risk to the health or safety of others, or any risk could have

been or could be eliminated by the provision of reasonable modifications and/or non-

discriminatory services." ECF No. 150 ¶ 226. That goes to whether D.P., E.S., and W.B. posed a

"direct threat," which goes to whether they were qualified individuals. *See R.W. v. Bd. of Regents*

*of the Univ. Sys. of Georgia*, 114 F. Supp. 3d 1260, 1283 (N.D. Ga. 2015); *see* 28 C.F.R.

§ 35.139(a). To the extent particular accommodations were not provided to D.P., E.S., or W.B.,

the discussion above shows that there is a genuine dispute as to the material facts about whether it

was because a reasonable judgment was made based on the best available objective evidence that

they posed a direct threat under the circumstances. *See* 28 C.F.R. § 35.139(b).

**IV.**    **Conclusion**

      For the foregoing reasons, the School Board respectfully requests that the Court deny

Plaintiffs' motion for partial summary judgment, except that it does not contest Plaintiff DRF's

standing to represent students with disabilities in the District.

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on June 14, 2023, the foregoing document was electronically

filed via CM/ECF and thereby served via email on all counsel of record.

The School Board of Palm Beach County, Florida
Shawn Bernard, Esquire, General Counsel

By:   /s/ *Sean Fahey*
     Sean Fahey, Esq.
     Florida Bar No. 0101083
     Office of General Counsel
     3318 Forest Hill Boulevard, Suite C-331
     West Palm Beach, Florida 33406
     Tel: (561) 434-8500
     Fax: (561) 434-8105
     sean.fahey@palmbeachschools.org
